UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PETER YOUNG,

                                  Plaintiff,
          v.
                                                            9:12-cv-01642
                                                            (MAD/TWD)

BRIAN FISCHER, et al.,

                                  Defendants.
_____

APPEARANCES:                                      OF COUNSEL:

PETER YOUNG,
Plaintiff, *pro se*
3225 Burnet Ave. Apt. #5
Syracuse, New York 13206

HON. ERIC T. SCHNEIDERMAN                          AIMEE M. PAQUETTE, ESQ.
Attorney General for the State of New York         Assistant Attorney General
Counsel for Defendants
615 Erie Blvd. West, Suite 102
Syracuse, New York 13204


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


<u>**ORDER and REPORT-RECOMMENDATION**</u>

## I.     INTRODUCTION

        This matter has been referred to the undersigned for a report and recommendation by the

Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Northern District of New York Local Rule ("L.R.") 72.3(c).  *Pro se* Plaintiff Peter Young, a

former inmate in the custody of the New York State Department of Corrections and Community

Supervision ("DOCCS"), commenced this civil rights action pursuant to 42 U.S.C. § 1983 on

September 13, 2012, asserting claims arising out of his confinement at Auburn Correctional Facility ("Auburn").  (Dkt. No. 1.)  Upon initial review, the Court *sua sponte* dismissed all of Plaintiff's claims pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), and Plaintiff was granted leave to file an amended complaint.  (Dkt. No. 26.)

On March 27, 2013, Plaintiff timely filed an amended complaint.  (Dkt. No. 30.) Following initial review of the amended complaint, the Court found the following claims survived review and required a response:

(1) First Amendment retaliation claims against Commissioner Brian Fischer ("Fischer"), Superintendent Harold D. Graham ("Graham"), Sergeant Brower ("Brower"), Sergeant Frank Chandler ("Chandler"), Corrections Officer ("C.O.") Paul J. Casler ("Casler"), C.O. Trevor Heath ("Heath"), and C.O. Edward Fagen ("Fagan"[1]);

(2) First Amendment legal mail interference claims against Fischer, Graham, Chandler, Casler, and Heath;

(3) First Amendment denial of access to the court claims against Graham, Chandler, Casler, and Heath;

(4) Eighth Amendment conditions of confinement claims against Fischer, Brower, and Chandler;

(5) Eighth Amendment excessive force claim against Fischer, Graham, and Lieutenant Joseph L. Vasile ("Vasile");

(6) Fourteenth Amendment forced medical care claim against Graham; and

(7) Fourteenth Amendment deprivation of personal property claim against Graham.

(Dkt. No. 44 at 29-30.[2])

---

[1]  Although Plaintiff names C.O. Edward Fagen as a Defendant, his surname is correctly spelled "Fagan."  (Dkt. No. 139.)

[2]  Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Dkt. No. 139.) Defendants move for summary judgment on the grounds that Plaintiff's constitutional claims are meritless, and that Plaintiff has failed to establish the personal involvement of the Fischer, Graham, Chandler, and Vasile. (Dkt. No. 139-7.) Plaintiff has opposed the motion, and Defendants have filed a reply. (Dkt. Nos. 142 and 144.) For the reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

## II.     FACTUAL BACKGROUND

The relevant facts in this case were outlined in Judge D'Agostino's decision on initial review of the amended complaint, and will be recited herein for clarity and continuity, with additional details drawn from the transcript of Plaintiff's February 25, 2016, deposition. (Dkt. Nos. 44 and 139-3.)

Plaintiff claims Commissioner Fischer retaliated against him for filing a previous federal civil rights lawsuit naming Fischer as a defendant, for filing grievances, and for his religious beliefs. (Dkt. No. 30 at 7.) Regarding his religious beliefs, Plaintiff testified he is a "solider of God" and that he prays to the "creator of heaven and earth and all things beautiful." (Dkt. No. 139-3 at 54, 85.) Plaintiff explained it is against his "religious beliefs to have any medical treatment of any kind" and that his "mind, soul, and heart is God's temple." *Id*. at 55. Plaintiff prays three time a day, believes in the Old Testament, and does not eat pork. *Id*. at 86-87. Further, he does not celebrate "holidays or anything like that." *Id*. at 85.

Specifically, Plaintiff claims Fischer retaliated against him by, among other things, directing his agents to use excessive force and to employ chemical agents against him without justification, by subjecting him to inadequate conditions of confinement, by giving his staff

permission to tamper with Plaintiff's legal mail, and by refusing to mail out Plaintiff's civil rights claims. *Id.* at 8.

Plaintiff alleges Superintendent Graham retaliated against him for filing a previous federal civil rights lawsuit naming Graham as a defendant, for filing grievances, and for his religious beliefs. (Dkt. No. 30 at 13.) Plaintiff alleges Graham retaliated against him by, among other things, ordering Plaintiff to be taken to the facility infirmary for medical treatment against his religious beliefs, by directing corrections officers to use excessive force and employ chemical agents against him without justification, and by tampering with his legal mail. *Id.* at 9-10. Plaintiff claims Graham instructed his subordinate officers to remove all of Plaintiff's legal documents, along with socks and underwear from his cell to be destroyed without due process. (Dkt. No. 139-3 at 55-56; Dkt. No. 30 at 10.)

Plaintiff alleges Graham interfered with his legal mail by "not mailing legal documents and other correspondence" to attorneys and to the court and by "reading attorney privileged mail." (Dkt. No. 30 at 11.) Plaintiff also alleges that, on one occasion, Graham kept legal transcripts mailed to Plaintiff in the facility's package room for over three months after receiving them and that, as a result, a case Plaintiff had pending in the Eastern District of New York was dismissed by the court for failure to file a memorandum of law. *Id.* at 12. Plaintiff alleges Graham refused to provide him with mailing supplies or access to the facility's law library. *Id.* at 13. Lastly, Plaintiff claims Graham ordered Lieutenant Vasile to take Plaintiff to the infirmary for medical treatment against his religious beliefs. *Id.* at 9.

Plaintiff alleges Sergeant Brower retaliated against him for filing a previous federal civil rights lawsuit naming Brower as a defendant, for filing grievances, and for his religious beliefs. *Id.* at 14-15. Plaintiff alleges Brower retaliated against him by, among other things, having the

water turned off in his cell for thirty days.  *Id*. at 15.  Plaintiff testified he was provided with a bucket of hot water twice a day for drinking, washing, and laundry to "belittle" Plaintiff because he refused to shave off his beard and attend a D.W.I. program, both of which were against his religious beliefs.  (Dkt. No. 139-3 at 59-60.)  Plaintiff further testified Brower refused to give Plaintiff his legal mail.  *Id*. at 66-67.  Plaintiff testified Brower was part of the cell extraction team, and that although he was not physically involved, Brower "ordered it."  *Id*. at 68.

Plaintiff alleges Sergeant Chandler interfered with his legal mail and tampered with his food in order "to get [Plaintiff] . . . to shave [his] beard against [his] religious belief."  (Dkt. No. 30 at 16-17.)  Plaintiff claims Chandler interfered with his legal mail by refusing to send Plaintiff's outgoing mail and by refusing to give Plaintiff mail sent to him.  *Id*. at 17-18.  At his deposition, Plaintiff clarified that Chandler ordered officers to throw away his legal mail.  (Dkt. No. 139-3 at 72-73.)  As a result of Chandler's refusal to mail his legal documents, Plaintiff claims he "lost [an] appeal and lawsuit."  (Dkt. No. 30 at 18.)  Plaintiff alleges Chandler tampered with his food by allowing food service staff to place dirty gloves on his food tray and to provide him with inadequate food at meal times.  *Id*.  As a result, Plaintiff "lost weight and had no energy to do anything."  *Id*.

Plaintiff alleges C.O. Casler retaliated against him for filing federal civil rights lawsuits, for filing grievances, and for his religious beliefs.  *Id*. at 22.  Specifically, Plaintiff claims Casler retaliated against him by, among other things, tampering with his legal mail, tampering with and withholding food, and by removing and destroying documents from his cell.  *Id*. at 21-23.  Plaintiff further claims Casler refused to send his legal mail to the court and to his attorney.  *Id*. at 23.  In one instance, Plaintiff alleges that Casler's refusal to mail a letter requesting an extension of time in a case pending in the Eastern District of New York resulted in the judge

dismissing Plaintiff's case. *Id.* In addition, Plaintiff testified Casler was part of the extraction team on one occasion, and that he "ordered it." (Dkt. No. 139-3 at 70.)

Plaintiff claims C.O. Heath retaliated against him for filing federal civil rights lawsuits, for filing grievances, and for his religious beliefs. *Id.* at 24. Plaintiff alleges Heath retaliated against him by, among other things, interfering with his legal mail and tampering with his food. *Id.* at 25. Plaintiff claims Heath refused to give him incoming legal mail and to send outgoing mail to attorneys and to the court. *Id.* As a result of Heath's actions, Plaintiff alleges that the judge in one of his pending cases did not receive Plaintiff's motions and other correspondence. *Id.* Plaintiff also testified Heath was personally involved in one of the cell extractions, and that Heath twisted and lifted his arm while he was handcuffed, tearing his rotator cuff. (Dkt. No. 139-3 at 78-79.) Plaintiff testified he felt extreme pain but did not seek medical attention because of his religious beliefs. *Id.* at 79.

Plaintiff alleges C.O. Fagan retaliated against him for filing federal civil rights lawsuits, for filing grievances, and for his religious beliefs. (Dkt. No. 30 at 26-27.) Plaintiff claims Fagan retaliated against him by, among other things, tampering with his food, refusing to give him legal supplies, providing him with dirty linens and towels, refusing to give him hot water, and by making unwanted sexual advances. *Id.* at 26-28.

Plaintiff alleges Lieutenant Vasile forced him to go to the infirmary for medical treatment against his religious beliefs, used excessive force and chemical agents against him without justification, and removed legal documents and other property from his cell. *Id.* at 29-31. Plaintiff alleges Vasile used excessive force on multiple occasions to extract him from his cell in order to force Plaintiff to receive unwanted medical attention. *Id.* at 29. Plaintiff alleges that during the cell extractions, Vasile and officers wearing "full riot gear" assaulted him using night

sticks and shields, and that Vasile sprayed a chemical agent into his eyes. *Id.* at 29-30. Plaintiff

alleges the cell extractions and assaults occurred approximately four times in the year preceding

the filing of the amended complaint. *Id.*

At his deposition, Plaintiff could not recall the dates of the cell extractions. (Dkt. No.

139-3 at 70.) In addition, Plaintiff explained members of the extraction team always wore "full

riot gear" including face shields. *Id.* at 70. Plaintiff did however, testify that on one occasion, he

recognized Heath and Casler as members of the extraction team after the removed their face

shields. *Id.* As to Vasile's personal involvement in the cell extractions, Plaintiff testified that

Vasile never physically "did the work" but ordered his "underlings" to do "the work." *Id.* at 69.

## III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986). The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence that no genuine issue of material fact

exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d

at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the

[plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). Indeed, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *see also Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[3]

"Statements that are devoid of any specifics, but replete with conclusions, are insufficient to

---

[3] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Woods*, 2006 WL 1133247, at *3 & n.11.

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Plaintiff has failed to respond to Defendants' Statement of Material Facts as required under L.R.(a)(3).[4] (Dkt. No. 142.) His response does not mirror Defendants' Statement of

---

[4] L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material

Material Facts (Dkt. No. 139-6), nor does it specifically admit or deny the statements therein and cite references to evidence in the record supporting or refuting Defendants' statements. (Dkt. No. 142.) Where a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[5] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[6]  *See Artuz*, 76 F.3d at 486.

However, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).  In addition, because Plaintiff's amended complaint is verified, the Court will treat it as an affidavit in opposition to Defendants' cross motion for summary judgment.  *See Colon*, 58 F.3d at 872.

---

Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[5]  L.R. 7.1(a)(3) provides that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[6]  Defendants complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to the summary judgment motion.  (Dkt. No. 139-1.)

Plaintiff's opposition, however, is unsworn. (Dkt. No. 142.) Unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g.*, *Witzenburg v. Jurgens*, No. CV-05-4827 (SJF)(AKT), 2009 WL 1033395, at *11 (E.D.N.Y. Apr. 14, 2009) (unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment). Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g.*, *Hamm v. Hatcher*, No. 05 Civ. 503(ER), 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (to afford *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No. 09CV718 (HBS), 2012 WL 2401574, at *7 (W.D.N.Y. June 25, 2012). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V.    ANALYSIS

### A.    Official Capacity Claims for Money Damages

Plaintiff has sued all Defendants for money damages under § 1983 in both their individual and official capacities. (Dkt. No. 30 at 1-5.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state. *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006). The Eleventh Amendment also bars all money damages claims against state officials acting in their official

capacities, including the DOCCS Defendants herein. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against all individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the State's Eleventh Amendment immunity).

Therefore, although Defendants have not raised an Eleventh Amendment argument in moving for summary judgment, the Court recommends that all of Plaintiff's § 1983 claims for money damages against Defendants in their official capacities be *sua sponte* dismissed with prejudice on Eleventh Amendment grounds. *See Woods*, 466 F.3d at 238 (recognizing that courts may raise the issue of Eleventh Amendment immunity *sua sponte*).

### B. Retaliation

Plaintiff claims that Fischer, Graham, Brower, Chandler, Casler, Heath, and Fagan retaliated against him for filing lawsuits and grievances, and for his religious beliefs. Defendants maintain that these retaliation claims are legally deficient, and that the record contains no evidence upon which a factfinder could conclude that unlawful retaliation occurred. (Dkt. No. 139-7 at 15-19.) The Court agrees with Defendants.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, correction officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *Id*. at 381-83. The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated," courts should "examine prisoners' claims of retaliation with skepticism and particular care." *Colon*, 58 F.3d at 872; *accord*, *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

12

To establish a claim under § 1983 for unlawful retaliation, a plaintiff must prove that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). In the prison context, "adverse action" is objectively defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381.

In a case such as this, analysis of retaliation claims typically turns upon whether there is evidence tending to link the protected activity in which the inmate plaintiff has engaged and the adverse action allegedly taken against him by the defendant. "When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims." *Williams v. Silliman*, No. 9:11-CV-1477 (TJM/DEP), 2014 WL 991876, at *8 (N.D.N.Y. Mar. 13, 2014) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)). Such is the case here.

Plaintiff alleges in a completely conclusory fashion that Defendants' actions were taken because he has filed grievances and lawsuits, and for his religious beliefs. (*See generally* Dkt.

No. 30.[7])  First, Plaintiff asserts Fischer retaliated against him by directing his agents to use excessive force and to employ chemical agents against him without justification, by subjecting him to inadequate conditions of confinement, and by giving his staff permission to tamper with Plaintiff's legal mail.  *Id*. at 8.  Second, Plaintiff claims Graham retaliated against him by ordering Plaintiff to be taken to the facility infirmary for medical treatment against his religious beliefs, by directing corrections officers to use excessive force and to employ chemical agents on him without justification, tampering with his legal mail, denying his access to the courts, and taking and destroying his personal property.  *Id*. at 9-10.  Third, Plaintiff alleges Brower retaliated against him by turning the water off in his cell for thirty days.  *Id*. at 15.  Fourth, Plaintiff claims Chandler retaliated against him by tampering with his legal mail, denying him access to the courts, and tampering with his food.  *Id*. at 16-18.  Fifth, Plaintiff claims Casler retaliated against him by tampering with his legal mail, denying him access to the courts, tampering with and withholding food, and removing and destroying documents from his cell.  *Id*. at 21-23.  Sixth, Plaintiff claims Heath retaliated against him by interfering with his legal mail and tampering with his food.  *Id*. at 25.  Seventh, Plaintiff claims Fagan retaliated against him by tampering with his food, refusing to give him legal supplies, providing him with dirty linens and towels, refusing to give him hot water, and by making unwanted sexual advances.  *Id*. at 26-28.

In addition, Plaintiff claims Defendants retaliated against him because he refused to shave off his beard and attend a D.W.I. program, both of which were against his religious beliefs. (Dkt. No. 139-3 at 59-60.)  Without any further explanation, Plaintiff surmises that his refusal to

---

[7] Although his amended complaint alleged otherwise, Plaintiff testified that with the exception of Fischer, he has never filed a lawsuit against the Defendants in this action.  (Dkt. No. 139-3 at 45-46.)

attend the D.W.I. program cost the government thousands of dollars. (Dkt. No. 30 at 13.) Plaintiff claims Defendants retaliated against him by, among other things, removing legal documents from his cell and discarding his "original 1983 claim," which was never filed with the court. (Dkt. No. 30 at 10.)

Aside from those conclusory allegations, there is no record evidence to support Plaintiff's claims. Claims of retaliation must be "supported by specific and detailed factual allegations" and not "stated in wholly conclusory terms." *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000). Further, Plaintiff's assumptions that officers took action against him based on the facts that officers "stick together" and are a part of a "brotherhood" is insufficient as a matter of law to support a retaliation claim. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 368-69 (S.D.N.Y. 2011); *see e.g.*, Dkt. No. 139-3 at 59.

Now that the matter has progressed to the summary judgment stage, it is no longer sufficient for Plaintiff to engage in mere conjecture; instead, in response to Defendants' motion, Plaintiff needed to come forward with evidence from which a reasonable factfinder could find the requisite nexus between his protected activity and the adverse actions taken against him. *See Flaherty*, 713 F.2d at 13 ("a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone").

Even assuming, without deciding, that Plaintiff engaged in protected conduct and Defendants took adverse action, Plaintiff has set forth no evidence to provide the necessary causal link between the two. An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a

15

number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has been found insufficient to survive summary judgment. *See Roseboro*, 791 F. Supp. 2d at 370 (citations omitted).

Here, the record is devoid of evidence, admissible or otherwise, that supports Plaintiff's assertions. Because Plaintiff's claims of retaliation have been alleged in only conclusory form, and are not supported by evidence now in the record establishing a nexus between any protected activity and the adverse actions complained of, the Court recommends dismissing Plaintiff's First Amendment retaliation claims against Fischer, Graham, Brower, Chandler, Casler, Heath, and Fagan.

## C. Supervisor Liability

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Aschcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement."

*Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at \*6, (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).  Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered."  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."  *Colon*, 58 F.3d at 873.[8]

Here, the record evidence reveals that Plaintiff sued Fischer because "he was the top man, C.E.O. of Department of Corrections."  (Dkt. No. 139-3 at 25.)  Plaintiff testified that he wrote numerous letters to Fischer "stating what they were doing to me and the abuse and everything [he] was getting from them."  *Id*.  Plaintiff believes that Fischer delegated his letters to a deputy commissioner.  *Id*. at 34, 37-38.

---

[8]  The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability.  *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Indeed, Plaintiff testified he sent a letter to Fischer explaining that his legal mail was being tampered with, and yet, Fischer "didn't do nothing" and that "[b]y him not doing anything, [Fischer] condoned what the corrections officers were doing to [him]." *Id*. at 37. Plaintiff testified that "all [Fischer] had to do was pick up the phone and tell them to give [him the] legal mail." *Id*.

Similarly, as to the conditions of confinement claim, Plaintiff testified he sent a letter to Fischer inquiring as to why he was assigned to the "worst correctional facilities," including Attica, Auburn, Clinton, Southport, and an isolation cell at Upstate, when he had been a model prisoner at Gouverneur, Gowanda, and the Suffolk County "honor farm." *Id*. at 38. Plaintiff also sent correspondence to Fischer informing him that he was in solitary confinement without due process. *Id*. Indeed, Plaintiff testified Fischer "could have looked into it" and "could have corrected it" because he "runs the place" but instead Fischer "didn't do nothing." (Dkt. No. 139-3 at 39.) Inmates, however, do not have a right to be housed at a specific facility or in a specific type of housing. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983) (inmates have no right to be confined in a particular state or particular prison within a given state); *Montayne v. Haymes*, 427 U.S. 236, 243 (1976) (New York state prisoners have no right to incarceration at a particular prison facility); *Klos v. Haskell*, 835 F. Supp. 710, 723 (W.D.N.Y. 1993), *aff'd*, 48 F.3d 81 (2d Cir. 1995) (citing cases). Moreover, DOCCS has "broad leeway in deciding where to house the inmates under its protective care, be it state or county jail." *McFadden v. Solfaro*, Nos. 95 Civ. 1148, 95 Civ. 3790, 1998 WL 199923, at *10 (S.D.N.Y. Apr. 23, 1998).

Conclusory claims that a supervisor did not respond to letters or grievances, or that a supervisory official referred a letter to subordinates is insufficient to establish personal involvement. Indeed, it is well-settled "that receipt of letters or grievances, by itself, does not

amount to personal involvement." *Guillory v. Ellis*, No. 11-CV-600 (MAD/ATB), 2012 WL 2754859, at *10 (N.D.N.Y. July 9, 2012) (citing *Vega v. Artus*, 610 F. Supp. 2d 185, 199 (N.D.N.Y. 2009)); *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability."). Likewise, "allegations that an official ignored a prisoner's letter is not enough to establish personal involvement." *Atkins v. County of Orange*, 251 F. Supp. 2d 1225, 1233 (S.D.N.Y. 2003).

Regarding the excessive force claim, Plaintiff testified Fischer never personally used any force against him, nor was Fischer present during any of the cell extractions. (Dkt. No. 139 at 36-37.) Rather, Plaintiff alleges Fischer authorized Graham to use of excessive force and chemical agents during cell extractions at Auburn. *Id.* However, a claim that a supervisor violated the Eighth Amendment by authorizing the use of force or chemical agents during a cell extraction, without more, does not amount to personal involvement. *See, e.g.*, *Scarbrough v. Thompson*, No. 10-CV-901 (TJM/CFH), 2012 WL 7761439, at *10 (N.D.N.Y. Dec. 12, 2012) (granting summary judgment to prison official where inmate failed to alleged the supervisor was present for the extraction and directly failed to intervene to protect inmate from excessive force).

In sum, because the record discloses no bases to find personal involvement, or indeed any awareness, on the part of Fischer, the Court recommends dismissing all supervisory claims against Fischer for lack of personal involvement. (*See* Dkt. No. 139-7 at 20-21.)

### D. Interference with Legal Mail and Access to the Courts

It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith*, 430 U.S. 817, 823 (1977). Derivative of that right, prisoners also have

a right to send and receive legal mail. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents, or file them[.]" *Lewis v. Casey*, 518 U.S. 343, 351, 353 (1977) (citations omitted). "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.'" *Davis*, 320 F.3d at 352 (citing *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995)). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351 (1996). Thus, an inmate must show more than a refusal to provide legal materials. *Id*. To demonstrate "actual injury" the inmate must demonstrate "that a nonfrivolous legal claim had been frustrated or was being impeded" due to the action or inaction of prison officials. *Id*. at 353.

As set forth above, Plaintiff claims Fischer authorized Graham to tamper with Plaintiff's legal mail. (Dkt. No. 30 at 8.) In turn, Plaintiff alleges Graham interfered with his legal mail by "not mailing legal documents and other correspondence" to attorneys and the court and by also "reading attorney privileged mail." *Id*. at 12. Plaintiff also claims Graham delayed Plaintiff's receipt of legal documents, including keeping legal transcripts mailed to Plaintiff in the facility's package room for more than three months before turning the documents over to Plaintiff. *Id*. Plaintiff also claims Graham refused to provide Plaintiff with mailing supplies or access to the facility's law library. (Dkt. No. 30 at 13.)

Further, Plaintiff claims Graham instructed subordinate officers to remove all of Plaintiff's legal documents from his cell. *Id*. at 10. Plaintiff claims Chandler, Casler, and Heath interfered with Plaintiff's legal mail by refusing to send outgoing mail and refusing to give him incoming legal mail. *Id*. at 17-18, 23, 25. In addition, Plaintiff alleges Chandler ordered subordinate officers to throw away Plaintiff's legal mail. (Dkt. No. 139-3 at 72-73.)

As a result of the alleged legal mail tampering and denial of legal supplies, Plaintiff claims that he suffered injury and prejudice in other legal actions. (Dkt. No. 30 at 12-13, 16-18.) Specifically, Plaintiff claims his petition for a writ of *habeas corpus* filed in the Eastern District of New York was dismissed for failing to timely file a memorandum of law. *Id*. at 12. He claims that he lost an appeal and lawsuit, including the assistance of an attorney, because he could not receive nor send legal correspondence. *Id*. at 12-13. He also claims motions and demands were not filed in two civil actions pending in the Western District of New York. *Id*. at 16-17.

Defendants argue Plaintiff's legal mail and access to court claims against Fischer, Graham, Chandler, Heath, and Casler fail as a matter of law because Plaintiff has not established that he suffered actual injury. (Dkt. No. 139-7 at 23.) The Court agrees with Defendants.

A thorough review of the amended complaint, along with the publicly available documents filed on Pacer, establishes Plaintiff has filed three other federal lawsuits, all of which were dismissed on the merits.[9] On December 14, 2009, Plaintiff filed a § 1983 action in the Western District of New York. *See Young v. Kadien*, No. 6:09-cv-6639 (FPG), Dkt. No. 1. On September 30, 2011, the court appointed Karen Bailey Turner ("Bailey Turner") as *pro bono*

---

[9] Plaintiff testified he has never filed an action in state court. (Dkt. No. 139-3 at 24.)

counsel to Plaintiff. *Id.*, Dkt. No. 105. The case went to trial on August 26, 2013, which was, as Defendants correctly pointed out, approximately five months after Plaintiff filed the amended complaint in this action. *Id.*, Dkt. Nos. 135; Dkt. No. 139-7 at 13. On August 27, 2013, at the close of Plaintiff's proof, defense counsel made a Rule 50 motion, which was granted in part. *Young v. Kadien*, No. 6:09-cv-6639, Dkt. No. 136. After additional testimony was heard, defense counsel made a second Rule 50 motion, which was granted. *Id.*, Dkt. No. 137. Judgment was entered September 10, 2013. *Id.*, Dkt. No. 138.

On January 6, 2011, Plaintiff commenced a second § 1983 action in the Western District of New York. *Young v. Canfield*, No. 6:11-cv-06007 (FPG/JWF), Dkt. No. 1. Less than ten days after the amended complaint was filed, Bailey Turner volunteered to represent Plaintiff as *pro bono* counsel. *See Young v. Canfield*, No. 11-CV-6007-FPG, 2014 WL 3385186, at *1 (W.D.N.Y. July 9, 2014). In that case, Plaintiff alleged he was given medical care in violation of his religious beliefs and subjected to excessive force. *Id.* On November 11, 2013, the defendants moved to dismiss the compliant pursuant to Rule 12(b)(6). *Young v. Canfield*, No. 11-CV-6007, Dkt. No. 27. Plaintiff opposed the defendants' motion. *Id.*, Dkt. No. 30. Oral argument was held on June 25, 2014. *Id.*, Dkt. No. 31. By Decision and Order dated July 9, 2014, the court granted the defendants' motion to dismiss on the merits. *Id.*, Dkt. No. 32.

On January 3, 2011, Plaintiff filed his petition for writ of *habeas corpus* in the Eastern Dist. *Young v. People of State of New York*, No. 2:11-cv-00110 (JFB), Dkt. No. 1. The court received Plaintiff's letter requests dated August 24, 2011, January 5, 2012, and April 25, 2012. *Id.*, Dkt. Nos. 10, 12, 16. By Memorandum and Order dated December 20, 2012, the Court denied the petition in its entirety on the merits, and judgment was entered. *Id.*, Dkt. Nos. 17-18.

In light of the foregoing, there is no evidence that Plaintiff's lawsuits were dismissed for the reasons he claims. *See Singleton v. Williams*, No. 12 Civ. 02021(LGS), 2014 WL 2095024, at *5 (S.D.N.Y. May 20, 2014) (finding no constitutional violation where the evidence established that the plaintiff's criminal case was not impacted as a result of the defendants "messing with his mail").

Further, Graham has submitted a reply declaration in further support of Defendants' motion, stating:

> I never entered Plaintiff's cell; I never destroyed any of Plaintiff's legal mail; I never ordered anyone to enter Plaintiff's cell to destroy property, including legal mail; I never ordered anyone to destroy Plaintiff's property, including legal mail; I never read and/or was aware of the alleged draft of the original complaint in this matter; I never destroyed and/or ordered the alleged draft of the original complaint in this matter; and I never authored a letter to Plaintiff advising him that I destroyed his property of legal mail.

(Dkt. No. 144-1 at ¶ 6.)

Based on the foregoing, there is no evidence that Plaintiff suffered an actual injury as result of the alleged mail tampering and deprivation of legal supplies, if indeed it did occur. Accordingly, the Court recommends granting summary judgment to Fischer, Graham, Chandler, Heath, and Casler on Plaintiff' First Amendment interference with legal mail claims and access to court the courts claims.

### E.    Forced Medical Care

The Fourteenth Amendment protects the right of a competent person to refuse unwanted medical treatment. *See, e.g.*, *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (recognizing "the principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment")); *Alston v. Bendheim*, 672 F. Supp. 2d 378,

384 (S.D.N.Y. 2009) (holding "inmates have a constitutionally protected liberty interest in refusing the medical treatment they are offered by correction officials.").

The Second Circuit has held, moreover, that "[i]t is a firmly established principle of the common law of New York that every individual of adult years and sound mind has a right to determine what shall be done with his own body and to control the course of his medical treatment." *Kulak v. City of New York*, 88 F.3d 63, 74 (2d Cir. 1996) (quoting *Rivers v. Katz*, 504 N.Y.S.2d 74, 78 (1986)); *see also Project Release v. Prevost*, 722 F.2d 960, 978-80 (2d Cir. 1983). Such a right may be set aside only in narrow circumstances, including those where the patient "presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution." *Kulak*, 88 F.3d at 74.

Although a prisoner has a right to refuse medical treatment, liability for a constitutional violation is nonetheless absent unless the prisoner's individual liberty interest outweighs the relevant countervailing state interests. *See Pabon v. Wright*, 459 F.3d 241, 252 (2d Cir. 2006) (citing *Turner*, 482 U.S. at 89); *see also Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998) (holding that the "preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline" were significant governmental interests outweighing the prisoner's liberty interest).

In this case, Plaintiff alleged Graham ordered that Plaintiff be taken to the infirmary for medical treatment "against [his] religious belief." (*See* Dkt. No. 44 at 14-15.) At his deposition, Plaintiff clarified, that although he was taken to the infirmary, "where they tried to give [him] medical treatment," Plaintiff successfully refused the medical treatment, having only been forced to have his vital signs monitored. (Dkt. No. 139-3 at 53-54.) Further, Plaintiff has not alleged that any of the Defendants actually provided him with medical treatment, or that Graham

violated his limited right to refuse medical treatment. Specifically, as to whether Graham was personally involved, Plaintiff testified, "[o]h, well, he was there one time, so I guess so." *Id*. at 54.

Based on the forgoing, the summary judgment record is devoid of evidence that Graham violated Plaintiff's Fourteenth Amendment right to refuse medical treatment. Accordingly, the Court recommends granting summary judgment to Graham on this claim.

F. **Conditions of Confinement**

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment conditions of confinement claim, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway*, 37 F.3d at 66. Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Id*. (quoting *Wilson v. Seiter*, 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) ("only those deprivations denying the minimal civilized measures of life's

necessities are sufficiently grave to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted)).  A denial of basic human needs includes food, clothing, shelter, medical care, reasonable safety, or exposure to conditions that pose an unreasonable risk of serious damage to prisoner's future health.  *See Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind."  *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300).  "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.  *Farmer*, 511 U.S. at 835.  In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety.  *Hathaway*, 37 F.3d at 66.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  *Id.*

### 1.    Deprivation of Water

Plaintiff claims Brower turned off the water in his cell for thirty (30) days, limiting Plaintiff to two buckets of hot water a day for drinking, bathing, and laundry.  (Dkt. No. 30 at 15.)  Defendants respond that prisoners are not entitled to complete and unfettered access to water or showers, and that the turning off of in-cell water, when the inmate had access to other sources of water, does not constitute a denial of the "minimal civilized measure of life's necessities."  (Dkt. No. 139-7 at 25.)  Defendants argue this claim must be dismissed as a matter of law because Plaintiff admitted he was provided with two buckets of water per day during the period of alleged in-cell water deprivation.  *Id.*

"Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers." *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (collecting cases). Instead, an Eighth Amendment violation is considered objectively serious when prison officials subject inmates to conditions that violate basic standards of "human decency." *Id.* (citations omitted). "Where a prisoner alleges that he or she was denied drinking water in his or her cell, the resolution of the claim hinges on whether the prisoner received fluids at other times or suffered any adverse effects." *DeBlasio v. Rock*, No. 9:09-CV-1077 (TJM/GHL), 2011 WL 4478515, at *17 (N.D.N.Y. Sept. 26, 2011); *see, e.g.*, *Johnson v. Comm'r of Corr. Servs.*, 669 F. Supp. 1071, 1074 (S.D.N.Y. 1988) (prisoner confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals); *Atkins v. Cnty. of Orange*, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) (inmate raised triable issue of fact that the defendants subjected her to unconstitutional conditions of confinement by depriving her of water in her cell for almost one month despite fact that they provided her with fluids at meals where medical records showed inmate suffered adverse effects from water deprivation).

Here, Plaintiff has alleged that because the water in his cell was turned off, he was forced:

> to drink water ment for washing that came around two times a day morning and lunch in 50 gallon barel which was treated with some chemicals. The barel was dirty and not ment for drinking water. I was told by Officer Bell not to drink that water. It was poured into a 1 gallon bucket in my cell and I had no choice but to drink that water or the toilet water in my cell.

(Dkt. No. 30 at 15 (errors in original).) Similarly, Plaintiff testified that "the only water I had – made me drink out of a bucket of hot water that they brought around twice a day, made my do

my laundry, my underwear, my socks in – in what I call a bird bath." (Dkt. No. 139-3 at 58-59.)

Plaintiff claims that he was forced to "drink hot water unfit for human" consumption, causing him to suffer from stomach problems for weeks. (Dkt. No. 142 at ¶ 23.) Plaintiff has alleged "the seriousness of not having water took a toll on my health and well-being." (Dkt. No. 30 at 15.) Plaintiff further claims the officers only provided him with water when they "felt like it." (Dkt. No. 142 at ¶ 23.) In support of their motion, Defendants have submitted a reply declaration from Graham, stating that "[i]nmates in the Special Housing Unit in Auburn are sometimes subjected to water deprivation orders, during which time they still received drinks with all of their meals." (Dkt. No. 144-1 at ¶ 12.)

On a summary judgment motion, a court may not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). "The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury." *Id*. at 856; *see also Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (on a summary judgment motion "the court should not weigh evidence or assess the credibility of witnesses . . . . These determinations are within the sole province of the jury.").

Because weighing the conflicting evidence in the summary judgment record and assessing the credibility of the parties is within the sole province of the jury, the Court recommends denying Defendants' motion for summary judgment on this claim.

### 2. Food Tampering

Defendants have identified Plaintiff's Eighth Amendment conditions of confinement claim against Chandler for food tampering as included in their motion for summary judgment.

(Dkt. No. 139.)  As Defendants correctly note, the conditions of confinement claim against

Chandler survived initial review because Plaintiff alleged that Chandler allowed food service

staff to place dirty gloves on his food tray and to provide him with inadequate food at meal times

and, as a result, Plaintiff claimed that he "lost weight had no energy to do anything."  (Dkt. No.

44 at 16-17.)  During his deposition, Plaintiff testified as follows:

> Q:  The only claim that you have left of food tampering is
> against Sergeant Chandler.  So what I want to know is did
> Sergeant Chandler tamper with your food?
>
> A:  Him, personally?  No.  He ordered it.
>
> Q:  Okay.  And how do you know he ordered it?
>
> A:  Because he's the Sergeant and told me he did it.
>
> Q:  Did he specifically say to you I ordered the other
> officers to tamper with your food?
>
> A:  Yeah, he did --in -- in so many words, he did.  Yes.
>
> Q:  So how -- how -- how did he do that in so many words?
>
> A:  I don't remember.  I don't remember the exact
> conversation.  No.
>
> Q:  Okay.  Do you know when it was that you had that
> conversation with him?
>
> A:  I don't remember dates, no.
>
> Q:  Did you ever have notes -- as you said, a diary that
> would have told you?
>
> A:  That's what everything was taken from me.
>
> Q:  So you did have that written down at some point?
>
> A:  Yes, sir.

(Dkt. No. 139-3 at 74-75 (omissions and errors in original).)

Despite seeking dismissal of the amended complaint in its entirety and addressing Plaintiff's conditions of confinement claims against Chandler in the Statement of Material Facts, Defendants do not address the merits of this claim in their memorandum of law. (Dkt. Nos. 139-6 at ¶¶ 35-36 and 139-7 at 25.[10]) As such, the Court does not consider this claim to be a part of Defendants' motion for summary judgment.

Even if Defendants had addressed the merits, the Court would have been constrained to deny summary judgment based on the current record. Although Plaintiff's evidentiary support of this claim is weak at best, Chandler has submitted no affidavit or declaration disputing Plaintiff's sworn allegations.

### G. Excessive Force

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments . . . including the unnecessary and wanton infliction of pain." *Giffen v. Crispen*, 193 F.3d 89, 91 (2d Cir. 1999) (citation and internal quotation marks omitted). An Eighth Amendment excessive force claim has two elements – "one subjective focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63

---

[10] In fact, Defendants mistakenly claim, that "Plaintiff's only surviving conditions of confinement claims is that his in-cell water was turned off for thirty days." (Dkt. No. 139-7 at 25.)

(2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268)) (internal quotation marks omitted).  The test for wantonness on an excessive force claim "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted maliciously or wantonly, "a court must examine several factors including: the extent of the injury and mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.") (citation and internal quotation marks omitted)).

The objective component requires a showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions."  *Harris*, 818 F.3d at 64 (citation omitted).

In addition, a corrections officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate in the use of force.  *See, e.g.*, *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. May 24, 2010); *Cicio v. Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010).  Indeed, an official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence.  *Cicio v. Graham*, 2010 WL 980272, at *13.  In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.

*Tafari*, 714 F. Supp. 2d at 342; *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

Here, Plaintiff contends he was subjected to excessive force and chemical agents during several cell extractions. Specifically, Plaintiff contends Graham ordered Vasile "to force" Plaintiff out of his cell "by any means," including using chemical agents. (Dkt. No. 30 at 9.) In turn, Plaintiff alleges Vasile ordered the extraction team to force Plaintiff out of his cell, and "do bodily harm," including spraying a chemical agent into Plaintiff's eyes. *Id*. at 29.

Defendants argue Plaintiff's failure to present any evidence whatsoever establishing when the alleged excessive force was used is fatal his claims. (Dkt. No. 139-7 at 26.) Specifically, Defendants contend the excessive force claims must be dismissed as a matter of law because Plaintiff does not know the names of any of the officers who used excessive force against him during the extractions, Plaintiff admitted that Commissioner Fischer, Superintendent Graham, and Lieutenant Vasile never used force against him, and Plaintiff could not recall the date of any alleged excessive force. *Id*.

Plaintiff has, however, alleged in his verified amended complaint that on March 28, 2012, after 4:00 p.m., Vasile and four John Doe officers forced Plaintiff out of the isolation ward and subjected Plaintiff to excessive force, by picking Plaintiff up by his handcuffs and throwing him head first into a van, causing injury to Plaintiff's head, neck, and back. (Dkt. No. 30 at 30.) After this incident, Plaintiff claims that he could not walk. *Id*. Plaintiff also alleged that on January 4, 2013, Vasile ordered the extraction team to use excessive force. *Id*. On that date, an officer charged Plaintiff's cell using a shield to "push" Plaintiff to the bed, where they proceeded to choke, punch, and knee Plaintiff in the back and ribs, causing bruising, a knot on his head, and

pain in his back for months.  *Id.*  Plaintiff alleges as a result of the assault, his ribs were black and blue, he had a knot on his head, and pain in his back for months.  *Id.*

Although Plaintiff testified Vasile and Graham never personally used physical force against him during any of the cell extraction, Plaintiff also testified Vasile was present at most of the cell extractions and that Vasile ordered his "underlings" to "physically do it."  (Dkt. No. 139-3 at 50-51, 68-70.)  Specifically, Plaintiff claims that on one occasion, while standing "no more than 2 feet away watching," Vasile gave the order to "break him up." (Dkt. No. 142 at ¶ 20.)  As to Graham's personal involvement, Plaintiff testified he believed that Graham was present during one of the cell extractions.  (Dkt. No. 139-3 at 52.)  Moreover, during his deposition Plaintiff identified Heath and Casler as two members of the extraction team, and claims that Heath twisted and lifted Plaintiff's arm while he handcuffed in the back, causing his rotator cuff to tear.  *Id.* at 78-79.  Plaintiff also testified that Brower was part of the extraction team, by "ordering it." *Id.* at 68.

Without question, the evidentiary support for Plaintiff's excessive force claim is thin. The record is devoid of medical records, photographs, or grievances concerning the alleged use of excessive force during the cell extractions.  Also absent from the record, however, is an affidavit or declaration from any Defendant denying or disputing Plaintiff's account of the use of excessive force during the cell extractions, or any evidence proffering that any force used was necessary to restore discipline and subdue Plaintiff.

Where "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically," summary judgment is improper "even where the plaintiff's evidence of injury [is] slight and the proof of excessive force [is] weak."  *Wright*, 554 F.3d at 269.  On the record now

before the Court, Plaintiff has testified under oath that Heath and Casler were members of the extraction team, and that on various occasions, Graham, Vasile, and Brower ordered the cell extractions. Further, unlike Plaintiff's claim against Fischer, Plaintiff has demonstrated that genuine issues of material fact exists as to whether Graham, Vasile, and Brower were present when they ordered a cell extraction, and therefore failed to intervene in violation of the Eighth Amendment. *Cf. Scarbrough*, 2012 WL 7761439, at *10 (summary judgment granted to supervisory official where inmate failed to allege the supervisor was present for the extraction and directly failed to intervene to protect inmate from the excessive force).

Given the foregoing, the Court finds Defendants have failed to demonstrate no issue of material fact exists on Plaintiff's Eighth Amendment claims. Therefore, the Court recommends that Plaintiff's Eighth Amendment excessive force and failure to intervene claims against Graham, Vasile, Brower, Heath, and Casler survive summary judgment.

### H. Deprivation of Personal Property

In cases where an inmate alleges a deprivation of property by prison staff, the Supreme Court has held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson*, 468 U.S. at 533 (holding only post-deprivation remedy is required following intentional destruction of an inmate's personal property by a prison guard, because the state was not "in a position to provide for predeprivation process"); *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003). The Second Circuit has held that "confiscation . . . [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of post-deprivation remedies in the New York Court of Claims." *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

34

However, as the Court explained on initial review, an exception to this principle exists in cases where the deprivation in question "was caused by high-ranking officials who have final authority over the decision-making progress." (Dkt. No. 44 at 11.) Accordingly, only Plaintiff's claim against Graham for deprivation of personal property survived initial review. *Id.* at 14-15, 33.

At his deposition, Plaintiff testified Graham does not personally take his property. (Dkt. No. 139-3 at 56.) Rather, Plaintiff claims in conclusory fashion that Graham orders subordinate officers to "take all my personal property, legal work, and carbon copies[.]" (Dkt. No. 142 at ¶ 12.) However, as set forth above, Graham has submitted a reply declaration stating that:

> I never entered Plaintiff's cell; I never destroyed any of Plaintiff's legal mail; I never ordered anyone to enter Plaintiff's cell to destroy property, including legal mail; I never ordered anyone to destroy Plaintiff's property, including legal mail; I never read and/or was aware of the alleged draft of the original complaint in this matter; I never destroyed and/or ordered the alleged draft of the original complaint in this matter; and I never authored a letter to Plaintiff advising him that I destroyed his property of legal mail.

(Dkt. No. 144-1 at ¶ 6.)

In light of the above, Plaintiff has not raised a triable issue of material fact as to Graham's personal involvement in the alleged deprivation of property claim. Indeed, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer*, 156 F.3d at 400; *see also Smith v. Rosati*, No. 9:10-CV-1502 (DNH/DEP), 2013 WL 1500422, at *12 (N.D.N.Y. Feb. 20, 2013) ("Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact."). Evidence must be based on personal knowledge. *See Patterson v. Cnty. of*

*Oneida*, 375 F.3d at 219. Therefore, the Court recommends granting summary judgment to Graham on this claim.

## VI.     CONCLUSION

Based on the findings above, it is recommended that Defendants' motion for summary judgment be granted as to all claims, with the exception of the Eighth Amendment conditions of confinement claims against Chandler and Brower, and the Eighth Amendment excessive force and failure to intervene claims against Graham, Vasile, Brower, Heath, and Casler. Thus, it is also recommended that Fischer and Fagan be dismissed from this action.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 139) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED** that Plaintiff's claims against Defendants in their official capacities be *sua sponte* dismissed; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's (1) First Amendment retaliation claims against Fischer, Graham, Brower, Chandler, Casler, Heath, and Fagan; (2) First Amendment legal mail and access to courts claims against Fischer, Graham, Chandler, Heath, and Casler; (3) Eighth Amendment conditions of confinement and excessive force claims against Fischer; and (4) Fourteenth Amendment forced medical care and deprivation of personal property claims against Graham; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment be **DENIED** as to Plaintiff's (1) Eighth Amendment conditions of confinement against Brower and Chandler; and (2) Eighth Amendment excessive force and failure to intervene claims against Graham, Vasile, Brower, Heath, and Casler; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: March 6, 2017
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[11]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that
1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

[1]     Given my duty to liberally construe a *pro se*
        plaintiff's civil rights complaint, I construe Plaintiff's
        Amended Complaint as including a claim that
        various Defendants violated Plaintiff's rights under
        the Fourth Amendment to be free from unreasonable
        searches and seizures. *See Phillips v. Girdich,* 408
        F.3d 124, 130 (2d Cir.2005) ("We leave it for the
        district court to determine what other claims, if any,
        [the plaintiff] has raised. In so doing, the court's
        imagination should be limited only by [the plaintiff's]
        factual allegations, not by the legal claims set out
        in his pleadings.") [citations omitted]. *(See also*
        Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that
        Defendants Woods and Holt "violat[ed] plaintiff's
        4th ... Amendment[ ] rights"], ¶ 15 [alleging that

Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se*, this Court is faced with the ... responsibility of granting significant liberality in

how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam)* (*pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS
The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]    *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based on "personal knowledge." [7] An affidavit

or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[8]

[6] *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; *Fed.R.Civ.P.* 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

[7] *Fed.R.Civ.P.* 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

[8] *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made

on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory.[9] Of course, an affidavit may be conclusory because its assertions are too general.[10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

[9] *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[10] *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985);

*Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11  *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No.

42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

12  (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13  *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff **"stuck with them** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate

was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to **hold a copy of the complaint"** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents **being in my possession ...** you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]     (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]     (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube".])

[16]     (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]     (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]     (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar
and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]     (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]     (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer

were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

21     (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. 22

22     (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. 23 In pertinent part, the letter stated,

23     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already took both of you that I am helping him with the filing of his motions, etc....
Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. 24

24     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. 25

25     (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. 26 In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." 27 In addition, the last page of the letter states:

26     (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

<sup>27</sup> (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original*.

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession.<sup>28</sup>

<sup>28</sup> (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.<sup>29</sup> In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

<sup>29</sup> (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.<sup>30</sup> The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request."<sup>31</sup>

<sup>30</sup> (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

<sup>31</sup> (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.<sup>32</sup> The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention."<sup>33</sup>

<sup>32</sup> (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

<sup>33</sup> (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic."<sup>34</sup>

<sup>34</sup> (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods.<sup>35</sup> The note stated, in pertinent part:

<sup>35</sup> (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a <*DEAD*> man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration

cannot take any action against the inmate's family nor myself. [36]

[36]    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37]    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38]    (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39]    (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]    (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]    (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]    (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who

found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[46]

[45]     (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]     (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20.[48]

[47]     (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]     (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee;[49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization;[50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

family member without the consent or approval of the Superintendent or his designee. [51]

[49] (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50] (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14] [v].

[51] (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52] (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53] (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54] (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11

[Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

[55] (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

[56] (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

[57] (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any

denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (*Id.*)

59    (*Id.*)

### Meetings Between Defendants
### Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 38 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 38 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible

evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

### Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

64    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

65    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the

record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

[66] (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67] (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68] (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty

right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. See *Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. See *Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of

the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]  *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at *7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J.) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]  (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]  (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]  (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without

providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1 ¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    *(See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense

counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. [76] Specifically, the allegations contained in *Paragraph 15* of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. [77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

76    *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites

the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am".)

78　(Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

79　*See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80　*See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

81　(Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and

seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

82　(Dkt. No. 5, ¶ 12 [Am. Compl.].)

83　I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84　*See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

## C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU

as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation
Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a

prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

85     "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

86     (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

87     *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at \*11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at \*4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

88     (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89     (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he

suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

[90]    (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]    (*See, supra,* Statement of Fact No. 29.)

**\*13** More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

[92]    (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]    (*Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94]    (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. [95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]    *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antonelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]     (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]     (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]     (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely

moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]     (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]    (*See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose

> decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions,

testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]    (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]    (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16**  Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any

prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

[104]    (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]    (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school.[106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F.[107] Indeed, he had filed grievances immediately before and during this very time period.[108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17**  In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S.

477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue.[109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated.[110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.[111]

[109]    See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]    See *Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]    *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect

Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

**F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy**

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the

unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result,

I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995)

(citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]   *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113]   *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter"

regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.       25

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]   In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1033395
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

James Martin WITZENBURG, Plaintiff,

v.

Charles Herman JURGENS, individually and as
Executor of the Estate of Louise Jurgens, Defendant.

No. CV–05–4827 (SJF)(AKT).
|
April 14, 2009.

West KeySummary

**1**  **Executors and Administrators**
  👉 Time for making distribution

In a dispute between relatives, the executor
of the decedent's estate did not breach
his fiduciary duties by failing to distribute
estate assets on the ground that he was not
required to distribute the assets under New
York law until there was a final accounting.
The executor made certain distributions to
beneficiaries of the decedent's will. The
executor had not made any distributions to
himself or taken any fees. It was the conduct
of the cousin bringing the suit, including his
failure to pay the outstanding judgment that
he owed to the estate totally over $750,000,
that prevented the executor from conducting
a final accounting and in turn making the
final distributions under the will. McKinney's
EPTL 11–1.5(c).

Cases that cite this headnote

**Attorneys and Law Firms**

James Martin Witzenburg, Kemah, TX, League City, TX,
pro se.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1**  Before the Court are objections by plaintiff to a
Report and Recommendation of United States Magistrate
Judge A. Kathleen Tomlinson dated March 16, 2009
("the Report") that recommends: (1) granting defendant's
motion for summary judgment pursuant to Rule 56 of the
Federal Rules of Civil Procedure and dismissing plaintiff's
amended complaint in its entirety; (2) denying plaintiff's
motion to amend the amended complaint to add Patrick
McCarthy, Esq. as a defendant; and (3) denying plaintiff's
motion to compel discovery responses and to impose
sanctions upon defendant. For the reasons stated herein,
the Report of Magistrate Judge Tomlinson is accepted in
its entirety.

I

Rule 72 of the Federal Rules of Civil Procedure
permits magistrate judges to conduct proceedings on
dispositive pretrial matters without the consent of the
parties. Fed.R.Civ.P. 72(b). Any portion of a report and
recommendation on dispositive matters, to which a timely
objection has been made, is reviewed *de novo.* 28 U.S.C. §
636(b)(1); Fed.R.Civ.P. 72(b). The court, however, is not
required to review the factual findings or legal conclusions
of the magistrate judge as to which no proper objections
are interposed. *See, Thomas v. Arn,* 474 U.S. 140, 150, 106
S.Ct. 466, 88 L.Ed.2d 435 (1985). To accept the report
and recommendation of a magistrate judge to which no
timely objection has been made, the district judge need
only be satisfied that there is no clear error on the face of
the record. *See,* Fed.R.Civ.P. 72(b); *Baptichon v. Nevada
State Bank,* 304 F.Supp.2d 451, 453 (E.D.N.Y.2004),
*aff'd,* 125 Fed.Appx. 374 (2d Cir.2005); *Nelson v. Smith,*
618 F.Supp. 1186, 1189 (S.D.N.Y.1985). Whether or not
proper objections have been filed, the district judge may,
after review, accept, reject, or modify any of the magistrate
judge's findings or recommendations. 28 U.S.C. § 636(b)
(1); Fed.R.Civ.P. 72(b).

II

Plaintiff contends that Magistrate Judge Tomlinson erred, *inter alia,* in: (1) not understanding that he is a "double first cousin once removed," to the decedent Louise Jurgens ("decedent"), (Plaintiff's Opposition to Report and Recommendation [Plf. Obj.], ¶ 1); (2) finding that the purported false will was filed in New York Surrogate's Court, as opposed to New York Supreme Court, (Plf Obj., ¶ 2); (3) finding that plaintiff moved to Texas on or about April 17, 2002, when he actually moved on August 22, 2003, (*id.*); (4) failing to recognize that he was willing to be deposed in Texas, or by remote means, but not in New York because he has a "genuine fear for his safety [which] precluded [his] attendance in New York," (Plf.Obj., ¶ 3); (5) assuming that he had access to the records of the Suffolk County Supreme Court and received a copy of the final accounting, (Plf.Obj., ¶¶ 4, 11); (6) failing to recognize that he "moved in Federal court [for relief from the final accounting] as soon as [he] could," (Plf. Obj ., ¶ 5); (7) finding that defendant did not breach his fiduciary obligation to decedent's estate notwithstanding (a) that defendant did not require McCarthy, the guardian of decedent's property, to reconcile his final account with the inventory of assets prepared by defendant, which showed a monetary difference in excess of eight hundred thousand dollars ($800,000.00), and (b) that defendant did not account for and identify "the properties returned to the Estate from Federated Securities," (Plf.Obj., ¶¶ 6–8, 11); (8) finding that defendant "pays for the various law suits and the proceedings in which the estate is involved," (Plf.Obj., ¶ 7); (9) discounting the "Jurgens Conspiracy" theory he asserts in his amended complaint, (Plf.Obj., ¶ 9); (10) finding that because defendant had no authority to oversee or supervise McCarthy, as decedent's property guardian, he had a right to abandon his fiduciary duty to account for and locate assets of the estate, (Plf.Obj., ¶ 10); and (11) "rendering [her] decision on facts which are not proven, not evidence in this case and beyond the power of [the] court to consider under the doctrine of judicial notice but on figments of the Courts [sic] imagination," (Plf.Obj., ¶ 13).

**\*2** Upon *de novo* review of the Report and consideration of plaintiff s objections and defendant's response thereto, plaintiff's objections are overruled and the Report is accepted in its entirety as an order of the Court. [1]

[1] Plaintiff has not objected to the branches of Magistrate Judge Tomlinson's Report as recommended denying his motions to amend

the amended complaint and to compel discovery responses or impose sanctions. Upon review of those branches of the Report, the Court is satisfied that the Report is not facially erroneous. Accordingly, the Court accepts and adopts those branches of the Report.

## II. Conclusion

Upon *de novo* review of the Report, plaintiff's objections are overruled, the Report is accepted in its entirety, defendant's motion for summary judgment is granted and the amended complaint is dismissed in its entirety with prejudice. Plaintiff's motions to amend the amended complaint and to compel discovery responses or to impose sanctions are denied. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and to close this case.

SO ORDERED.

### *REPORT AND RECOMMENDATION*

A. KATHLEEN TOMLINSON, United States Magistrate Judge.

This action arises out of the role of Defendant Charles Herman Jurgens ("Defendant" or "Jurgens") as Executor of the Estate of Louise Jurgens ("Louise" or "Decedent"). Several motions are presently before the Court. Plaintiff James Martin Witzenburg ("Plaintiff" or "Witzenburg"), a beneficiary of Louise's estate, brought this action against Defendant for, *inter alia,* (1) breach of fiduciary duty, seeking to recover damages in the amount of his inheritance under Louise's Will, (2) alleged mismanagement and/or conversion of funds of Louise's estate, and (3) interest and costs. Defendant moves here for summary judgment seeking dismissal of the remaining claims. By separate motion, Plaintiff moves to add a party defendant, namely, Patrick McCarthy, Esq., who served as a court-appointed property guardian of Louise's property for thirteen months before her death. Finally, Plaintiff moves to compel Defendant to respond to outstanding document requests and interrogatories and for the imposition of sanctions. District Judge Feuerstein has referred these three matters to me for a Report and Recommendations.

### I. *BACKGROUND*

### A. *Factual Background*

The facts of this case are set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order granting in part and denying in part Defendant's motion to dismiss [DE 73]. Only the facts necessary for the analysis contained in this Report will be recited here.

Plaintiff and Defendant are apparently both cousins, in varying degrees, of the Decedent Louise Jurgens ("Louise" or the "Decedent"). [1] In and around July 1999, Jurgens obtained a "full" power of attorney from Louise. On September 9, 1999, Defendant Jurgens commenced a guardianship proceeding on behalf of Louise in the Supreme Court, Suffolk County, pursuant to Article 81 of the New York Mental Hygiene Law (*Jurgens v. Jurgens,* Index No. 20414–99) (the "Suffolk Supreme Court Action"). (Schmidt Decl. [2] ¶ 4.) On December 28, 1999, the Suffolk Supreme Court appointed non-party attorney Patrick McCarthy ("McCarthy") as guardian of Louise's property and named Jurgens as Louise's personal needs guardian (*id.;* Jurgens Aff. [3] ¶ 3; Def.'s 56.1 Stat. [4] ¶ 2). As Louise's personal guardian, Jurgens attended to her medical and personal needs. (Jurgens Aff. ¶ 3; Def.'s 56.1 Stat. ¶ 5.) However, during the period from December 1999 until Louise's death in January 2001 (the "guardianship period"), Jurgens did not have any control over Louise's finances or property, as those were under the control of Attorney McCarthy as the property guardian. (Jurgens Aff. ¶ 11; Schmidt Decl. ¶ 28; Def.'s 56.1 Stat. ¶ 5.) Moreover, Jurgens had no authority to oversee or supervise McCarthy's conduct as property guardian. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 25; Def.'s 56.1 Stat. ¶ 25.)

[1] The record is unclear as to Plaintiff's exact relationship with Louise, as it is variously stated that he is her first cousin once removed (Compl. at 2; Jurgens Aff., Ex. A), her second cousin (Jurgens Aff. ¶ 1), or her nephew (Schmidt Decl. ¶ 4).

[2] Citations to "Schmidt Decl." are to the June 17, 2008 Declaration of Michael C. Schmidt, Esq., in Support of Defendant Jurgens' Motion for Summary Judgment [DE 123].

[3] Citations to "Jurgens Aff." are to the June 10, 2008 Affidavit of Charles Herman Jurgens in support of Motion for Summary Judgment [DE 124].

[4] Citations to "Def.'s 56.1 Stat." are to the Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 [DE 125].

**\*3** Pursuant to the April 14, 2000 order of the Supreme Court, Suffolk County, McCarthy retained two Smith Barney stockbrokers as independent financial consultants to advise McCarthy with respect to managing Louise's portfolio, among other things [DE 73 at 3]. In general, McCarthy's conduct as property guardian was supervised and reviewed by the Suffolk County Supreme Court. McCarthy accounted for his actions as property guardian in a formal accounting filed with that Court (the "McCarthy Accounting"), in which he was represented by counsel. That Accounting was reviewed by McCarthy's representatives, the attorney for the Estate, the Supreme Court's accounting department, the Supreme Court Examiner, and a bonding company. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 26; Def.'s 56.1 Stat. ¶ 26.) Although Jurgens received a copy of McCarthy's Accounting, he had no role in its preparation. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 27; Def.'s 56.1 Stat. ¶ 27.)

On January 6, 2001, Louise died and both guardianships ceased. (Jurgens Aff. ¶ 4; Schmidt Decl. ¶ 6; Def.'s 56.1 Stat. ¶ 6.) Jurgens was appointed Preliminary Executor of Louise's estate (the "Estate") on January 30, 2001, and was appointed Permanent Executor on December 30, 2001. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 9.) Thereafter, Jurgens filed Louise's Last Will and Testament dated October 16, 1995 and Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) Upon reviewing the Will, Witzenburg executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

In his capacity as Executor of Louise's Estate, Jurgens took steps to liquidate her assets and sell her house, all of which was accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In the course of performing his duties as Executor, which included locating and accounting for various assets of the Estate, Jurgens discovered that Witzenburg had withheld certain of Louise's money and personal property valued at $789,039.04, which Witzenburg had obtained through specific withdrawals, transfers and check negotiations

between March 1997 and June 2000. (Jurgens Aff. ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 11.)

Following this discovery, on December 5, 2001, Jurgens, in his capacity as Executor, commenced a special proceeding in Suffolk County Surrogate's Court, pursuant to Section 2103 of New York Surrogate's Court Procedure Act, alleging that money and personal property belonging to Louise, valued at $789,039.04, had been withheld by Plaintiff (the "Surrogate's Court Action") (Jurgens Aff ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 12.) On January 14, 2002, Jurgens filed an affirmation with the Surrogate's Court identifying the specific withdrawals, transfers and check negotiations in which Plaintiff had engaged between Marcy 1997 and June 2000. (Schmidt Decl. ¶ 7.)

**\*4** On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr., granted Jurgens' motion (made on behalf of Louise's Estate) for summary judgment on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> Sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogate's Court is directed to serve a copy of the Court's decision upon the Suffolk County District Attorney for further investigation[.]"

(Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Witzenburg. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens alleges, upon information and belief, that Witzenburg left New York shortly after entry of the Judgment on August 22, 2003. (Schmidt Decl. ¶ 12.) To date, Witzenburg has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Witzenburg has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the instant action), it will ultimately be able to offset the amount of the Judgment against Witzenburg's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Since his preliminary appointment in January 2001 and continuing through the present date, Jurgens, in his capacity as Executor, avers that he has consistently acted in the interests of the Estate. (Jurgens Aff. ¶¶ 7, 15; Schmidt Decl. ¶¶ 22, 31; Def.'s 56.1 Stat. ¶ 22.) For example, Jurgens maintains the Estate accounts, files and pays fiduciary taxes, and assists and pays for the various lawsuits and proceedings in which the Estate is involved. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23.) In addition, Jurgens oversaw certain distributions of Louise's Will to beneficiaries during the period December 2001 through January 2004, pending a final accounting in Surrogate's Court. Jurgens has not made any distribution to himself personally and has not taken any Executor fees. (Jurgens Aff. ¶ 7; Schmidt Decl. ¶¶ 23, 24.)

To date, the Estate remains open, pending the outcome of the instant action. Once this case is resolved, Jurgens intends to render a final accounting of the Estate's property (the proceeds of which are currently held in the Estate accounts at Citibank or Smith Barney) in Surrogate's Court. (Jurgens Aff. ¶ 16; Schmidt Decl. ¶ 16.) As part of the final accounting, Witzenburg's share of the Estate will be determined, against which the Suffolk County Judgment can be applied. Then, according to Jurgens, the Estate can render final distributions of the Estate property and he can close the Estate in Surrogate's Court and complete his duties as Executor. (Jurgens Aff. ¶¶ 8, 12, 16.)

**B.** *Procedural Background*

**\*5** The procedural background of this action is also set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order [DE 73] granting in part and denying in part Defendant's motion to dismiss. Only the procedural background germane to this Report will be repeated here.

On December 21, 2004, Plaintiff filed the instant action against Defendant Jurgens, individually and as Executor of the Estate, as well as against Merrill Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch) and Solomon Smith Barney Citigroup ("Smith Barney") in the United States District Court for the Southern District of Texas. On April 27, 2005, Plaintiff filed a First Amended Verified Complaint (the "Amended Complaint"). With respect to Jurgens, Plaintiff alleges that Jurgens and his attorneys were a "corrupt enterprise" and that they depleted Louise's assets, converted assets, committed "frauds" and breached a "fiduciary duty." (Amended Complaint, dated April 27, 2005 ("Am.Compl."), at 4.) On September 15, 2005, Jurgens' motion to transfer venue was granted and the action was transferred to this Court [DE 45].

### 1. *Defendant's Prior Motion To Dismiss*
By motion dated February 3, 2006 [DE 62–65], Defendant Jurgens moved to dismiss the Complaint as against him on the grounds that the Court: (1) lacked subject matter jurisdiction under the *Rooker–Feldman* doctrine and the probate exception to diversity jurisdiction; or in the alternative, (2) should abstain from hearing this dispute because it concerns the administration of an estate; or in the alternative, (3) should dismiss the amended complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.

By Order dated March 1, 2007 [DE 73], Judge Feuerstein held that, "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the alleged conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed" [DE 73 at 8]. Moreover, Judge Feuerstein explained that, to the extent Plaintiff seeks damages resulting from a diminished inheritance, he lacks standing because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover estate property." (*Id.* at 21 (citing cases).)

On the other hand, Judge Feuerstein did not dismiss Plaintiff's claims for breach of fiduciary duty and mismanagement of assets, holding that those claims were not directly addressed in the Surrogate's Court proceeding and are not "inextricably intertwined" with the prior state court determination and. thus, are not barred by

the *Rooker–Feldman* doctrine. (*Id.* at 8–9.) In addition, Judge Feuerstein held that the probate exception to diversity jurisdiction does not apply to Plaintiff's breach of fiduciary duty claims. (*Id.* at 12.) In sum, the Court found that to the extent Plaintiff requests damages "to the heirs of the estate of Louise" and for "the depletion of the estate of Louise" based upon causes of action for breach of fiduciary duty, mismanagement of assets and fraud, the probate exception does not deprive this Court of subject matter jurisdiction over those claims. (*Id.* at 12 (citing cases)).

**\*6** Likewise, the Court denied the portion of Jurgens' motion requesting that the federal court abstain from exercising jurisdiction on the grounds that, even if the Court were to assume the existence of parallel proceedings in this Court and Surrogate's Court, the balance of factors nonetheless weighs against abstention. (*Id.* at 14–17.)

The Court also denied the portion of Jurgens' motion seeking dismissal of the Amended Complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure on the grounds that Plaintiff's *pro se* complaint, although "not a model of clarity or brevity," satisfied the requirements of Rule 8(a) by providing fair notice of what plaintiff's claims are and the grounds upon which they rest. (*Id.* at 17–19.)

With regard to Plaintiff's claims against Smith Barney and Citibank, the Court granted Smith Barney's motion and dismissed the Amended Complaint as against it in its entirety, and *sua sponte* dismissed the entirety of the Amended Complaint against Merrill Lynch for lack of subject matter jurisdiction. (*Id.* at 19–22, n .6.)

In sum, the only claim against Jurgens which is before this Court on summary judgment is whether Jurgens, in his capacities as power of attorney and executor, breached his fiduciary duties to Louise's Estate, including whether he mismanaged Louise's or the Estate's funds, thereby causing "the depletion of the estate of Louise" and causing harm "to the heirs of the estate of Louise" [DE 73 at 12].

### 2. *The Preclusion Order Against Plaintiff*
On multiple occasions during the course of the present action, specifically between October 2007 and February 2008, Plaintiff failed to appear for his properly-noticed deposition, despite the Court's denial of his two motions for protective orders [DE 90, 100] and several opportunities to appear. (Schmidt Decl. ¶ 19.) During

this time, the Court explicitly warned Plaintiff as to the consequences of his failure to appear for deposition. By Order dated February 4, 2008 [DE 100], Judge Boyle cautioned Plaintiff that

> [s]hould he fail to be deposed in this action on or before February 27, 200 [8] he faces a preclusion order barring him from filing any affidavit in favor or in opposition to any motion for summary judgment, and further barring him from testifying at trial."

[DE 100.] Between February 4 and February 25, 2008, Defendant made several attempts to schedule Plaintiff's deposition, but Plaintiff nonetheless refused to appear. (DE 106, 107; Schmidt Decl. ¶ 21.) As a result, by Order dated March 4, 2008 (the "Preclusion Order") [DE 109], Judge Boyle held that

> [c]onsistent with the cautionary advice set forth in the order dated February 4, 2008, the *pro se* plaintiff, James Witzenburg, is hereby precluded from offering any affidavit in support of or in opposition to any motion for summary judgment and is also precluded from testifying at trial in this action unless, within ten (10) business days, he submits to a deposition at a mutually agreed date and time at the placed noticed by counsel for the defendants.

**\*7** [DE 109.]

On March 4, Defendant's counsel sent a letter to Plaintiff by fax, e-mail, and regular mail, enclosing a copy of the Court's March 4, 2008 Order, and offering to depose Plaintiff on March 7, 12, 14, 17, or 18, 2008. (Schmidt Decl. ¶ 22.) Plaintiff did not respond to the letter of Defendant's counsel in any traditional or electronic medium. Moreover, Plaintiff did not appear for his deposition by March 18 as directed by Judge Boyle's March 4 Order. (DE 106, 107; Schmidt Decl. ¶ 22; Def.'s 56.1 Stat. ¶ 33.) Accordingly, by operation of the March 4, 2008 Order, Plaintiff is precluded from offering any affidavit in opposition to the current summary judgment

motion and from offering any testimony at trial. Judge Boyle's decision on this issue is now the law of the case.

### C. *Summary Of Plaintiff's Allegations*

In the Amended Complaint, Plaintiff seeks monetary damages as follows: (1) $106,714.43 for funds converted by Jurgens, acting alone or in concert with others, and the Merrill Lynch and Smith Barney brokers, from a brokerage account allegedly owned by Plaintiff; (2) $2,293,225 for which Jurgens is liable "to the heirs of the estate of Louise Jurgens, including Plaintiff," for breach of fiduciary duties to the Estate and/or conversion of Louise's assets; (3) $1,299,175 for which Jurgens is liable because "[b]y placing an unwarranted guardianship on Louise ... Jurgens initiated the frenzy of activity that resulted in ... depletion of the estate of Louise ..." in that amount; (4) $350,000 in inheritance to which Plaintiff is allegedly entitled pursuant to Louise's "true will," including a $300,000 specific bequest and $50,000 which he claims is his share of the residual value of the Estate (his inheritance per stripes via his mother's inheritance of 40% of the residual value of the Estate); and (5) interests and costs. (Am. Compl. at 33–34). [5]

[5] The Amended Complaint does not contain separately numbered paragraphs and does not identify specific "causes of action." Accordingly, citations are to page numbers within the Amended Complaint. Moreover, the Court affords the Amended Complaint, filed by *pro se* Plaintiff "as liberal a reading as circumstances permit." *Hardie v. Grenier,* No. 84 Civ. 4710, 1987 U.S. Dist. LEXIS 12664, at \*6 (S.D.N.Y. Jan. 15, 1988); *see also Lerman v. Board of Elections in the City of N.Y.,* 232 F.3d 135, 140 (2d Cir.2000).

As discussed above, in the Order granting in part Defendant's motion to dismiss, Judge Feuerstein found that "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed." [DE 73 at 8.] Moreover, Judge Feuerstein explained that to the extent Plaintiff is seeking damages resulting from a diminished inheritance, he has no standing to do so because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover restate property," [DE 73 at 21 (citing cases).] Accordingly,

Plaintiff's claims for $106,714.43 for funds allegedly converted by Jurgens and the Merrill Lynch and Smith Barney brokers (No. (1) listed above) and $1,299,175 for depletion of Louise's assets during the guardianship period (No. (3) listed above) were dismissed pursuant to Judge Feuerstein's Order and need not be considered here. Likewise, Plaintiff's claim for $2,293,225 (No. (2) listed above) was dismissed to the extent it was based on alleged conversion of Louise's assets. The issues remaining before this Court are whether Jurgens breached his fiduciary duties to the Estate and is thus liable to Louise's heirs for $2,293,225 (No. (2) above), and whether Plaintiff is entitled to $350,000, or any portion thereof, in inheritance, pursuant to Louise's "true will" (No. (4) listed above).

**\*8** Insofar as the allegations in the Amended Complaint relate to Defendant Jurgens and are currently before this Court, Plaintiff alleges that Jurgens, in his capacity as executor of Louise's Estate, "committed five separate acts of fraud and many breaches of fiduciary duty." (Am. Compl. at 20). These acts of fraud and breaches of fiduciary duty, as distilled by the Court from the Amended Complaint, are as follows:

- Jurgens knowingly filed a false Last Will and Testament of Louise, which was prepared by Jurgens' counsel in the Surrogate's Court Action, thereby causing the Suffolk Supreme Court Action and/or the Surrogate's Court Action to be "premised upon the filing of a false document which was a fraud on the court," as well as on Louise, her estate, and her beneficiaries, including Plaintiff. (*Id.* at 20–21, Exs. 7, 8.)

- McCarthy was not an independent property guardian and he, together with the Smith Barney experts, "mismanaged" Louise's assets, and filed a false final accounting in the Suffolk Supreme Court Action. (*Id.* at 21–22, Ex. 1.)

- Jurgens' counsel in the Surrogate's Court Action hired a forensic accounting firm to prepare "a report" for which the Estate paid a fee of $53,428.94. However, no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions. Thus, the $53,428.94 "expense" "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (*Id.* at 24.)

- Jurgens' counsel in the Surrogate's Court Action caused the final accounting prepared by McCarthy, which was sent by the Court to the forensic accounting firm, to be sent to a non-existent person at the firm so that the firm would not be in the position of having to approve McCarthy's fraudulent final accounting. (*Id.* at 24–25.)

- In arranging the Estate's sale of Louise's residence, Jurgens did not conduct the sale as an "arm's length" transaction; the only appraisal submitted was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager." (*Id.* at 25.) Moreover, Jurgens submitted an affidavit to the Surrogate's Court affirming that the sale was an "arm's length" transaction. (*Id.*) Jurgens' conduct constituted a breach of his fiduciary duty to Louise's Estate. (*Id.*)

- Jurgens filed a fraudulent bond with the Surrogate's Court and such bond does not actually exist, thereby conferring a fraud on the court and Louise's beneficiaries. (*Id.* at 25–26, Ex. 9.)

In addition, Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (*Id.* at 9.) Finally, Plaintiff claims that Jurgens brought the Suffolk Supreme Court Action against him "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (*Id.*)

## II. *THE SUMMARY JUDGMENT MOTION*

### A. *Standard of Review*
**\*9** In reviewing a motion for summary judgment, the Court is guided by the tenets set forth in Federal Rule of Civil Procedure 56(c), which provides, in part:

... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ....

Fed.R.Civ.P. 56; *Globecon Group, LLC v. Hartford Fire Ins. Co .,* 434 F.3d 165, 170 (2d Cir.2006); *Gray v. Lutheran Social Servs. of Metro. New York., Inc.,* No. 04–2843, 2006 WL 1982859, at *3 (E.D.N.Y. Jul.13, 2006). The moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In addition, to determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that inference in the light most favorable to the non-moving party. *Id .* at 157; *Fischl v. Armitage,* 128 F.3d, 50, 55 (2d Cir.1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id. See also McPherson v. N.Y. City Dep't Of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. Of Educ.,* 243 F.3d 93, 101 (2d Cir.2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl,* 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of law." *Fed.R.Civ.P. 56(e)(2).* In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Dobbs v. Dobbs,* No. 06 CV 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims ...").

**\*10** However, because Plaintiff is proceeding *pro se,* the Court is compelled to "read [*pro se* plaintiff's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, "the nonmoving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (quotation omitted).

### B. *Procedural Issues*

On June 17, 2008, Defendant Jurgens served his motion for summary judgment on Plaintiff Witzenburg by e-mail and regular mail [DE 122]. With his summary judgment motion, Defendant also served Plaintiff with a cover letter providing the requisite Notice to *Pro Se litigant* which, in accordance with Local Rule of the Eastern District of New York 56.2, stated:

> [y]ou are required to serve any opposition papers on my office ***within 10 days of my service of this motion,*** without filing any of your opposition papers with the Court .... Accordingly, to the extent you intend to oppose this motion, please send me within the requisite 10 days a service copy of your papers as well as an additional copy of your papers for me to send to the Court.

[DE 126] Plaintiff did not file any opposition papers or attempt any communication with Defendant or the Court by the June 27, 2008 due date. By letters dated July 1 and July 14, 2008, Defendant asked the Court to grant the summary judgment motion without opposition [DE 128, 133].

By Order To Show Cause dated July 15, 2008, the Court gave Plaintiff one final opportunity to demonstrate why Defendant's motion for summary judgment should not be treated as unopposed. The Court directed Defendant (i) to submit a written explanation to the Court no later than August 6, 2008 setting forth good cause why Plaintiff had failed to oppose Defendant's summary judgment motion; and (ii) to file any opposition papers to Defendant's summary judgment motion no later than August 6, 2008 [DE 134].

Plaintiff served his opposition to Defendant's motion for summary judgment on August 5, 2008 [DE 136], but did not submit a written explanation why he had failed to file his opposition by the original due date. (Schmidt Reply Dec. [6] ¶ 2.) Plaintiff's opposition, styled "Plaintiff's Response in Opposition to Defendant Charles Jurgens' Motion for Summary Judgment" (the "Response"), is, in effect, an unsworn affidavit. Unsworn affidavits are not competent summary judgment evidence unless they meet the requirements of [28 U.S.C. § 1746](#) or, at minimum, "substantially compl[y] with the[ ] statutory requirements [of [28 U.S.C. § 1746](#)] ...." *[LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham,](#) 185 F.3d 61, 65 (2d Cir.1999); see also Nissho–Iwai Amer. Corp. v. Kline,* 845 F.3d 1300, 1306 (5th Cir.1988). Although Plaintiff signed the Response, it is not a sworn affidavit. Likewise, there is no statement that the contents are "true and correct" or made "under penalty of perjury" as required under [28 U.S.C. § 1746](#) and Second Circuit case law.

[6]     Citations to "Schmidt Reply Decl." are to the August 7, 2008 Reply Declaration of Michael C. Schmidt, Esq., in Further Support of Defendant Jurgens' Motion for Summary Judgment [DE 137].

**\*11** Moreover, Plaintiff is precluded from submitting any affidavits in support of his opposition to Defendant's motion for summary judgment based upon Judge Boyle's March 4, 2008 Order, which the Court finds is law of the case on this issue. Under the "law-of-the-case doctrine, a court has discretion to re-examine an issue in certain circumstances." *[Public Employees Retirement Association of New Mexico v. PriceWaterhouseCoopers LLP,](#)* No. 07–3756–cv, 2009 WL 27704, at * 3 (2d Cir. Jan.6, 2009). However, "[c]ourts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge." *[Ali v. Mukasey,](#) 529 F.3d 478, 490 (2d Cior.2008)* A court's

decision whether to apply law-of-the-case is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *[Prisco v. A & D Carting Corp.,](#) 168 F.3d 593, 607 (2d Cir.1999)* (internal quotation marks omitted).

With regard to law-of-the-case doctrine, the Second Circuit has noted that

> [t]he law of the case doctrine ... while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

*[ATSI Communications, Inc. v. the Shaar Fund, Ltd.,](#) 547 F.3d 109, 112 n. 3 (2d Cir.2008)* (citing *[Ali v. Mukasey,](#) 529 F.3d at 490*). I find that the law-of-the-case doctrine applies in the current circumstances. Plaintiff has provided no argument or rationale here that there has been some "intervening development of law or fact that renders reliance on [Judge Boyle's] earlier ruling inadvisable." *[Calabrese v. CSC Holdings, Inc.,](#) No. 02–CV–5171, 2009 WL 425879, at * 6 (E.D.N.Y. Feb. 19, 2009)*. Plaintiff has never presented any good faith reason for his failure to show up at his duly noticed deposition, in the face of specific Orders from the court to do so. The law of the case will be disregarded "only when the court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *[Fogel v. Chestnutt,](#) 668 F.2d 100, 109 (2d Cir.1991)* (quoting *[Zdanok v. Glidden,](#) 327 F.2d 944, 953 (2d Cir.1964)*). Here, Plaintiff presents no new evidence or facts to serve as any reasonable justification for his prior conduct or any basis whatsoever to disturb Judge Boyle's prior rulings.

In addition to the applicability of the law-of-the-case doctrine here, the Court also observes that because Plaintiff's Response constitutes an unsworn declaration, it is inadmissible for purposes of [Rule 56](#) and cannot be considered by the Court in rendering a decision on the present motion. *Nissho–Iwai Amer. Corp.,* 845 F.3d at 1306; *[Hale Propeller LLC v. Ryan Marine Prods. Pty., Ltd.,](#) 151 F.Supp.2d 183, 200–01 (D.Conn.2001)*

(disregarding affidavit where it failed to conform to the standard for unsworn declarations set forth by 28 U.S.C. § 1746); *compare LeBoeuf, Lamb, Greene & MacRae, LLP,* 185 F.3d at 65–66 (defendant's unsworn affidavit could be considered on summary judgment where it stated that "under penalty of perjury I make the statements contained herein" and was signed and dated). Accordingly, Plaintiff's Response cannot be considered on this motion.[7]

[7] Even if Plaintiff's Response were considered, the substance of the Response falls far short of the threshold necessary to support a showing of genuine issue of material fact with regard to the remaining claims. Rather, the Response contains conclusory and unsubstantiated statements, most of which purport to address "the numerous factual inaccuracies and misleading statements" in the Schmidt Declaration [DE 136 at 3], and none of which provide any evidentiary support for Plaintiff's claims.

**\*12** In addition, Plaintiff did not include in the Response a contravention of Defendant's Statement of Undisputed Material Facts [DE 125] or a separate statement of additional material facts for which there exists a genuine dispute, as required under Local Civil Rule 56.1(b).[8] Pursuant to Local Rule 56.1(c), each numbered paragraph in the moving party's statement of material facts "will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Accordingly, for purposes of this motion, the statements contained in Defendant's Statement of Undisputed Material Facts [DE 125] are hereby deemed admitted as unopposed.

[8] Local Rule 56.1(b) provides: "The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

Nevertheless, where, as here, the motion for summary judgment is unopposed, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law ." *Vermont Teddy Bear Co. v. Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004); *Layachi v. Minolta Bus. Sys., Inc.,* 00 Civ. 731, 2001 WL 1098008, at \*3 (S.D.N.Y. Sept.18, 2001) (where "non-moving *pro se* party has failed to submit papers in opposition, summary judgment should not be granted automatically") (internal citations omitted). The Second Circuit has stated:

> the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.

*Vermont Teddy Bear Co.,* 373 F.3d at 244. Plaintiff's failure to oppose summary judgment in any legally meaningful way allows the Court to accept Defendant's factual assertions as true; however, the court "must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

### C. Breach of Fiduciary Duty Claims

As discussed above, Plaintiff seeks monetary damages against Jurgens in the amount of $2,293,225 on the grounds that, in his role as executor of Louise's Estate, Jurgens breached his fiduciary duties through various acts, including mismanaging the Estate's assets. New York law vests executors of estates with broad powers to dispose of and manage the decedent's interests in real property. Specifically, under the Fiduciaries' Powers Act, "every fiduciary is authorized" *inter alia:*

- with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein;

- to employ any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York as custodian of any stock or other securities held as a fiduciary, and the cost thereof;

**\*13** • to cause any stock or other securities (together, "securities") held by any bank or trust company to be registered and held in the name of a nominee of such bank or trust company without disclosure of the

fiduciary relationship; and to direct any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York to register and hold any securities deposited with such bank, trust company or private banker in the name of a nominee of such bank; and

• to contest, compromise or otherwise settle any claim in favor of the estate, or in favor of third person and against the state.

*See* N.Y. EPTL § 11–1.1(5)(B), (9), (10), (13).

Notwithstanding this broad authority, the Fiduciaries' Powers Act also requires executors to strictly adhere to their fiduciary duties. The following is a brief review of executors' fiduciary duties as relevant to the present case.

Pursuant to the duties of loyalty, care and safekeeping, an executor must collect and preserve the assets of the estate. *In re Estate of Donner,* 82 N.Y.2d 574, 584, 606 N.Y.S.2d 137, 141, 626 N.E.2d 922 (N.Y.1993) (noting that the executors "were fiduciaries who owed a duty of undivided loyalty to the decedent and had a duty to preserve the assets that she entrusted to them") (citing *Meinhard v. Salmon,* 240, N.Y. 458, 464 (N.Y.1928)); *Bender v. City of Rochester,* 765 F.2d 7, 12 (2d Cir.1985) (administrator of an estate has "the legal duty to collect and preserve [decedent's] assets, [and] to pay [decedent's] debts"); *In re Estate of Skelly,* 284 A.D.2d 336, 725 N.Y.S.2d 666, 667 (2d Dep't 2001) (executor "has a duty to preserve the assets of the estate ....") (internal citation omitted). Likewise, an executor is prohibited from commingling estate assets with any other assets. *See* N.Y. EPTL § 11–1.6 ("[e]very fiduciary shall keep property received as fiduciary separate from his individual property"). The Fiduciary Powers Act authorizes an executor to protect the estate's assets by employing "any broker-dealer which is registered with the [SEC] and the department of law in the state of New York ... as a custodian for a fiduciary of any stock or other securities ... [and] to register such securities in the name of such broker." N.Y. EPTL § 11–1.10.

An executor's duty of diligence and prudence requires him to administer and manage the estate assiduously in the interest of the beneficiaries. This includes "employing such diligence and prudence in the care and management of the estate assets and affairs as would a prudent person

of average discretion and intelligence." *In re Robinson,* 282 A.D.2d 607, 724 N.Y.S.2d 424, 426 (2d Dep't 2001) (finding no basis to deny executors' commissions where executors adequately explained reasons for waiting to sell decedent's property and objectant did not present any evidence to refute the explanations) (internal citations omitted); *In re Bello,* 227 A.D.2d 553, 554, 642 N.Y.S.2d 953, 954 (2d Dep't 1996) (concluding that executor met the standard of care under difficult circumstances); *In re Scott,* 234 A.D.2d 551, 651 N.Y.S.2d 592, 593 (2d Dep't 1996 (finding executors' delay in paying tax deficiencies, where resulting accrued interest exceeded amount earned by the estate, constituted breach of duty of diligence and care).

**\*14** The duties of diligence and prudence also relate to the executor's authority to invest the assets of an estate. Under the Prudent Investment Act, [9] the executor must make investment decisions pursuant to the prudent investor standard, which requires the executor to "exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(2). The Prudent Investment Act sets out specific requirements for an executor's investment strategy. N.Y. EPTL § 11–2.3(b)(3). For example, executors are required to "pursue an *overall* investment strategy to enable the trustee to make appropriate present and future distributions to or for the benefit of the beneficiaries under the governing instrument, in accordance with risk and return objectives reasonably suited to the *entire* portfolio." *In re Heller,* 6 N.Y.3d 649, 653, 2006 Slip Op 3469, at *3 (N.Y.2006) (emphasis in original) (quoting N.Y. EPTL § 11–2.3(b)(3) (A)). The statute also provides, in relevant part, as follows:

9     The Prudent Investor Act applies to investments "made or held" by a trustee on or after January 1, 1995, and thus applies to the present matter. *See In re Estate of Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997) (citing N.Y. EPTL § 11–2.3(b) (3)(C).)

[t]he prudent investor rule requires a standard of conduct, not outcome or performance. Compliance with the prudent investor rule is determined in light of facts and circumstances prevailing at the time of the decision or action of a trustee. A trustee is not liable

to a beneficiary to the extent that the trustee acted in substantial compliance with the prudent investor standard or in reasonable reliance on the express terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(1). Moreover, an executor is obligated to "diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(3)(C) (quoted in *In re Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997).

Also, under New York law, an executor has discretion whether to pay any testamentary disposition or distributive share before the completion of the publication of notice to creditors or, if no such notice is published, before the expiration of seven months from the time letters testamentary or of administration are granted. Thereafter, the executor is required to pay any testamentary disposition or distributive share no more than seven months following the date the letters testamentary are granted. N.Y. EPTL § 11–1.5(a). If the executor fails to make such disposition, an heir may bring a proceeding against the executor. However, for the purpose of computing the time for the heir to commence the proceeding against the executor, the cause of action does not accrue until the executor's account "is judicially settled." N.Y. EPTL § 11–1.5(c).

Typically, the determination of whether the executor's conduct "measures up to the appropriate standards of prudence, vigilance, and care" is an issue of fact to be decided by the court. *Donner,* 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922; *Janes,* 90 N.Y.2d at 50, 659 N.Y.S.2d at 169, 681 N.E.2d 332 (internal citations omitted).

### III. *DISCUSSION*

**\*15** The issue to be decided by this Court is whether there exists any genuine issue of material fact which would preclude summary judgment in favor of Defendant on Plaintiff's claims that (1) Defendant, in his role as executor of Louise's estate, breached his fiduciary duties through various acts, including mismanaging the Estate's assets, thereby depleting the Estate's assets and harming Louise's heirs; and (2) Plaintiff is entitled to an inheritance in the amount of $350,000 pursuant to Louise's "true will."

In determining whether there are any genuine issues of material fact, the Court remains mindful of Judge Boyle's Preclusion Order which prohibited Plaintiff from submitting "any affidavit in support of or in opposition to any motion for summary judgment" [DE 109]. The Court is also cognizant that, based upon Plaintiff's failure to oppose Defendant's motion for summary judgment in a substantively meaningful way, including his failure to submit a Local Rule 56.1(b) statement contravening Defendant's statement of undisputed facts, Defendant's factual assertions must be accepted as true. *See* Local Rule 56.1(c).

#### A. *Jurgens' Conduct As Executor*

Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens fulfilled his fiduciary duties as executor of Louise's estate. Pursuant to the duties of loyalty, care and safekeeping, Jurgens was required to collect and preserve the assets of the estate. *See, e.g. Donner,* 82 N.Y.2d at 584, 606 N.Y.S.2d at 141, 626 N.E.2d 922. Thus, following his appointment as Executor of Louise's Estate, Jurgens took steps to liquidate Louise's assets and sell her house, all of which were accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In addition, since his appointment, Jurgens has continued to maintain the Estate accounts, has filed and paid fiduciary taxes, and has assisted and paid for the various lawsuits and proceedings involving the Estate. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23 .)

Although Plaintiff alleges that Jurgens has breached his fiduciary duties by failing to distribute the assets of the Estate, Jurgens is not actually required to do so until there is a final accounting. Jurgens made certain distributions to beneficiaries of Louise's Will between December 2001 and January 2004. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 24.) Moreover, Jurgens has not made any distributions to himself or taken any Executor fees to date. (*Id.*)

Jurgens will only be required to distribute the Estate's assets when the Estate "is judicially settled." *See* N.Y. EPTL § 11–1 .5(c). In fact, it is Plaintiff's conduct, including the failure to pay the outstanding Surrogate's Court Judgment against him in the amount of $789,039.04, that has prevented Jurgens from conducting a final accounting and in turn making the final

distributions under the Will. (Jurgens Aff. ¶ 8; Def.'s 56.1 Stat. ¶ 24.)

**B. Breach Of Fiduciary Duty Claims**

*1. The Purported False Will*

**\*16** Plaintiff alleges that Jurgens knowingly filed a false Last Will and Testament of Louise, thus committing fraud on the court, Louise, her estate, and her beneficiaries, including Plaintiff. (Am. Compl. at 20–21, Exs. 7, 8.) Furthermore, Plaintiff claims that pursuant to Louise's "true will," he is entitled to an inheritance in the amount of $350,000.

Contrary to Plaintiff's assertions, Defendant Jurgens states that in his role as executor of the Estate, following Louise's death, he duly filed Louise's Last Will and Testament dated October 16, 1995 as well as the Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

Moreover, prior to the admission of the Will to probate, Plaintiff reviewed the Will and executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Waiver and Consent provides that Plaintiff "consents that the court admit to probate the decedent's Last Will and Testament dated October 16, 1995 (and codicils, if any, dated July 28, 1998), a copy of each which testamentary instrument has been received by me and that Letters Testamentary issue to Charles Jurgens." (Jurgens Aff., Ex. A.) Notably, at no time during the Surrogate's Court proceedings did Plaintiff raise any objection to the Will, despite having had ample opportunity to do so. Plaintiff raised this issue for the first time only upon bringing this action, long after the admission of the Will to probate.

If Plaintiff were seeking to withdraw his Waiver and vacate the decree admitting Louise's Will to probate in order to contest the Will (for which he has not so moved), such motion would have to be made before the Surrogate's Court, where the Waiver was entered. It is well-established that the jurisdiction to administer the probate of wills, including entry of waivers, falls within the ambit of the Surrogate's Court. *See Groman v. Cola,* 07 CV 2635, 2007 WL 3340922, at \*4 (S.D.N.Y. Nov.7, 2007) (noting that federal jurisdiction is barred under the probate exception

if the action requires "the probate or annulment of a will [or] the administration of a decedent's estate") (citing *Marshall v. Marshall,* 547 U.S. 293, 311–12, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)); *Lefkowitz v. Bank of N.Y.,* 528 F.3d 102,106 (2d Cir.2007) (affirming dismissal of certain tort claims against executor because "[w]ith these claims, Plaintiff seeks to mask in claims for federal relief her complaints about the maladministration of her parent's estates, which have been proceeding in probate courts) (citation omitted); *see also* DE 73 at 10. Here, any request by Plaintiff to set aside his Waiver must properly be made before the Surrogate's Court and such request would be subject to the applicable statute of limitations in that court.

However, even if Plaintiff were to make such a motion, it is unlikely he would succeed based on the record currently before this Court. Under New York law, "[a] party seeking to set aside a probate decree entered upon his consent must show that such consent was obtained by fraud or overreaching, [or] was the product of misrepresentation or misconduct, or that newly-discovered evidence, clerical error or other sufficient cause justifies the reopening of the decree." *Moser v. Pollin,* 294 F.3d 335, 342 (2d Cir.2000) (overruled on other grounds by *Marshall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)) (quoting *In re Hall,* 185 A.D.2d 322, 322, 586 N.Y.S.2d 285, 286 (2d Dep't 1992)); *In re Coccia,* 2008–0802, 2009 N.Y. Slip Op 1477, 2009 App. Div. LEXIS 1463, at \*1 (citations omitted). In other words, the party challenging the probate decree must establish "sufficient cause ... to justify reopening the decree." *Coccia,* 2009 App. Div. LEXIS 1463, at \*2 ("appellant's unsubstantiated and conclusory allegations that he did not appreciate or understand the significance of the waiver and consent were insufficient to satisfy this standard").

**\*17** Here, not only has Plaintiff not moved to set aside the Waiver, but he has not even addressed the fact that he submitted the Waiver to the Surrogate's Court. Moreover, based on the record now before this Court, no evidence has been introduced which would allow a court to determine that Jurgens had a fraudulent will admitted to probate. Nowhere does Plaintiff submit any evidence showing that he signed the Waiver as a result of fraud, overreaching, misrepresentation or misconduct on the part of any party involved in the Surrogate's Court proceeding. Neither has Plaintiff submitted newly-discovered evidence, or evidence of a clerical error or

other sufficient cause which would justify the reopening of the decree. In fact, the extent of Plaintiff's assertions on this point, other than in the Amended Complaint, is found in his Summary Judgment Response, where he takes issue with Paragraph 6 of the Schmidt Declaration for, among other things, not addressing "the presence of 2 wills" which were annexed to the Amended Complaint. (Pl. Opp'n Summ. J. at 4.)

In sum, there no evidence that Plaintiff's Waiver was fraudulently obtained and should be withdrawn or that Jurgens had a false will admitted to probate. Accordingly, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duty as Executor in regard to the admission of the Will to probate. Likewise, Plaintiff's claim that he is entitled to an inheritance in the amount of $350,000 under a will other than the Will that was admitted to probate in the Surrogate's Court Action is without merit.

### 2. McCarthy's Final Accounting

Plaintiff alleges that Jurgens breached his fiduciary duty because the court-appointed property guardian for Louise, Patrick McCarthy, was not functioning independently and McCarthy, together with the Smith Barney experts, "mismanaged" Louise's assets, ultimately filing a false Final Accounting in the Suffolk Supreme Court Action. (Am. Compl. at 21–22.)

However, Jurgens has stated that he had "absolutely no authority to oversee, let alone supervise, [McCarthy's] actions while he served as Louise's property guardian." (Jurgens Aff. ¶ 10; Def.'s 56.1 Stat. ¶ 25.) Specifically, during the guardianship period, Jurgens did not have any control over Louise's finances or property. (Jurgens Aff. at ¶ 11; Def.'s 56.1 Stat. ¶ 28.) Moreover, at the conclusion of the guardianship period, McCarthy accounted for his actions as Louise's Property Guardian in a formal accounting which was approved by the Suffolk County Supreme Court. (Jurgens Aff. ¶ 10.) Despite having had ample opportunity to do so, Plaintiff at no time objected to McCarthy's Final Accounting and only raises this issue for the first time in the current action, several years after the entry of McCarthy's Final Accounting.

If Plaintiff had been seeking to challenge McCarthy's Final Accounting (for which he has not so moved), he would necessarily have had to bring that information to

the attention of the Suffolk County Supreme Court, which previously approved the Final Accounting. *See, e.g., In re Hunter,* 4 N.Y.3d 260, 270, 794 N.Y.S.2d 286, 292, 827 N.E.2d 269 (N.Y.2005) (Explaining that res judicata principles "apply with equal force to judicially settled accounting decrees. As a general rule, an accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom Surrogate's Court obtained jurisdiction.") (citations omitted).

**\*18** Notwithstanding these purported facts, however, this allegation does not pertain to Jurgens, as he played no role in McCarthy's conduct as guardian. (Jurgens Aff. ¶ 11.) In fact, the conduct at issue here occurred before Louise's death, and thus prior to Jurgens' appointment as executor of Louise's estate and prior to his undertaking the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*) Moreover, McCarthy is not a party to this action.

Because this allegation relates solely to events that occurred prior to Jurgens' appointment as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duties in regard to McCarthy's conduct as Property Guardian and/or McCarthy's Final Accounting.

### 3. The Purported Fraudulent Forensic Accounting Report

Plaintiff contends that, in either the Suffolk Supreme Court Action or the Surrogate's Court Action, Jurgen's attorney hired a forensic accounting firm to prepare "a report" for which Louise's Estate was billed $53,428.94. Plaintiff contends that no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions and thus, Plaintiff argues, the $53,428.94 "expense" ... "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (Am. Compl. at 24.)

At first glance, it is unclear whether Plaintiff is alleging that the fraudulent forensic accounting report was prepared during the guardianship period in the course of the Suffolk Supreme Court Action, or following Louise's death in the course of the Surrogate's Court Action. However, based on Plaintiff's assertion that the accountant who was hired to prepare this report informed Plaintiff's attorney (presumably in one of these earlier actions) that he did not know McCarthy, the Court

concludes that the conduct alleged here occurred during the guardianship period, because that is the only time McCarthy was involved with Louise. Specifically, Plaintiff contends that the accountant stated that "he did not know the property manager Patrick McCarthy had never spoken with Patrick McCarthy, and was hired by James Klein." (Am. Compl. at 24.) Plaintiff also adds that the accountant made this statement "after he was paid" for the report. (*Id.*)

Insofar as this allegation pertains to the guardianship period, there is no claim against Jurgens and thus nothing for the Court to consider because this conduct occurred prior to Jurgens' appointment as executor of Louise's estate—and prior to his assuming the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*)

Even if the Court were to presume that this claim alleges conduct which occurred following Louise's death—and thus while Jurgens was the executor— there is no support, beyond Plaintiff's conclusory and unsubstantiated statements, to show that Jurgens fraudulently billed the Estate for an accounting report that was not received. Thus, the Court finds that there is no genuine issue of material fact whether Defendant caused his counsel to hire a forensic accounting firm to prepare a fraudulent report or to pay an impermissible fee to such firm.

### 4. The Alleged Non–Existent Forensic Accountant

**\*19** Plaintiff alleges that in the Surrogate's Court Action, Jurgens, through his counsel, caused the Final Accounting prepared by McCarthy to be sent by the Court to a non-existent person at a forensic accounting firm so that the accounting firm would not be in the position of having to approve McCarthy's fraudulent Final Accounting. (Am. Compl. at 24–25.) However, as noted above, Jurgens did not play any role in McCarthy's conduct as the property guardian. Moreover, beyond these conclusory and unsubstantiated allegations, the only evidence offered by Plaintiff is a copy of an envelope addressed to "Ernest Patrick Smith, CPA" at a street address in Melville. Contrary to Plaintiff's proffer, the envelope does not indicate that it is directed to the accounting firm of Callahan Nawrocki. (*Id.* at 25, 794 N.Y.S.2d 286, 827 N.E.2d 269.) Further, the envelope was returned by the post office bearing the stamped notation "Attempted Unknown" (not "addressee unknown" as stated by Plaintiff). (*Id.*; Am. Compl. Ex. 11.)

Because there is no evidence of Jurgens having played any role in this alleged conduct, the Court finds that Plaintiff has failed to raise a genuine issue of material fact to support his contention that Jurgens caused McCarthy's Final Accounting to be sent to a non-existent forensic accountant.

### 5. Sale Of Decedent's Residence As An Arm's Length Transaction

With regard to the sale of Louise's residence, Plaintiff alleges that Jurgens breached his fiduciary duties as executor because the only appraisal obtained for Louise's house was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager[,]" and thus the sale was not an "arm's length" transaction. (Am. Compl. at 25.) As noted above, the New York Fiduciary Powers Act provides the executor with broad authority with regard to the sale of decedent's property. The applicable statutory provision authorizes an executor "with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein." N.Y. EPTL § 11–1.1(5).

Plaintiff's only support for his claim that Jurgens breached his fiduciary duty in the sale of the residence is his assertion that the appraisal was submitted by a company with whom McCarthy had ties, thereby resulting in a transaction which was not at arm's length. However, Plaintiff does not specify McCarthy's connection to that company or offer any proof to show that any unlawful conduct occurred as a result of this purported connection. Nor does Plaintiff offer any proof to show that Jurgens knew or believed this sale was not "most advantageous" to Louise's beneficiaries, as required under New York law.

Significantly, by Order dated February 21, 2001, the Surrogate's Court granted Jurgens' application for permission to sell Louise's home in accordance with the terms of the contract which Jurgens had provided to the Court (Am.Compl., Ex. 9). In the Order, the Surrogate noted that Jurgens had "proffered a copy of a contract of sale for $270,000.00 and state[d] that the sale of the premises minimizes the estate's obligation to pay taxes and carrying charges on the property during the pendency of the probate proceeding." (*Id.*) The Surrogate found that Jurgens had satisfied his fiduciary duties with regard to

the sale of Louise's home, and Plaintiff has not presented any evidence here to convince this Court otherwise. Accordingly, the Court finds there is no genuine issue of material fact regarding Defendant's conduct in the sale of Louise's home.

### 6. The "Fraudulent Bond" Allegation

**\*20** Plaintiff maintains that Jurgens filed a fraudulent bond with the Surrogate's Court and that no true bond actually exists, thereby resulting in a fraud on the court and Louise's beneficiaries. (Am. Compl. at 25–26, Ex. 9.) In support of this allegation, Plaintiff claims that, pursuant to the order of the Surrogate's Court requiring Jurgens to file a bond on his performance, Jurgens filed "several unbound unexecuted pages purporting to represent an executor's performance bond underwritten by Fidelity and Deposit Company of Maryland" ("F & DC"), and that in 2003, an F & DC representative informed him that "no bond exists or ever existed on the performance of Charles H. Jurgens." (*Id.* at 25–26, 794 N.Y.S.2d 286, 827 N.E.2d 269.)

In his summary judgment motion, Jurgens explains that F & DC insured Louise's Estate for $3,353,000, based on Jurgens' preliminary estimate of the value of the Estate at the time he filed the Preliminary Executor's Bond with the Surrogate's Court. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 29.) The value of the Estate was ultimately determined to be higher than the face value of the bond. However, by the time that determination was made, the Will had already been admitted to probate and an increase in the the bond was not necessary. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 30.)

In support of his allegation that Jurgens breached his fiduciary duties by filing a false bond, Plaintiff cites to Exhibit 9 annexed to the Amended Complaint. (Am. Compl. at 25–26.) However, Exhibit 9 is neither the purported bond nor any document even suggesting that Jurgens fraudulently obtained the bond. Rather, Exhibit 9 consists of the FD & C's power of attorney dated August 25, 2000, F & DC's statement of financial condition dated May 24, 2000, and FD & C's New York State Insurance Certificate dated April 12, 2001. These documents do not in any way support Plaintiff's contention that Jurgens committed fraud in obtaining the bond, thereby breaching his fiduciary duties.

As a result, Defendant has provided no more than conclusory allegations here regarding the supposed fraudulent nature of the bond, and those allegations are not supported by the irrelevant papers included in Exhibit 9. Accordingly, the Court finds that Plaintiff has failed to carry his burden to establish a genuine issue of material fact regarding the bond filed by Jurgens with the Surrogate's Court.

### 7. Purported Accounting Discrepancies

Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (Am. Compl. at 9.)

**\*21** The conduct alleged here refers to actions taken during the guardianship period. As explained above, during this time, Jurgens had no authority over McCarthy, who was solely in charge of managing Louise's assets. Moreover, Plaintiff had ample opportunity to challenge McCarthy's accounting, including this alleged discrepancy, during the course of the Suffolk Supreme Court Action. Because this allegation relates solely to events that occurred prior to the commencement of Jurgens' role as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact regarding any alleged breach by Jurgens of his fiduciary duties as Executor.

### 8. Jurgens' Purported Improper Motives

Finally, Plaintiff claims that Jurgens brought the Suffolk Surrogate's Court action against Plaintiff "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (Am. Compl. at 9.) Plaintiff explained that, following his appointment as preliminary executor of Louise's estate in January 2001:

> In the course of performing my duties as executor, I attempted to locate and preliminarily account for

various assets of the Estate. In that capacity, I learned that Plaintiff had withheld certain of Louise's money and personal property valued at $789,039.04, obtained through specific withdrawals, transfers and check negotiations in which Plaintiff engaged during the period prior to Louise's death from March 1997 through the time that Mr. McCarthy was appointed as Louise's property guardian. As a result, I commenced a special proceeding in Suffolk County Surrogate's Court in my capacity as Executor, seeking to discover property withheld by Plaintiff.

(Jurgens Aff. ¶ 5.)

On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr. granted Jurgen's motion for summary judgment (made on behalf of Louise's Estate) on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogates' Court is directed to serve a copy of the Court's decision upon the Suffolk County District Attorney for further investigation[.]"

**\*22** (Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Plaintiff. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens believes that shortly after entry of the Judgment in August 2003, Plaintiff left New York. (Schmidt Decl. ¶ 12.) To date, Plaintiff has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Plaintiff has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the present action), it will ultimately be able to offset the amount of the Judgment against Plaintiff's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Notwithstanding that the history of the Surrogate's Court Action strongly suggests that Plaintiff brought the instant case in an effort to further elude the Judgment entered in Surrogate's Court, Jurgens, as Executor, was well within his authority to bring that case against Plaintiff. The New York Fiduciary Powers Act specifically provides that "every fiduciary is authorized ... [t]o contest, compromise or otherwise settle any claim in favor of the estate ...." N.Y. EPTL § 11–1.1(13). Thus, once Jurgens obtained information that Plaintiff had withheld funds which properly belonged to Louise's Estate, he acted properly in bringing the Surrogate's Court Action against Plaintiff to recover those funds.

### C. *Conclusion*

For the foregoing reasons, Plaintiff has not provided any evidentiary basis which would enable this Court to find that Jurgens breached his fiduciary duties in his role as executor of Louise's Estate and that Jurgens' actions caused Witzenburg or any other beneficiary to incur damages. Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens' conduct as executor "measures up to the appropriate standards of prudence, vigilance, and care" as required by New York law. *See Donner,* 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922.

Having reviewed all of the papers submitted in support of and in opposition to Defendant's Motion for Summary Judgment on the remaining claims in this action, and reviewing the evidence in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Defendant has met his burden of showing that there

is no genuine issue of material fact to be tried in this case regarding Plaintiff's claims that Defendant breached his fiduciary duties to the Estate of Louise Jurgens and that he mismanaged the Estate's assets.

Accordingly, I respectfully recommend to Judge Feuerstein that Defendant's motion for summary judgment on the remaining claims be GRANTED and that the Amended Complaint be dismissed in its entirety.

## IV. *PLAINTIFF'S MOTION TO AMEND THE COMPLAINT*

Plaintiff Witzenburg also moves to amend the Amended Complaint pursuant to Fed.R.Civ.P. 15 to add Patrick McCarthy, Esq. as a party defendant. McCarthy served as the court-appointed property guardian of Louise's property for thirteen months before her death. Defendant's motion papers [DE 117] do not include a proposed Second Amended Complaint containing the requested changes. Counsel for Patrick McCarthy filed a letter [DE 119] requesting permission to oppose the motion and to extend the time to submit his opposition. By Order dated June 20, 2008 [DE 120], Judge Boyle granted McCarthy's motion without objection from Plaintiff and extended the deadline for the opposition to July 15, 2008. Defendant Jurgens has not filed papers in opposition to Witzenburg's motion to amend.

**\*23** Plaintiff seeks to amend his pleading for a second time on the grounds that, as guardian of Louise's property, McCarthy "created a false business document identified as 'The Final Accounting,' and filed said false business document with the New York State Supreme Court." [DE 117] Because the deadline to amend the pleadings has expired, [10] the amendment is permissible only if it "relates back" to the original Complaint as defined in Rule 15(c). Under Rule 15(c)(1), an amendment "relates back" to the original pleading when, *inter alia,*

[10]     Pursuant to the Scheduling Order [DE 22] in this action, the deadline to amend the pleadings was May 6, 2005.

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out— or attempted to be set out—in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Thus, subsection (C) governs the relation back of newly added parties, as opposed to newly added claims and claims and defenses, which is governed by subsection (B) (although under the terms of (C), Plaintiff must also satisfy (B).) *See Sidney v. Wilson,* 228 F.R.D. 517, 520 (S.D.N.Y.2005).

In order for Plaintiff to amend the Amended Complaint to add McCarthy as a party Defendant, he must show that McCarthy originally would have been named as a defendant "but for a mistake concerning the proper party's identity." Under Second Circuit law, a 'mistake' in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of 'misnomer or misidentification' " or when a plaintiff omits the individual defendant altogether in the erroneous belief that suing a government department will suffice. *Messer v. Fahnestock & Co. Inc.,* 03–4989, 2008 WL 4934608, at \*20 (E.D.N.Y. Nov.18, 2008) (internal citation omitted) (quoting *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469–70 (2d Cir .1995)); *Colombo v. S.C. Dep't of Soc. Servs.,* 221 F.R.D. 374, 376 (E.D.N.Y.2004). "However, the relation-back doctrine does not apply where defendants were not originally named merely 'because plaintiff did not know their identities.' " *Colombo,* 221 F.R.D. at 376 (quoting *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999)). Nor does the relation-back doctrine apply where plaintiff does not allege he would have sued the proposed defendant in the original complaint but for a mistake in identity. *See Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir.1994) (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake"); *see also* Fed.R.Civ.P. 15(c) (3) [11] Advisory Committee's note (1991 Amendment) (this

provision was revised to address "the problem of the misnamed defendant").

11    Although numbered differently from the current version of Rule 15(c), the wording is the same.

**\*24**  In his motion papers, Plaintiff asserts that the proposed amendment "asserts a claim that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Plaintiff further contends that McCarthy will not be prejudiced because he "knew or should have known that this action would have been brought against him but for a mistake concerning the proper party's identity ...." [DE 117] Other than these conclusory statements, however, Plaintiff gives no explanation as to any mistake on his part concerning McCarthy's identity. There is no evidence that Defendant's failure to name McCarthy as a defendant in the original Complaint was a result of a "misnomer or misidentification," as required under Second Circuit law. *See, e.g., Messer,* 2008 WL 4934608, at \*20, *Colombo,* 221 F.R.D. at 376. In addition, given the history of the related Suffolk Supreme Court and Surrogates' Court Actions that occurred before Plaintiff filed the Complaint in the present case, it is implausible for Plaintiff to assert that he was uncertain of Patrick McCarthy's identity. Rather, Plaintiff chose not to name McCarthy as a defendant in the present action—a mistake which does not allow the proposed amendment to "relate back" to the Complaint. *See Cornwell,* 23 F.3d at 705 (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake").

Moreover, even if the Court were to accept Plaintiff's contention that McCarthy "knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity [,]" Plaintiff must show that McCarthy received timely notice of this action so as to avoid prejudice in defense of the action on the merits. *See* Fed.R.Civ.P. 15(c)(2)(C)(ii); *Colombo,* 221 F.R.D. at 377. To this end, Plaintiff states:

> [a]s Patrick McCarthy was represented by Donald J. Farrinacci when he was the Guardian of Louise Jurgens' Property, as Donald

> J. Farrinacci had been employed at Cozin O'Conner and is an associate of Michael Schmidt, attorney for Charles H. Jurgens, Patrick McCarthy knew or should have know that this action would have been brought against him, but for a mistake concerning the proper party's identity ...."

[DE 117] The Court understands Plaintiff's assertion to mean that McCarthy was on notice of the present action, and therefore will not be prejudiced by being added as a defendant, because, for at least some portion of the time he served as Louise's property guardian (December 1999–January 2001), he was represented by counsel who at one time had worked with Jurgens' current counsel.

Rule 15(c) requires a showing that the defendant who is to be added to the complaint "received such notice of the action that it will not be prejudiced in defending on the merits[.]" Rule 15(c) (2)(C)(ii). Knowledge of the pendency of the action may be imputed to a party to be added as a defendant to that action where there has been "some showing that the proposed defendant's attorney knew that the additional defendant would be added to the existing suit." *Colombo,* 221 F.R.D. at 377 (granting motion to add individual defendants under *Rule 15(c)* where county attorney's office represented the named defendants, including county police department and correctional facility, and was also counsel for the proposed defendants, including individual police and correction officers, the attorneys "should have known that, despite the deficiencies in the original complaint, these individual officers should have been named, and would be added when the mispleading became evident"); *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989) (holding that notice of a lawsuit cannot be imputed to a proposed defendant based on sharing of counsel with a named defendant; "there must be some showing that the attorney(s) knew that the additional defendants would be added to the existing suit") (citation omitted).

**\*25**  Plaintiff's allegation that McCarthy was on notice of the present action because he was, in a prior case, represented by counsel who had at one time worked with Jurgens' current counsel, is insufficient to constitute notice under Rule 15(c)(2)(C)(ii). Plaintiff does not provide the Court with any evidence regarding the relationship between McCarthy's attorney and Jurgens'

former attorney. [12] Moreover, Plaintiff has not made any showing that McCarthy or his attorney knew that McCarthy would be added to the existing suit before Plaintiff filed this motion. For the foregoing reasons, Plaintiff has not satisfied the requirements of Rule 15(c) and therefore should not be permitted to amend his pleading for a second time for this purpose. Accordingly, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to add Patrick McCarthy as a party defendant be DENIED.

[12]     In addition, the Court notes that, based on preliminary research, Plaintiff's statement appears to be incorrect. No attorney by the name of Donald J. Farrinacci presently works at the law firm of Cozen O'Connor, where Jurgens' attorney, Michael J. Schmidt, currently works. However, Schmidt's biography on the Cozen O'Connor website states that until 2005, Schmidt worked at Fischbein Badillo Wagner Harding, a firm that represented McCarthy for at least some portion of his tenure as guardian. *See* http://www.cozen.com/attorney_detail.asp?d=1 & atid=835.

## V. *PLAINTIFF'S MOTION TO COMPEL*

Plaintiff also moves to compel Defendant to respond to outstanding discovery requests. By motion dated June 26, 2008 [DE 130], Plaintiff requests an order requiring Defendant to respond to outstanding document requests and interrogatories, which Defendant has previously refused to answer on the grounds that the application of the *Rooker–Feldman* doctrine excused them from doing so. The motion is titled "Plaintiff's Motion & Notice of Motion For Sanctions," but nowhere in the body of the motion does Plaintiff request the imposition of sanctions or provide a legal basis for doing so. Accordingly, the Court will treat this request for relief as a motion to compel and to impose sanctions upon Defendant.

By letter dated July 8, 2008 [DE 131], Defendant states that, to the extent the meaning of Plaintiff's motion can be discerned, and to the extent the motion seeks to compel Defendant's further responses to discovery requests, Defendant opposes the motion on the grounds that (1) the Court had already denied an earlier motion to compel by Plaintiff, and (2) there is no basis for an award of sanctions against Defendant.

In a previous motion filed on January 31, 2008 [DE 95–97], Plaintiff moved to compel Defendant "to file adequate responses to Plaintiff's discovery requests." Specifically, Plaintiff objected to Defendant's responses to Interrogatories 4, 6, 13, and 14, and Requests for Admissions ("RFAs") numbered 1, 8, 9, 16, and 17 as being "incomplete," and requested that the Court order Defendant to respond further to the Interrogatories and to deem as admitted the specified RFAs [DE 96]. In opposition, Defendant filed the Declaration of Michael C. Schmidt, dated February 4, 2008 [DE 99], objecting to Plaintiff's motion to compel. By Order dated February 4, 2008 [DE 100], Judge Boyle ruled that, after reviewing the motion to compel, he found Defendant's response[s] "adequate." The Order also stated that the "plaintiff is advised that he may further pursue those request[s] which do not relate to dismissed parties and causes of action, at the deposition of defendant Jurgens."

**\*26** Thus, Judge Boyle unequivocally denied Plaintiff's motion to compel on the grounds that Plaintiff's responses were sufficient and any further information could be obtained by deposing Defendant. Plaintiff's current motion to compel is essentially a more vague repetition of his earlier motion. However, Plaintiff does not provide any basis, let alone a legally sufficient one, for reconsidering Judge Boyle's Order denying that motion, and the Court declines to do so. For all of the reasons stated previously in this Report, Judge Boyle's February 4, 2008 Order on this topic is also law-of-the-case and Plaintiff has not met any of the criteria to exempt that Order from such a finding.

To the extent Plaintiff's motion seeks the imposition of sanctions upon Plaintiff, the Court interprets the motion to be requesting sanctions for "Failure to Disclose, to Supplement an Earlier Response, or to Admit," under Rule 37(c). Here, Judge Boyle previously determined that Defendant's responses were adequate. Since that time, Plaintiff has not served any additional discovery requests and Defendant has not incurred any additional obligation to respond to the original discovery requests. Consequently, there is no basis for the Court to impose sanctions on Defendant.

For the foregoing reasons, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to compel and for sanctions be DENIED.

## V. *CONCLUSION*

For the reasons discussed above, I respectfully recommend to Judge Feuerstein that: (1) Defendant's motion for summary judgment on the remaining claims be GRANTED and that Plaintiff's Amended Verified Complaint be dismissed in its entirety; (2) Plaintiff's motion to amend the Amended Complaint to add Patrick McCarthy, Esq. as a party defendant be DENIED; and (3) Plaintiff's motion to compel discovery responses and to impose sanctions upon Defendant be DENIED.

Pursuant to 28 U.S.C. § 636(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections shall be filed with the Clerk of the Court via ECF, *except in the case of a party proceeding pro se. Pro Se Plaintiff James Witzenberg must file his objections in writing with the Clerk of the Court within the prescribed time period noted above. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Sandra J. Feuerstein, and to my chambers* as well. *Any requests for an extension of time for filing objections must be directed to Judge Feuerstein prior to the expiration of the (10) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal.* Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)*;* Beverly v. Walker, 118 F.3d 900, 901 (2d Cir.)*, cert. denied,* 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997)*;* Savoie v. Merchants Bank, 84 F.3d 52, 60 (2d Cir.1996)*.*

**\*27** Defendants' counsel is directed to serve a copy of this Report and Recommendation forthwith upon Plaintiff *Pro Se* by overnight mail and first class mail at Plaintiff's last known address. Defendant's counsel is further directed to file proof of service of the same upon ECF.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1033395

---

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2017 Thomson Reuters. No claim to original U.S. Government Works. 21

2013 WL 71770
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jeffrey HAMM, Plaintiff,
v.
Richard HATCHER, and City
of New York, Defendants.

No. 05 Civ. 503(ER).
|
Jan. 7, 2013.

**Attorneys and Law Firms**

Jeffery Hamm, East Elmhurst, NY, pro se.

Kimberly D. Conway, Esq., New York City Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

### OPINION AND ORDER

RAMOS, District Judge.

**\*1** *Pro se* Plaintiff Jeffrey Hamm ("Hamm" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Richard Hatcher ("Hatcher")[1] and the City of New York (the "City," and collectively, "Defendants."). Plaintiff alleges that while he was incarcerated in Rikers Island, Defendants violated his rights under the Fourteenth Amendment to the U.S. Constitution when they suspended his antidepressant medications. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons set forth below, Defendants' motion is GRANTED.

[1] Plaintiff has named "Richard Hatcher" as a Defendant in this action. It appears from Defendants' papers, however, that his correct name is "Richard Fletcher." Because the caption of this case names "Richard Hatcher" as a Defendant, the Court will continue to refer to him by what seems to be an incorrect name.

**I. Background**

**A. Undisputed Facts**

Plaintiff is a 52 year-old man with a long history of substance addiction and criminal activity.[2] (Conway Decl. Ex. F ("Hamm Dep.") 9:19–23, 31:15–21, 36:24–37:6.) After serving in the military from 1980–1982, (*id.* 10:24–11:2, 35:2–8), Plaintiff and his ex-wife divorced. (*Id.* 35:15–17.) At that time, he became addicted to crack cocaine and remained addicted through 2000, (*id.* 9:20–10:2, 10:24–11:6), when he completed a twenty-day rehabilitation program and enrolled in New York City College of Technology. (*Id.* 10:4–8.) In December of 2001, on his second day of college, Plaintiff was arrested and released. (*Id.* 11:24–12:2, 13:12–14.) He struggled with substance abuse at that time, and continued to relapse into early 2002. (*Id.* 11:7–17.)

[2] Plaintiff, by his own estimation, has been arrested at least 100 times and has been convicted of a crime at least fifty times. (Hamm Dep. 36:24–37:3.) Most of his arrests have been for the possession or sale of marijuana. (*Id.* 37:4–6.)

Plaintiff was again arrested in March 2002. (*Id.* 13:15–17.) He was immediately taken into custody at the Manhattan Detention Center. (*Id.* 13:18–25.) On March 15, 2002, while incarcerated there, Plaintiff was issued two antidepressant medication prescriptions for fourteen days each—one for forty milligrams daily of Paxil and the other for fifty milligrams daily of Trazodone. (First Unnumbered Exhibit to the Third Amended Complaint ("TAC") at first unnumbered page.) Plaintiff states that he had been taking antidepressant medications before his arrest, as well.[3] (Hamm Dep. 15:22–16:8; Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem.") at first unnumbered page.)

[3] Plaintiff was first diagnosed with depression and anxiety by a psychiatrist in the Department of Corrections, though he does not specify when. (Hamm Dep. 16:8–9.) He believes he suffered from these psychological conditions for many years prior to his diagnosis and that they caused him to begin using narcotics in the first place. (*Id.* 16:10–14.)

In or about June 2002, Plaintiff was transferred to another detention facility,[4] but remained there for less than two months due to an incident involving an assault.[5] (*Id.* 14:11, 21–25 .) After this incident, in or about August 2002, he was transferred to segregated housing in the Central Punitive Segregation Unit of

the Otis Bantum Correctional Center ("OBCC") on Rikers Island. (Conway Decl., Ex. A at 1, 2; Hamm Dep. 14:22–15:2). On August 14, 2002, a mental health clinician, Michele Garden, Ph.D. ("Garden") evaluated Plaintiff, and reported that he presented antisocial behavior, mood changes, persistent anger, and withdrawal symptoms. (Conway Decl., Ex. A at 1.) Garden diagnosed Plaintiff with early onset dysthymic disorder, dependent personality disorder, and polysubstance dependence, and directed that Plaintiff was to undergo biweekly clinician visits. (*Id.* at 1, 2.) On August 14, 2002, Plaintiff was also seen by a psychiatrist, Roberto Caga–Anan, M.D. ("Caga–Anan") at OBCC, who noted that Plaintiff stated, "I am ok," and observed that he did not present a danger to himself or to others. (Conway Decl, Ex. B at 1.) Caga–Anan prescribed Plaintiff with forty milligrams daily of Paxil and fifty milligrams daily of Atarax. (*Id.*) Both prescriptions were to last for fourteen days. (*Id.,* Ex. C.)

4    Plaintiff refers to this detention facility as the "Beacon facility." (Hamm Dep. 14:1–4.)

5    The details of this assault are unclear in Plaintiff's deposition testimony, but it appears to have involved corrections officers. (Hamm Dep. 14:11, 24–25.)

*2 On August 22, 2012, Garden and Caga–Anan again observed and evaluated Plaintiff. (Conway Decl., Ex. E.) They confirmed their prior observations, and diagnosed him with opioid dependence and adjustment disorder with depressed mood. (*Id.* at 1.) They again directed that he was to undergo biweekly clinician and psychiatrist visits. (*Id.* at 2.) On August 28, 2002, Caga–Anan renewed Plaintiff's Paxil prescription and issued him an additional prescription for fifty milligrams of Trazodone daily. (*Id.,* Ex. C.) Caga–Anan discontinued Plaintiff's Atarax prescription. (*Id.*) Again, both prescriptions were to last Plaintiff for fourteen days-until September 11, 2002. [6] (*Id.*)

6    Plaintiff states that he was medicated for the entire duration of his detention in segregated housing at OBCC. (Hamm Dep. 15:13–17.)

### B. Facts in Dispute
In early September 2002, Plaintiff was transferred from segregated housing at OBCC to the George Motchan Detention Center ("GMDC") on Rikers Island. (Hamm Dep. at 15:18–21.) It is at this point where Plaintiff's and Defendants' versions of facts diverge.

### 1. Defendant's Version of Facts
Defendants assert that on September 12, 2002–the day after Plaintiff's prescriptions were due to expire—Vivia Francois, M.D. completed a Consultation Request form on Plaintiff's behalf and referred him to the Mental Health Department at GMDC. (Conway Decl., Ex. G.) There is no evidence in the record, however, that his prescriptions were renewed at that time. On September 13, 2002, Plaintiff was admitted to the Mental Health Department and screened by S. Hernandez ("Hernandez"), a clinical social worker. (*Id.*) Hernandez completed a mental health intake form for Plaintiff, and noted that he had a history of mental illness and that he was taking medication for depression. (*Id.,* Ex. I.) There is no evidence in the record that Plaintiff's prescriptions were renewed at that time, either.

On September 16, 2002, a clinical supervisor reported that Plaintiff's case had been assigned to Hernandez and that a psychological assessment had been scheduled to determine whether Plaintiff was "on the proper medication with the proper dosage." (*Id.,* Ex. J.) On the same day, Hatcher [7] first evaluated Plaintiff in the Mental Health Clinic at GMDC. (Conway Decl., Ex. K.) Hatcher reported that Plaintiff stated he had not received Paxil for *five* days, that he felt mildly to moderately depressed at times due to his "legal problems and not recently getting his scheduled medications," and that Plaintiff stated, "I know I need the medication because as soon as I stop it I start feeling anxious, irritable and depressed." (*Id.*) However, Hatcher also noted that Plaintiff stated "I'm doing alright," that he denied experiencing any hallucinations or side effects of his medications, that he denied any suicidal or homicidal ideations, that his mood was calm and stable, that he was eating and sleeping well, and that he did not present any paranoia. (*Id.*) Hatcher diagnosed Plaintiff with Dysthymic Disorder, and stated that he would "re-start [Plaintiff's] regimen at 'start doses.' " (*Id.*)

7    Hatcher's position is unclear from the record. According to a Progress Note and a Medication Order Sheet he completed upon treating Plaintiff, it appears Hatcher may be a Nurse Practitioner, as indicated by his signature "Richard Fletcher NP." (Conway Decl., Exs. K, L.) However, during Hamm's deposition, Defendants' attorney repeatedly

referred to Hatcher as "Dr. Fletcher." (*E.g* . Hamm Dep. 17:16.)

**\*3** Hatcher prescribed Plaintiff twenty milligrams daily of Paxil for depression and fifty milligrams daily of Trazodone for sleep. (*Id* .) Hatcher issued prescriptions for one immediate dose of both of medications on September 16, 2002, (*id.,* Ex. L), and an additional prescription for both medications to being immediately thereafter and to last for fourteen days. (*Id.*) Thus, according to the prison medical records submitted by Defendants, Plaintiff was without his prescribed medications from September 11, 2002 through September 15, 2002–a total of five days.

On September 19, 2002, Hernandez evaluated Plaintiff again. (*Id.,* Ex. N.) A Clinical Assessment and Comprehensive Treatment Plan noting Plaintiff's symptoms, diagnosis, and treatment plan was completed and signed by Hernandez, Gerard Derisse, a psychiatrist, and Gilberto Matta, C.S.W., a clinical supervisor. (*Id.*) Plaintiff was thereafter periodically treated for his psychiatric conditions; the last record of his treatment submitted to the Court is dated January 1, 2003. (Third, Fourth, and Fifth Unnumbered Exhibits to TAC.)

### 2. Plaintiff's Version of Facts [8]

[8]   As set forth more fully below, the Court finds that all such disputed facts are not material, and even construing the facts in a light most favorable to Plaintiff, he cannot defeat Defendants' motion.

Plaintiff stated in his deposition testimony that when he was transferred from segregated housing at OBCC to GMDC in September 2002 and was first seen by Hatcher, Hatcher told him that GMDC maintained a policy that newly transferred inmates were required to wait ten days before receiving any medical prescriptions. (*Id.* 17:21–25, 22:2–7.) Hatcher then took Plaintiff off of Paxil and Trazodone for ten days despite Plaintiff's statements to Hatcher that he needed the medication. [9] (*Id.* 17:16–18, 22:2–13.)

[9]   Plaintiff's evidence regarding the time during which he went without his medication is inconsistent. In his memorandum of law in opposition to the instant motion, he states that he "hadn't had [his] medication in 5 days" when he was first transferred to GMDC and met with Hatcher. (Pl.'s Mem. second unnumbered page.) He further states that Hatcher "took it upon himself to lower [his] dosage" after

learning of the five-day delay in receiving treatment. (*Id.*) The Court discusses these inconsistencies below. *See infra* n. 13.

Plaintiff further stated in his deposition testimony that once he stopped taking his medication, he began to experience the "side effects of withdrawal." (Hamm Dep. 23:2–4.) These symptoms included exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (*Id.* 23:5–16.) He avers that he made frequent attempts to alert the mental health staff to the side effects he experienced while not taking his medication [10] -including filing a grievance at GMDC, (*id.* 41:23–42:8, 42:22–43:4; TAC at 4)-but that he remained without his medication for the duration of his first ten days there. (Hamm Dep. 23:17–24:2, 24:10–11.) When the ten days expired, Plaintiff testified that Hatcher prescribed him half of his regular dosage of Paxil and his full dosage of Trazodone. (*Id.* 18:1–3, 28:1–8.) Hatcher later prescribed Risperidone to Plaintiff for impulse control. (*Id.* 29:4–8.)

[10]   Plaintiff's testimony is also inconsistent in this regard. For example, he also stated in his deposition testimony that he did *not* ask to speak to anyone on the mental health staff in his first ten days at GMDC when he was not medicated. (Hamm Dep. 25:25–26:3, 26:22–25, 27:17–19.)

Plaintiff testified in his deposition that he did not tell Hatcher the full extent of the symptoms he was experiencing as a result of going off of his medications. (*Id.* 19:10–14, 21:13–22, 24:8–19.) He believed that because he had recently come out of segregated housing as a result of his involvement in an assault, if he were to explain the nature and degree of his symptoms, he would be placed on suicide watch, be forcibly sedated, or be placed in segregated housing. (*Id.* 21:21–22:1, 24:8–19.)

### 3. The Criminal Prosecution of Plaintiff

**\*4** Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was sentenced to three to six years imprisonment. (First Unnumbered Exhibit to Second Amended Complaint ("SAC")at 12.) Plaintiff later attempted to withdraw his guilty plea, arguing that he was impaired by his state of withdrawal from medication. (SAC ¶ 6.) On February 6, 2003, Judge Ronald A. Zweibel of the Supreme Court of the State of New York, New York County denied Plaintiff's motion to withdraw his plea, and the Supreme Court, Appellate Division, First

Department affirmed the denial of Plaintiff's motion on April 5, 2005. (First Unnumbered Exhibit to SAC at 12–13.) In its Decision and Order, the Appellate Division stated that the record established that Hamm's plea "was knowing, intelligent, and voluntary, and [the record failed] to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (*Id.*) The Appellate Division also noted that the Plaintiff had "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and that the trial court had "relied on its own recollection of [Hamm's] lucidity at the time of the plea" in rejecting his motion to withdraw his plea. (*Id.*) On June 18, 2005, The Court of Appeals of the State of New York denied Plaintiff's application for leave to appeal. (Second Unnumbered Exhibit to SAC at first unnumbered page.)

## II. Procedural History

Plaintiff filed suit on May 17, 2004 in the Northern District of New York, from where this action was transferred to the Southern District of New York on January 14, 2005. (Doc. 1.) Then–Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend, (*id.*), and Plaintiff filed an Amended Complaint on March 28, 2005. (Doc. 2.) The case was subsequently reassigned to the Honorable Colleen McMahon. (Doc. 3.) Plaintiff filed a Second Amended Complaint on July 31, 2006. (Doc. 9.) The case was again reassigned to the Honorable Kenneth M. Karas on August 6, 2007. (Doc. 18.) Plaintiff, who by that time had completed his prison term, moved for default judgment as to Hatcher on December 6, 2007. (Doc. 24.) On September 5, 2008, Defendants filed a motion to dismiss the Second Amended Complaint, (Doc. 22), and on September 8, 2008, Judge Karas denied Plaintiff's motion for default judgment. (Doc. 27.) On May 5, 2009, Judge Karas issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss, and granting Plaintiff leave to amend the complaint. [11] (Doc. 31.) On August 7, 2009, Plaintiff filed a Third Amended Complaint. (Doc. 33.) On January 23, 2012, this matter was reassigned to the undersigned, and on June 21, 2012, Defendants filed the instant motion. (Docs.61, 63 .)

[11] In his opinion, Judge Karas dismissed Plaintiff's Fourteenth Amendment claim against Hatcher to

the extent that it was based on allegations that Plaintiff received a lower dose of Paxil than he requested. (Doc. 31 at 21.) Accordingly, this Court only addresses herein the portion of Plaintiff's Fourteenth Amendment claim that has survived the motion to dismiss, i.e., that Defendants violated his constitutional rights by depriving him of antidepressant medication for some period of time.

## III. Applicable Legal Standards

### A. Summary Judgment

**\*5** Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009) (citing *Celotex Corp.,* 477 U.S. at 322–23). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp.,* 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts. *Senno,* 812 F.Supp.2d at 467. The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "[T]he non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor ." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57 (1986)).

**B. Local Rule 56.1 and *Pro Se* Litigants**
 **\*6** Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Fed.R.Civ.P. 56, must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). In answering a motion for summary judgment, litigants in this District are required to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record. Local R. 56.1(b), (d); *see also* Fed.R.Civ.P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). If the moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1. Local R. 56.2. Once served with a statement pursuant to Local Rule 56.2, "[*p]ro se* litigants are then not excused from meeting the requirements of Local Rule 56. 1." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009) (citing *Vt. Teddy Bear Co. v. 1–*

*800–BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir.2004)). Each factual statement set forth in the moving party's Rule 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local R. 56.1(c); *see also T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied,* 130 S.Ct. 3277 (2010).

In the instant case, the Defendants have complied with their obligations by submitting a Local Rule 56.1 Statement and providing Plaintiff with notice, pursuant to Local Rule 56.2, of his obligations. (Docs.63, 66.) Plaintiff has failed to submit an appropriate response. Instead, he filed an unsworn, handwritten memorandum of law in opposition to the instant motion with several exhibits attached. (Doc. 60.) However, as the Second Circuit has made clear, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (quoting *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)), and "where a *pro se* plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali,* 678 F.Supp.2d at 178 (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001)). Moreover, courts are to read a *pro se* litigant's submissions "liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

 **\*7** Therefore, this Court has endeavored to discern from the record if there is any evidentiary support for the assertions contained in Plaintiff's opposition papers and the documents attached thereto, and to determine if there are any other material issues of fact based on the evidence in the record. *Geldzahler v. N.Y. Med. Coll .,* 746 F.Supp.2d 618, 620 n. 1 (S.D.N.Y.2010). The Court has considered the present motion in light of the entirety of the record to afford Plaintiff the special solicitude to which he is entitled, *Burke v. Royal Ins. Co.,*

39 F.Supp.2d 251, 257 (E.D.N.Y.1999), as well as the unsworn statements in his opposition papers-but only to the extent that they are based on personal knowledge or supported by other admissible evidence in the record—on the assumption that if his allegations were sufficient to raise an issue of fact, Plaintiff would be given an opportunity to submit an affidavit properly attesting to those allegations. *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 603 n. 1 (S.D.N.Y.2004). However, even in light of Plaintiff's *pro se* status, the Court cannot rely on any assertions for which he has failed to offer proper support. *Goenaga,* 51 F.3d at 18.

## IV. Discussion

### A. Plaintiff's Claim Against Hatcher

#### 1. Cruel and Unusual Punishment

The Eighth Amendment to the U.S. Constitution guarantees convicted prisoners the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. A prisoner's Eighth Amendment rights are violated when he is denied adequate medical care due to a prison official's deliberate indifference to a substantial risk of serious harm. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (quoting *Farmer v. Brennan,* 511 U.S. 825, 828 (1994)). Because the Eighth Amendment only applies where there has been a "formal adjudication of guilt," a pretrial detainee—such as Plaintiff, whose cause of action arose before he was convicted—enjoys a right to adequate medical care pursuant to the Due Process Clause rather than the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983). Nevertheless, the analysis is the same under the Due Process Clause and the Eighth Amendment in this Circuit, because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856; *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment"). Thus, an "official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant,* 101 F.3d at 856.

The standard for a cruel and unusual punishment claim under both the Eighth Amendment and the Due Process Clause includes an objective and a subjective component. *E.g., Mitchell v. Prison Health Services, Inc.,* 07 Civ. 8267(PKC), 2008 WL 5069075, at *3 (S.D.N.Y. Nov. 20, 2008).* First, the objective component requires the alleged deprivation of medical care to be sufficiently serious. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). A deprivation of medical care is sufficiently serious if two prongs are satisfied: (1) the prisoner was actually deprived of adequate medical care; and (2) the inadequacy in medical care was sufficiently serious. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). An actual deprivation of adequate medical care occurs only if a prison official denies an inmate reasonable medical care, *Id.* (citing *Farmer,* 511 U.S. at 844–47), and it is sufficiently serious if "a condition of urgency ... that may produce death, degeneration, or extreme pain" is present. *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks and citations omitted). Relevant factors to this inquiry include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks, brackets, and citation omitted).

**\*8** Second, the subjective component requires the defendant to "act with a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson,* 501 U.S. at 298). An official acts with the requisite deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. This is the "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002)).

In the instant case, Plaintiff is unable to satisfy both the subjective and objective components.

#### 2. Plaintiff Did Not Sustain a Sufficiently Serious Deprivation of Medical Care.

When a prisoner alleges a complete denial of adequate medical care, courts must evaluate the seriousness of the prisoner's underlying medical condition. *Bellotto v. Cnty. of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (citing *Smith,* 316 F.3d at 184–86 .) Alternatively, when —as in the instant case—a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, the seriousness inquiry is "narrower," *Salahuddin,* 467 F.3d at 280, and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the prisoner's underlying medical condition. *Id.* (citing *Smith,* 316 F.3d at 185); *see also Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188–89 (11th Cir.1994) (explaining that the seriousness of a delay in medical treatment may be decided "by reference to the *effect* of delay in treatment .... [considering] the seriousness of the medical need [and] deciding whether the delay worsened the medical condition") (emphasis in original)). In the latter scenario, the court must examine all relevant facts and circumstances when determining whether a delay in treatment is sufficiently serious. *DiChiara v. Wright,* 06 Civ. 6123(KAM)(LB), 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011) (quoting *Smith,* 316 F.3d at 187). Accordingly, because Plaintiff's claim against Hatcher is based on a short-term interruption in the treatment that is otherwise unchallenged,[12] the court must focus on the risk of harm from the challenged delay in analyzing whether the alleged deprivation was sufficiently serious.

[12] To the extent that Plaintiff has argued that Hatcher prescribed him a dosage of Paxil that was too low—and thus inadequate—after the ten-day delay, such a claim has already been addressed and dismissed by Judge Karas. *See supra* n. 11.

"Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need." *Cuoco,* 222 F.3d at 106 (internal quotation marks and citation omitted). It is also true that "[f]requently missed doses [of medication] could readily result in adverse medical events." *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009). Such a delay or interruption in treatment, however, only gives rise to a violation of a prisoner's constitutional rights if it "reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment."

*Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002). Although adverse medical effects are not required to prove a constitutional violation, "the absence of ... physical injury will often be probative," and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith,* 316 F.3d at 187, 188.

**\*9** Plaintiff contends that he was deprived of adequate medical care because his access to his medication was interrupted for ten days when he was transferred from OBCC to GMDC. (TAC at 3; Hamm Dep. 18:20–25.) He further avers that the delay was the result of a policy at GMDC that prevented all newly transferred inmates from taking any medication for their first ten days of detention there.[13] (TAC at 3; Hamm Dep. 17:21–25, 21:13–15, 22:2–7.) Plaintiff relies exclusively on the alleged statement made by Hatcher to establish the existence of the ten-day policy. However, he cannot demonstrate that such a purported policy, as applied to him, caused a sufficiently serious deprivation of adequate medical care.

[13] As noted above, *see supra* n. 9, Plaintiff's evidence of GMDC's adherence to this policy is inconsistent. First, in his Third Amended Complaint, dated August 7, 2009, and again in his deposition testimony, dated December 30, 2009, Plaintiff stated that due to a GMDC policy, he was unable to receive his medications for the first ten days after being transferred there. In his opposition papers, dated October 17, 2011, however, Plaintiff states that after not receiving his medication for *five* days upon his transfer to GMDC-with no mention of a prison policy-Hatcher lowered his Paxil dosage. While the Court is well aware that on summary judgment, it may not resolve issues of credibility, it is also well settled that "a party cannot attempt to defeat a summary judgment motion by contradicting factual allegations in his complaint" or in prior sworn testimony. *Rojas v. Roman Catholic Diocese of Rochester,* 783 F.Supp.2d 381, 407 (W.D.N.Y.2010) *aff'd,* 660 F.3d 98 (2d Cir.2011) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528–529 (2d Cir.1985).

The Court is not required to accept Plaintiff's assertion that he was deprived of the medication for ten days, as opposed to five, given that his statements are both equivocal, *see id.,* and unsupported by admissible evidence, *see Wali,* 678

F.Supp.2d at 178 (citing *Holtz,* 258 F.3d at 73.), and in light of the uncontroverted documentary evidence submitted by Defendants. *See Celotex Corp.,* 477 U.S. at 322. However, because the allegations fail even if the Court accepts Plaintiff's assertion that the delay lasted ten days, the Court will analyze the claim based on that version of the facts.

As a result of the delay in access to his medication, Plaintiff avers that he began to experience the "side effects of withdrawal," including exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (Hamm Dep. 23:1–4, 6–16.) Even assuming that Plaintiff's averments were substantiated by admissible evidence, the psychological consequences he alleges to have suffered are insufficient to show that he was subjected to a significant risk of serious harm. [14] Courts have repeatedly refused to find constitutional violations where the harm alleged as a result of a delay in medical care is similar to that alleged here. *Bellotto,* 248 F. App'x at 237 (plaintiff who alleged missed medication dosages and inadequate monitoring of medications did not sustain a constitutional violation "because the risk of harm [he] faced as a result of the alleged treatment was not substantial," and because the only medical consequence he alleged was an "anxiety attack," which resulted in no physical injuries or acute distress); *Barnard v. Beckstrom,* No. 07–CV–19, 2008 WL 4280007, at *16 (E.D .Ky. Sept. 17, 2008) (doctor's affidavit found no merit in plaintiff's claim that a ten-day delay in making alterations to psychiatric medication rose to the level of a serious medical need as he did not "suffer from any physical injury as the result of any alleged or actual delay in treatment"); *Caldwell v. McEwing,* No. 00–CV–1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept. 28, 2006) (granting summary judgment to defendants where plaintiff saw a doctor for psychiatric assessments, refused to take psychiatric medication, and no physical harm resulted); *cf. Bilal v. White,* 10–4594–PR, 2012 WL 3734376, at *2 (2d Cir. Aug. 30, 2012) (plaintiff who suffered from epilepsy and arthritis—"arguably ... serious underlying conditions"-but failed to demonstrate that his condition worsened due to the delay, was unable to establish a sufficiently serious medical need); *Smith,* 316 F.3d at 181–82 (two separate delays of several days each in provision of medication to inmate with HIV-positive status—an indisputably serious medical condition—did not cause sufficiently serious injury where plaintiff suffered temporary itching, severe headaches, as well as stress due to the missed medication, but his HIV infection and overall health did not worsen).

[14]     Although the Court would have greatly benefitted from an affidavit from Hatcher or other medical professionals employed by the City's Department of Corrections—and is perplexed why Defendants failed to submit one—"summary judgment may not properly be based on an absence of a statement from an expert that the care given was [or was not] grossly negligent when inferences drawn from the record could support such a finding." *Pellum v. Burtt,* 9:05–3339–JFA–GCK, 2008 WL 759084, at *33 (D.S.C. Mar. 20, 2008) (citing *Miltier v. Beorn,* 896 F.2d 848, 852 (4th Cir.1990)).

**\*10** The relevant case law makes clear that a greater showing of harm is required in order to meet the high standard of a constitutional violation within the context of a delay in treatment. *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (dentist's one-year delay in treating a cavity—a condition tending to cause acute pain if left untreated—precluded summary judgment in defendant's favor because of the severity of the risk of harm involved); *Demata v. N .Y. State Corr. Dept. of Health Servs.,* No. 99–0066, 198 F.3d 233 (Table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (a delay in providing necessary medical care may rise to the level of a constitutional violation, but the Second Circuit has reserved such a classification for cases involving deliberate delay of treatment as a form of punishment, disregard for a life-threatening and fast-degenerating condition, and extended delay of a major surgery) (collecting cases); *Hathaway,* 37 F.3d at 67 (plaintiff found to have serious medical need where he suffered from a degenerative hip condition that caused him to have difficulty walking and significant pain over an extended period of time, and corrective surgery was delayed over two years); *Silvera v. Conn. Dept. of Corr.,* 726 F.Supp.2d 183, 191–92 (D.Conn.2010) (plaintiff who suffered from severe mental health issues and was an acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need). The absence of any physical injury to Plaintiff as a result of the ten-day delay underscores the Court's finding. *Smith,* 316 F.3d at 187.

There is no indication in the record that Hatcher's conduct "significantly increased [Plaintiff's] risk for medical injury or similar serious adverse consequences." *Wright v.*

*Genovese,* 694 F.Supp.2d 137, 159 (N.D.N.Y.2010) *aff'd,* 415 F. App'x 313 (2d Cir.2011). Accordingly, Defendants' motion for summary judgment may be granted on this basis alone.

### 3. Hatcher Did Not Act With Deliberate Indifference.

However, even assuming *arguendo* that Plaintiff had been subjected to a "sufficiently serious" deprivation of medical care, his claim for cruel and usual punishment against Hatcher would still fail because he cannot prove that Hatcher acted with deliberate indifference. As discussed above, *see supra* Part IV.A.1, a prison official cannot be found to have acted with deliberate indifference unless a plaintiff can demonstrate that the official "knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer,* 511 U.S. at 837). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result," but he must be subjectively aware that his conduct creates a substantial risk of harm. *Salahuddin,* 467 F.3d at 280. Mere negligence, however, even if it gives rise to a medical malpractice claim, is insufficient to sustain a constitutional claim. *Salahuddin,* 467 F.3d at 280; *Hathaway,* 37 F.3d at 68. Thus, in order to establish liability, Plaintiff must demonstrate the Hatcher knew of and disregarded an excessive risk to his safety in delaying Plaintiff's access to his medication for ten days.

**\*11** While Plaintiff alleges that he was "severely depressed" when Hatcher first evaluated him, (First Unnumbered Exhibit to TAC, second unnumbered page), by his own testimony he never communicated that to Hatcher. (Hamm Dep. 19:10–15.) Indeed, Plaintiff admits that he *purposely* withheld the full extent of his symptoms from Hatcher in order to avoid being placed in segregated housing, on suicide watch, or being sedated. (Hamm Dep. 21:18–22:1, 24:8–21.) Rather, Plaintiff told Hatcher that he was "doing alright," that he was eating and sleeping well, and that he felt only "mild[ly] to moderately depressed due to his legal problems and not recently getting his scheduled medications." (Conway Decl., Ex K.) Hatcher noted that Plaintiff's mood was "calm and stable" at that time. (*Id.*) Therefore, Plaintiff has set forth no facts tending to prove that Hatcher knew of any risk to Plaintiff's health resulting from the short-term delay in his treatment, much less that he disregarded any

such risk. Accordingly, any potential risk to Plaintiff's health as a result of the delay in receiving antidepressant medication would not be actionable, because Plaintiff did not properly advise Hatcher of his actual psychological condition.

As there is no evidence in the record before the Court that Hatcher acted with deliberate indifference by failing to prescribe Plaintiff his medications for the first ten days of his detention at GMDC, Plaintiff's claim against Hatcher would fail the subjective test, as well.

### B. Plaintiff's Claim Against the City ("*Monell* Claim")

The Court need not reach the merits of Plaintiff's *Monell* claim. As the Second Circuit has stated, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) (emphasis in original). When a district court concludes that there is "no underlying constitutional violation," it need not address "the municipal defendants' liability under *Monell.*" *Id.* Therefore, the Court GRANTS Defendants summary judgment on Plaintiff's *Monell* claim against the City.

### V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge V. United States,* 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to teminate this motion (Doc. 63), enter judgment in favor of Defendants, and close this case.

It is SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 71770

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    9

2012 WL 2401574
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nicholas ROBLES, Plaintiff,
v.
Warden S. KHAHAIFA, et al., Defendants.

No. 09CV718.
|
June 25, 2012.

**Attorneys and Law Firms**

Nicholas Robles, Albion, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

**Order**

HUGH B. SCOTT, United States Magistrate Judge.

 *1  Before the Court is defendants' motion for summary judgment dismissing this action (Docket No. 37 [1] ). Responses to this motion were due by April 3, 2012, and any reply was due by April 16, 2012 (Docket No. 47). After denying (Docket No. 53) plaintiff's motions (Docket No. 47) for appointment of counsel and to stay the defense summary judgment motion (Docket No. 50), responses were due by May 14, 2012, and replies by May 25, 2012 (id.). The parties consented to proceed before the undersigned as Magistrate Judge on August 15, 2011 (Docket No. 30).

[1]     In support of this motion, defendants submitted their Memorandum of Law, Docket No. 38; their Statement of Facts, Docket No. 39; the declarations of defendants sergeant Darin Austin, Docket No. 40; inmate grievance resolution program supervisor Brian Fitts, Docket No. 41; retired Superintendent Sibatu Khuhaifa, Docket No. 42; Dr. Dwight Lewis, Docket No. 43; corrections officer Todd Wilson, Docket No. 44; and a declaration of their counsel, with exhibit (videotape of May 7, 2009), Docket No. 45; the declaration of Dr. Winston Douglas with exhibits, plaintiff's medical record, filed under seal,

Docket No. 48; their attorney's reply Declaration, Docket No. 58.

     In opposition, plaintiff submits his motion to stay summary judgment and for appointment of counsel and its supporting papers, Docket Nos. 50, 51, 52; his letter to Chambers, dated Apr. 11, 2012, Docket No. 54; and his "Affidavit of Truth Amendment in Opposition to Respondents Summary Judgment," with enclosed Affidavit of Junior Lorenzo Cepeda and exhibit of a grievance, Docket No. 55; his amendment renewed motion for stay of defense motion, Docket No. 57.

Plaintiff filed a renewed motion to stay the defense motion (Docket No. 57); that motion is **denied.**

BACKGROUND

Plaintiff, proceeding *pro se,* commenced this action alleging that defendants were deliberately indifferent to his medical condition while he was incarcerated at the Orleans Correctional Facility ("Orleans") in 2009 (Docket No. 14, Am. Compl.; Docket No. 39, Defs. Statement ¶¶ 1, 3). The Amended Complaint alleges claims against Superintendent S. Khuhaifa, Dr. Winston Douglas and Dr. Dwight Lewis, inmate grievance supervisor Fitts, Sergeant Austin, and corrections officer Wilson (Docket No. 14, Am. Compl.). He claims that Drs. Douglas and Lewis exhibited deliberate indifference to plaintiff's right shoulder from February 2009 to June 2010 by failing to treat his shoulder and depriving plaintiff of pain medication. He alleges that the original injury arose from a prison assault while he was at Fishkill Correctional Facility, but he alleges here only claims arising in this District surrounding the treatment he received (or did not receive) while at Orleans (id. ¶¶ 16–17). Since plaintiff did not receive what he believed to be adequate pain medication, he substituted illegal marijuana to self-medicate his pain and was disciplined for marijuana possession (id. ¶ 20). Plaintiff moved for leave to proceed *in forma pauperis* (Docket Nos. 2, 5) and leave was granted (Docket No. 7).

*Defense Motion for Summary Judgment*
According to defendants' Statement of Undisputed Facts (Docket No. 39), plaintiff alleges that defendants were deliberately indifferent to the condition of his right shoulder, alleging that Superintendent Khahaifa instituted a policy which forbade prescribing narcotics

to inmates (Docket No. 39, Defs. Statement ¶ 3; *see also* Docket No. 14, Am. Compl. ¶ 21). Superintendent Khahaifa states that, because medical decisions are delegated to medical personnel, he disclaims any influence over that decision making and denies that a no antinarcotic policy exists at Orleans (Docket No. 39, Defs. Statement ¶ 4; Docket No. 42, Khahaifa Decl. ¶ 6). Narcotic pain medication is prescribed on a case-by-case basis as needed by an inmate patient (Docket No. 39, Defs. Statement ¶ 5). Khahaifa received five letters and numerous grievances from plaintiff regarding his medical treatment which he forwarded to appropriate office or, with the grievances, he considered the appeal and affirmed denial of relief, with these appealed grievances then appealed to Department of Corrections and Community Supervision ("DOCCS") Albany central office (*id.* ¶ 9; Docket No. 42, Khahaifa Decl. 12).

**\*2** Defendant Fitts was employed as an inmate grievance resolution program supervisor at Orleans (Docket No. 39, Defs. Statement ¶ 11; Docket No. 41, Fitts Decl. ¶ 1). Plaintiff claims that Fitts circumvented the grievance process (Docket No. 39, Defs. Statement ¶ 12), but Fitts claims that all grievances were filed and processed pursuant to DOCCS directives (*id.* ¶ 13).

Defendant Austin was a sergeant at Orleans during this time and plaintiff alleges that he mislead and misinformed unnamed DOCCS officials in Albany by incorrectly telling them that he saw plaintiff lift weights (*id.* ¶¶ 17–18). Austin denies contacting Albany about plaintiff and he disclaims ever seeing plaintiff exercise (*id.* ¶¶ 22, 23).

Defendant Wilson is a corrections officer at Orleans (*id.* ¶ 25) and plaintiff claims that Wilson interfered with plaintiff's medical care by collaborating with nursing staff and Sergeant Austin in misinforming Albany officials about plaintiff's ability to lift weights (*id.* ¶ 26). When Wilson was questioned by medical staff about plaintiff, Wilson told them that he saw plaintiff lift weights daily (*id.* ¶¶ 27–28). A member of medical staff then went to the gym but missed plaintiff because he finished there (*id.* ¶ 29). Wilson never contacted Albany about plaintiff; had such contact been made, it would have been memorialized in a memorandum (*id.* ¶ 31).

Plaintiff alleges that Dr. Douglas, Facility Health Services Director at Orleans, refused to prescribe narcotics to plaintiff and instead chose to treat plaintiff's shoulder

differently (*id.* ¶ 35). Dr. Douglas was plaintiff's primary physician at Orleans (*see* Docket No. 43, Dr. Lewis Decl. ¶ 4). Dr. Douglas explains that plaintiff made repeated demands for Percocet and other narcotics that were not medically necessary and plaintiff was not compliant with medical instructions (Docket No. 39, Defs. Statement ¶ 39; *see id.* ¶¶ 36–38, 40–41; Docket No. 48, Dr. Douglas Decl. ¶¶ 17, 18, 15, 20). Knowing plaintiff's history of drug abuse and his medical condition, Dr. Douglas changed plaintiff's medication (Docket No. 39, Defs. Statement ¶ 40; Docket No. 48, Dr. Douglas Decl. ¶ 20). Plaintiff was prescribed a sling and physical therapy as treatment for his shoulder (Docket No. 39, Defs. Statement ¶ 43), but plaintiff did not regularly wear the sling or attend physical therapy sessions, seeking instead imaging of the shoulder (*id.* ¶¶ 44, 42). Plaintiff also lifted weights (*id.* ¶ 45; Docket No. 48, Dr. Douglas Decl. ¶¶ 12–13), despite being told by medical staff to refrain from lifting weights (Docket No. 48, Dr. Douglas Decl. ¶ 12). On plaintiff's almost daily sick calls, medical staff noted plaintiff's "bulky well defined deltoids and bicep muscles, which are signs indicative of continued exercise" (*id.*). Defendants point to plaintiff's failed November 2008 surgery by outside surgeon Dr. Stegamann at Erie County Medical Center as the cause for plaintiff's rotator cuff damage (Docket No. 39, Defs. Statement ¶ 46; Docket No. 48, Dr. Douglas Decl. ¶ 24, Ex. A, at Bates No. 311).

**\*3** Plaintiff charges that Dr. Lewis, a facility physician at Orleans, was deliberately indifferent (Docket No. 39, Defs. Statement ¶¶ 49–50). Dr. Lewis asserts that plaintiff was given proper medical care for his shoulder while at Orleans, he was prescribed pain and antiinflammatory medicines, physical therapy, and a sling (*id.* ¶ 51; Docket No. 43, Dr. Lewis Decl. ¶ 3), as well as monitoring images of his shoulder and examinations by outside consulting physicians (Docket No. 39, Defs. Statement ¶ 52; Docket No. 43, Dr. Lewis Decl. ¶ 3).

Defendants argue that both the subjective and objective elements of a deliberate indifference claim are not met here. Subjectively, they argue that plaintiff has not proven a culpable state of mind for any of the defendants (Docket No. 38, Defs. Memo. at 8–13). Objectively, defendants contend that plaintiff was scheduled for shoulder surgery in 2007 but was released and that surgery was never performed. Plaintiff was again incarcerated in 2008 and had two surgeries on his shoulder (Docket No. 48, Dr. Douglas Decl. ¶ 6). In 2009, plaintiff was deemed not

to be a candidate for surgery, and was prescribed anti-inflammatory medication instead. Plaintiff, however, was not compliant with medical advice. Plaintiff worked out extensively, with one routine on May 7, 2009, videotaped showing plaintiff lifting weights, punching a heavy bag, and playing basketball, despite medical instruction to avoid such strenuous activity (Docket No. 45, Defs. Atty. Decl. ¶¶ 5–10, Ex. A (videotape) [2] ). Defendants conclude that plaintiff's complaints did not rise to the level of serious medical need to meet the objective prong of the deliberate indifference claim (Docket No. 38, Defs. Memo. at 5–7).

[2]     Plaintiff reviewed the videotape, Docket No. 45, Defs. Atty. Decl., Ex. A, cover letter Feb. 13, 2012 (with written notation "tape reviewed: 2–16–12" and signed by plaintiff).

Defendants each deny conspiring against plaintiff (Docket No. 39, Defs. Statement ¶¶ 10, 16, 24, 33, 48, 54; Docket No. 38, Defs. Memo. at 19–21) and deny any deliberate indifference on their part to plaintiff's condition (*see* Docket No. 39, Defs. Statement ¶ 54). They also argue that plaintiff fails to establish the personal involvement of Superintendent Khahaifa, Austin, Fitts, or Wilson in plaintiff's medical care (Docket No. 38, Defs. Memo. at 13–19). Defendants alternately argue that they are entitled to qualified immunity if a constitutional violation is found here (*id.* at 21–23).

Plaintiff responds that he complains that he continues to suffer pain in that shoulder due to not being prescribed pain medication (Docket No. 54, Pl. letter response dated Apr. 11, 2012, at 1–2), although he has not amended his Complaint to allege continuous liability. He was prescribed Ibuprofen 800 mg., but plaintiff states that he could not tolerate this medicine in his stomach (*id* . at 1). Plaintiff previously argued that there is conflicting testimony (Docket No. 51, Pl. Memo. in support of motion for appointment of counsel and stay of defense motion ¶¶ 2, 5) but does not identify these conflicts. Plaintiff denies that he alleges any conspiracy among the defendants (Docket No. 52, Pl. Aff. in support of appointment motion ¶ 3).

 **\*4** Plaintiff also complains about an assault that allegedly occurred on April 4, 2012, seeking to have this Court and prison grievance official review videotape of the incident (Docket No. 54, Pl. letter, at 1–2). That incident

and others he raises in his papers (some discussed below), however, are beyond the scope of this pending action [3] .

[3]     Plaintiff also sought production of his medical records from January 2012 to present, Docket No. 54, Pl. Letter at 3. Docket No. 48 is plaintiff's medical record during the relevant period for this action, from February 13, 2009, to June 1, 2010, *see* Docket No. 48, Dr. Douglas Decl. ¶ 4, Ex. A, at first page, cover letter of April 12, 2011; *see generally id.,* Ex. A.

In his "Affidavit of Truth" (Docket No. 55), plaintiff describes the injury to his shoulder that lead to the surgeries and pain he suffers (Docket No. 55, Pl. Aff., FACTS ONE, TWO, FOUR, Ex. B; Docket No. 57, Pl. Amend. ¶¶ 7–8) and complains that physical therapy ended with his transfer to Fishkill Correctional Facility prior to his imprisonment at Orleans (Docket No. 55, Pl. Aff., FACT SIX). He faults Dr. Douglas for relying upon other medical personnel in plaintiff's medical record rather than his own assessment (*id.* FACT TEN), in fact plaintiff claims that Dr. Douglas used a purported assessment of plaintiff from Erie County Medical Center in January or February 2011 which claimed that plaintiff was in the Attica Correctional Facility but plaintiff was not confined there at that time (*id.* FACT NINE). Plaintiff states that due to "the medical malpractice of Winston Douglas," plaintiff had undergone severe and excruciating pain (*id.* FACT ELEVEN). He claims that he was denied proper medical assistance at Orleans (*id.* FACT SEVEN) and that a Jane Doe, a nurse administrator at Orleans but not named as a defendant here, violated HIPAA [4] by having security personnel investigate plaintiff's medical claims (*id.* FACT EIGHT). Plaintiff then alleges that, on April 11, 2012, he was assaulted by prison guards during a cell search (*id.* FACT 14).

[4]     Health Insurance Portability and Accountability Act, Pub.L. No. 104–191, 110 Stat.1936 (1996). As recently held by this Court, any violation of medical privacy under HIPAA is limited to enforcement by the Secretary of Health and Human Services, *Wright v. Szczur,* No. 11 CV 140, 2012 U.S. Dist. LEXIS 10872, at *15,2012 WL 268283 (W.D .N.Y. Jan. 30, 2012) (Skretny, Ch. J.). Thus, even if plaintiff were deemed to allege such a claim, it would have to be denied.

He submits Junior Cepeda's "Affidavit of Truth" about medical staff disregarding plaintiff's complaints on March 28, 2012 (Docket No. 55, Cepeda Aff. of Truth). Cepeda states that he saw unnamed medical personnel "refuse

to listen" to plaintiff on March 28 to his complaints, stating that plaintiff would always "complain about the same right shoulder all the time and everyday" (*id.* FACT 3). Cepeda states that he overhead medical staff talking about plaintiff's medical condition with security personnel at Orleans (*id.* FACT 4). Cepeda also witnessed plaintiff being assaulted by security personnel on April 11, 2012 (*id.* FACT 6).

Because plaintiff was refused pain medication, he claims that he took marijuana and then plead guilty in a disciplinary proceeding to marijuana use when caught (Docket No. 57, Pl. Amend. ¶ 9). He states that he declined what he termed an experimental surgical procedure by Dr. Stegamann in January of 2011 (*id.* [first] ¶ 10). Plaintiff alleges that since his reassignment to Orleans, defendants has been denied appropriate pain medication (*id.* [second] ¶ 10; *see id.* ¶ 11). Plaintiff's condition worsened when he injured his right knee and was then denied pain medication (*id.* ¶ 12).

 **\*5** In their reply, defendants note that plaintiff made "numerous irrelevant references (Docket No. 58, Defs. Atty. Reply Decl. ¶¶ 4, 6) and submitted an unsworn witness statement (*cf.* Docket No. 55, Cepeda Aff. of Truth) that he saw medical personnel walk from plaintiff on March 28, 2012 (Docket No. 58, Defs. Atty. Reply Decl. ¶ 5). Defendants argue that this statement is too vague and conclusory to create a material issue of fact, it does not identify any defendant as the medical personnel involved, and is outside the time period (2009–10) for this action (*id.*). They conclude that plaintiff has failed to raise a material issue of fact to preclude summary judgment (*id.* ¶ 7).

## DISCUSSION

I. Summary Judgment Standard

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); Fed.R.Civ.P. 56(a), (c)(1) (effective Dec. 2010). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact

exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford, supra,* 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 522 U.S. 864 (1997). While the moving party must demonstrate the absence of any genuine factual dispute, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original removed); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285–86 (2d Cir.2002). The opponent to summary judgment may argue that he cannot respond to the motion where it shows, by affidavit, "that, for specified reasons, it cannot present facts essential to justify its opposition," Fed.R.Civ.P. 56(d).

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a) (1), (2) (effective Jan. 1, 2011). The movant is to submit facts in which there is no genuine issue, *id.* R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, *id.* R. 56(a)(2). Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, *id.* Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, *id.* R. 56(a)(3).

 **\*6** The pleading of a *pro se* plaintiff, however, is to be liberally construed, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* [550 U.S. 544, 555], 127 S.Ct. 1955, 1964, (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp., supra,* at [555], 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, (citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))."

*Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam). In *Erickson,* the Court held that the Tenth Circuit departed from the liberal pleading standards of Rule 8(a)(2) by dismissing a *pro se* inmate's claims.

"The Court of Appeals' departure from the liberal pleading standards set forth by Rule 8(a)(2) is even more pronounced in this particular case because petitioner has been proceeding, from the litigation's outset, without counsel. A document filed *pro se* is 'to be liberally construed,' [*Estelle v. Gamble,* 429 U.S., 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' *ibid.* (internal quotation marks omitted). *Cf.* Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice").

551 U.S. at 94; *see Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008). Thus, the *pro se* plaintiff's complaint has to be construed "more liberally" than one filed by counsel, *Boykin, supra,* 521 F.3d at 214.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made with personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," Fed.R.Civ.P. 56(c)(4) (2010) (formerly Rule 56(e)).

## II. Deliberate Indifference Standard

Under the Eighth Amendment, in order to state a claim for inadequate medical treatment, plaintiff must allege that defendants acted with "deliberate indifference to [a] serious medical need," *LaGrange v. Ryan,* 142 F.Supp.2d 287, 293 (N.D.N.Y.2001); *see Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Hathaway, supra,* 37 F.3d at 66 (quoting *Estelle, supra,* 429 U.S. at 104). Mere negligent treatment or malpractice upon a suspect, however, does not create an Eighth Amendment violation, *see Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). This claim has two elements, an objective component, that the deprivation must be sufficiently serious; and a subjective component, that the defendant official must act with sufficiently culpable state of mind. *Hathaway, supra,* 37 F.3d at 66. "Sufficiently serious" for the objective component contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (quoted in *Hathaway, supra,* 37 F.3d at 66). Plaintiff needs to prove that defendants wantonly intended to cause him to suffer. *Wilson v. Seiter, supra,* 501 U.S. at 302.

## III. Application

A. Procedural Grounds

**\*7** Here, plaintiff did not submit his counterstatement of facts providing a point-by-point refutation or adoption of the defense statement of facts. Instead, plaintiff provides in moving papers an attempt to stay the hearing of this motion and in other documents alleging generally that there were contested issues of fact (Docket Nos. 51, 52) or stating specific facts (contested or not) that he is now asserting in response to the motion (Docket Nos. 55, 57). He lists various facts in the latter instances without clearly indicating which fact is material to this motion. Despite his *pro se* status, the fact plaintiff did not state what facts were contested (even if not in a formal counterstatement) and compels this Court to look exclusively at defendants' statement as the conceded facts in this case. Plaintiff does point to some minor discrepancies in facts (for example, Dr. Douglas relying upon medical findings in 2011 while plaintiff was in another facility, Docket No. 55, Pl. Aff. FACT NINE; *but cf.* Docket No. 48, Dr. Douglas Decl. ¶ 11, Ex. A Bates No. 277 (consultation with Dr. Stegamann occurred in *2010* )) but these are not material to oppose the defense motion.

First, plaintiff submits his own and a witness's "Affidavit of Truth" (Docket No. 55), but both are unsworn and not witnessed statements, *cf.* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or opposing a summary judgment motion need not be notarized, they may be made under penalty of perjury, but unsworn statements will be rejected). Plaintiff certified and swore "to my unlimited commercial liability that the testimony I give before this court is, to the best of knowledge and understanding, true, correct, and complete, not misleading, the truth, the whole truth, and nothing but the truth, so help me God," and concluded that he declared "under the Laws of the Constitution of the United States of America that the above stated facts are true, correct, and complete to the best of my knowledge and belief. So help me God" (Docket No. 55, Pl. Aff. of Truth at pages 1 of 3 and 3 of 3). Witness Cepeda, a "sovereign American," submits a similar "Affidavit of Truth," declaring that "the facts stated/listed below are true, correct, and complete to the best of my understanding and belief so help me God," concluding that he "declares under the laws of the constitution of the United States of America (1787) as amended (1791) by the Bill of Rights that the above is true, correct, and complete, to the best of my belief

and knowledge. And does declare that notary assistance was not possible upon time and date of submitting this Affidavit of Truth. So help me God" (*id.,* Cepeda Aff. of Truth). The handwriting for both Affidavits is similar as is the verbiage. Neither document is a declaration stating expressly that they were made under penalty of perjury, *cf.* 28 U.S.C. § 1746.

**\*8** Nevertheless, given that plaintiff is an inmate proceeding *pro se* and, as indicated by Cepeda, may have lacked notary assistance with these documents, this Court will consider them as part of the opposition to summary judgment. But even considering these papers, Cepeda's Affidavit of Truth is not admissible for the information it contains since it discusses events in 2012 that are beyond the scope of this action as currently plead, *see* 10B Wright, Miller & Kane, *supra,* § 2738, at 330, 341 (court excludes summary judgment affidavit if its irrelevance is clear). As currently plead, this case involves defendants' deficient treatment of plaintiff in 2009–10; plaintiff has not sought to amend this Complaint again to allege continuing harm. Further, Cepeda's statement accuses an unnamed medical staffer for ignoring plaintiff's pleas for treatment on his shoulder without any connection of that unnamed employee to the named defendants in this case.

Next, this Court addresses the substance of defense arguments.

B. Deliberate Indifference

As for the objective element of a deliberate indifference Eighth Amendment claim, at worst plaintiff alleges medical malpractice (if that) in not prescribing the medication he desired. He sought narcotic medication while the facility medical staff prescribed Ibuprofen. That allegation is not sufficient to state a constitutional deprivation. Mere negligent treatment or malpractice upon a prisoner does not create an Eighth Amendment violation. *Estelle, supra,* 429 U.S. at 106; *Corby, supra,* 457 F.2d at 254. Plaintiff also exercised his shoulder, engaging in weight lifting and hitting a heavy bag, stressful and strenuous activities on an injured rotator cuff. Defendants' motion for summary judgment on this ground is **granted.**

As for subjective element, plaintiff has not suggested that defendants wantonly wished to cause him to suffer or lay out that defendants had the sufficiently culpable state of mind to establish this element. On this ground, defendants' motion is also **granted.**

### C. Personal Involvement

As alternative ground, defendants motion is **granted** as to certain supervisory defendants because plaintiff fails to establish the personal involvement of supervisory officials retired Superintendent Khahaifa, Austin, Fitts, or Wilson in the denial of the sought medical care. The medical decisions were made by medical staff, in particular defendant Doctors Douglas and Lewis. The administrators named here merely considered grievances raised by plaintiff regarding this care.

To state a § 1983 claim, plaintiff must allege the manner in which defendant was personally involved in depriving plaintiff of his rights, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). There are several ways to allege personal involvement: plaintiff could claim that defendant had direct participation in the event; plaintiff could claim that defendant failed to remedy the violation after it was noticed; defendant created the policy which lead to the violation or allowed the policy to continue; defendant was grossly negligent in managing subordinates which caused the violation to occur; or defendant exhibited gross negligence or deliberate indifference to plaintiff's rights by failing to act on information indicating that unconstitutional acts were taking place, *Wright, supra,* 21 F.3d at 501. An allegation of personal involvement is a prerequisite for damages under a § 1983 claim in this Circuit, *e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001).

**\*9** Plaintiff here has not alleged any of these bases for personal involvement of the supervisory defendants. Plaintiff merely claims that they failed to intervene or grant his grievance regarding the quality of medical care he received or that the superintendent had a no narcotics policy for the inmates. He does not refute defendants' contention that the supervisory defendants had no role in the medical decision making for plaintiff's treatment or Khahaifa's denial of having a policy regarding prescribing narcotics to inmates. Defendants' motion for summary judgment on this ground is **granted.**

### D. Qualified Immunity

When confronted by a claim of qualified immunity, one of the first questions for the Court to resolve is do the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under *Saucier,* this Court first considers the constitutional question, then considers the qualified immunity question, *id.* But the Supreme Court, in *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), overruled *Saucier* in mandating the order in which trial courts are to consider qualified immunity claims. In *Pearson,* the Court recognized that district and circuit courts had the discretion to determine the order of the *Saucier* steps they would consider first (either the substance of the constitutional claim or the immunity claim), 555 U.S. at 232.

Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, *see Frank v. Reilin,* 1 F.3d 1317, 1327 (2d Cir.1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996).

Given that no constitutional violation was found, this Court **need not address** defendants' alternative contention that they deserve qualified immunity for their actions.

### IV. Post Script—2012 Allegations

During the pendency of this action, plaintiff has been transferred, first from Orleans to Attica Correctional Facility then to Groveland Correctional Facility and later back to Orleans. Plaintiff has written two letters to this Court and to the grievance officials complaining about conditions following his last transfer to Orleans (letter of plaintiff to Chambers, Apr. 30, 2012; letter of plaintiff to Chambers, Apr. 30, 2012). In these letters (and in other papers he submitted in response to defendants' motion, Docket No. 54; *see also* Docket No. 57), plaintiff claims that he was harassed and beaten by prison guards when he refused to lift his arms for a frisk due to his shoulder injuries. He also alleges that medical staff at Orleans refused to treat him in 2012. In his responding papers,

he also discusses an April 2012 incident that he seeks the Court to investigate (Docket No. 54; *see also* Docket No. 57).

 **\*10**  Since these letters and papers allege incidents that occurred in February 23, 2012, and April of that year, well after the incidents alleged in this pending action and unrelated to those in this action, this Court **declines** plaintiff's implied request to amend the Complaint to add these new allegations. Since plaintiff also sent these letters to the grievance authorities, any potential claims may not have been administratively exhausted.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Docket No. 37) is **granted.** Plaintiff's renewed motion to stay consideration of defendants' motion (Docket No. 57) is **denied** and plaintiff's attempted motion for leave to amend the Complaint to assert claims arising from the April 2012 incident is also **denied.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

The Clerk of Court is instructed to close this case.

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2401574

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  8

KeyCite Yellow Flag - Negative Treatment

Distinguished by United States v. Folse, D.N.M., June 15, 2016

2014 WL 991876
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald Edward WILLIAMS, Plaintiff,

v.

Corporal SILLIMAN, Defendant.

No. 9:11–CV–1477.
|
Signed March 12, 2014.
|
Filed March 13, 2014.

**Attorneys and Law Firms**

Ronald Edward Williams, Terre Haute, IN, pro se.

Frank W. Miller Law Firm, Bryan N. Georgiady, Esq., of Counsel, East Syracuse, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

### I. INTRODUCTION

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

In his February 18, 2014 Report and Recommendation, Magistrate Judge Peebles recommends that Plaintiff's motion for judicial notice, even if construed as a motion for reconsideration of the Court's August 30, 2012 Decision and Order that dismissed Plaintiff's previously pled court access claims, be **DENIED;** that Defendant's cross-motion for summary judgment be **GRANTED;** and that all remaining claims in the present action be dismissed in their entirety. Plaintiff has filed an objection to Magistrate Judge Peebles's recommendations. *See* Dkt. No. 49.

### II. STANDARD OF REVIEW

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1); *see also* United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir.1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." Machicote v. Ercole, 2011 WL 3809920, at \*2 (S.D.N.Y., Aug.25, 2011) (citations and interior quotation marks omitted); DiPilato v. 7–Eleven, Inc., 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same).

General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); see *Frankel v. N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb.25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1).

### III. DISCUSSION

Plaintiff fails to make specific objections to Magistrate Judge Peebles's report. Accordingly, the Court reviews the Report and Recommendation for clear error, and finds none. Even under *de novo* review, the Court accepts and adopts Magistrate Judge Peebles's recommendations for the reasons stated in his thorough report.

### IV. CONCLUSION

For the reasons discussed above, the Court accepts and adopts Magistrate Judge Peebles's February 18, 2014 Report and Recommendation in its entirety. Accordingly, Plaintiff's motion for judicial notice (Dkt. No. 35) is **DENIED.** Defendant's cross-motion for summary

judgment (Dkt. No. 36) is **GRANTED,** and all remaining claims are dismissed in their entirety.

**\*2  IT IS SO ORDERED.**

RONALD EDWARD WILLIAMS,

Plaintiff,

v.

CORPORAL SILLIMAN, [1]

Defendant.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Ronald Edward Williams, a federal prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging that, while confined as a pretrial federal detainee in a local jail facility, he was denied meaningful access to legal materials and retaliated against for complaining regarding that deprivation. Currently pending before the court in connection with the action are cross-motions. The motion process was initiated by plaintiff, who filed an application requesting that the court take judicial notice of certain facts. The defendant has opposed that motion and cross-moved for summary judgment dismissing plaintiff's remaining retaliation claim, based on both procedural and substantive grounds. For the reasons set forth below, I recommend that plaintiff's motion be denied, and that plaintiff's remaining retaliation claim be dismissed based upon his failure to exhaust available administrative remedies before commencing suit.

### I. *BACKGROUND*

Between May 21, 2011, and March 6, 2012, plaintiff was a pretrial detainee held in the custody of the United States Marshal Service, and housed at the Cayuga Correctional Facility ("CCF"), located in Auburn, New York. *See generally Dkt. No. 12; Dkt. No. 36–5 at 2–3.1–2.* Plaintiff's detention was the result of federal charges pending against him during the times relevant to his claims in this action. In

connection with those charges, plaintiff was represented by the Office of the Northern District of New York Federal Public Defender. *Dkt. No. 36–4 at 3.*

Plaintiff's amended complaint challenges the adequacy of the law library at the CCF, alleging that it is missing certain court resources and fails to comply with both constitutional and state mandated standards. *See generally Dkt. No. 12.* On August 2, 2011, while confined at the CCF, plaintiff filed a grievance, No. 11–053, concerning those allegations. [2] *Dkt. No. 36–5 at 4, 23–26.* That grievance neither included any allegations against defendant Silliman, nor complained of unlawful retaliation. *Id.* Following an investigation, during which it was determined that the prison's law library met minimum New York standards, the grievance was denied on or about August 9, 2011. *Dkt. No. 36–5 at 4, 27–28.* That denial was subsequently upheld on appeal by Williams to the New York State Commission of Correction Citizens Policy and Complaint Review Council ("CPRCR"), on November 30, 2011. [3] *Id.* at 5, 32.

In December 2011, plaintiff wrote to the Cayuga County Supreme Court law library, located in Auburn, New York, to request that a copy of a United States Supreme Court decision be sent to him at the CCF. *Dkt. No. 36–7 at 2; Dkt. No. 43–2 at 3–4.* In accordance with established protocol, instead of responding directly to the plaintiff, Jill Fandrich, the Cayuga County Supreme Court law library clerk, forwarded the request by e-mail to Missy Field, a county employee, offering to provide a copy of the decision if it could not be located online. *Dkt. No. 36–7 at 2, 5.* Upon receiving that e-mail, Ms. Field prepared a copy of the requested U.S. Supreme Court decision and provided it to defendant Stanley Silliman, a Cayuga County Sheriff's employee, to forward to the plaintiff. *Dkt. No. 36–6 at 9.* Defendant Silliman forwarded the decision to plaintiff, and, at the request of Ms. Field, asked plaintiff not to request legal materials directly from the Cayuga County Supreme Court law library, reminding him that the proper procedure for obtaining materials unavailable in the prison library is to submit request slips for the desired legal materials to jail personnel. *Id.* Plaintiff alleges that, following his efforts to seek legal materials from the Cayuga County Supreme Court law library, defendant Silliman retaliated against him by ignoring or sabotaging his subsequent requests for legal materials. *Dkt. No. 12 at 5.* Defendant Silliman, in contrast, denies

retaliating against Williams following that incident. *Dkt. No. 36–6 at 9–10*.

## II. *PROCEDURAL HISTORY*

 **\*3** Plaintiff commenced this action on December 19, 2011. *Dkt. No. 1.* As defendants, plaintiff's complaint named United States Attorney General Eric Holder and David McNulty, the United States Marshal for the Northern District of New York, as well as additional "Jane and John Does," asserting a denial of access to the courts claim, arising from the alleged insufficiency of the law library at the CCF. *See generally id.* Plaintiff's complaint and accompanying motion for leave to proceed *in forma pauperis* ("IFP") were forwarded to Senior District Judge Thomas J. McAvoy for review, pursuant to 28 U.S.C. §§ 1915(e) and 1915A. Based upon that review, Judge McAvoy issued a decision, dated April 20, 2012, in which he granted plaintiff IFP status but dismissed his claim on the merits, with leave to replead. *See generally Dkt. No. 9.*

Plaintiff subsequently filed an amended complaint on June 11, 2012. *Dkt. No. 12.* That amended complaint again names Attorney General Holder and Marshal McNulty as defendants, reasserts his denial of access to the courts claim, and adds a retaliation claim against defendant Silliman for allegedly ignoring his requests for legal materials after plaintiff reached out to the Cayuga County Supreme Court law library for assistance. *See generally id.* Plaintiff's amended complaint seeks recovery of $150 million in compensatory damages and $20 million in punitive damages against each of the named defendants. *Id.* at 8.

Upon its filing, Judge McAvoy reviewed plaintiff's amended complaint for facial sufficiency, and issued a decision, dated August 30, 2012, again holding that plaintiff's denial of access to the court claim is legally deficient in light of the fact that he was assigned counsel to represent him in the underlying criminal action. *Dkt. No. 14 at 4.* Judge McAvoy also found, however, that, liberally construed, plaintiff's amended complaint asserts an additional claim of unlawful retaliation against defendant Silliman, who Judge McAvoy ordered added as a named defendant. [4] *Id.* at 5.

On May 6, 2013, plaintiff filed a written request asking that the court take judicial notice of certain facts. *Dkt.*

No. 35. In addition to responding in opposition to that application, defendant has cross-moved for the entry of summary judgment dismissing plaintiff's remaining retaliation claim based on both procedural grounds and the merits. *Dkt. No. 36.* Plaintiff has since responded in opposition to defendant's cross-motion for summary judgment, and a reply memorandum was subsequently submitted on behalf of the defendant. Dkt. Nos. 43, 44.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

 A. *Plaintiff's Motion for Judicial Notice*
 **\*4** Judicial notice is governed Rule 201 of the Federal Rules of Evidence, which provides as follows:

 **(b) Kinds of Facts That May Be Judicially Noticed.** The court may judicially notice a fact that is not subject to reasonable dispute because it:

  (1) is generally known within the trial court's territorial jurisdiction; or

  (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Fed.R.Evid. 201(b); *see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 70 (2d Cir.1998). "Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Int'l Star Class Yacht Racing Ass'n,* 146 F.3d at 70.

Plaintiff's motion for judicial notice contains both factual and legal assertions. *See* generally *Dkt. No. 35.* Judicial notice, however, is not intended as a vehicle for advancing legal principles. *See, e.g., Toth v. Grand Trunk R.R.,* 306 F.3d 335, 349 (6th Cir.2002) ("[J]udicial notice is generally not the appropriate means to establish the legal principles governing the case."). With respect to the factual assertions of which the plaintiff seeks the court to take judicial notice, they principally relate to the denial of

access to the court cause of action that has been dismissed by the court.[5] For this reason, plaintiff's request for judicial notice is inappropriate.

Mindful of my obligation to liberally construe a *pro se* litigant's papers, I find that it is possible that plaintiff's motion for judicial notice may be also be construed as a request for reconsideration of the court's prior order dismissing his court access claims.[6] Judge McAvoy's decision dismissing that claim was issued on August 30, 2012. *Dkt. No. 14 at 5*, 6. With respect to motions for reconsideration, this court's local rules provide that,

In addition to being untimely, plaintiff's motion fails on the merits. A district court may properly reconsider its previous ruling if (1) there is an intervening change in the controlling law, (2) new evidence not previously available comes to light, or (3) it becomes necessary to remedy a clear error of law or to prevent obvious injustice. *Stewart Park & Res. Coalition, Inc. v. Slater,* 374 F.Supp.2d 243, 253 (N.D.N.Y.2005) (Treece, M.J.). The standard for granting a motion for reconsideration is strict. *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). The Second Circuit has made clear that motions for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader,* 70 F.3d at 257.

In this instance, plaintiff has provided no basis for the court to conclude there has been any intervening change in the controlling law, that new evidence now exists that was not previously available to him, or that there is a demonstrable need to correct clear or error of law to prevent manifest injustice. Accordingly, to the extent that plaintiff's application for judicial notice could be construed as a motion for reconsideration under the local rules of this court, I recommend that it be denied.[7]

### B. *Defendant's Motion for Summary Judgment*

#### 1. *Legal Standard Governing Motions for Summary Judgment*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250. When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers = Educ. Ass = n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### 2. *Failure to Exhaust*

In support of his cross-motion for summary judgment, defendant Silliman contends that dismissal of plaintiff's complaint is warranted in light of the fact that plaintiff failed to exhaust the administrative remedies available to him at the CCF prior to filing this action. *Dkt. No. 36–1 at 20–21*. In response, plaintiff appears to concede that he did not file a grievance while confined at the CCF regarding his allegations that defendant Silliman retaliated against him, but he argues that the grievance procedure was rendered unavailable to him due to his transfer to another facility in March 2012. *Dkt. No. 43 at 17–19*.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ( "Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan.31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [8] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

**\*6** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is an affirmative defense that must be raised by a defendant in response to an inmate suit. [9] *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford).*

The sole remaining claim in this action arises from plaintiff's allegation that, after he contacted the Cayuga County Supreme Court law library directly, defendant Silliman retaliated against him by denying him access to legal materials. *Dkt. No. 12 at 5.* There is no record evidence now before the court that suggests plaintiff filed a grievance complaining of retaliation on the part of defendant Stillman. The record does reflect, however,

that plaintiff filed a grievance concerning the adequacy of the legal materials available at the CCF. Dkt. No. 22–26. Because that grievance was submitted on August 2, 2011, it could not be even liberally construed to refer to a retaliation claim against defendant Silliman, which plaintiff alleges occurred after he sent his letter to the Cayuga County Supreme Court law library in December 2011. *Dkt. No. 12 at 5; Dkt. No. 36–6 at 8–9.* Accordingly, I find that plaintiff failed to exhaust available administrative remedies prior to commencing this action. [10]

Plaintiff's failure to exhaust, however, does not warrant dismissal of his complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

**\*7** In this instance, the record fails to reveal any basis on which plaintiff's failure to exhaust could be excused under *Hemphill* and its progeny. A comprehensive inmate grievance policy exists at the CCF. *Dkt. No. 36–5 at 3–4,* 15–18. That grievance policy is set forth in an inmate handbook, a copy of which plaintiff acknowledged receiving upon being processed into the prison, regarding policies and procedures at the CCF. *Id.* at 15–18, 20. Plaintiff was familiar with that grievance process, and knew it was available to him, as evidenced by the three grievances he filed while incarcerated at the CCF. *Id.* at 22–26, 35–38, 46–48.

In his response to the pending motion, plaintiff contends that the grievance process was not available to him because he was transferred out of the CCF on March 26, 2012. *Dkt. No. 43 at 18*. His transfer on that date, however, has no bearing on whether the grievance procedures in place at the CCF were available to him at the times relevant to this action. Pursuant to the grievance procedure in place at CCF, a grievance must be filed within five days of the date of the act or occurrence giving rise to the grievance. *Dkt. No. 36–5 at 16*. While his complaint does not specifically identify the date(s) on which defendant Silliman allegedly retaliated against him, it is clear from the record that it occurred after he received the legal materials he requested from the Cayuga County Supreme Court law library in December 2011. *Dkt. No. 36–6 at 8–9; Dkt. No. 36–7 at 2, 5; Dkt. No. 12 at 5*. Plaintiff has failed to allege any facts suggesting that defendant Silliman's alleged retaliatory conduct occurred so close to his transfer date in March 2012, that the established grievance process at the CCF was rendered unavailable to him. Instead, plaintiff's complaint, which is virtually the only evidence in the record to even suggest retaliation by defendant Silliman, vaguely alleges that defendant Silliman retaliated against plaintiff some time after he received the U.S. Supreme Court case he had requested from the law library.[11] *Dkt. No. 12 at 5*. Without more, and mindful that plaintiff filed three grievances in August 2011, February 2012, and March 2012 while confined at the CCF, I conclude that the grievance process was available to him during the times relevant to his claim against defendant Silliman.

With respect to the two other grounds upon which a plaintiff may be excused for failing to exhaust the available administrative remedies prior to filing suit, no facts are alleged in either plaintiff's amended complaint or in his opposition to defendant's motion to suggest that the defendant should be estopped from raising failure to exhaust as an affirmative defense, or that special circumstances exist excusing him from filing a grievance concerning the alleged retaliation by defendant Silliman. *See generally* Dkt. Nos. 12, 43.

In sum, the uncontradicted evidence now before the court reflects that plaintiff failed to comply with the PLRA requirement that he exhaust available administrative remedies before filing this action, and that there is no basis to excuse that failure. Accordingly, I recommend that

plaintiff's remaining claim be dismissed on this procedural basis.

### 3. *Merits of Plaintiff's Retaliation Claim*

**\*8** As an alternative ground for dismissal, defendant Silliman contends that, based upon the record now before the court, no reasonable factfinder could conclude that he unlawfully retaliated against Williams for having directly contacted personnel at the Cayuga County Supreme Court law library. *Dkt. No. 36–1 at 16–19*.

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) ( "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated," courts should "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *accord, Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) the conduct prompting the retaliatory acts was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Garrett v. Reynolds,* No. 99–CV–2065, 2003 WL 22299359, at \*4 (N.D.N.Y. Oct.3, 2003) (Sharpe, M.J.). "[P]rison officials' conduct constitutes an 'adverse action' when it 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

In a case such as this, analysis of retaliation claims typically turns upon whether there is evidence tending to

link the protected activity in which the inmate plaintiff has engaged and the adverse action allegedly taken against him by the defendant. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Such is the case here. Plaintiff's claim of retaliation is set forth in his amended complaint in only conclusory fashion, alleging that,

> after Plaintiff attempted to request help from an outside source, but circumstances had worked to seriously curtail is means of assistance, Corporal Scilliman [sic] retaliated against him by ignoring Plaintiff's requests altogether when made.

**\*9** *Dkt. No. 12 at 5.* Aside from those allegations, there is no record evidence to support plaintiff's claim.

In support of his motion, defendant Silliman submitted an affidavit in which he denies retaliating against the plaintiff and emphasizes that he had no incentive or motivation to retaliate based upon plaintiff's actions. *Dkt. No. 36–6 at 9–10.* Indeed, defendant Silliman highlights that, after receiving the CPRCR's decision with respect to plaintiff's grievance from August 2011, CCF personnel "began processing all requests for all research materials regardless of whether the requesting inmate was represented by an attorney. That, of course, included [plaintiff]." *Id.* at 8. Plaintiff's response in opposition to the pending motion focuses upon his claim that the law library at the CCF is constitutionally deficient, and fails to offer anything of evidentiary nature that would support the otherwise wholly conclusory allegations contained in his amended complaint concerning retaliation. *See generallyDkt. No. 43.* As it relates to the retaliation claim asserted against defendant Silliman, plaintiff's response contains only the following argument:

> Here Plaintiff alleges that soonafter [sic] filing a grievance against the law library that's run and supervised by the defendant, all assistance stopped! Notwithstanding after

being told not to write the Cayuga County Law Library without any reason given as to why, defendant stated to Plaintiff that in good faith he would supply all his legal necessities. Subsequently, Plaintiff's notice of the present lawsuit became evident when the court clerk notified the jail through facsimile of the pending stipulation. To compel upon the retaliatory matter further, defendant used his influence to have Plaintiff transferred.

*Id.* at 16. Accordingly, even assuming, without deciding, that plaintiff engaged in protected conduct by reaching out to the Cayuga County Supreme Court law library, and that plaintiff can establish, despite defendant Silliman's denial, that the defendant refused Williams' subsequent requests for library assistance, the plaintiff has set forth no evidence to provide the necessary causal link between the two. For example, as noted above in connection with the exhaustion analysis, nothing in the record establishes a timeframe for the alleged retaliatory conduct, which precludes the court from concluding that plaintiff has established a temporal proximity between the protected activity and the alleged adverse action. Based upon this failure of proof, I conclude that plaintiff has failed to carry his burden of establishing the existence of a genuine dispute of material fact precluding the entry of summary judgment dismissing his retaliation claim. For that reason, I recommend that summary judgment be granted, dismissing plaintiff's remaining retaliation claim against defendant Silliman on the merits.

## IV. *SUMMARY AND RECOMMENDATION*

Despite his apparent belief otherwise, plaintiff's sole remaining claim in this action alleges that defendant Silliman retaliated against him due to his direct request from an outside source for legal materials not available to him at the CCF. To the extent that plaintiff requests the court take judicial notice of facts addressing a denial of access to the courts cause of action, that motion should be denied on the basis that Judge McAvoy previously dismissed that claim. Turning to defendant's motion, I find that dismissal of plaintiff's remaining claim is appropriate based on his failure to file a grievance and pursue that grievance to completion before commencing this suit, and the finding that no reasonable factfinder

could conclude, based upon the record now before the court, that defendant Silliman unlawfully retaliated against the plaintiff. Accordingly, it is hereby respectfully

**\*10** RECOMMENDED that plaintiff's motion for judicial notice (*Dkt.No.35* ) be DENIED; and it is further

RECOMMENDED that defendant's cross-motion for summary judgment (*Dkt. No. 36* ) be GRANTED, and that all remaining claims in this action be dismissed in their entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby respectfully ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

ORDERED that the clerk correct the spelling of defendant Silliman's last name on the court's records in this action.

Filed Feb. 18, 2013.

1   While both plaintiff's amended complaint and the court's records identify the remaining defendant in the case as "Corporal Scilliman," an affidavit submitted in connection with the pending cross-motions reflects that the correct spelling of this individual's last name is "Silliman." *See generally Dkt. No. 36–6.* The clerk is respectfully directed to adjust the court's records accordingly.

2   Grievance No. 11–053 was one of three submitted by Williams during the course of his confinement at the CCF. *Dkt. No. 36–5 at 4,* 35–38, 46–48. The other two complained of (1) allegedly cold temperatures experienced in his cell (No. 12–026, submitted on February 14, 2012), *id.* at 35–38; and (2) his transfer into the facility's restrictive housing unit (No. 12–049, submitted March 4, 2012), *id.* at 46–48.

3   The CPCRC upheld one aspect of the plaintiff's grievance, instructing prison officials that, under state regulations, inmates are permitted to request research materials listed under the New York minimum standards from the jail directly, even if the inmate is represented by counsel. *Dkt. No. 36–5 at 32.*

4   Moreover, Judge McAvoy concluded that Cayuga County Sheriff David Gould should also be added as a defendant, but that all claims against him were subject to dismissal. *Dkt. No. 14 at 3* n. 2, 6. Plaintiff's claims against the "John and Jane Doe" defendants similarly were dismissed. *Id.* at 5 n. 5, 6.

5   For example, plaintiff requests the court take judicial notice of the following:

   7. That a general provision allows for federal detainee[s] to have access to an adequate law library and/or legal assistance program, or someone trained in the law, to provide help with legal materials in preparation of a possible trial and/or enable access to courts....
   10..... Petitioner also sought federal reference materials in the law library, only to discover that the library was devoid of federal statutory and case law. That the only books available were those to accommodate state level prisoners[ ]....
   12. Petitioner, Ronald–Edward:Williams, was a prisoner at the Cayuga County Jail. Williams wishes to bring suit alleging in his argue [sic] that limitations on the legal resources to him and other prisoners at the Cayuga County Jail had unconstitutionally restricted their access for & to the courts, thus violating all involved Fourteenth Amendment rights.
   *Dkt. No. 35 at 3–4.*

6   To the extent that plaintiff's application could also be considered as requesting summary judgment, it is deficient in that it does not comply with the requirements of this court's local rules, which require, *inter alia,* the submission of a notice of motion, a supporting affidavit, and a statement of undisputed material facts. N.D.N.Y. L.R. 7.1(a).

7   To the extent that Rule 60 of the Federal Rules of Civil Procedure may apply, plaintiff's motion does not cite to that provision, nor does it rely upon any of the grounds on which a motion for reconsideration under that statute may be granted. More specifically, Rule 60 provides that,

   [o]n motion and just terms, the court may relieve a party ... from a judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence ...;

(3) fraud ..., misrepresentation, or misconduct by an opposing party; ... [or]

(6) any other reason that justifies relief.

Fed.R.Civ.P. 60. Plaintiff's motion merely realleges the same facts as those considered by the court in its decisions reviewing the facial sufficiency of his original and amended complaints. Thus, to the extent plaintiff's motion for judicial notice can be construed as a motion to reconsider pursuant to Rule 60, I recommend it be denied.

8    All unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

9    In this case, defendant Silliman timely asserted failure to exhaust as an affirmative defense in his answer to plaintiff's amended complaint. *Dkt. No. 17 at 3.*

10   It is worth noting that, in his response to defendant's cross-motion for summary judgment, plaintiff does not assert that he, in fact, exhausted the available administrative remedies regarding his retaliation claim against defendant Silliman. *Dkt. No. 43 at 17–19.* Moreover, the other two grievances filed by plaintiff while confined at the CCF do not involve any allegations regarding defendant Silliman's retaliatory conduct. Dkt. *No. 36–5 at 35–38,* 46–48.

11   To be clear, the following allegations constitute plaintiff's entire basis for the retaliation claim against defendant Silliman:

9. Scilliman [sic] claimed that since Plaintiff was 'pro se'... that he needn't request their help because he himself could fulfill whatever legal request Plaintiff desired, and proceeds to hand Plaintiff the requested material that was requested from the outside library. Thereafter, meeting with Corporal Scilliman [sic] became a major production. When making requests, he would provide materials with missing pages or wouldn't know how to research cases and/or just didn't care. His objective was accomplished just as long as Plaintiff did not make contact with an outside source. Plaintiff believes that after Plaintiff attempted to request help from an outside source, but circumstances had worked to seriously curtail his means of assistance, Corporal Scilliman [sic] retaliated against him by ignoring Plaintiff's requests altogether when made.

Dkt. No. 12 at 5.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 991876

---

Footnotes

[u]nless Fed.R.Civ.P. 60 otherwise governs, a party may file and serve a motion for reconsideration or reargument no later than **FOURTEEN DAYS** after the entry of the challenged judgment, order, or decree.

N.D.N.Y. L.R. 7.1(g) (emphasis in original). Accordingly, plaintiff's motion, if deemed as constituting a request for reconsideration of the court's order dated August 30, 2012, is untimely.

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

### *MEMORANDUM DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of the New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.)[1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

1   This is the fourth civil rights action filed by Plaintiff
in this District. Generally, two of these actions arose
out of Plaintiff's refusal to consent to a strip search
and the subsequent actions taken against Plaintiff
as a result of his refusal. *See Groves v. New York,*
09–CV–0406, Decision and Order (N.D.N.Y. filed
May 11, 2009) (Hurd, J.) (*sua sponte* dismissing
complaint pursuant to 28 U.S.C. § 1915[e][2][B] );
*Groves v. The State of New York,* 9:09–CV–0412,
Decision and Order (N.D.N.Y. filed Mar. 26, 2010)
(Sharpe, J.) (granting defendants' motion to dismiss
the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).
The third action alleged numerous violations of
Plaintiff's constitutional rights during the period July
23, 2009, and August 26, 2009, and was dismissed
without prejudice upon Plaintiff's request in October,
2010. *See Groves v. Maxymillian,* 9:09–CV–1002,
Decision and Order (N.D.N.Y. filed Oct. 8, 2010)
(Suddaby, J.). As a result, it does not appear that
the current action is barred because of res judicata,
collateral estoppel, and/or the rule against duplicative
litigation.

### I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.)[2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See*

*generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

2      At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

3      The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

 **\*2**  It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by

the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

[4] *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5] *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6] It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed–who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [7]

[7]    *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them

that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

### 1. Excessive Force Claims Against Defendants Davis, Still and Nicolette

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an

Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp.

35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).).[8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[9]

[8]     Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]     Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment

when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

[10]  The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

[11]  *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not

establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

[12] *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13] *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force

on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted

unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill,

Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

**V. MOTION FOR APPOINTMENT OF COUNSEL**

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

[14]      For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10** **ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is *GRANTED;* [15] and it is further

[15]      Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is *DENIED;* and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is *DENIED* **without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* *DISMISSED* **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maximmillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte DISMISSED* **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Curry v. Kerik, S.D.N.Y., April 10, 2001

1998 WL 199923

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Reginald MCFADDEN, Plaintiff, pro se,

v.

Nicholas SOLFARO, Anthony Farina, William
Clark, Joseph Conjura, Maynelle E. Nowlin,
J.C. Liska, Hugh Tracy, William Schoenleber,
John Byron, Louis Lanton, J. Garofal, John
Stein, Richard Mallin, Christopher Falco, Todd
Layman, Fred Malone, and S. Felix, Defendants.

Reginald McFadden, Plaintiff, pro se,

v.

Philip Coombe, Sr., Robert Kuhlman, W. Wilhelm,
Pitt (CAPT.), Heazy (LT.), Hosking (C.O.), Sanok
(C.O.), Klein (C.O.), Senft (C.O.), Saccone (C.O.),
Burlingame (C.O.), Faller (C.O.), Defendants.

Nos. 95 Civ. 1148(LBS), 95 Civ. 3790(LBS).

|

April 23, 1998.

**Attorneys and Law Firms**

Reginald McFadden, Fallsburg, NY, plaintiff pro se.

William K. Kerrigan, MacCartney, MacCartney,
Kerrigan & MacCartney, Nyack, NY, for defendants.

Dennis C. Vacco, Attorney General of the State of NY,
New York City, by Michael Kennedy, for the defendants.

**OPINION**

SAND, J.

**\*1** *Pro se* Plaintiff Reginald McFadden ("McFadden")
brings this consolidated civil rights action [1] pursuant
to 42 U.S.C. § 1983 against Philip Coombe,
Commissioner of the State of New York Department
of Correctional Services ("DOCS"), Nicholas Solfaro,
Facility Administrator of the Rockland County
Correctional Center ("RCCF") in New City, New
York and Robert Kuhlmann, Superintendent of Sullivan

Correctional Facility in Fallsburg, New York ("Sullivan")
and against twenty-five corrections officers at both
RCCF and Sullivan as listed in the above caption
("Defendants"). [2] McFadden's Amended Complaint of
March 5, 1996 ("the 95 Civ. 1148 Complaint"),
submitted after the consolidation of the two cases, but
addressing only the claims of the original action, alleges nineteen
causes of action for violations of rights under the
First, Sixth, Eighth and Fourteenth Amendments as a
result of alleged incidents during McFadden's period
of incarceration as a pre-trial detainee at RCCF from
October 1994 through April 10, 1995. McFadden's
Complaint of April 30, 1995 ("the 95 Civ. 3790
Complaint") contains seven causes of action, also
for violation of his constitutional rights, during his
immediately subsequent period of pre-trial incarceration
at Sullivan from April 10, 1995 through April 30, 1995.
McFadden alleges that Defendants at Sullivan conspired
to deprive him of his rights in retaliation for his filing of
the original 95 Civ. 1148 lawsuit.

[1]     These two actions (*McFadden v. Coombe, et al.*, 95
        Civ. 1148(LBS) & *McFadden v. Solfaro, et al.*, 95
        Civ. 3790(LBS)), which contain related issues of law
        and fact, were consolidated for all purposes by order
        of this Court signed January 17, 1996 pursuant to
        Fed.R.Civ.P. 42.

[2]     The actions consolidated here involve two distinct
        lists of named defendants employed as corrections
        officers in a state and a county facility and
        represented by different counsel. For purposes of
        this consolidated motion for summary judgment and
        cross-motion for summary judgment, we treat them
        as one group, labeled "Defendants." For the sake
        of clarity, however, we make specific reference to
        allegations cited in complaints from both actions and
        distinguish between the Defendants' two motions for
        summary judgment and other pleadings by original
        case number.

Plaintiff, currently an inmate at the Sullivan Correctional
Facility, seeks declaratory and injunctive relief for
practices he describes as abusive and unconstitutional,
including his placement in administrative segregation
without due process of law at RCCF and at Sullivan
while he was a pre-trial detainee, the conditions of
his confinement at these institutions and his allegedly
retaliatory transfer from RCCF to Sullivan in April 1995.
He further demands compensatory and punitive damages
from each Defendant. Defendants now collectively bring

two Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff, who proceeds here *pro se,* opposes the Defendants' Motions and has styled his own Cross–Motion as one for Summary Judgment.

In McFadden's Affidavit in Opposition to the Notice of Motion for Summary Judgment in the 95 Civ. 3790 action, he drops Defendants Pitt, Heazy (or Healy as he is sometimes called), Hosking, Sanok, Senft, Saccone, Burlingame, Klein and Faller. (McFadden Aff. in Opp'n at 3 and McFadden EBT at 153.) On Plaintiff's consent, therefore, we grant these Defendants' Motion for Summary Judgment and hereby order all claims against them dismissed.

Despite the numerosity of causes of action alleged against the remaining Defendants as contained in the Complaints relevant to this consolidated action, after careful consideration, we find the action to be entirely without merit. For the reasons set forth below, we grant Defendants' Motions for Summary Judgment and deny Plaintiff's Cross–Motion.

### BACKGROUND

 **\*2** On October 7, 1994, McFadden entered RCCF in New City, New York as a pre-trial detainee to await trial on charges of rape, robbery, burglary and kidnaping. [3] Previously convicted for murder, he had been paroled after twenty-five years from the Pennsylvania prison system the same year. Early in his incarceration in Rockland County, he was moved to Nassau County Jail where he remained briefly (November 2–December 6) until he was returned to RCCF. On April 10, 1995 he was transferred from RCCF to Sullivan where he is incarcerated in the custody of DOCS at the present time.

[3]    He was convicted of these crimes perpetrated upon a victim from South Nyack, New York (and on subsequent additional counts of murder, rape and robbery) and sentenced to 37.5 to 75 years in August 1995 for this incident.

In Plaintiff's two Complaints [4] and pleadings related to these Motions presently before us, McFadden sets forth the following facts.

[4]    We refer to the Amended Complaint in 95 Civ. 1148(LBS) and the original Complaint in 95 Civ. 3790(LBS), both of which are relevant to this consolidated case. Because this Plaintiff proceeds *pro se* and his Amended Complaint subsequent to the Order of Consolidation of this Court clearly does not cover the incidents alleged in 95 Civ. 3790(LBS), though both case numbers are referenced in the caption to the Amended Complaint, we consider both pleadings in order that Plaintiff might have all his claims heard and be considered for full and final relief in this action.

In the 95 Civ. 1148 Complaint, pertaining to events at RCCF from October 7, 1994 through April 10, 1994, Plaintiff alleges that while still a pre-trial detainee he was unjustly and arbitrarily placed in punitive "lock-in," also known as administrative segregation, separate from the general prison population at Rockland, without the requisite procedural due process. He challenges Defendants' failure to follow "the minimum standards of their own statutory and regulatory mandatory procedures." (Pl.'s 95 Civ. 1148(LBS) Mem. of Law at 10.) Facility Administrator Solfaro is alleged to have acquiesced in this abuse. Lieutenant Liska is said to have participated in Plaintiff's unfair classification and lock-in. McFadden describes incidents in December 1994 at RCCF when he was allegedly dragged by c.o.s Layman, Stein, Mallone and Schoenleber, shackled and handcuffed, under orders from c.o. Clarke, acting under orders from Captain Anthony Farina, from his cell to the medical facility for weighing on three occasions. (95 Civ. 1148(LBS) Compl. at 17.) McFadden asserts that the nurse's notation that he was weighed "sitting down," without any further explanation, "made it clear that force was used." (95 Civ. 1148(LBS) Pl.'s Mem. of Law at 22.) Defendants argue, by contrast, that McFadden's willful refusal to walk or to cooperate in any way necessitated the use of force to bring him to the medical facility. While at RCCF, McFadden asserts that the was denied proper medical care, including inattention to injuries suffered while in police custody subsequent to his arrest, and that he was exposed to and not treated for tuberculosis. Lieutenant Clark is alleged to have ordered c.o.s Lanton, Malone, Stein and Garofal to spray the Plaintiff with pepper spray on three occasions in late March of 1995. (Pl.'s EBT at 154, ln. 12.) C.O. Christopher Falco is said to have aided in the "daily harassment and dehumanizing treatment" of Plaintiff. (95 Civ. 1148(LBS) Compl. at 14.) C.o. Felix is accused of "putting human hair in my meals,

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

dehumanizing Plaintiff with abusive names, throw [sic] coffee or juice and water into cell, keep turning on night light." (95 Civ. 1148(LBS) Compl. at 16) In addition, in his "Third Cause of Action," Plaintiff makes a general allegation of restraint on his freedom of religious practice and belief, claiming that he was denied the right to shave his body, a part of his religious practice .[5]

[5]     Plaintiffs chemical depilatory creme was removed from his cell in order to facilitate a court ordered hair sampling for his criminal trial. McFadden's use of the the hair remover to denude himself of any body hair made it impossible to take a sample. (Honan Aff. at ¶ 12.)

**\*3** In the 95 Civ. 3790(LBS) Complaint, relevant to the April 10–30, 1995 stay at Sullivan, McFadden alleges that Defendants, in particular Commissioner Coombe and Superintendent Kuhlmann, unfairly conspired to transfer him on April 10, 1995 from RCCF to Sullivan to retaliate for his filing of the 95 Civ. 1148(LBS) action and to impede the progress of this suit and limit his access to counsel in his criminal trial. He also blames these Defendants for his assignment to a Special Housing Unit ("SHU"), segregated from the general population, allegedly without due process, on charges of three disciplinary violations. Defendants contend that he was afforded the necessary due process and that the assignment was the result of McFadden's obstreperous behavior with which the county prison found itself unable to cope. He lived in a cell in Sullivan where the water to his sink and toilet was twice temporarily cut off (April 13–17, 1995 and April 25–30, 1995) and conditions were cold and smelling of urine and excrement. He attributes the failure to remedy the water situation to Superintendent Kuhlmann and to Deputy Superintendent Wilhelm (as well as to Lieutenants Pitt, Heazy [sic] and c.o. Saccone, who have since been dropped from this suit). He claims that the water shut-off—and not any conduct on his part—gave rise to the flooding for which Plaintiff was written up and placed in administrative segregation. McFadden further states, in general terms, that he was denied his religious rights when he was served pork on his meal tray by c.o.s Hosking and Klein, denied permission to speak to a "member of his faith" (presumably a cleric) and prevented from prayer by the odor in his cell. These allegations are not substantiated by any additional details. McFadden also states generally that he was denied access to the law library in violation of his Sixth Amendment rights though he gives no details with regard to this claim. Finally, guards harassed him

with frequent cell searches and the use of pepper spray, activity sanctioned by Captain Farina and acquiesced in by Superintendent Solfaro. McFadden believes that his abuses suffered in prison were the result of a conspiracy among RCCF and Sullivan, then-candidate for governor, George Pataki, and Pataki's brother, as well as police officers, to frame McFadden and cover up a death caused by police.[6] (McFadden 95 Civ. 1148 Aff. in Opp. S.J. ¶ 31a.)

[6]     Sullivan c.o.s Hosking, Senf, Sanok and Klein were alleged during the time period relevant to 95 Civ. 3790(LBS) to have humiliated and threatened the Plaintiff upon his intake to Sullivan and subsequently. He originally alleged that on April 25 and April 28, 1995, Defendants Saccone, Burlingame and Fuller rigorously searched his cell and took away his pen and messed up his legal papers before Plaintiff withdrew allegations against them. Plaintiff has, however, dropped his suit against these Defendants and therefore any consideration of these facts is irrelevant to the matter before us.

### RELEVANT LEGAL STANDARDS

This Court has read *pro se* Plaintiff's meticulously prepared and voluminous pleadings with care and accorded them greater latitude than it would to those of a litigant represented by professional counsel. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), *reh'g denied,* 405 U.S. 948, 92 S.Ct. 963, 30 L.Ed.2d 819 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("[W]e read [the pro se party's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest.") *Pro se* litigants are entitled to liberal construction of otherwise inartfully drafted pleadings. Though McFadden is what is sometimes referred to as a "vexatious litigant," known for the repeated filing of lawsuits, some of which are still *sub judice* before this Court, nevertheless we have considered the instant suit with its twenty-eight defendants and twenty-six causes of action carefully, on its own merit, and read and weighed the claims in this case rigorously and with due care, applying the following apposite standards for summary judgment in the matter before us.

**\*4** Summary judgment may be granted where the moving papers and affidavits submitted by the parties "show that there is no genuine issue as to any material fact and that

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The role of the court is not to resolve disputed facts, but rather to determine whether the record as a whole supports any issues that require a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Used properly, Rule 56 is a sharp procedural weapon to ward off wasteful trials and "to isolate and dispose of factually unsupported claims," *Celotex* at 323–24 (1986). Without passing on the merits of the claims, the question therefore before us is whether the facts as alleged, if assumed to be true, would constitute controverted facts worthy of trial and ripe for adjudication by a rational trier of fact. The central issue to be resolved in the instant motions is whether the parties have, in fact, established that no genuine issue of material fact exists relevant to 42 U.S.C. § 1983 regarding Plaintiff's allegations of unconstitutional treatment during his incarceration as a pre-trial detainee in RCCF and Sullivan from October 7, 1994 through April 30, 1995.

When Congress enacted 42 U.S.C. § 1983, it created a civil cause of action against any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by federal law. *See Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). In order to prevail on a claim under § 1983, a plaintiff must prove that the defendants: (1) acted; (2) under color of state law; and (3) in a manner that deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

McFadden's claims of unconstitutional abuses in prison arise in the context of his confinement *before* he was convicted of those crimes for which he is now incarcerated for the rest of his life. As a result, Plaintiff's case, despite his pleading to the contrary, does not implicate

the Eighth Amendment prohibition against "cruel and unusual punishment," because presumed-innocent pre-trial detainees are not subject to punishment. [7] A pre-trial detainee is presumed innocent and therefore cannot be punished. If he or she cannot be punished then the nature of the punishment cannot be either cruel or unusual. Rather, this action invokes an altogether different legal standard which we can apply to all of Plaintiff's claims. We are not writing on a clean slate; this action implicates a line of cases concerning the rights of pre-trial detainees held in the custody of DOCS awaiting trial. *Ingraham v. Wright,* 430 U.S. 651, 671–672 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). [8] Generally speaking, the inquiry we undertake will examine whether Plaintiff has been subjected to punishment prior to his conviction when, despite his prior criminal record, his innocence was still presumed. At the same time as we consider whether those conditions amounted to punishment. The scope of this Court's review encompasses consideration of the exigencies of prison administration. There are understandably difficulties which arise from the need to house together two categories of inmates, pre- and post-trial detainees, with different rights. In assessing the conditions of confinement, we must distinguish between the rights of a pre-trial detainee and a convicted prisoner. *Bell v. Wolfish,* 441 U.S. 520, 534–535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Covino v. Vermont Dep't. of Corrections,* 933 F.2d 128, 129 (2d Cir.1991); *Lareau v.. Manson,* 651 F.2d 96, 102 (2d Cir.1981) The absence of Eighth Amendment protection does not mean that pre-trial detainees are without recourse to complain of the conditions of their confinement. To the contrary, we review the claims of a pre-trial detainee in a state facility under the Fourteenth Amendment's Due Process clause, rather than under the Eighth Amendment, which affords him protection at least as great, if not more, than that afforded a convicted prisoner. *Bell v. Wolfish,* 441 U.S. 678, 685 (1978). To determine whether an event or action should be construed by the courts as despotic and unlawful "punishment" for purposes of due process, the Supreme Court has guided us to ask if the event or action is imposed for the purpose of punishing or is "but an incident of some other legitimate governmental purpose." *Wolfish* at 538; *Lareau v. Manso,* 651 F.2d 96, 103 (2d Cir.1981). Hence the applicable test here is whether the events McFadden complains of in any way constitute "punishment" in violation of his due process rights. "Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Wolfish* at 537. We find that on the record before us, the conditions detailed by the Plaintiff, while perhaps unpleasant, do not rise to the level of *unconstitutional* punishment.

[7]  *Pro se* Plaintiff cannot be faulted for misapplying the Eighth Amendment to his case. Defendants' attorneys, however, can be.

[8]  The distinction between the rights of pre- and post-trial convicts is expounded upon in a series of Supreme Court cases, including, *inter alia: Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

**\*5** This Court is obliged to ensure that inmates, such as McFadden, despite a notorious criminal past, are not unlawfully subjected to punishment by the corrections system before their conviction in a court of law. Innocent until proven guilty applies with as much force to those who were, on a prior occasion, found guilty and to whom punishment has been meted out and served, as to those with a spotless record. At the same time, the Court recognizes that pre-trial detainees are often imprisoned without bail because they represent potential security threats to society and, similarly, to the orderly and safe administration of prison life. Corrections institutions are well within their bounds —which the courts invade normally with reluctance and with dispatch when necessary—in imposing the necessity of incarceration and its attendant unpleasantness on pre-trial detainees. So long as the conditions and incidents of the confinement are not "punitive," (a standard we shall explore below) but reasonably related to the institution's interest in maintaining security, safety and order, then they will be found to be constitutional. [9]

[9]  The Supreme Court has held that prison officials must be granted broad discretionary authority. "To hold ... that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (quoting *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)).

## DEFENDANTS NOT PERSONALLY OR DIRECTLY INVOLVED

At the outset, we must dismiss the action as to those captioned Defendants who, based on the facts alleged by Plaintiff McFadden, were not personally or directly involved in any way in the actions alleged by McFadden's Complaints. In addition to those Defendants already dismissed on Plaintiff's consent, we clearly must dismiss the Complaint as to Defendants Coombe, Solfaro, Byron, Conjura, Mallin and Tracy. In order to succeed on a claim under § 1983, a plaintiff must allege direct or personal involvement in the alleged constitutional deprivations by each defendant. Such allegations must further be supported with specific factual support, linking the acts of a defendant to the injuries a plaintiff suffers. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Where the Plaintiff fails to allege facts demonstrating that a particular Defendant had any direct involvement with, knowledge of, or responsibility for an alleged deprivation of his civil rights, such a claim will be dismissed with regard to such Defendant(s) as it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (discussing dismissal of frivolous actions which embrace invalid legal conclusions and fanciful factual allegations). Furthermore, with particular reference to Defendants Coombe and Solfaro, liability for damages in a § 1983 action may not be based on the doctrines of respondeat superior or vicarious liability. *Monell v. Dep't. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Morales v. New York State Dep't. of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (inmate stated no claim against prison superintendent absent allegation of a connection between inmate's injuries and any acts on the part of superintendent). Plaintiff has made Defendants Coombe and Solfaro party to this action as a result of their titular status without concrete indications on this record of their actual participation in any of the described events.

**\*6** None of these six Defendants, though named in the above caption, are alleged in these pleadings to

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

have been directly responsible for any unconstitutional wrongs perpetrated upon the Plaintiff. Where accusations are levelled against them as, for example, against Commissioner Coombe, they are without sufficient specificity to create any connection between the Defendant and any unconstitutional action. Sergeant John Byron is only alleged to have failed to act on Plaintiff's complaints and to have refused to have given him a haircut. Defendant Joseph Conjura "was not involved in any of the abusive attacks." (95 Civ. 1148(LBS) Compl. at 10 & 13.) He, too, is accused only of passive participation and not of active involvement. Sergeant Richard Mallin is alleged not to have perpetrated any wrong on the Plaintiff but to have abused other inmates, which would not give rise to a claim by Plaintiff against him. (95 Civ. 1148(LBS) Compl. 14.) Lieutenant Hugh Tracy is alleged (without anything more on the record) to have searched Plaintiff's cell, removed property and given orders to use force on the Plaintiff but not directly to have participated in any way in the use of force. (95 Civ. 1148(LBS) Compl. at 12.) Because § 1983 requires direct involvement in any unconstitutional actions, no triable claim has been proferred as to Lt. Tracy.

No allegation on these Complaints, no matter how generously construed, can be read to state a claim against Defendants Coombe, Solfaro, Byron, Conjura, Mallin and Tracy and summary judgment is granted as to these six Defendants.

### ASSIGNMENT OF PRE–TRIAL DETAINEE TO ADMINISTRATIVE AND DISCIPLINARY SEGREGATION

We examine Plaintiff's assignment to administrative segregation at RCCF and his confinement to disciplinary segregation in an SHU at Sullivan. [10] We treat the two instances together, not only because they are factually somewhat similar incidents in this consolidated action, but because they are reviewed under this same legal standard. In his Complaint, Plaintiff states that "his October 8th, 1994 classification and assignment to administrative segregation was arbitrarily, erraticly [sic], unconstitutionally done in gross violation of state and federal laws, statutes and constitutions." (Pl.'s Mem. of Law at 41.) The Plaintiff complains, first, of placement in administrative segregation at RCCF without a hearing and without opportunity to challenge such a classification.

He raises the question of whether the method used in his assignment, when he was still a pre-trial detainee, to administrative segregation involving 23–hour a day lock-in was, in fact, constitutional or constituted a violation of his due process rights. (Aff. in Opp. to S.J. in 95 Civ. 1148 at ¶ 6.) He implicates primarily Lieutenants Kuhlmann and Liska in this alleged abuse.

[10]    The Second Circuit has previously characterized confinement in the SHU as a form of solitary confinement. Prisoners are separated from the general population and face a loss of other benefits in addition to being restricted in their right to visitors and commissary privileges. *Walker v. Bates,* 23 F.3d 652, 655 (2d Cir .1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (citing *Patterson v. Coughlin,* 761 F.2d 886, 893 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986)); *see also McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1982) ("[A]n inmate who is or may be sentenced to a term of confinement in a Special Housing Unit has a right to the procedural protections of the Due Process Clause.").

Secondly, McFadden objects to his placement in disciplinary segregation in an SHU almost immediately after his arrrival at Sullivan. This separation from the general population was the result of disciplinary violations at the prison which Plaintiff believes were concocted to place him unlawfully in segregation, also robbing him of due process in retaliation for the suit filed against Rockland County officials. As a result of alleged disciplinary infractions on April 12, 1995 (unhygienic acts), on April 13 (unhygienic acts and threats) and April 25 (unhygienic acts), [11] McFadden was confined to a Special Housing Unit continuously through November 29, 1995. According to Defendants, in each instance, prison disciplinary officers held a hearing on the matter which McFadden refused to attend.

[11]    The Rules of Prohibited Prisoner Behavior in New York prohibit the throwing of feces or urine. N.Y.Comp.Codes R. & Regs. tit. 7, § 270.2

**\*7** McFadden asserts that the ongoing confinement to segregation, either as a result of classification as maximum security or as a result of disciplinary action, was unconstitutional per se because of the lack of due process, the deprivation of adequate access to his lawyer, an issue we shall address in turn, and the hardship created for him in resolving affairs outside of prison prior to

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

his trial. (Pl.'s 95 Civ. 3790 at 4.) Defendants argue that Plaintiff's placement in pre-trial detention did not violate his constitutional rights. Under New York Correctional Law, the Commissioner of DOCS "shall provide for such measures as he may deem necessary or appropriate for the safety, security and control of correctional facilities and the maintenance of order therein." N.Y. Correction Law § 137(2). The Commissioner has "broad discretion in the formulation and implementation of policies relating to security and the disciplining of inmates. *Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 527 N.E.2d 1194, 1197 (N.Y.1988) Inmates may be placed in administrative segregation when their presence in the general population would jeopardize security and where there is "some evidence" on the record to support the classification. *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). Defendants further challenge Plaintiff's claim by pointing to the lack of specificity in identifying the source of the constitutional deprivation. His classification as a maximum security risk and assignment to segregation and the continuation of that status during his stay in Rockland, Defendants contend, comported with his past criminal and prison record and present behavior. His placement in a Special Housing Unit at Sullivan, they claim, was not arbitrary but directly and rationally related to disciplinary purposes —the need to impress upon him the rigors of prison discipline and to protect staff and other inmates from McFadden's spreading of bodily fluids, in particular, feces and urine—subsequent to McFadden's "unhygienic acts" and threats described in Defendants appended exhibits. (95 Civ. 3790(LBS) Defs.' Mem. of Law at 13.)

Plaintiff's pleadings suffer, on this claim, from a paucity of details describing the specific individuals responsible for the allegedly unconstitutionality. Technically, we need not even reach the question of the existence of disputed material fact surrounding McFadden's claims with regard to his segregation. He does not tell the Court how his assignment to administrative segregation upon intake into RCCF constituted any abuse of discretion. (95 Civ. 1148(LBS) Defs.' Mem. of Law at 4.) Furthermore he failed to respond to Defendants' presentation of prison disciplinary hearing reports from Sullivan, finding him guilty of infractions of prison rules and therefore subject to segregation pursuant to 7 N.Y.Comp.Codes R. & Regs. Tit. 9, § 300 (1997). In order to state a colorable claim under 42 U.S.C. § 1983 a litigant must establish the personal involvement of particular defendants in a

deprivation of rights. *Morales v. New York State Dep't. of Corrections,* 842 F.2d 27, 30 (2d Cir.1988); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Given the opacity to incarcerated inmates of prison administrative measures, the courts may inquire into such matters when raised by a *pro se* litigant. Nevertheless, we find that Plaintiff still fails to state a claim for deprivation of due process, either on the basis of his assignment at RCCF or Sullivan.

**\*8** The Supreme Court held in *Bell v. Wolfish,* 411 U.S. 520, 535–37 (1979) that the conditions of pre-trial detention are constitutional under the Due Process Clause as long as they do not amount to punishment of the detainee. *El–Shabazz v. Wagenstein,* 1995 WL 489686 (S.D.N.Y.1995). Our initial inquiry is, therefore, whether the placement of Reginald McFadden in pre-trial administrative segregation, away from the general prison population was punitive. This inquiry has two parts: (1) was he deprived of due process under the Constitution; and (2) following the Court of Appeals lead in *Covino,* we next inquire whether state law, by statute or regulation, gave rise to a liberty interest in remaining in the general population by prescribing mandatory procedures to government placement in administrative segregation. [12] *Covino v. Vermont Dep't. of Corrections,* 933 F.2d 128 (2d Cir.1991).

[12]    The Supreme Court in *Sandin* moved away from this rule, holding that due process liberty interests created by prison regulations will be generally limited to freedom from restraint which, while not exceeding sentence in such unexpected manner as to give rise to protection by due process clause of its own force, "nonetheless imposes atypical and significant hardship on inmate in relation to ordinary incidents of prison life," *Sandin* focused only the rights of convicted prisoners and not of pre-trial detainees. *Sandin v. Conner,* 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

The contentious issue at hand is therefore whether prison officials' confinement of Plaintiff to segregation based on his security classification and continued detention there for six months as well as his "sentence" to SHU after hearings which Plaintiff did not attend constituted sufficient due process. On the Due Process prong, we find that at both RCCF and Sullivan, the assignment to segregated housing was not punitive. The Supreme Court has held that legitimate operational concerns of prisons

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

in this country often necessitate "administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial," including the maintenance of security and order. *Wolfish* at 5. Defendants append documentary evidence of Plaintiff's initial classification as a maximum security, high escape risk candidate for administrative segregation. (Honan Aff. Ex. C.) They also include copies of Plaintiff's signed acknowledgment of his classification status and copies of bimonthly classification review letters. It would appear from the record in this case that Defendant was considered for a change of classification after two months in administrative segregation at Rockland. Officials decided, however, to delay the change in status. It was at this point in mid-December, that Plaintiff's disciplinary infractions and noncooperative behavior at RCCF began in earnest, thereby prolonging his confinement to administrative segregation (and prompting the recommendation for transfer which put an end to his stay in administrative segregation at RCCF). (Honan Aff. Ex. D.)

On the second prong of our inquiry, the creation of any liberty interests by state statute or regulation, we can find nowhere on the record before us, any suggestion that the hearing provided for by DOCS regulations is not designed to afford an inmate the opportunity to challenge his removal from the general population. Nor is there evidence that DOC's regulations were not complied with. The record in this case indicates that Plaintiff received notice at RCCF of his placement in administrative segregation in RCCF as a result of his "present criminal charges, past criminal history, present classification and recommendations from Supervisory Personnel." (Honan Aff. C.) The record contains regular letters of review of Plaintiff's status and extensive evidence of his disciplinary problems at the RCCF. On these facts, Plaintiff's administrative segregation was a reasonable response to concerns for institutional safety, order and morale, serving the goals of prison administration to which this Court must grant wide-ranging deference. Though McFadden alleges that his hearings did not comply with DOC regulations, there is no indication of such beyond his conclusory statements to that effect. The Rockland County Jail's Inmate Rules and Regulations on Disciplinary Procedures ¶ ¶ 15, 16, in accordance with 9 N.Y.Comp.Codes R. & Regs. tit. 9, § 7006.8 (1997), specifically allow for a prisoner's non-attendance or even exclusion from his or her disciplinary hearing. (Pl.'s Ex. B.)

Disciplinary infractions constitute a basis for assignment to an SHU.

**\*9** State Defendants at Sullivan have provided ample documentary evidence that McFadden's segregation from the general population was not unwarranted, but tied to the legitimate objective of maintaining order and impressing the need for discipline. The record indicates that Plaintiff had contravened prison regulations on three occasions, committing so-called unhygienic acts and threatening guards, for which he was written up and granted three hearings for prison disciplinary violations. He was informed of the charges against him and invited to participate in these hearings but chose not to attend and was "sentenced" in absentia to two terms of ninety and one term of forty-five days in SHU as well as a loss of other privileges (commissary, walkman, phone). This modicum of due process afforded him the opportunity to be heard in an "informal, non-adversary review of the information supporting respondent's administrative confinement....," though he did not avail himself of it. *Hewitt v. Helms,* 459 U.S. 460, 474, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *El–Shabazz* at 4.

## ACCESS TO COUNSEL

Plaintiff additionally alleges that his incarceration in segregation as a pre-trial detainee and his transfer from RCCF to Sullivan (*see infra* ) both interfered with the successful defense of his criminal case in violation of his Sixth Amendment rights. In order to make a valid § 1983 claim on this ground, the Plaintiff must allege facts showing that the alleged interference actually impeded his access to the courts or prejudiced an existing action. A claim of inadequate access to the courts must be made on a showing of actual injury. A mere statement, as Plaintiff makes in his pleadings, that a prison law library is inadequate does not state a claim for constitutional redress. *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2176, 135 L.Ed.2d 606 (1996); *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995).

A prison transfer is unconstitutional under the Sixth Amendment only if it moves a prisoner to a facility so distant as to impair his access to his legal counsel. *Covino v. Vermont Dep't of Corrections,* 933 F.2d 128 (2d Cir.1991) (*per curiam* ). Beyond the naked claim that the segregation and transfer abrogated his right of access to counsel and

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

courts, Plaintiff offers no specific facts to support his claim. He does not inform us how and on what occasion he was denied access to his counsel or legal relief to which he was entitled. He details no contested actual events where Defendants maliciously or otherwise prevented his representation or prejudiced his existing legal actions.

The only name mentioned (and not subsequently dismissed from this suit) in connection with the restriction of access to courts or counsel was that of c.o. Wilhelm at Sullivan (Pl.'s Dep. at 184). This reference, however, lacks the requisite specificity for us to find there to be any triable issue of fact on this claim. There is nothing on the record to indicate that Plaintiff was in any way prejudiced in his legal representation. McFadden's prodigious litigation and extensive pleadings before this Court, even without counsel, evidence Plaintiff's ability to navigate the complex pathways of the judicial system.

**PRISON TRANSFER**

**\*10** McFadden alleges that his transfer on April 10, 1995 from RCCF to Sullivan violated his First, Fourth, Sixth and Fourteenth Amendment rights because it was done solely in retaliation for his filing of the 95 Civ. 1148(LBS) action and intended to interfere with his litigation of this case and his pending criminal trial on charges of kidnaping, rape and robbery. He deems this transfer to have been "arbitrary, capricious, retaliatory, and in violation of the procedural and the substantive due process of both state and federal laws and constitutions." (Pl's Mem. of Law at 51)

The only remaining Defendant implicated by McFadden in the unlawful prison transfer claim is Captain Farina, who signed the transfer request. At the outset therefore we dismiss this claim with regard to any other Defendants. This Defendant asserts that he is immune from suit because the Eleventh Amendment bars prosecution of all actions in federal court against state officials sued in their official capacities where the state is the real party in interest. (State Defs.' Mem. of Law at 8) There is no evidence from Plaintiff's papers that this should be construed as a suit against the state. Obliged to construe Plaintiff's pleadings liberally, we reject this defense as inapposite in a case such as this one where Defendant is alleged to have acted wantonly and capriciously, exceeding the scope of his official duties.

Plaintiff has provided no facts, however, to demonstrate how Defendant Farina was personally involved in any deprivation of Plaintiff's rights. Even had he made such a showing, however, there is no evidence here of any constitutional misdeeds.

It is true that prison transfer solely in retaliation for the exercise of constitutional rights is unlawful. *Meriwether v. Coughlin,* 879 F.2d 1037, 1047 (2d Cir.1989); *see also Matiyn v. Henderson,* 841 F.2d 31, 34 (2d. Cir.1988), *cert. denied,* 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988). Due process does not protect against transfer. There is no constitutional right to process before or after a prison transfer. Absent a constitutionally impermissble motive, such as to interfere with a prisoner's litigation, he may be transferred in compliance with state law and regulations without any hearing. Prisoners also possess no right to be placed in a particular facility. The Department of Corrections has broad leeway in deciding where to house the inmates under its protective care, be it state or county jail. Furthermore, the Supreme Court has held that, absent state law or practice conditioning such transfers on proof of serious misconduct or occurrence of other events, the due process clause of the Constitution does not even entitle a state prisoner to a hearing when he is transferred to a prison, the conditions of which are substantially less favorable. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

In assessing the adequacy of Plaintiff's claim, we must inquire whether he was constitutionally deprived as a result of the transfer. "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the states." *El– Shabazz v. Wangenstein,* 1995 WL 489686 \*3 (S.D.N.Y.) (quoting *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). As a matter of Due Process, a pre-trial detainee has a right not to be subjected to conditions which amount to punishment of the detainee. *Bell v. Wolfish,* 441 U.S. 520, 536, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Butler v. New York State Correctional Dep't.,* 1996 WL 438128, \*4 (S.D.N.Y.). The Second Circuit has held that the mere transfer of a pretrial detainee "to less amenable and more restrictive quarters for nonpunitive reasons" does not amount to punishment per se. *Covino v. Vermont Dep't. of Corrections,* 933 F.2d 128, 129 (2d Cir.1991). Despite Plaintiff's allegations, there is no factual evidence on the record to show that the transfer was in any way punitive and therefore violative of his his Due

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

Process. He was not deprived of access to counsel nor was he denied any notice due to him as a result of the transfer. The record, instead, indicates that McFadden, due to his misconduct, caused a strain on resources at the RCCF which permitted a transfer to another correctional facility.

**\*11** We must next inquire whether McFadden's transfer contravened any state law. Here the Court must determine whether any state "statute or regulation prescribes mandatory procedures that ... create a liberty interest." *Covino v. Vermont Dep't. of Corrections,* 933 F.2d 128, 129 (2d Cir.1991), citing *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). The mere existence of a regulation does not, by itself, create an expectation on the prisoner's part that he would not be transferred absent misbehavior. *Butler v. New York State Correctional Dep't.,* 1996 WL 438128, \*5 (S.D.N.Y.1996) (quoting *Cofone v. Manson,* 594 F.2d 934, 938 (2d Cir.1979)). New York Corrections Law provides for the transfer of detainees, whether pre-trial or post-conviction, from one facility to another "when, due to extraordinary circumstances, the facility administrator determines that the public interest and facility security would be served by the transfer of an inmate or group of inmates to another suitable place or facility." N.Y.Comp.Codes R. & Regs. tit. 9, § 7300.5 (1997) ("Substitute Jail Order"); *see* McKinney's Correction Law § 504 ("Designation of Substitute Jail").

We find Plaintiff's claim based on prison transfer, or the procedures used to effect the transfer in his case, to be without merit in light of the fact that, according to Plaintiff himself, he *asked* Judge Kelly of Rockland County to be transferred out of RCCF. (Pl.'s EBT at 155–56.) His transfer was then requested by Captain Farina of RCCF as a result of McFadden's disciplinary problems. [13] (Honan Aff., Ex. F.) McFadden's was dissatisfied with his treatment there and filed an Order to Show Cause requesting to be transferred out of RCCF. (Pl.'s EBT at 156.) We find nothing improper or unconstitutional with regard to McFadden's transfer from RCCF to Sullivan.

[13] Capt. Anthony Farina writes in a letter of April 10, 1995 to the Undersheriff of Rockland County that, "McFadden has become increasingly hostile and has been involved in assaults on inmates and staff. His conduct has escalated and required a number of officers to be present each time he is taken out of his cell. This involves a substantial drain on the resources of the jail which is overcrowded. This, in turn, effects

our ability to ensure the safety of other inmates and staff." (Honan Aff. Ex. F.)

## FIRST AMENDMENT CLAIM

Plaintiff, despite his initial invocation of the First Amendment, fails to state a claim that his prison transfer or any other conduct alleged in the instant case infringed upon his First Amendment right of free expression. There is absolutely no evidence before us to indicate that McFadden's free speech had been curtailed. In addition, even assuming that there was some speech or expression at issue here, a prisoner's right to free speech must always be assessed in the institutional context of necessary and legitimate penological interests. "[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate pernological interests' ... This is true even when the constitutional right claimed to have been infringed is fundamental." *Washington v. Walter Harper,* 494 U.S. 210, 223, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). The transfer of a prisoner or his confinement to administrative segregation with extensive monitoring, searches and other controls, subject to periodic review, can be attendant necessities of safe and secure prison life without violating the inmate's constitutional fights. McFadden's segregation, as well as his transfer, have been shown to have been neither exaggerated nor unreasonable responses on the part of prison officials.

## CONDITIONS OF CONFINEMENT

**\*12** Plaintiff's Complaints allege that the conditions of his confinement and the treatment he received at the hands of his jailers violated his constitutional rights. He catalogues a variety of unpleasant conditions. He states that he was kept in an "unsanitary cell." (95 Civ. 1148 Compl. at 4.) Additionally, Plaintiff complains that various Defendants denied him hot showers, confined him to a small cell, exposed him to cold air and unbearable noise and caused him to witness the beating of other inmates. (95 Civ. 1148 Compl. at 9.) More specifically, he alleges that Defendant Sergeant William Schoenleber refused Plaintiff the right to clean his cell. (95 Civ. 1148 Compl. at 12.) "Only when [the] condition

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

became too unbearable for him and his guards ... did [Schoenleber] finally allow Plaintiff to clean [the] cell." (95 Civ. 1148(LBS) Compl. at 12.) Plaintiff alleges that Defendant correctional officer S. Felix deliberately placed human hairs in Plaintiff's meals and was wont to throw coffee, juice and water into the cell. (95 Civ. 1148(LBS) Compl. at 16.) Plaintiff also objects to the shut-off of water to his cell in Sullivan over two periods of three days each in April 1995. Finally, Plaintiff further charges that, while at RCCF, Defendants knowingly exposed him to tuberculosis. (95 Civ. 1148(LBS) Compl. at 2.) He claims that Defendants Lieutenants J.C. Liska and M.E. Nowlin detained Plaintiff over an extended period in a cell usually reserved for "in-take," where new inmates are temporarily held until a cell becomes available in the general population. (95 Civ. 1148(LBS) Compl. at 11, 16.) Plaintiff alleges that inmates with tuberculosis resided in "in-take" previously and that his detention there exposed him to the disease which he claims to have contracted. (Pl.'s Mem. of Law at 58.) However, Defendants assert that "there is no proof whatsoever that plaintiff presently has or previously contracted tuberculosis." (Def.'s Mem. of Law at 6.)

First, with regard to the nature of Plaintiff's cell, we find that his confinement to a small cell did not violate his due process. The Supreme Court has held that confinement of two pre-trial inmates to a cell designed for single occupancy did not deny due process. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Plaintiff's complaint, therefore, that his cell, which he inhabited by himself, was small does not create a cause of action. Furthermore we find that, even for a pretrial detainee, the presence of unpleasant odors, while unfortunate, also does not constitute punishment where, as in the instant case, the condition was temporary.

Secondly, Plaintiff's claim that he was injured by virtue of witnessing the abuse of another prisoner does not state a cause of action. Plaintiff cannot demonstrate how his rights were deprived nor does he state with sufficient specificity any supporting facts to bolster such a claim.

Third, Plaintiff's complaints of excessive noise are unsupported by any additional evidence or specific allegations. By themselves, these accusations are merely conclusory and describe a *de minimis* infraction, if any.

*13 Fourth, the allegation that on at least one occasion, hair was placed in his food tray, is a non-material fact. One or two instances of finding a hair in one's food is not only not a punitive and unconstitutional violation of rights but a frequent occurrence, even for non-incarcerated diners in better restaurants. Officials are not charged here with any interference with McFadden's essential nutritional requirements, such as starving him or serving inadequate and generally unsanitary food. The offense complained of and the facts alleged are *de minimis* and therefore do not give rise to any triable issues on this point. *Cf. Robles v. Coughlin,* 725 F.2d 12 (2d Cir.1983) (Court of Appeals found allegation that prison officials served food contaminated with glass, dust and human waste for twelve days, three of which were consecutive, over a fifty-three day period, thereby starving prisoners, withstood *sua sponte* dismissal).

Fifth, Plaintiffs claim that the shut-off of his water for two three-day stints violated his constitutional rights is without merit. Given the temporary nature and limited consequence of this water problem, again the unpleasant condition did not trigger a constitutional controversy. On an Eighth Amendment inquiry, a court has found that an inoperable sink for nine days did not constitute a constitutional violation. *Johnson v. Commissioner of Correctional services,* 699 F.Supp. 1071 (S.D.N.Y.1988). Defendants claim that the water shut-off was not retaliatory, but necessary to stop overflowing of the Plaintiff's sink and toilet. It is thoroughly disingenuous for Plaintiff, who harrassed his keepers by throwing feces and urine at them, to now attempt to recover on a constitutional claim for a situation which he precipitated. Furthermore it is not disputed that the Plaintiff received drinks with his meals at this time and therefore suffered no dehydration. Finally, not only is the claim not cognizable on these facts, but it is not actually alleged against any Defendants still remaining in this suit. We therefore dismiss this claim altogether.

Finally, on the question of tuberculosis contamination we must inquire whether prison officials here acted or failed to act with "deliberate indifference to serious medical needs of prisoners" in such a way, in this case, as to have punished the Plaintiff unconstitutionally. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (indifference to serious medical needs constitutes violation of Eighth Amendment rights). There is no evidence on this record that Defendants caused Plaintiff to be infected

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

with tuberculosis or failed to treat such an illness. In fact, there is no evidence at all that Plaintiff at any time had or continues to have tuberculosis. Defendants append Plaintiff's RCCF medical reports from the duration of his stay at that institution. (Honan Aff. Ex. E.) Nowhere is there any indication that Plaintiff had or contracted tuberculosis at Rockland. Furthermore there is ample documentation indicating regular medical examination and treatment. We therefore dismiss his claim for redress based on tuberculosis infection for which there is no supporting evidence beyond unsupported allegations. "[M]ere negligence in the treatment of a prisoner's physical condition, or claims based on differences of opinion over matters of medical judgment, fail to rise to the level of a § 1983 violation." *Sloan v. Zelker*, 362 F.Supp. 83, 84 (S.D.N.Y.1973) (quoting *Corby v. Conboy*, 457 F.2d 251, 254 (2d Cir.1972)). Furthermore Plaintiff alleges no facts relating to his medical condition which shows that specific Defendants here were indifferent to his medical needs.

## OTHER ABUSES

**\*14** We dismiss Plaintiff's allegations of verbal abuse and harrassment. Mere words cannot create a cognizable injury under § 1983. *Zeno v. Cropper*, 650 F.Supp. 138 (S.D.N.Y.1986) (the alleged use of vile and abusive language against pre-trial detainees does not provide a basis for a civil rights action).

We also dismiss Plaintiff's allegations of unconstitutional violation of his religious rights. There is no evidence on this record that he was in any meaningful way deprived of the exercise of his faith. His claim that the odor in his cell and his inability to shave his body inhibited his religious practice does not state a claim which rises to the level of a constitutional violation. McFadden does not explain what religious belief purportedly requires him to shave the entirety of his body. Defendants' exhibits of prison logs show that McFadden received special Ramadam meals during the relevant period, served to him especially early to comply with his religious needs. (Honan Aff. Ex. C.)

Also Plaintiff describes the use on him of pepper spray on three occasions. Unfortunately, the use of pepper spray is sometimes a required incident of prison discipline to maintain order and safety under difficult conditions. There is no indication that the use of the spray was punitive or inflicted on Plaintiff except on three discrete

and necessary occasions with no injury or lasting harm suffered. On these uncontroverted facts, we can find no action in violation of 42 U.S.C. § 1983.

Plaintiff's Complaint charges that in December 1994, while incarcerated at RCCF, he was dragged forcibly and shackled from his cell to the prison medical facility for weighing. [14] McFadden, as a protest, stopped eating while in prison and a state court ordered that he be weighed to ensure his safety. (Compl. at 17.) McFadden describes that, when the guards dragged him down the concrete corridor and steps, his head banged against the stairs and he became partially paralyzed in his left hand due to the pressure from the metal shackles on his wrists. Whereas many of Plaintiff's other allegations have been without merit as a matter of law, we find that this allegation presents a much closer call, especially as Plaintiff details the incident with specificity and reference to particular responsible Defendants, namely c.o. Stein, c.o. Layman and c.o. Malone, acting under orders from Lt. Clark. Controverted charges that corrections officers dragged a prisoner, allegedly indifferent to his safety and the possible infliction of bodily harm, would normally survive a motion for summary judgment and constitute the kind of material fact requiring trial. However, we have a unique situation before us. It appears from Plaintiff's, as well as Defendants', papers that this deplorable-sounding treatment was not unprovoked but made regrettably necessary by Plaintiff's own conduct.

[14]  Captain Farina is alleged to have ordered the guards to "drag plaintiff to the prison hospital, while his hands and legs were cuffed, on the floor, with his head knocking violently against the hard floor and down the concrete steps—at the prison hospital, plaintiff was disgraceful [sic] hung up by the chains linking the two writst and two ankels [sic], while plaintiff bottom sat on scale to be weigh like a piece of meat while the female looks on." (95 Civ. 1148(LBS) Compl. at 8.)

McFadden admits that, when the appointed time arrived to go to the hospital for weighing, he refused, despite the court order, to be weighed. In fact, he refused to walk or to move, leaving prison officials with no choice but to move him in some forcible way. They had already had experience with McFadden's refusal to cooperate with a court order, such as when he threatened to "kick in the head" of the doctor sent to take a pubic hair sample. As the path from his cell to medical required the traversing of a flight of stairs, Defendants allegedly opted against the

**McFadden v. Solfaro, Not Reported in F.Supp. (1998)**

1998 WL 199923

use of a wheelchair to transport McFadden and chose, instead, to drag him. The question we must answer is whether it was permissible on three occasions for prison officials to drag a pretrial detainee against his will to and from the prison hospital down concrete steps for the purpose of fulfilling a court order. We inquire, cognizant of the Plaintiff's due process rights and also against "the backdrop of prior decisions recognizing that courts are ill-equipped to substitute their judgments on matters of prison administration for those of prison authorities." *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996).

 **\*15**  Prison officials have the authority and discretion to use reasonable physical force upon an inmate to compel compliance with necessary orders, maintain prison safety and the requisite order vital to security in a correctional facility. We find on the uncontroverted facts that prison officials, faced with an extremely difficult situation, applied reasonable force in good faith to further legitimate penological interests.

In this unique and narrow instance, where there is no dispute that Plaintiff was difficult, uncooperative and, historically, a troublemaker, Defendants choice to drag him, though perhaps unwise, does not rise to the level of a constitutional violation. Plaintiff's allegations of egregious abuses are unsupported by any evidence that he suffered lasting injury as a result of this incident.

We find based on the record before us that there remains no outstanding issue of material fact necessitating trial. For the reasons set forth above we grant all Defendants' Motions for Summary Judgment on all claims.

SO ORDERED.

### All Citations

Not Reported in F.Supp., 1998 WL 199923

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2754859
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,
v.
Kurt ELLIS, Cleric, Mid–State Correctional
Facility; Kyle Ready, Correctional Officer, Mid–
State Correctional Facility; Theda Kupiec, Senior
Mail Room Supervisor, Mid–State Correctional
Facility; Sheila Marlenga, Facility Steward, Mid–
State Correctional Facility; Maureen Boll, Deputy
Commissioner, Department of Corrections and
Community Supervision; and Brian Fischer,
Commissioner, Department of Corrections
and Community Supervision, Defendants.

No. 9:11–CV–600 MAD/ATB.
|
July 9, 2012.

**Attorneys and Law Firms**

Patrick Guillory, 09–B–0714, Gouverneur Correctional
Facility, Scotch Settlement Road, Gouverneur, New
York, Plaintiff pro se.

Office of The New York State Attorney General, The
Capitol, Albany, New York, for Defendants.

William J. McCarthy, Jr., AAG, of Counsel.

## MEMORANDUM–DECISION AND ORDER

DAGOSTINO, J.

## I. INTRODUCTION

**\*1** On November 4, 2011, Plaintiff *pro se* filed a motion
for a Temporary Restraining Order ("TRO"), and on
December 29, 2011, Plaintiff filed a motion for summary
judgment relating to his civil rights complaint. In his
civil rights complaint, Plaintiff alleges that Defendants
subjected him to religious discrimination, denied him
access to courts, and retaliated against him for exercising

his First Amendment Rights. *See* Dkt. No. 48–1; Dkt. No.
54 at 1.

Magistrate Judge Baxter issued a Report–
Recommendation dated March 22, 2012, recommending
that the Court deny both motions. *See* Dkt. No. 54 at
2. Currently before the Court are Plaintiff's objections
to Magistrate Judge Baxter's March 22, 2012 Report–
Recommendation. [1]

[1] Plaintiff's objections to Magistrate Judge Baxter's
Report–Recommendation were filed with the Court
on March 27, 2012, as well as supplemental objections
to the same, filed with the Court on April 3, 2012 and
May 21, 2012. *See* Dkt. Nos. 56, 58 & 70.

## II. BACKGROUND

A. Factual Background
In a September 27, 2011 Decision and Order, the Court
dismissed some of Plaintiff s claims "with prejudice"
and some "without prejudice with leave to replead,"
and allowed the following claims to proceed without
amendment to the complaint:

(1) Plaintiff's First Amendment Free Exercise Clause
and Religious Land Use and Institutionalized
Persons Act ("RLUIPA") [2] claim against Defendant
Ready regarding the events of December 7, 2010;

[2] 42 U.S.C. § 2000cc (2006).

(2) Plaintiff's First Amendment Free Exercise Clause
and RLUIPA claims against Defendant Ellis
regarding the events of March 20, 2011;

(3) Plaintiff's claim that Defendant Ready denied
Plaintiff the right to attend a religious service
on December 7, 2010 in retaliation for filing a
grievance;

(4) Plaintiff's Equal Protection claim against
Defendant Ready;

(5) Plaintiff's claim that Defendants Kupiec and
Marlenga lost or destroyed Plaintiff's property
in retaliation for filing grievances;

(6) Plaintiff's claim that Defendants Kupiec and Marlenga interfered with Plaintiff's right to send and receive mail;

(7) Plaintiff's claim that Defendants Kupiec and Marlenga denied Plaintiff access to the courts, and

(8) Plaintiff's claims against defendants Fischer and Boll (except those claims relating to the allegedly inadequate grievance system).

*See id.* at 41 n. 11. For a more complete discussion of the underlying claims, the Court directs the parties to the Court's September 27, 2011 Decision and Order.

B. Magistrate Judge Baxter's Report–Recommendation
In his Report–Recommendation date March 22, 2012, Magistrate Judge Baxter recommended that the Court deny Plaintiff's motions for summary judgement and for a TRO. *See* Dkt. No. 54 at 2.

Regarding the current motion for a TRO, this is the third of its kind that Plaintiff has filed. *See* Dkt. 35; Dkt. No. 54 at 3 n.3. Magistrate Judge Baxter noted that the Court previously denied Plaintiff's other two motions for injunctive relief based on Plaintiff's transfer from Mid–State Correctional Facility to Gouverneur Correctional Facility. *See* Dkt. No. 54 at 5. Ching to *Day v. Chaplin,* 354 Fed. Appx. 472, 473 (2d Cir.2009), the Court held that an inmate's request for injunctive relief against a particular correctional facility becomes moot upon transfer or discharge to a different correctional facility. As with his previous motions, Magistrate Judge Baxter equally found that Plaintiff's third motion for a TRO is moot. *See* Dkt. No. 54 at 5.

**\*2** Magistrate Judge Baxter based his decision on several factors, including that the motion for injunctive relief was not directed at the original defendants because Plaintiff had been transferred to a new correctional facility, and the " 'new' alleged deprivations" that had occurred after the issuance of the Court's previous order "were over." *See id.* at 5–6. Magistrate Judge Baxter also found that Plaintiff's concerns of possible future retaliation are "too speculative to warrant injunctive relief." *See id.* at 6 (citing *Smolen v. Dildine,* No. 11–CV–6434, 2011 WL 6030112, \*2 (W.D.N.Y. Dec. 5, 2011) (other citations omitted)).

As to the motion for summary judgment, Magistrate Judge Baxter's Report–Recommendation recommends that the Court find that there are questions of fact remaining with regards to certain claims, and that Plaintiff has not met his burden entitling him to summary judgment with respect to other claims. *See id.* at 10, 11, 12, 16.

Regarding the claims involving an alleged violation of Plaintiff's First Amendment Free Exercise rights under RLUIPA, Magistrate Judge Baxter recommended, with respect to the December 7, 2010 incident involving Defendant Ready, [3] that "[P]laintiff's own exhibits show that there is a question of fact regarding these issues." *See id.* at 9–10. With respect to the March 20, 2011 incident involving Defendant Ellis, [4] Magistrate Judge Baxter examined Plaintiff's grievance, and the investigation report of that grievance, which indicated that the Rabbis arrived late for the Purim celebration. [5] *See* Dkt. No. 48– 2, Ex. B. Magistrate Judge Baxter concluded that it is clear a question of fact remains regarding Defendant Ellis' conduct, and thus Plaintiff's motion should be denied. *See* Dkt. No. 54 at 11.

3    On December 7, 2010, Plaintiff was denied attendance to religious services by Defendant Ready despite his name appearing on a call-out list for such services. *See* Dkt. No. 54 at 9–10 (citing Compl. at ¶¶ 37–47).

4    On March 20, 2011 Plaintiff was permitted a scheduled visit with a Rabbi for a Purim celebration, but the service was cut short by Defendant Ellis. *See* Dkt. No. 54 at 10 (citing Compl. ¶ 65). Plaintiff filed a grievance with Mid–State's Superintendent regarding Defendant Ellis' action. *See* Dkt. 48–1 at ¶¶ 19, 20.

5    The Purim celebration commenced upon the arrival of the Rabbis. *See* Dkt. No. 48–2, Ex. B.

Regarding the claims involving retaliation, Magistrate Judge Baxter stated that the "fact that corrective action was taken after a grievance by plaintiff, without more, does not prove that a constitutional or statutory violation occurred." *See id.* Additionally, although an "alleged adverse action occurred in close proximity to the protected conduct," this does not "necessarily prove plaintiff's claim by a preponderance of the evidence." *See id.* at 12 (citing *Davis v. Goord,* 320 F.3d 346, 352–54 (2d Cir.2003); *Jackson v. Goord,* No. 06–CV–6172, 2011 WL 4829850, \*17 (W.D.N.Y. Oct. 12, 2011); *Brown v. Graham,* No. 9:07–CV–1353, 2010 WL 6428251, \*16–20 (N.D.N.Y.

Mar. 30, 2010)). Accordingly, Magistrate Judge Baxter recommended that the Court find Plaintiff is not entitled to summary judgment on his retaliation claims. *See id .*

Addressing the access to courts/mail claims, Magistrate Judge Baxter noted that a constitutional violation of denying access to the courts requires that Plaintiff show Defendants' conduct was deliberate and malicious, and resulted in injury to Plaintiff. *See id.* at 13–14 (citing *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008)). Magistrate Judge Baxter recommended that the Court find that a question of fact still exists, noting that just because Plaintiff received a reimbursement for the certified mail from Defendant Kupiec does not mean she was responsible for the error. *See id.* at 14.[6] As such, Magistrate Judge Baxter determined that a question of fact exists regarding causation in Plaintiff's access to the courts claim. *See id.* at 15. Magistrate Judge Baxter also came to the same conclusion regarding Plaintiff's claim that Defendant Kupiec destroyed his mail in retaliation for his complaints. *See id.*

[6]    Magistrate Judge Baxter also noted that Plaintiff filed a motion to dismiss his own complaint with prejudice in his case before the Court of Claims. *See id.* at 14. Magistrate Judge Baxter stated that "Plaintiff cannot ask the Court of Claims to dismiss his action and then blame the defendant for the 'injury' " if such injury does in fact exist. *See id.* at 15.

**\*3** With respect to the claims made against the supervisory officials, Magistrate Judge Baxter noted that "[p]ersonal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability." *See id.* at 16 (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)) (other citations omitted). Magistrate Judge Baxter recommended the Court find that, "[b]ecause questions of fact remain regarding the individuals who allegedly committed the violations, and [D]efendants' Boll and Fischer's liability depends on the liability of their subordinates, [P]laintiff has not shown that he is entitled to summary judgment against these two [D]efendants." *See id.* at 17.

C. Plaintiff's objections to Magistrate Judge Baxter's Report–Recommendation

Plaintiff filed objections to Magistrate Judge Baxter's March 22, 2012 Report–Recommendation on March 27, 2012, and supplemental objections on April 3, 2012. *See* Dkt. No. 56; Dkt. No. 58. Plaintiff's sixteen objections are as follows: 1) his request for injunctive relief was, in fact, directed at the original Defendants in the complaint; 2) his motion for a TRO is seeking to maintain the status quo regardless of whether the alleged deprivations are new, old, or pending; 3) he was not merely speculating about retaliation after the Court issued its September 27, 2011 Order, after which he was allegedly denied food for 104 hours; 4) he has met his burden for the Court to issue a TRO; 5) Defendants' failure to submit an affidavit in opposition to summary judgment and Defendants' had an adequate opportunity to conduct discovery; 6) the Court is promoting discovery abuse by issuing the Report–Recommendation since Defendants' request for an extension of time was not granted, nor has the pretrial discovery and scheduling order been amended for a continuance; 7) the Report–Recommendation prejudicially advocates for Defendants to be given an extension of time to respond to discovery, to be given an extension of time to respond to the application for summary judgment, and to be given the chance to affix an affidavit to support such extension; 8) summary judgment regarding the retaliation claims against Defendant Ready should be because on the Department of Corrections and Community Supervision ("DOCCS") Office of Counsel's response indicating that corrective action was taken in response to Plaintiff's grievance and this is an admission to malfeasance on Defendant Ready's part; 9) summary judgment should be granted in Plaintiffs favor against Defendant Ellis because the law sets forth that where a non-moving party willfully fails to respond adequately to a properly filed motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute; 10) the Report–Recommendation violates Local Rule 7.1(a)(1) in that it contains citations to decisions exclusively reported on computerized databases, and copies of those decisions were not affixed to the Report–Recommendation, and the Report–Recommendation fails to support its denial of Plaintiff's motion as to the retaliation claims with any relevant facts; 11) the grievance response received containing an apology from Defendant Kupiec regarding her action of not mailing Plaintiff's Notice of Intention to File a Claim as instructed and the letter from Defendant Kupiec apologizing for destroying Plaintiff's test scores are admissions to his mail claims against Defendant Kupiec; 12) the Report–Recommendation sends the message that Defendants have special privileges

with respect to discovery, and Magistrate Judge Baxter will go against his own prior text orders to support such abuse; 13) specifically detailed Defendants Boll and Fischer's personal involvement regarding the liability of their subordinates, and thus there is no question of material fact regarding this issue; 14) granting Defendants' second letter motion for an extension, without an accompanying affidavit, is a double standard and is not in compliance with this Court's rules; and 15) the Report–Recommendation should be reversed in the interest of justice because the Federal Rules of Civil Procedure and the Northern District Local Rules should apply equally to both *pro se* litigants and prisoners, as well as state defendants. *See* Dkt. No. 56 at 3–34; Dkt. No. 58 at 3–7.

**\*4** In his supplemental objections filed on March 21, 2012, Plaintiff claims that he "received some documents from Defendants' Counsel ... which proves that more Jews are being starved throughout the Department of Correction and Community Supervision (DOCCS) when the said individuals file grievances." *See* Dkt. No. 70 at 2. Plaintiff claims that the two emails from DOCCS employees discussing two complaints filed by other inmates at Mid–State regarding issues similar to those in the present matter. *See id.* at Exhibit "A."

### III. DISCUSSION

A. Review of a Magistrate Judge's Decision

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objection in made." *28 U.S.C. § 636(b)(1) (2006).* However, when a party files "[g]eneral or conclusory objection or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court review those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011)* (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *28 U.S.C. § 636(b)(1).*

B. Injunctive Relief

1. Standard of Review

A party seeking injunctive relief must demonstrate 1) irreparable harm; and 2) either a) a likelihood of success on the merits of the claims, or b) existence of serious questions going to the merits of the claims, and a balance of hardships tipping decidedly in moving party's favor. *See D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits." ' *Candelaria v. Baker,* No. 00–CV–012E, 2006 WL 618576, *3 (W.D.N.Y. Mar. 10, 2006)* (quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) (per curiam)).

A higher standard than ordinarily required must be met "where an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act ." *Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997) (citation omitted). To meet such a higher standard, the moving party must "show[ ] 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from a denial of the injunction." *Id.* at 133 (other citations omitted). Additionally, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord,* 981 F.Supp. 140, 167 (W.D.N.Y.1997) (citing *Farmer v.. Brennan,* 511 U.S. 825, 846–47, 114 S.Ct. 1970, 1983–84, 128 L.Ed.2d 811 (1994)) (other citations omitted).

2. Application

**\*5** Regarding Plaintiff's current motion, this Court agrees with Magistrate Judge Baxter's finding that Plaintiff has not met his burden showing that he is entitled to injunctive relief. The Second Circuit has repeatedly held that "a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996); *see, e.g., Day v. Chaplin,* 354 Fed. Appx. 472, 473–74 (2d Cir.2009) (other citations omitted). Since the alleged unconstitutional and retaliatory acts occurred while Plaintiff was incarcerated at Mid–State, his transfer to Gouverneur renders his application for a TRO moot.

Moreover, Plaintiff has directed his motion for a TRO to individuals not included in the original complaint, with the exception of Defendants Boll and Fischer.[7] *See* Dkt. No.

35–1 at ¶¶ 4–7. As such, this Court agrees with Magistrate Judge Baxter's finding that "[i]f additional individuals denied [P]laintiff his constitutional right to practice his religion, he may move to supplement his complaint or bring a separate action against individuals at Gouverner." *See* Dkt. No. 54 at 7. Even if Plaintiffs motion for a TRO was directed at Defendants in this action, Plaintiff has failed to establish an imminent threat of irreparable harm or that other serious injury that would result if injunctive relief is not granted because the alleged new deprivations have already occurred.

7    Magistrate Judge Baxter's Report–Recommendation noted that original Defendants Boll and Fischer are employees of DOCCS, and are not located at any specific facility. *See* Dkt. No. 54 at 5 n.9 (citing Dkt. No. 45 at ¶¶ 40–48). Magistrate Judge Baxter further noted that Plaintiff's claim that Defendants Boll and Fischer approve all transfers—even if true—is not proof that they were responsible for subsequent denials of Plaintiff's religious rights by individuals at Gouverner. *See* Dkt. No. 54 at 6 n.10.

Finally, Plaintiff's concerns of possible future retaliation are too speculative to warrant injunctive relief, since no imminent threat is posed. *See Smolen v. Dildine,* No. 11–CV–6434, 2011 WL 6030112, *2 (W.D.N.Y. Dec. 5, 2011) (citations omitted).

For the foregoing reasons, Plaintiff's motion for preliminary injunctive relief is denied.

C. Summary Judgment

*1. Standard of Review*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n.5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*6** In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 303 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, *2 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

*2. Application*

*a. Sufficiency of Defendants' response*

In his objection, Plaintiff argues that because Defendants failed to submit an affidavit in support of their response in opposition to summary judgment the Court must grant his motion. *See* Dkt. No. 56 at 12–15. While not issuing a formal response, Defendants submitted a letter to Magistrate Judge Baxter, stating that Plaintiffs motion

for summary judgment is premature and should be denied because they have not had the opportunity to conduct discovery. *See* Dkt. No. 49 at 1.

The Second Circuit has held that,

> a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing " '(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." '

*Gurary v. Winehouse,* 190 F.3d 37, 43–44 (2d Cir.1999) (quoting *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995)) (other citations omitted). Defendant's response to Plaintiff's motion for summary judgment only consisted of a letter to Magistrate Judge Baxter, citing to case law and Rule 56(f) of the Federal Rules of Civil Procedure, indicating that summary judgment should not be granted because they have not been afforded adequate opportunity to conduct discovery. Defendants failed to attach a Rule 56(f) affidavit to their response, and the letter did not address facts to be sought with additional discovery that would create a genuine issue of material fact. *See* Dkt. No. 49 at 1–2. [8]

[8] Defendants referenced Rule 56(f) in the response letter to Magistrate Judge Baxter. However, "[a] reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985)). As such, "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985) (other citations omitted).

Although Plaintiff is correct that Defendants' response was deficient, Plaintiff is still not entitled to summary judgment. Four days before the response deadline, Magistrate Judge Baxter issued a text order providing that "[n]o further submissions are required or allowed...." Clearly, Magistrate Judge Baxter believed, as does the

Court, that Plaintiff's motion was premature and fell short of carrying his burden; and, therefore, did not require a formal response. Defendants' failure to comply with Rule 56(f) does not obviate Plaintiff's burden of proof, which he failed to meet. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (holding that "[a]n unopposed summary judgment motion may also fail where the undisputed facts fail " 'to show that the moving party is entitled to judgment as a matter of law" " ' (quotations omitted)); *see also Giannullo,* 322 F.3d at 140–41 (holding that the "non-movant is not required to rebut an insufficient showing").

#### b. Religion

**\*7** Prisoners are certain constitutional protection with regards to the First Amendment Free Exercise Clause. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (quoting 42 U.S.C. § 2000cc–1(a) (2006)); *see e.g., Brown v. Graham,* No. 9:07–CV–1353, 2010 WL 6428251, \*15 (N.D.N.Y. Mar. 30, 2010) (citation omitted). Plaintiff claims that his First Amendment Free Exercise rights under RLUIPA were violated by Defendants Ready and Ellis.

With respect to the incident that occurred on December 7, 2010, involving Defendant Ready's refusal to allow Plaintiff to attend religious services, this Court agrees with Magistrate Judge Baxter's findings that a question of fact remains based on the exhibits Plaintiff submitted. Specifically, the investigation report issued in response to Plaintiffs grievance about the matter indicates that the call-out list for Jewish Services on December 2, 2010 was not distributed following normal procedure. *See* Dkt. No. 1, Ex. L. As a result of this error, the call-out list was hand delivered to housing units, but not the program areas, where Plaintiff was at the time of the incident. *See id.* The report also indicates that there was insufficient evidence "to substantiate any malfeasance by staff" and that there was "no malice intended." *See id.*

Plaintiff asserts that DOCCS Office of Counsel's response, indicating that corrective action was taken regarding this incident, is an admission to unconstitutional acts. *See* Dkt.

No. 56 at 17–18. A statement indicating that corrective action was taken is not necessarily the equivalent of an admission to unconstitutional conduct. Additionally, in his objection, Plaintiff claims that the DOCCS Office of Counsel overruled the superintendent's decision regarding the grievance. *See id.* at 18. This claim, however, is untrue. Plaintiff's own exhibit shows that the Central Office Review Committee ("CORC") upheld the decision of the superintendent regarding this grievance, and stated that it had "not been presented with sufficient evidence to substantiate that [Plaintiff] was purposefully denied attendance to the callout or discriminated against by staff." *See* Dkt. No. 1, Ex. S. Thus, there remains a question of material fact regarding the incidents of December 7, 2010, and Plaintiff's objection regarding the incident is unfounded.

Similarly, regarding the incident that occurred on March 20, 2011, it is clear from Plaintiff's own submissions that a question of fact still remains regarding Defendant Ellis' conduct. Plaintiff claims that the religious services scheduled for March 20, 2011 were intentionally cut short by Defendant Ellis in an expression of anti-Semitic behavior. *See* Dkt. No. 1 at ¶ 65. However, the investigation report in response to Plaintiff's grievance indicates that the Rabbis arrived late for the services, and inmates were sent back to their housing units until they arrived. *See* Dkt. No. 48–2, Ex. D. As such.

**\*8** Based on the foregoing, the Court finds that Plaintiff has failed to establish that there are no issues of material fact and is, therefore, not entitled to summary judgment on this claim.

### c. Retaliation

The Second Circuit has held that retaliation against a prisoner for filing a grievance is a violation of that prisoner's First Amendment right to petition the government for redress. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citing *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988)). To establish a claim of retaliation, the plaintiff must establish "(1) that the disciplined conduct was constitutionally protected, and (2) that his punishment was motivated, in whole or in part, by his conduct—in other words, that the prison officials' actions were substantially improper retaliation." *Id.* Additionally, there must be a causal connection between the protected activity and the adverse action. *See Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239

F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

Plaintiff claims he was subjected to several instances of retaliation, including the following: (1) the events of March 20, 2011, for filing an earlier grievance against Defendant Ellis, and CO. Johnston;[9] (2) improperly mailing out Plaintiff's Notice of Intent to File a Claim in retaliation for filing grievances; (3) Defendant Kupiec's destruction of two of Plaintiff's packages in retaliation for filing a Notice of Intent to File a Claim and grievances; and (4) the tearing of Plaintiff's mail in retaliation for filing grievances. *See* Dkt. No. 48–1 at ¶¶ 20, 22, 23, 97.

[9]    Plaintiffs grievance number MS–20189–10 was filed in response to Defendant Ellis' and CO. Johnston's refusal to permit Plaintiff to remain in the law library when he was excused from work and/or programs in accordance with the Jewish Holiday. *See* Dkt. No. 1, Ex. F.

Again, Plaintiff has failed to establish that there are no issues of material fact regarding the above mentioned events. Plaintiff has failed to put forth evidence indicating that these events "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord,* 320 F.3d at 353 (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). In fact, evidence of the exact opposite exists in that Plaintiff continually filed grievances for acts he thought were in violation of his rights. Plaintiff is merely relying on the fact that these events occurred in close proximity to protected conduct, and such reliance "does not strongly establish [a] causal nexus." *Jackson v. Goord,* No. 06–CV–6172, 2011 WL 4829850, \*17 (W.D.N.Y. Oct. 12, 2011).

### d. Access to Courts/Mail Claims

"Under the First Amendment, prisoners have a right to 'the free flow of incoming and outgoing mail.' " *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (quoting *Davis v. Goord,* 320 F.3d at 351). A prisoner's right to send and receive mail can be regulated, if such regulation "is reasonably related to legitimate penological interests." *Id.* (quoting *Rodriguez v. James,* 83 F.2d 8, 12 (2d Cir.1987) (other quotation omitted)). To establish such a claim, it must be shown that "the defendant's conduct was deliberate and malicious, and that the defendant's

actions resulted in an actual injury to the plaintiff." *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008) (citing *Davis v. Goord,* 320 F.3d at 351). Actual injury is established by demonstrating that the plaintiff's efforts in pursuing a nonfrivolous claim were frustrated as a result of the defendant's actions. *See id.* (citing *Lewis v. Casey,* 518 U.S. 343, 353 (1996)).

**\*9** With respect to non-legal mail, a "prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, \*5 (S.D.N.Y. Mar. 29, 2001) (quoting *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993)). "In order for an inmate to state a claim for interference with incoming non-legal mail he must show a pattern and practice of interference that is not justified by any legitimate penological concern." *Id.* (citing *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999)).

In the present matter, Magistrate Judge Baxter correctly held that Plaintiff has failed to show that no question of fact exists regarding the issue of his legal mail not being sent out as instructed. Plaintiff has not produced any evidence showing that Defendant Kupiec's conduct was deliberate and malicious. Plaintiff states that the apology letter received from Defendant Kupiec was an admission to the error in mailing. *See* Dkt. No. 56 at 25. However, as Magistrate Judge Baxter noted, the fact that Defendant Kupiec responded to Plaintiff's complaint, apologized to Plaintiff for the error, and issued him a reimbursement does not establish that her conduct was deliberate and malicious. *See* Dkt. No. 54 at 14.

Plaintiff also refers to his claim that Defendant Kupiec lost or destroyed his mail, specifically his test scores, in retaliation for grievances filed. *See* Dkt. No. 54 at 15; Dkt. No. 56 at 25. Although Plaintiff may be able to succeed on a claim for interference with incoming non-legal mail by showing that a pattern and practice of interference exists between the two packages that were allegedly destroyed or missing, and the destruction of his test scores, that was not justified by any legitimate penological interest, questions of fact remain as to who committed the violations with respect to the two packages, and with regard to Defendant Kupiec's motive in ripping Plaintiff's mail, as noted by Magistrate Judge Baxter. *See* Dkt. No. 54 at 15.[10]

10   In a letter from Defendant Kupiec to Plaintiff, Defendant Kupiec apologizes for tearing the test scores because she mistook them for advertisements that could not be forwarded. *See* Dkt. No. 48–2, Ex. S.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly held that questions of fact exist which preclude summary judgment at this time.

*e. Supervisory Officials*

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted). " '[W]hen monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.)). There is a sufficient showing of personal responsibility of a defendant if (1) the defendant directly participated in the alleged constitutional deprivation; (2) the defendant is a supervisory official who failed to correct the wrong after learning about it through a report or appeal; (3) the defendant is a supervisory official who created a policy or custom under which the constitutional deprivation occurred, or allowed such a policy or custom to continue; or (4) the defendant is a supervisory official that was grossly negligent in managing subordinates who caused the constitutional deprivation. *See id.* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

**\*10** It is well-settled that receipt of letters or grievances, by itself, does not amount to personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009). Further, "[p]rison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint" *Id.* at 199 n.13 (citations omitted); *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997).

Magistrate Judge Baxter correctly held that, because there are remaining questions of fact as to whether any unlawful violations actually occurred, Plaintiff's motion for summary judgment as to Defendants Boll and Fischer must be denied. Moreover, contrary to Plaintiff's

assertion, Magistrate Judge Baxter did, in fact, address his claims against Defendants Fischer and Boll and correctly found that summary judgment as to those Defendants was inappropriate at this time. *See* Dkt. No. 54 at 6 n.10, 16–17.

Based on the foregoing, the Court finds that Plaintiff has failed to establish that he is entitled to summary judgment as to Defendants Boll and Fischer.

### f. Other Objections

In his tenth objection, Plaintiff states that the Report–Recommendation is in violation of Local Rule 7.1(a)(1) in that it contains citations to decisions exclusively reported on computerized databases, and copies of those decisions were not affixed to the Report–Recommendation. *See* Dkt. No. 56 at 21–22. By the very language of Local Rule 7.1(a)(1), however, this Local Rule is only applicable to parties, not the court. *See* LOCAL RULES N.D.N.Y. 7.1(a)(1). [11]

[11] * * *

With regards to his twelfth objection, Plaintiff is not being "condimed [sic] for taking appropriate action" with respect to dismissing his own Court of Claims action. Magistrate Judge Baxter noted with respect to this claim, that "[i]f an injury exists, there is at least a question of fact regarding the causation of the injury to plaintiff's legal claim." *See* Dkt. No. 54 at 16; Dkt. No. 56 at 29. Plaintiff still has the opportunity to prove this claim at trial.

Plaintiff also objects to Magistrate Judge Baxter "granting" Defendants' second letter motion for an

extension. Plaintiff's objection is without merit because, quite simply, Defendant's second letter motion to stay discovery was denied by Magistrate Judge Baxter in a text order dated May 15, 2012.

The Court has reviewed Plaintiff's remaining objections and finds that they are meritless and often quite difficult to comprehend.

## IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Report–Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Magistrate Judge Baxter's March 22, 2012 Report–Recommendation is ADOPTED in its entirety for the reasons stated therein; and the Court further

**\*11** ORDERS that Plaintiff's motions for preliminary injunctive relief (Dkt. No. 35) and for summary judgment (Dkt. No. 48) are DENIED; and the Court further

ORDERS that the Clerk of the Court shall serve the parties with a copy of this Memorandum–Decision and Order in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2754859

2012 WL 7761439
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lester Lee SCARBROUGH, Jr., Plaintiff,

v.

Steven D. THOMPSON, Sergeant, Upstate
Correctional Facility; Timothy Arquitt, Correctional
Officer, Upstate Correctional Facility; Thomas
Smith, Correctional Officer, Upstate Correctional
Facility; Brian Gary, Correctional Officer,
Upstate Correctional Facility; Bruce Truax,
Correctional Officer, Upstate Correctional
Facility; Bryan Clark, Correctional Officer,
Upstate Correctional Facility; Paul Burgess;
Robert H. Reynolds; John Matejaik; John Salls;
Thomas Quinn; Donald Quinn; Gary Gettmann;
Marla Travers; and David Rock, Defendants. [1]

[1] The following defendants have been identified
with their job positions: Paul Burgess, corrections
officer; Robert H. Reynolds, corrections officer;
John Matejaik, corrections officer; Steven Salls,
lieutenant; Thomas Quinn, superintendent; Donald
Quinn, captain; Gary Gettmann, sergeant; Marla
Travers, nurse; and David Rock, superintendent.
Am. Compl. (Dkt. No. 37) ¶ 31; Reynolds Decl. (Dkt.
No. 76–20) ¶ 2; Matejaik Decl. (Dkt. No. 76–16) ¶
2; Scarbrough Dep. (Dkt. No. 76–3) at 57; T. Quinn
Decl. (Dkt. No. 76–24) ¶ 2; D. Quinn (Dkt. No.
76–11) ¶ 2; Gettmann Decl. (Dkt. No. 76–12) ¶ 2;
Travers Decl. (Dkt. No. 76–18) ¶ 2; Rock Decl. (Dkt.
No. 76–10) at ¶ 2.

No. 10–CV–901 (TJM/CFH).
|
Dec. 12, 2012.

**Attorneys and Law Firms**

Lester Lee Scarbrough, Jr., Niagra Falls, NY, pro se.

Hon. Eric T. Schneiderman, Michael G. Mccartin,
Esq., of Counsel, Assistant Attorney General, Attorney
General for the State of New York, Albany, NY, for
Defendants.

**REPORT–RECOMMENDATION AND ORDER** [2]

[2] This matter was referred to the undersigned for report
and recommendation pursuant to 28 U.S.C. § 636(b)
and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate
Judge.

**\*1** Plaintiff pro se Lester Lee Scarbrough, Jr.
("Scarbrough"), a former inmate in the custody of
the New York State Department of Correctional and
Community Supervision ("DOCCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that fifteen officials
and employees of DOCCS violated his constitutional
rights under the First and Eighth Amendments. Am.
Compl. (Dkt. No. 37). Presently pending is defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.
56. Dkt. No. 76. Scarbrough opposes this motion. Dkt.
No. 82. For the following reasons, it is recommended that
defendants' motion for summary judgment be granted in
part and denied in part.

### I. Background

The facts are related in the light most favorable to
Scarbrough as the non-moving party. *See* subsection II(A)
*infra.* At all relevant time periods, Scarbrough was an
inmate at Upstate Correctional Facility ("Upstate"). Am.
Compl. ¶ 3.

#### A. Cell Flooding

On the morning of December 31, 2009, Scarbrough
was flushing the toilet in his cell when it began to
overflow. Am. Compl. ¶ 25. Upon Scarbrough's call out
for assistance, defendant Burgess, a corrections officer,
arrived at the cell. *Id.* ¶¶ 28, 31. Despite Scarbrough's
explanation that the flooding was accidental, Burgess
informed Scarbrough that he was lodging a misbehavior
report against Scarbrough for intentionally flooding the
prison gallery, resulting in the reduction of Scarbrough's
Progressive Inmate Movement System ("PIMS") Level
from a 3 to a 1. *Id.* ¶ 32. This required Scarbrough to
move to another cell. [3] *Id.* ¶ 32; Scarbrough Dep. at 21–22.

Scarbrough refused to move before a disciplinary hearing was conducted. Am. Compl. ¶¶ 36, 38, 88. Thereafter, Burgess left Scarbrough's cell. *Id.* ¶ 39.

3    According to Scarbrough, Upstate employs a Progressive Inmate Movement System ("PIMS"), which categorizes inmates on a three-level merit system. Am. Compl. ¶¶ 33–34. Level–3 being the highest, it offers inmates various amenities that are unavailable to lower levels. *Id.* ¶ 35. For example, a Level–3 inmate has recreation twice a day, four showers a week, and can keep thirty books in his cell. Scarbrough Dep. at 23.

During his deposition, Scarbrough testified to the following on the issuance of a misbehavior report before a cell transfer:

Q: Isn't it true that the officers do not have to wait to have a misbehavior report written, and then have that misbehavior report acted upon before an inmate is moved from one cell to another?

A: They do that. But I also seen people cash tickets and stay in the same cell until they are given their hearing. And then they go downstairs because they were found guilty.

Q: That's the decision of the officers to make, not the inmates to make, though[,] correct?

A: I'm not saying that I made any decision. I didn't do nothing wrong. You know what I'm saying? ... The people that came to my cell wasn't trying to hear me.... Scarbrough Dep. at 28–29. As to whether he refused to move out of the cell, Scarbrough testified to the following:

Q: What I'm talking about is what happened. And an officer came and told you [that] you had to move out of your cell—

A: Yes.

Q: —and you refused that?

A: Yeah. I wasn't really thinking, ... I ain't do nothing wrong.

...

Q: You realize that as you sit here today that the officers have the right to put you in whatever cell they choose[,] correct?

**\*2** A: They shouldn't ....

...

Q: So ... if you were up at Upstate and an officer told you, you got to move out of your cell today, pack up, you're moving out of your cell, is it your position as you sit here today that you have the authority as an inmate to refuse that order? ...

A: That's when they got to have a sergeant come to your cell. And you explain to the sergeant what's going on.

*Id.* at 30–32.

**B. Cell Extraction**

Shortly after Burgess left Scarbrough's cell, three other officers came to Scarbrough's cell and ordered him to voluntarily move to another cell. Defendant Thompson, a sergeant, entered Scarbrough's cell and told him to move to another cell because of his PIMS-level reduction. Am. Compl. ¶¶ 40, 42. Regardless of Thompson's order, Scarbrough refused to move and Thompson left the cell. *Id.* ¶ 43. The same exchange occurred between Scarbrough and defendant Salls, a lieutenant. *Id.* ¶ 45. Salls said to Scarbrough, "[m]ake sure you have your boots on tight because we're coming in there, mother fu\* \* er...." *Id.* ¶ 46. Finally, defendant Donald Quinn, a captain, ordered Scarbrough to exit his cell. *Id.* ¶ 47. Scarbrough remained adamant that he did nothing wrong and refused to leave his cell. *Id.*

Certain DOCCS officials and employees granted authorization for the use of a chemical agent, the medical clearance for such use, and a potential cell extraction. Defendant Rock, a superintendent, authorized Thompson to use a chemical agent on Scarbrough and to conduct a cell extraction if necessary. Rock Decl. ¶ 5. Donald Quinn gave Thompson the final order to use a chemical agent and conduct a cell extraction if necessary. D. Quinn Decl. ¶ 5. Based on Scarbrough's medical records, defendant Travers, a nurse, determined that nothing in the records showed that a chemical agent could not be used against Scarbrough. Travers Decl. ¶ 6. Thereafter, Travers gave

medical clearance for the use of a chemical agent against Scarbrough. *Id.*

Thompson returned to administer five applications of a chemical agent. Am. Compl. ¶ 49. Between each application of the chemical agent, Thompson repeatedly ordered Scarbrough to come to the door. Ex. B— Handheld video (submitted with Defs.' Mot. for Summ. J.) (Dkt. No. 76–14).[4] Before the last application, an officer remarked, "appears hiding something in his hand" and "appears to be sock with something in it." *Id.*

[4]    Despite Scarbrough's complaints with regard to certain liberties he had while watching the videos as well as issues with identifying people in the videos, defendants satisfied the Court's text order by ensuring that Scarbrough reviewed the video recordings of his cell extraction. Dkt. report entry dated 3/22/2012; Dkt. Nos. 84, 85.

After the last application of the chemical agent, Thompson ordered corrections officers and defendants Arquitt, Smith, Gary, Truax, and Clark to enter the cell. Am. Compl. ¶¶ 50–51. Defendant Matejaik manually opened the hatch cover to the cell door and defendant Reynolds manually opened the cell door for the correction officers to enter. *Id.* ¶¶ 52–53. Before entering the cell, something had to be pushed away from the door to the cell in order for the officers to enter the cell.[5] Ex. B— Handheld Video.

[5]    Defendants identified the barrier as a mattress and a pillow. Use of Force Report (Dkt. No. 76–23) at 12.

**\*3** When the extraction team entered the cell, one of them held what resembled a broom handle. Ex. B—Handheld Video. Scarbrough alleged that he was already down, subdued, and not resisting, when the officers entered and beat him with batons, kicked him in the face, head, and back, and told him to stop litigating against the staff. Am. Compl. ¶¶ 54, 89. While he was unable to identify precisely what each officer did because he was blinded by the chemical agent, Scarbrough contends that the officer who was on the ground told him to stop filing lawsuits. Am. Compl. ¶ 60; Scarbrough Dep. at 40–41. Gary was the officer on the ground with Scarbrough. Gary Decl. ¶ 5.

The named defendants involved in the extraction identified the conduct that they carried out. As an initial matter, defendants contend that when the extraction team entered the cell, Scarbrough used a tube sock loaded with four bars of soap to strike the team.[6] Arquitt entered first, using a shield. Arquitt Decl. ¶ 2. Gary was the second officer to enter the cell and saw Scarbrough swing a weapon that struck Arquitt's shield. Gary Decl. ¶ 5; Arquitt Decl. ¶ 2. Gary struck Scarbrough with a baton in the upper right forearm and Scarbrough released the weapon.[7] Gary Decl. ¶ 5; Dkt. No. 76–23, at 2. Arquitt grabbed Scarbrough by the shoulder area with both hands and forced him to the floor. Dkt. No. 76– 23 at 2. Gary dropped to the floor with Scarbrough and grabbed his right shoulder. Gary Decl. ¶ 5. Truax grabbed Scarbrough's left shoulder with his left hand and the right shoulder with his right hand. Truax Decl. ¶ 5. Smith grabbed Scarbrough's left arm. Smith Decl. ¶ 5. Clark, the last officer to enter the cell, placed his hands on Scarbrough's left shoulder area while Scarbrough was on the ground. Clark Decl. ¶ 5. Gary grabbed Scarbrough's right arm with both hands and applied the handcuffs. Gary Decl. ¶ 5. The video does not clearly capture the events of the cell extraction, including the officers' entry and restraining of Scarbrough, all of which took approximately fifty seconds. Ex. B—Handheld video. However, the viewer's first sighting of Scarbrough is him already down on the ground. *Id.*

[6]    Defendants submitted a photo of the sock of soaps on the ground. Dkt. No. 76–15 at 8, 9. Defendants maintain that the sock of soaps was found on the floor near the shower in Scarbrough's cell. Dkt. No. 76–23 at 24.

[7]    Scarbrough maintains that he was never hit with a baton in the right arm; instead, he was hit in the back. Scarbrough Dep. at 43.

Gary and Arquitt removed Scarbrough's clothes with scissors. Gary Mem. at 1; Dkt. No. 76–23 at 12. Clark escorted Scarbrough to the decontamination shower, then to the lower holding area for a medical examination and photos to be taken, and finally, returned Scarbrough to his cell where a retention strap was applied. Clark Mem. at 1.

Scarbrough denies that he swung a sock of soaps against the extraction team or placed a mattress in front of the door to prevent the cell extraction. Scarbrough Dep. at 82, 110, 162; Am. Compl. ¶ 86. A DOCCS videotape showed that something was kicked out of the cell before the extraction team entered and something was then handed out of the cell shortly after the team entered the cell

and encountered Scarbrough. Ex. A—Corridor Camera at 20:58, 21:35.

**\*4** Scarbrough sustained a cut above his left eye-brow and bruising over his right eye as a result of the assault. Scarbrough Dep. at 45; Dkt. No. 76–19 at 2. Video evidence showed that when Scarbrough emerged from his cell, his entire face was covered with blood. Ex. B—Handheld Video. Scarbrough was bleeding and spitting up blood while undergoing decontamination in the shower. *Id.*

Scarbrough contends that his head was pushed against a wall with "blunt force" while the officers who cut off his clothing had also purposely cut him. Am. Compl. ¶¶ 61–62; Scarbrough Dep. at 92. Video evidence only showed that Scarbrough was held up in a stationary position against a wall while his clothing was removed. Ex. B—Handheld Video. Scarbrough felt that he was going to fall but the officers told him that they were holding him up. *Id.* Scarbrough complained about his foot because it was held against the wall and his fingers because they were being bent. *Id.* At one point, Scarbrough said that his face was bleeding because he was kicked in the face but someone responded, "nobody kicked you in the face," to which Scarbrough replied, "I know." *Id.*

Scarbrough was taken to a holding pen for photos to be taken by defendant Gettmann, a sergeant, as well as a medical examination administered by Travers.[8] Am. Compl. ¶¶ 63, 66. Despite his complaints regarding pains in his head and back, Scarbrough refused Travers's medical care, claiming that he had pre-existing conflicts with Travers and requested medical attention provided by another nurse. *Id.* ¶¶ 64, 67. Scarbrough testified that Travers should have sent him to another medical staff member for treatment and ensured that he received medical care before returning to his cell. Scarbrough Dep. at 36–37.

[8]    Scarbrough suspects that there is some sort of connection between Gettmann and Travers because Gettmann whispered something to Travers. Scarbrough Dep. at 47.

Scarbrough received two misbehavior reports, one for flooding his cell and one for the cell extraction. Scarbrough Dep. at 99. DOCCS records noted that the incident was triggered by a denial of a sick call by a nurse because Scarbrough did not follow proper procedures and

was told to sign up for sick call the following day. Dkt. No. 76–23 at 35. Scarbrough contends that had non-party Lieutenant Durgan properly reviewed the report, the report would have showed that he called out for assistance, there were problems with the pipes at Upstate prior to the alleged over flowing, and he did not swing a weapon at the officers. Pl.'s Response at 7.

### C. Post–Cell Extraction

At 12:10 am the next day, Scarbrough agreed to a medical evaluation, was escorted to the outside facility Alice Hyde Medical Center ("Alice Hyde"), and was seen by non-party Nurse Atkinson. Am. Compl. ¶ 70. Scarbrough received approximately twenty-five stitches for a cut above his upper left eye-brow. *Id.* ¶ 80. Since the cell extraction, Scarbrough continued to experience problems with his breathing and vision as well as pains in the head, back, spine, and collar bone. Am. Compl. ¶ 81.

**\*5** Upon Scarbrough's return to Upstate, he was assigned a cell mate. Am. Compl. ¶ 74. Shortly after his return, Scarbrough was attacked by that cell mate after he "exhibited complications with mental disorders." *Id.* ¶ 75. Scarbrough received a misbehavior report for engaging in a fight.[9] Pl.'s Response at 6.

[9]    Scarbrough contends that had non-party Lieutenant Anctil properly reviewed the misbehavior report, DOCCS would not have assigned him a cell mate, which presented an opportunity for the fight that ensued. Pl.'s Response at 7. Scarbrough was attempting to allege a failure to intervene claim under the Eighth Amendment. However, Scarbrough does not allege any facts indicating which defendant assigned him a cell mate or placed him in the cell with a cell mate. Further, even if Scarbrough had alleged the claim against Anctil, Anctil is not a defendant in this action. Moreover, to establish liability under a failure to intervene claim, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). Because the record is devoid of any evidence supporting these three elements, such

a speculative conclusion cannot survive a motion for summary judgment. *See McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("speculation alone is insufficient to defeat a motion for summary judgment"). Accordingly, Scarbrough's potential failure to intervene claim against Anctil or any defendant with respect to the cell mate assignment must fail as a matter of law.

As a result of the cell extraction, Scarbrough was sentenced to twelve months of confinement in the Special Housing Unit ("SHU") [10] and loss of good time credits. Scarbrough Dep. at 48–49. Scarbrough appealed this disciplinary hearing disposition; however, it was denied. *Id.* at 49–50. Scarbrough also filed grievances with regard to the cell extraction incident; however, all such grievances were denied and affirmed on appeal. Am. Compl. ¶¶ 83–84.

[10]  SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On January 12, 2010, between two and five o'clock in the afternoon, an unnamed sergeant came to Scarbrough's cell and told Scarbrough that the reason for the assault was partly due to his ongoing litigation and partly due to talking back at officers. Am. Compl. ¶ 85. [11]

[11]  Here, Scarbrough attempts to allege a retaliation claim against an unnamed sergeant. However, Scarbrough does not name such a sergeant as a defendant in his amended complaint. Moreover, even if Scarbrough named this sergeant as a "John Doe," more than 120 days has passed since the filing of Scarbrough's amended complaint, the statutory limit for service of process on a defendant. FED. R. CIV. P. 4(m). Accordingly, all claims, if any, alleged against the said sergeant should be dismissed.

On July 23, 2010, Scarbrough commenced this instant action. Compl. (Dkt. No. 1). On July 19, 2011, the Court granted Scarbrough's motion to amend his complaint, adding the following parties as defendants: Paul Burgess; Robert H. Reynolds; John Matejaik; Steven Salls; Thomas Quinn; Donald Quinn; Gary Gettmann;

Marla Travers; and David Rock. Decision and Order (Dkt. No. 34) at 3; Am. Compl. Scarbrough seeks a declaratory judgment against defendants for violating his constitutional rights, injunctive relief in the form of both a physical and mental health medical examination, nominal damages, compensatory damages, and punitive damages. Am. Compl. ¶¶ 97–102.

## II. Discussion

Liberally construing Scarbrough's complaint, Scarbrough has alleged that: (1) defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark violated his Eighth Amendment rights by using excessive force during the cell extraction on December 31, 2009; (2) defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann violated his Eighth Amendment rights by failing to intervene to protect him from the use of excessive force; (3) defendant Travers violated his Eighth Amendment rights by acting with deliberate indifference when she failed to provide him with medical care; (4) defendant Burgess violated his constitutional rights solely by lodging a false misbehavior report against him; and (5) defendant Gary violated his First Amendment rights by using excessive force against him in retaliation for filing lawsuits.

Defendants contend that Scarbrough's: (1) excessive force claims must fail because the video evidence of the cell extraction proves that no rational finder of fact would find in Scarbrough's favor; (2) failure to intervene claims must fail based on the lack of personal involvement of the named defendants; (3) medical indifference claim against Travers must fail because Scarbrough refused medical care that Travers had offered; and (4) claim that is based upon an alleged false misbehavior report is without merit. Alternatively, defendants claim that they are entitled to qualified immunity. Defendants do not address Scarbrough's retaliation claim against Gary.

### A. Legal Standard

**\*6** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of

disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191– 92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

## B. Eighth Amendment

**\*7** The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Eighth Amendment obligations include the duty to protect prisoners from other known harms. *Farmer v. Brennan,* 511 U.S. 825, 829 (1970); *Matthews v. Armitage,* 36 F.Supp.2d 121, 124 (N.D.N.Y.1999) (citations omitted). It also includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The

Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness. *Sims,* 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*8** Here, Scarbrough has satisfied the objective prong of the analysis. Considering it is undisputed that as a result of the cell extraction, Scarbrough sustained a cut above his left eyebrow requiring twenty-five stitches, such an injury can be fairly classified as a serious medical need. Moreover, when viewing the facts in the light most favorable to the plaintiff, and considering how Scarbrough acquired the injuries, an issue of material fact arises with respect to the subjective prong of the analysis.

Scarbrough and the defendants posit contrary recitations of fact with regard to the cell extraction. Defendants contend that upon the extraction team's entry into the cell, Scarbrough swung a sock at soaps at them, to which Arquitt blocked with a shield. Gary then struck Scarbrough's upper right forearm in order to compel Scarbrough to release the weapon. Conversely, Scarbrough maintains that he was already down on the ground, subdued, and not resisting, when the team entered. Further, Scarbrough adamantly maintains that he did not swing any weapon at the extraction team. What

is undisputed is the fact that Scarbrough emerged from the cell with a gash above one eyebrow and a bruise above the other. The video evidence does not resolve these issues of fact to the point that no rational finder of fact could find in favor of Scarbrough because the video does not show: (1) Scarbrough and what he was holding before defendants entered his cell; (2) how Scarbrough ended up on the ground; and (3) how defendants applied the restraints. This competing evidence rests on the credibility of Scarbrough on one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party leaves no choice but to credit Scarbrough's version of the events for purposes of this motion. *See In re Dana Corp.,* 574 F.3d 128, 152 (2d Cir.2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

Moreover, Scarbrough's evidence would also establish that he was weaponless and incapacitated by the chemical agents when the extraction team entered and that the use of force was unnecessary to extract Scarbrough from the flooded cell. Despite Scarbrough's repeated refusals to voluntarily exit his cell, defendants' actions in assaulting this inmate could constitute a *per se* constitutional violation that could not be resolved by a motion for summary judgment. Thus, viewing the facts in the light most favorable to Scarbrough, he has proffered sufficient evidence to raise an issue of material fact as to the subjective prong of the Eighth Amendment analysis to require resolution by a jury. Accordingly, defendants' motion on this ground should be denied.

### 2. Personal Involvement

**\*9** Defendants contend that Scarbrough failed to establish the personal involvement of Reynolds, Matejaik, Salls, Gettmann, Rock, Thomas Quinn, and Donald Quinn. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74

[2d Cir.1996)](). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [12]

[12]    Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *See McCarroll v. Fed. Bureau of Prisons,* No. 08–CV–1343 (DNH/GHL), 2010 WL 4609379, *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed *Iqbal'* s impact on the five *Colon* factors, several district courts have done so); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon'* s personal involvement standard). The unpublished opinion cited *supra, McCarroll v. Fed. Bureau of Prisons,* is attached to this Recommendation.

### a. Reynolds and Matejaik

Scarbrough contends that Reynolds opened the door, and Matejaik opened the hatch cover, to his cell; therefore, their actions allowed for the alleged use of excessive force that ensued. However, these claims did not involve either defendants' direct participation in the alleged constitutional violation as Scarbrough does not claim that the defendants were present during the assault such that they either directly participated in, or could have directly

prevented its occurrence. Even assuming defendants remained at their positions when the extraction team entered, the record is devoid of evidence supporting the defendants' availability to intervene. Accordingly, defendants' motion on this ground should be granted.

### b. Salls

Scarbrough contends that Lieutenant Salls verbally harassed him before the extraction team entered his cell; thereby, failing to intervene to protect him from the assault that ensued. This allegation neither demonstrates that Salls directly participated in the failure to intervene to protect Scarbrough from the use of excessive force nor that Salls had knowledge of the alleged constitutional violation prior to its occurrence and failed to prevent its occurrence. While Scarbrough alleged that Salls warned him to tighten his boots in preparation for the extraction, no facts were alleged to support that Salls knew excessive force was to be used on Scarbrough during the extraction. Further Scarbrough does not allege that Salls created or allowed the continuance of any policy or custom under which unconstitutional practices occurred, was grossly negligent in his supervision of other subordinates, or exhibited deliberate indifference to his rights by failing to act on information indicating that unconstitutional acts had occurred. Moreover, a claim of threats and harassment alone, without allegations of accompanied injury or use of force, is insufficient to state an Eighth Amendment claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983."). Thus, Scarbrough has failed to allege the personal involvement of Salls. Accordingly, defendants' motion on this ground should be granted.

### c. Gettmann

**\*10** Scarbrough contends that Gettmann failed to protect him from the use of excessive force by

videotaping the cell extraction. Assuming excessive force was used on Scarbrough, because Scarbrough's claim concerned Gettmann's presence during the assault and direct failure to intervene, Scarbrough has sufficiently alleged Gettmann's personal involvement. Accordingly, defendants' motion on this ground should be denied.

### d. Rock and Donald Quinn

Scarbrough contends that both Rock and Donald Quinn failed to intervene to protect him from the use of excessive force because they were supervisors who authorized the use of chemical agents against him and a cell extraction if necessary. Such claims do not allege that Rock or Donald Quinn had directly failed to intervene to protect Scarbrough from excessive force or they knew that excessive force was to be used on Scarbrough. Further, "mere linkage in the prison chain of command is insufficient to implicate" a defendant's personal involvement. *Richard v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal citations omitted). While Scarbrough alleged that Donald Quinn ordered him to leave his cell, there is nothing in the record indicating that Donald Quinn was present for the extraction and available to intervene in the alleged excessive use of force. Accordingly, defendants' motion on this ground should be granted.

### e. Thomas Quinn

Scarbrough names Thomas Quinn as a defendant. However, because Scarbrough does not allege any facts concerning any wrongdoing against Thomas Quinn, and the record does not show otherwise, Scarbrough has failed to allege that Thomas Quinn was either directly or indirectly involved in any of the alleged constitutional violations. Even drawing all inferences in Scarbrough's favor, without having any indication of what Thomas Quinn allegedly did, or did not do, there is no way to conclude that he was personally involved in any of the complained of events. Accordingly, defendants' motion should be granted on this ground and Thomas Quinn should be dismissed as a defendant.

### 3. Failure to Intervene

Assuming none of the defendants' personal involvement defenses are granted, Scarbrough's contention that defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann failed to intervene to protect him from excessive force must be addressed. Prison officials are obliged to protect prisoners from known harms. *Farmer,* 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). To establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.*

**\*11** Here, construing the complaint liberally, Scarbrough first contends that Salls knew or should have known that Scarbrough was to face excessive force when the extraction team was later called to remove Scarbrough from his cell because Salls warned him to tighten up his boots. However, such a conclusory and speculative statement does not show that a reasonable person has been warned that a constitutional violation was about to occur. In addition, there is nothing in the record demonstrating that Salls was aware that an assault was planned or had a realistic opportunity to intervene and prevent the harm when the video evidence showed that the alleged use of excessive force took place within fifty seconds. Thus, Scarbrough's claim against Salls must fail.

Second, Scarbrough contends that because Reynolds and Matejaik opened the cell door and hatch cover to his cell, they could have intervened in the alleged excessive use of force that ensued. However, a reasonable person carrying out the same actions would not be alerted that a constitutional violation would follow. Moreover, assuming both defendants stayed at their positions— outside of the cell while the extraction team entered— the record does not support an inference that there was a reasonable opportunity to intervene in light of the brief extraction time of fifty seconds. Thus, Scarbrough's claim against Reynolds and Matejaik must fail.

Third, Scarbrough contends that because Gettmann videotaped the entire cell extraction, Gettmann saw the use of excessive force and could have intervened to prevent

the constitutional violation from occurring. However, in light of the number of people in the cell and the relatively short period of time of fifty seconds when the alleged excessive force was used, it is unreasonable to conclude that Gettmann was confronted with a reasonable opportunity to identify a constitutional violation in which he could have intervened. *See O'Neill v. Krzeminski, 839 F.2d 9, 11–12 (2d Cir.1988)* (holding that an Eighth Amendment violation does not occur for failing to intervene when the assault occurs so quickly that the defendant "had no realistic opportunity to attempt to prevent them [because the event was not] of sufficient duration to support a conclusion that an officer who stood by without trying to assist ... became a tacit collaborator."). Therefore, Scarbrough's claim against Gettmann must also fail.

Lastly, Scarbrough contends that because Rock and Donald Quinn authorized the cell extraction, both Rock and Donald Quinn had a reasonable opportunity to intervene on his behalf. Similar to the reasoning above, such actions would not warn a reasonable person that a constitutional violation was about to occur.

Accordingly, defendants' motion on this ground should be granted.

### 4. Medical Indifference

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir.2003)* (quoting *Hudson, 503 U.S. at 9*). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir.2003)* (*citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)*). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith, 316 F.3d at 185*.

*12 Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)*. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble, 429 U.S. 97, 104 (1976)*. "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance, 143 F.3d at 703*. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)*.

In this case, it is undisputed that Scarbrough's injuries constituted a serious medical condition since Travers offered Scarbrough medical care. However, Scarbrough's contention that upon his refusal of Travers's care, Travers should have sought medical care on his behalf from another nurse is without merit. First, since Scarbrough is not entitled to the treatment of his choice, it follows that he is not entitled to receive treatment from a person of his choice. Thus, any alleged delay or interference in treatment was due to Scarbrough's own actions. This cannot now be transformed into an Eighth Amendment claim. Moreover, Scarbrough ultimately received medical treatment. *Perez v. Hawk, 302 F.Supp.2d 9, 21 (E.D.N.Y.2004)* (citation omitted) ("treatment of a [plaintiff's] medical condition 'generally defeats a claim of deliberate indifference.' "). Such treatment was provided the following day and resolved the condition, despite Scarbrough's prior refusals. In addition, any complaints regarding such treatment were not against Travers because she did not provide it. Therefore, the record shows that Scarbrough has failed to establish deliberate indifference on the part of Travers. Accordingly, defendants' motion on this ground should be granted and Travers should be dismissed from this action.

### C. False Misbehavior Report

Construing the plaintiff's complaint liberally, Scarbrough alleged that Burgess violated his constitutional rights solely by lodging a false misbehavior report against him. The Second Circuit has repeatedly held that the issuing of false charges by a corrections officer against

an inmate does not constitute a *per se* constitutional violation under § 1983. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1007) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). A false misbehavior report may constitute a constitutional violation when there is more such as "retaliation against the prisoner for exercising a constitutional right." *Id.* (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Further, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in [any] constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). Here, because Scarbrough's claim is based solely on an allegedly false misbehavior report without alleging more wrongdoing on Burgess's part, Scarbrough's assertion against Burgess must fail as a matter of law. Accordingly, defendants' motion on this ground should be granted.

### D. Retaliation

**\*13** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008).

"Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted).

There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson,* 549 F.Supp.2d at 214–15. Therefore, conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Here, Scarbrough successfully meets the first element for the filing of lawsuits is a constitutionally protected activity. *Graham,* 89 F.3d at 80. Scarbrough also meets the third element because he filed a lawsuit against Upstate employees on July 28, 2009, which satisfies the temporal proximity for a causal connection. Am. Compl. ¶ 21 (*Scarbrough v. Evans,* No. 09–CV–0850 (NAM) (DEP) (appeal dismissed on September 26, 2011)). However, a genuine issue of material fact arises with the second element. Even though Scarbrough alleged that Gary told him to stop filing lawsuits while Gary was assisting in the cell extraction, the record evidence is in dispute as to whether the excessive use of force flowed from Scarbrough's lawsuit or Scarbrough's refusal to exit his cell. A determination of the second element cannot be clearly established, which results in an issue of credibility that is inappropriate to be decided for purposes

of this motion. Noteworthy is the fact that defendants do not address this retaliation claim in their motion. Accordingly, Scarbrough's retaliation claim against Gary should remain.

### E. Qualified Immunity

**\*14** Defendants claim that even if Scarbrough's constitutional claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry must be discussed with regard to Scarbrough's Eighth Amendment excessive force and First Amendment retaliation claim. All other claims advanced in the complaint need not be reached because, as discussed *supra,* it has not been shown that defendants violated Scarbrough's constitutional rights.

There is no question that it was well-settled on December 31, 2009 that the Eighth Amendment prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate. *See Hudson,* 503 U.S. at 9–10. It was also well-settled on the same day that the First Amendment protected an inmate's right to file lawsuits. *Graham,* 89 F.3d at 80. Thus, accepting all of Scarbrough's allegations as true, qualified immunity cannot be granted to Thompson, Arquitt, Smith, Gary, Truax, and Clark for their alleged use of excessive force and Gary's alleged retaliatory conduct during the extraction. However, defendants' motion should be granted in the alternative on this ground as to all other defendants, for all other claims.

### III. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 76) be:

A. **DENIED** as to Scarbrough's excessive force claims against defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark; AND

B. **GRANTED** as to all other claims and all other moving defendants and that the complaint be **DISMISSED** with prejudice as to those defendants; AND

2. Further **RECOMMENDED** that Scarbrough's retaliation claim against defendant Gary remain in this action.

**\*15** Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); Fed R. Civ. P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2012 WL 7761439

2014 WL 3385186
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Peter David YOUNG, Plaintiff,
v.
Doctor CANFIELD, Male Nurse Mr.
Mcnett, and Southport Correctional
Facility H.I.P.A. Hospital, Defendants.

No. 11–CV–6007–FPG.
|
Signed July 9, 2014.

**Attorneys and Law Firms**

Karen Bailey Turner, Brown & Hutchinson, Rochester, NY, for Plaintiff.

J. Richard Benitez, NYS Attorney General's Office, Rochester, NY, for Defendants.

DECISION AND ORDER

FRANK P. GERACI, JR., District Judge.

 **\*1** Plaintiff Peter David Young has brought this action under Title 42, United States Code, Section 1983, alleging that while he was incarcerated he was given medical treatment that violated his religious beliefs, and that he was subjected to excessive force. Defendants have moved to dismiss the Amended Complaint, and because I find that Plaintiff's Complaint does not plausibly entitle him to relief, the Motion is granted and the case is dismissed.

### Background

Plaintiff's *pro se* Amended Complaint, filed December 14, 2011, is the operative pleading in this case. Dkt. # 11. It lists three Defendants: Doctor Canfield of DOCCS' Southport Correctional Facility, Nurse McNett of DOCCS' Southport Correctional Facility, and also lists Southport Correctional Facility H.I.P.A. Hospital itself as a Defendant. *Id.*

Less than 10 days after the Amended Complaint was filed, the Court appointed Karen Bailey–Turner as *pro bono* counsel to represent Mr. Young. Ms. Bailey–Turner had previously been appointed to represent Mr. Young in another case he had pending against DOCCS in federal court. Ms. Bailey–Turner volunteered to take on this second case, and I appreciate and commend her willingness to assist and represent Mr. Young in this case.

The allegations of the Amended Complaint center around November 24, 2010, when, according to Plaintiff, "Dr. Canfield and Nurse McNett of Southport Correctional Facility HIPA Hospital ... will be using excessive force to pin me down with the help of 4 extracting team members." Dkt. # 11. Plaintiff further alleges that "with excessive force they put me into a chair and took three tubes of blood, pulse, temperature, blood pressure, weight and other medical treatment" and that "its [sic] against my religious beliefs to have any medical treatment." *Id.*

Plaintiff further alleges that the Doctor and Nurse "violated Judge Whalen Court Order dated Nov 8, 2010 Index No # SF 2010–902521, State of New York, Supreme Court, County of Erie." *Id.* The only other injuries mentioned in the Amended Complaint are at the very end of the document where Plaintiff states that "[t]he extracting team using excessive force and physical abuse also assaulted me causing me bodily harm. Black and Blue marks on my body, twisted my arm almost broke it. Doing damage to my neck, back, ribs and legs that a month later I'm still hurting and in pain." *Id.*

While written as one claim, I interpret the Amended Complaint to actually allege two separate claims: First, a violation of Plaintiff's First Amendment rights to freedom of religion regarding medical treatment, and second, an Eighth Amendment Excessive Force claim.

Defendants have moved to dismiss the Amended Complaint on three main grounds. First, that Southport Correctional Facility is immune from suit and therefore is not a proper Defendant; second, that the religious freedom claims are barred under the so-called *Rooker–Feldman* doctrine; and third, that the named Defendants are immune from suit. The Plaintiff opposes the motion, Dkt. # 30, and on June 25, 2014, I heard oral argument from the parties.

## Discussion

### I. *Motion to Dismiss Standard*

**\*2** To succeed on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a defendant must show that the complaint contains insufficient facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint is plausible when a plaintiff pleads sufficient facts that allow the Court to draw reasonable inferences that the defendant is liable for the alleged conduct. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Plausibility "is not akin to a probability requirement," rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotation marks omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation marks and citation omitted). A pleading that consists of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombley,* 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. In considering the plausibility of a claim, the Court must accept factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir.2011). At the same time, a court is not required to accord "[l]egal conclusions, deductions, or opinions couched as factual allegations ... a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007) (quotation marks omitted).

When a Plaintiff is *pro se,* his pleadings are ordinarily interpreted liberally "to raise the strongest arguments that they suggest," *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009), and are held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted). While the Complaint and Amended Complaint were filed in this case *pro se,* Plaintiff is currently represented by counsel. It is an open question in the Circuit whether the Plaintiff is therefore entitled to the liberal construction afforded to *pro se* litigants. Under the facts of this case, I find that Plaintiff is not entitled to have his Complaint read as if he were

proceeding *pro se.* There is no doubt that Plaintiff drafted the Amended Complaint himself, but the decisive factor in my opinion is that at no time during this litigation did Plaintiff's counsel seek to amend the Amended Complaint, and therefore, effectively adopted it. Magistrate Judge Feldman's scheduling order in this case explicitly ordered that "all motions to join other parties and to amend the pleadings shall be filed on or before May 3, 2013." Dkt. # 23. In other words, Plaintiff and his counsel had from December 23, 2011 (when counsel was appointed) until May 3, 2013 to amend the Amended Complaint, but chose not to. In addition, at no time subsequent to May 3, 2013 has Plaintiff sought to amend the Amended Complaint.

**\*3** If the time period between counsel's appointment and the filing of the Motion to Dismiss were smaller, the result would likely be different. But here, where sufficient time to amend the operative pleading has elapsed, I find nothing unfair about viewing the Amended Complaint under the normal standards, and not the liberal rules that apply to *pro se* cases. *See, e.g., Muhammad v. Wal–Mart Stores East, L.P.,* No. 10–CV–6074, 2012 WL 3201668, at *5 n. 6 (W.D.N.Y. Aug. 2, 2012)* ("[0]nce [plaintiff] retained an attorney, his original *pro se* status no longer entitled him to a liberal interpretation of his pleadings. Although plaintiff initiated the complaint [ ] *pro se,* counsel could and should have [amended the Complaint if necessary]") (internal quotation omitted). To hold otherwise would allow the Plaintiff to have it both ways, in that he would be inappropriately afforded the benefit of having his amend the Amended Complaint construed liberally under the *pro se* standards, while at the same time, having the full assistance of counsel.

### II. *Southport Correctional Facility HIPA Hospital as Defendant*

Defendants have moved to dismiss institutional Defendant Southport Correctional Facility (named as Southport Correctional Facility HIPA [1] Hospital in the Amended Complaint) from the case, arguing that the facility itself is not a proper Defendant.

[1]     At oral argument, Plaintiff's counsel agreed that "HIPA" is an incorrect reference to the Health Insurance Portability and Accountability Act of 1996 (Pub.L. 104–191, 110 Stat.1936, enacted August 21, 1996), commonly referred to as "HIPAA," and

that Southport Correctional Facility is indeed the Defendant referred to in the Amended Complaint.

At oral argument on the motion, Plaintiff's counsel conceded that Southport Correctional Facility is not a proper defendant, and should be dismissed. I agree.

There are two possible statutes Plaintiff could use in attempting to bring this suit against Southport Correctional Facility. The first is the statute cited in his Amended Complaint–42 U.S.C. § 1983. Second, the Amended Complaint could potentially be brought under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), codified at 42 U.S.C. § 2000cc–1. Regardless of which statute the case is viewed under, the result is the same: Plaintiff cannot maintain this action against a state entity.

Southport Correctional is a facility within the New York State Department of Corrections and Community Supervision ("DOCCS"), which is an entity of New York State, and is therefore not subject to suit under 42 U.S.C. § 1983. It is well settled that the Eleventh Amendment bars federal court claims against states, absent their consent to such suit or an express statutory waiver of immunity. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45, (1989). "An official arm of the state," such as DOCCS and Southport, "enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999). *See also Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006) (Eleventh Amendment immunity extends to "state agents and state instrumentalities that are, effectively, arms of a state.") (internal quotation marks and citations omitted). Since New York State has not waived that immunity, the action cannot proceed under Section 1983 against Southport Correctional Facility.

**\*4** Even if the cause of action was brought under RLUIPA instead of Section 1983, the result is the same. The Supreme Court has held that "that sovereign immunity forecloses the availability of money damages as a remedy against states and state actors in their official capacities under RLUIPA." *Sossamon v. Texas,* ––– U.S. ––––, 131 S.Ct. 1651, 1663, 179 L.Ed.2d 700 (2011). Even assuming that the Plaintiff was attempting to maintain the action against Southport in something other than its official capacity, the actions would still be barred. As

the Second Circuit recently explained in *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir.2013) "RLUIPA does not provide a cause of action against state officials in their individual capacities."

As a result, the Plaintiff cannot maintain his claims against institutional Defendant Southport Correctional Facility, and it is dismissed from this action.

### III. *The Rooker–Feldman Doctrine*

The Defendants have also moved to dismiss the Amended Complaint under the so-called *Rooker–Feldman* doctrine, arguing that Plaintiff cannot challenge the underlying state court order in this forum. The Plaintiff's opposition centers around whether or not the state court order attached to the Motion is authentic, and whether or not the Defendants were actually authorized to take action under the state court order.

To the extent that Plaintiff is arguing that the state court order filed on the docket (as an attachment to the Motion to Dismiss) is not properly authenticated, or is not properly considered by the Court, I disagree.

Plaintiff referenced the state court order in his Amended Complaint, and specifically described it by the judge's name, the date, and the docket number. As such, the Court may consider the Order because Plaintiff incorporated it by reference in the Amended Complaint and relied on it in bringing this lawsuit. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (internal quotation marks and citations omitted).

Further, under Fed.R.Evid. 201(b) the Court may take judicial notice of "a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Here, the document is a court order, filed publicly, and is therefore readily available to the public. As such, it qualifies under Rule 201(b). *Faulkner v. Verizon Commc'ns, Inc.,* 156 F.Supp.2d 384, 391 (S.D.N.Y.2001) (under Fed.R.Evid. 201(b), courts "may take judicial notice of pleadings in other lawsuits attached to the defendants' motion to dismiss ... as a matter of public record"); *Stubbs v. de Simone,* No. 04 Civ. 5755(RJH)(GWG), 2005 WL 2429913, at \*5 (S.D.N.Y. Sept. 30, 2005) (relying on facts from court papers attached to defendants' motion to dismiss a Section 1983 action by prison inmate). As such, I take judicial

notice of the fact that the order attached to the Motion to Dismiss is a correct copy of the order issued by Justice Whalen. In reviewing the order, I would note that it has the same judge's name, the same date, and the same docket number as the Plaintiff refers to in his Amended Complaint. Further, that order found that "Peter Young is on a hunger strike and is at risk of possible starvation, dehydration and death" and that "it is necessary for [DOCCS] to force-feed Peter Young in order to keep him alive." The order authorized DOCCS to force feed Young, to obtain his vital signs, conduct physical examinations and blood tests and to treat other associated medical problems, and further authorized the use of physical restraints to accomplish these tasks.

**\*5** Having established that a valid court order permitted DOCCS to perform various medical treatments on Plaintiff, he cannot now complain about those acts in this forum.

Under the *Rooker–Feldman* doctrine, named after *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), federal district courts are precluded from exercising jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 1521 L.Ed.2d 454 (2005). Underlying this doctrine "is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions." *Green v. Mattingly,* 585 F.3d 97, 101 (2d Cir.2009); *see also Feldman,* 460 U.S. at 482 ("[r]eview of such judgments may be had *only* in [the Supreme Court].").

In order for the *Rooker–Feldman* doctrine to bar an action, the Second Circuit has explained that four requirements must be met. First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. And fourth, the state court judgment must have been rendered before the district court proceedings commenced. *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 85 (2d Cir.2005) *quoting Exxon Mobil Corp.,* 544 U.S. at 284 (alterations omitted).

In this case, there can be no dispute that Plaintiff lost in state court. DOCCS went to court to obtain an order to administer medication and treatment to Plaintiff because he was on a hunger strike, and because Plaintiff refused the prison officials' care and treatment. Plaintiff was represented by a Buffalo attorney at the hearing, and State Supreme Court Justice Gerald Whalen ruled against Plaintiff, and granted DOCCS' application. Second, Plaintiffs Amended Complaint also makes clear that the federal action is about that order, and indeed, the Amended Complaint describes the exact particulars of the order-the docket number, the date, and the judge. The third factor is clearly satisfied, since the Plaintiff is seeking one thing: a ruling from this Court that would effectively overturn or nullify the decisions rendered by the state courts. Finally, since the state court order was issued on November 8, 2010, it predates this action, which was commenced by Plaintiff on January 6, 2011.

In Plaintiff's response, he argues that "Justice Whalen's orders were only authorized if Plaintiff was on a hunger strike or if the extracting team was in the process of inserting a nasogastric tube (per the order's requirements) at the time they executed the order. Defendants have not alleged either of these facts." Dkt. # 30. This argument misses the mark. Since this is a Motion to Dismiss, it is not the Defendants' place to allege facts, rather, the Court judges the Amended Complaint based upon the facts alleged in Plaintiff's Amended Complaint.

**\*6** In that regard, it is the Plaintiff who never alleged in his Amended Complaint facts to support a plausible claim that the Defendants violated the state court order. Nowhere in the Amended Complaint does Plaintiff allege "I was not on a hunger strike when they took my blood" or anything even close to that. Rather, the best he alleges in that regard is that "the Doctor and Nurse McNett ... violated Judge Whalen Court Order Dated Nov 8, 2010." Dkt. # 11. That conclusory allegation is simply insufficient-it is nothing more than a threadbare recital of a cause of action that is devoid of any factual support. Without alleging any specific facts, the Amended Complaint "pleads facts that are merely consistent with a defendant's liability" and it therefore "stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal,* 556 U.S. at 678.

As all four of the *Hoblock* factors are satisfied, any challenge regarding the state court order is barred by the *Rooker–Feldman* doctrine, and deprives this Court of jurisdiction to entertain the claim. If the Plaintiff wished to challenge the state court order, his course of action would have been to seek review in the state court system, by appealing to the Appellate Division, Fourth Department, then the N.Y. Court of Appeals, and finally to the United States Supreme Court. He cannot use this Court as a forum to challenge that order, and as a result, the claim against Nurse McNett and Doctor Canfield for violating his religious freedom by subjecting him to medical treatment is dismissed.

As an alternative basis, Plaintiff argues in his responding papers that the Defendants knew he had a pending federal matter, and suggests that they may have "used force against Plaintiff in retaliation for his legal challenges against DOCCS."

First, this claim is not contained anywhere in the Amended Complaint. The words "retaliate" or "retaliation" appear nowhere in the Amended Complaint. The only possible sentence that counsel could be attempting to parlay into a retaliation claim is: "Dr. Canfield, Nurse McNett, and HIPA Hospital new [sic] I had a ongoing case in U.S. District Court Rochester N.Y. Case # 09–CV–6639CJS in front of Judge Siragusa." Dkt. 11. That claim stops well short of even attempting to convey a retaliation claim under the standards previously discussed. Further, in his Amended Complaint, Plaintiff describes his claims as "Religious Practice First Amendment, Assault Eight Amendment and Medical Care Against My Religion Eighth Amendment." *Id.* While Plaintiff's own description of his claims is not determinative, it is certainly worth noting that nowhere in his claims-nor in the body of his Amended Complaint-does he ever refer to retaliation, and Plaintiff may not use a Motion Response to add new claims to his case.

Even if judged on the merits, Plaintiff's claim is still barred. It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To state a retaliation claim under § 1983, "a plaintiff must show that: (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." *Friedl v.*

*City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (internal quotation and citation omitted.)

**\*7** Again, nowhere in the Amended Complaint does Plaintiff allege that Defendants' actions were taken because of, or in retaliation for, his pending lawsuit in federal court. Simply stating that the Defendants "knew" that he had a lawsuit is insufficient, as it fails to plead facts that would "nudge [his] claims across the line from the conceivable to the plausible." *Twombly,* 550 U.S. at 570.

### IV. *Excessive Force Claim and Immunity*

The final claim alleges that in carrying out the state court order, Doctor Canfield and Nurse McNett "with excessive force they put me into a chair and took three tubes of blood, pulse, temperature, blood pressure, weight and other medical treatment." Dkt. # 11.

Defendants have moved to dismiss the Amended Complaint on the ground that they are entitled to immunity. Plaintiff argues that the Defendants have not provided factual affirmations to support the "nature of their employment and/or relationship with the State of New York." Dkt. # 30.

Regardless of whether that statement is correct or not, the result is the same: the Plaintiff cannot maintain his Section 1983 claim for excessive force against these Defendants because if the Nurse and Doctor are state actors, then they are entitled to immunity. On the other hand, if they are not state actors, then no cause of action lies under Section 1983.

The Defendants pleaded qualified immunity in their Answer, and it is well settled that "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal citations and quotation marks omitted). "A police officer who has an objectively reasonable belief that his actions are lawful is entitled to qualified immunity." *Okin v. Village of Cornwall OnHudson Police Department,* 577 F.3d 415, 433 (2d Cir.2009).

The standard for qualified immunity is also well known. "Once qualified immunity is pleaded, plaintiff's complaint

will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation;" and (2) "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

Quasi-judicial immunity protects officials who are performing official duties that are comparable to functions for which judges are immune. *Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). As one court in this district has held, "Government officials carrying out a facially valid court order are entitled to immunity to suits for damages under § 1983." *Fludd v. Fischer,* No. 10–CV–6603–CJS, 2012 WL 3749652 (W.D.N.Y. Aug.28, 2012), citing *Roland v. Phillips,* 19 F.3d 552, 556 (11 th Cir.1994) ( "Therefore, law enforcement personnel, acting in furtherance of their official duties and relying on a facially valid court order, are entitled to absolute quasi-judicial immunity from suit in a section 1983 action.") The New York State Court of Appeals has stated that this immunity extends to "other neutrally positioned government officials, regardless of title, who are delegated judicial or quasi-judicial functions [and who] should also not be shackled with the fear of civil retribution for their acts." *MosherSimons v. Cnty. of Allegany,* 99 N.Y.2d 214, 219, 753 N.Y.S.2d 444, 783 N.E.2d 509 (2002). The reason for this immunity is well founded. As one federal district Court explained:

> **\*8** "Despite potential unfairness to plaintiffs, requiring prison officials to second-guess a court order when questions arise regarding its validity would place prison officials in a dilemma. On the one hand, public officials could face section 1983 liability if an order is later found to be erroneous. On the other hand, Public officials ... who do not act to implement decisions when they

are made do not fully and faithfully perform the duties of their office."

*Todd v. Hatin,* No. 2:13cv05, 2013 WL 3990815 (D.Vt. Aug.5, 2013).

Whether couched in terms of qualified immunity or quasi-judicial immunity, applying these standards, I find that Nurse McNett and Doctor Canfield are immune for their actions here if they are indeed state actors. The simple fact is that a valid court order was issued that authorized these medical officials to take basic actions to protect the life of the Plaintiff while he was confined in a DOCCS facility. As previously stated, the only force complained of by Plaintiff is that the Nurse and Doctor "put me into a chair and took three tubes of blood, pulse, temperature, blood pressure, weight and other medical treatment." Dkt. # 11. There is no allegation that the Nurse or Doctor took extreme or shocking actions, or that they did anything other than what the state court order authorized. There is no reason for the Defendants to have believed that carrying out the order would create any type of violation, and indeed, the Defendants could have subjected themselves to liability had they not complied with the order. As such, they are entitled to immunity for the acts they took to carry out the state court order.

On the other hand, if the Defendants were not state actors, they would not be acting under color of state law, and therefore would not be a proper party to a 1983 action. In order to state a claim under Section 1983, the Plaintiff must plausibly allege that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Flynn v. James,* 513 F. App'x 37, 39 (2d Cir.2013) quoting *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999). Under Section 1983, "[t]he traditional definition of acting under color of state law requires that the defendants ... have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). While the facts alleged here plainly allege that the Nurse and Doctor were indeed acting under color of state law-and as previously discussed, are therefore immune from suit under the facts of this case-to the extent that Plaintiff now argues that they were not acting under color of state

law, that would preclude his action under Section 1983. Under either situation, the result is the same, and the claims against Nurse McNett and Doctor Canfield must be dismissed.

**\*9** The only other allegations of excessive force in the Amended Complaint relate to individuals who are *not* named defendants in this case. Specifically, the end of the Complaint alleges that *"The extracting team* using excessive force and physical abuse also assaulted me causing me bodily harm. Black and Blue marks on my body, twisted my arm almost broke it. Doing damage to my neck, back, ribs and legs that a month later I'm still hurting and in pain." Dkt. # 11. (Emphasis added.) "The extracting team" is not named as a defendant in this action, nor are the members of the extracting team identified anywhere in the Amended Complaint nor in the caption. In addition, Plaintiff has had the benefit of time-since the Amended Complaint was filed over two years ago-and discovery has long since closed. However, despite being given that time, Plaintiff has not sought to file a second amended complaint to include the extracting team members. Simply put, what the extracting team did or did not do is not before me in this action.

Further, Plaintiff was notified of the fact that the extracting team members were not named by him as defendants in this case as part of the Court's March 7, 2012 Decision and Order. Dkt. # 13, n. 2. ("[T]he Court notes that plaintiff states that '4 extracting team members' used excessive force, but he does not name them as defendants, and the Court does not direct service on these individuals") Even despite that notification over two years ago, Plaintiff took no steps to add the extraction team members as defendants in this case. As such, they are not part of this case, and any allegations against them are not relevant to the present motion

### *Conclusion*

Based upon all of the foregoing, Plaintiff's Amended Complaint does not plausibly entitled him to relief, and the Defendants' Motion to Dismiss (Dkt. # 27) is therefore GRANTED. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3385186

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2095024
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Dwayne SINGLETON, Plaintiff,
v.
Correction Officer WILLIAMS, Defendant.

No. 12 Civ. 02021(LGS).
|
Signed May 20, 2014.

*OPINION AND ORDER*

LORNA G. SCHOFIELD, District Judge.

**\*1** Dwayne Singleton, pro se, brings this action pursuant
to 42 U.S.C. § 1983 against Defendant Correction
Officer Kimberly Williams, alleging interference with his
mail during his incarceration at the George R. Vierno
Center ("GRVC") on Rikers Island, in violation of the
First and Fourteenth Amendments. Defendant moves
for summary judgment dismissing the Complaint in its
entirety ("Motion"). Because Plaintiff has failed to adduce
sufficient evidence to permit a reasonable juror to return
a verdict in his favor, Defendant's Motion is granted.

## BACKGROUND

### I. Factual Background
The following facts are taken from Plaintiff's deposition,
Plaintiff's Complaint, Defendant's Statement pursuant to
Local Rule 56.1 ("56.1 Statement") and Defendant's other
filings in support of her Motion.

This case involves Plaintiff's allegations that his mail was
stolen or withheld while he was incarcerated at GRVC,
from December 2009 to May 2010, and from September
2011 to March 2012. While at GRVC, Plaintiff drafted
letters "everyday," usually "ten, fifteen letters in one
shot." Plaintiff corresponded with his mother, his cousins,
an ex-girlfriend, his lawyers, a friend named "Stacy,"
whose last name and contact information is unknown
to Plaintiff, and several other women whose names he
does not recall. Plaintiff also sent letters to outpatient

programs, drug programs, magazines, and "businesses,"
including a record company and a film company.

Plaintiff received "a lot of mail" while incarcerated at
GRVC, including from his mother, the ex-girlfriend, a
social worker and other individuals. Plaintiff also received
money from his mother and his cousins on numerous
occasions. In addition to personal mail, Plaintiff received
legal mail, which was recorded in a log. Plaintiff signed
for legal mail on twelve occasions between December 2011
and March 2012.

Plaintiff suspected he was not receiving all of his mail
because he "wrote to certain people and he didn't get [any]
response back [from] ... a few girls ... [and] businesses." In
addition, Plaintiff's friend "Stacy" told him that she had
not received any of the four or five letters Plaintiff had sent
her, and that she had sent him letters, which Plaintiff did
not receive. Plaintiff testified that no one except Stacy told
him they had sent mail that he had not received.

While Plaintiff was an inmate at GRVC, Defendant was
the primary mail officer on duty from Monday to Friday,
and frequently distributed Plaintiff's mail, usually after
lunch. When Defendant was unavailable, other correction
officers filled in and distributed mail to the inmates.

Plaintiff and Defendant offer conflicting evidence
concerning Defendant's alleged interference with
Plaintiff's mail. Plaintiff asserts that he first suspected that
Defendant was stealing his mail because she spoke to him
disrespectfully. Plaintiff testified that "[t]hings started to
get out of hand when [Plaintiff] suspected that [Defendant]
was ... messing with [his] mail." Plaintiff observed that
Defendant was friendly with some inmates and delivered
their mail, but heard that she was "playing with" the mail
of inmates she did not like.

**\*2** According to Plaintiff, when he confronted her, she
"would look at [him] with the mail in her hand, and
keep walking." On March 5, 2012, Defendant made two
statements to Plaintiff, both of which he interpreted as
admissions that she was withholding his mail. Defendant
made the statements when Plaintiff was questioning or
accusing Defendant about his mail, apparently not for
the first time, and she responded, "[y]ou keep asking me
stupid questions, you aint' getting your f*ckin' mail."
Defendant also said "you crazy, take ya' medication, cause
you got that right, you won't be getting no f*ckin' mail

from me." According to Plaintiff, he could not "prove" that Defendant was interfering with his mail until she made these statements. Plaintiff stated that during this exchange he was being "volatile" and "probably having bipolar disorder." After that incident, Plaintiff did not recall receiving mail from Defendant again, although he did receive mail from other correction officers. Plaintiff was transferred out of GRVC approximately one week after the confrontation with Defendant.

According to Defendant, near the end of Plaintiff's incarceration at GRVC, he accused her of stealing his mail, spit on the glass separating them, and threatened to kill her, at which point Defendant gave Plaintiff's mail to a different correction officer for delivery. Defendant states that after this incident, Plaintiff would "yell and threaten [her]" and on multiple occasions, threatened to kill her and her family. Defendant denies withholding, tampering, or otherwise interfering with Plaintiff's mail.

## II. Procedural History

On December 19, 2013, Defendant filed her Motion, 56.1 Statement, and supporting papers, including excerpts from Plaintiff's deposition. On January 22, 2014, Plaintiff filed his opposition to the Motion ("Opposition"). Plaintiff's Opposition consisted of six declaratory sentences reiterating the assertions in his Complaint. Plaintiff filed no supporting affidavits or other evidence, and no opposition to Defendant's 56.1 Statement. On January 29, 2014, Defendant filed her reply to Plaintiff's Opposition. On March 17, 2014, Plaintiff filed a "response" to Defendant's reply, asserting that he "did overhear [Defendant] tell [him] with her own words that she was stealing [his] mail," and that "there are no witnesses because it was just [Defendant] in front of [Plaintiff's] cell."

## STANDARD

The standard for summary judgment is well established. Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed.R.Civ.P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986); Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir.2002). The court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir.2008).

**\*3** If the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322–23; PepsiCo, Inc. v. Coca–Cola Co., 315 F.3d 101, 105 (2d Cir.2002). In other words, summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

"Although pro se plaintiffs are entitled to special latitude, when defending against summary judgment motions, absent a showing of concrete evidence from which a reasonable juror could return a verdict in [the non-moving party's] favor, summary judgment must be granted to the moving party." Jermosen v. Coughlin, 877 F.Supp. 864, 867 (S.D.N.Y.1999) (alteration in original) (citations omitted) (internal quotation marks omitted). "Evidence which is merely colorable, conclusory, speculative or not significantly probative is insufficient to withstand a summary judgment motion." Id. (internal quotation marks omitted).

Where the non-moving party fails to respond to a Rule 56.1 statement submitted by the moving party, the facts in the moving party's Rule 56.1 statement may be deemed admitted as a matter of law. S.D.N.Y.R. 56.1–56.2. In the Second Circuit, however, "[c]ourts ... typically forgive a pro se plaintiff's failure to file a Local Rule 56.1 Statement, and generally conduct their own independent review of the record." Lloyd v. Holder, No. 11 Civ. 3154, 2013 WL 6667531, at *5 (S.D.N.Y. Dec. 17, 2013).

## DISCUSSION

The Complaint alleges a violation of "federal laws," including the First Amendment to the Constitution and "Section 1309 of the U.S. Postal Code"[1] on account of Defendant "stealing" "personal mail ... business mail

and more," and asserts that jurisdiction is proper under [42 U.S.C. § 1983](). Construing the Complaint broadly, Plaintiff has stated claims pursuant to [42 U.S.C. § 1983]() for deprivation of Plaintiff's First Amendment rights on account of interference with non-legal mail, and deprivation of Plaintiff's First and Fourteenth Amendment rights on account of interference with legal mail. Because Plaintiff has failed to adduce evidence sufficient for a reasonable juror to find that the alleged interference with his mail amounted to a constitutional violation, summary judgment is granted on all claims.

1    Because no such legal provision exists, this claim will not be addressed.

### I. Non–Legal Mail

An inmate has a First Amendment right to "the free flow of incoming and outgoing mail." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003); *Heimerle v. Attorney General,* 753 F.2d 10, 13 (2d Cir.1985). Restricting prisoners' right to mail is permissible only where it "further[s] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and is] no greater than is necessary or essential to the protection of the particular governmental interest involved." *Ahlers v. Rabinowitz,* 684 F.3d 53, 64 (2d Cir.2012) (quoting *Davis,* 320 F.3d at 351). To establish a claim for interference with regular, non-legal mail in violation of the First Amendment, an inmate "must show a pattern and practice of interference that is not justified by any legitimate penological concern." *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001) (dismissing First Amendment claim where inmate identified only a "single instance" of interference with his regular mail). The Second Circuit has directed that "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis,* 320 F.3d at 351.

**\*4** Here, the evidence in the record is insufficient for a reasonable juror to find that Plaintiff has established interference with his incoming non-legal mail rising to the level of a First Amendment violation. Even construing the evidence in Plaintiff's favor, Plaintiff has alleged only one specific incident involving interference with his mail— that he attempted to exchange mail with his friend Stacy, whose last name and contact information he does not know, and that neither Plaintiff nor Stacy received each other's mail. Plaintiff's assertion that Defendant interfered

with his mail is otherwise based upon three facts: (1) that he wrote numerous letters to individuals, businesses and organizations, and did not receive responses to all of his letters; (2) that approximately one week before Defendant was transferred from GRVC, Defendant responded to Plaintiff's allegations that she was stealing his mail by stating "you crazy, take ya' medication, cause you got that right, you won't be getting no f\*ckin' mail from me" and "[y]ou keep asking me stupid questions, you' aint' getting your f\*ckin' mail"; and (3) that he heard from "some other guys" that Defendant was "playing with the mail" of the inmates she did not like. These allegations are insufficient to "establish a pattern and practice of interference [with Plaintiff's mail]," particularly where Plaintiff also testified that he otherwise received mail from "a lot of people" and that no other individuals told him that they had sent mail that he had not in fact received. Accordingly, Defendant's Motion as to Plaintiff's First Amendment claim for interference with non-legal mail is granted.

### II. Legal Mail

Interference with legal mail may constitute a violation of the right to free speech under the First Amendment and the right of access to the courts under the First and Fourteenth Amendments. *Davis,* 320 F.3d at 351; *Monsky v. Moraghan,* 127 F.3d 243, 246–47 (2d Cir.1997) (citing *Lewis v. Casey,* 518 U.S. 343 (1996)). As with interference with non-legal mail, interference with legal mail is permissible only where it "further[s] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and is] no greater than necessary or essential to the protection of the particular governmental interest involved." *Ahlers,* 684 F.3d at 64 (internal quotation marks omitted). Legal mail, however, is "afforded greater protection ... than ... non-legal mail." *Davis,* 320 F.3d at 351; *accord Cancel,* 2001 WL 303713, at *6. To establish a violation of the right to free speech, an inmate must still demonstrate that prison officials "regularly and unjustifiably interfered with the ... legal mail." *Cancel,* 2001 WL 303713, at *6 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). To establish a claim of denial of access to the courts, a plaintiff must show: (1) that the defendant acted deliberately and maliciously; and (2) that the plaintiff suffered actual injury in pursuing a legal claim. *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

**\*5** The record does not contain sufficient evidence to permit a reasonable juror to find that Plaintiff

has established that Defendant's conduct in respect of Plaintiff's legal mail amounted to a constitutional violation. First, Plaintiff has neither alleged nor produced evidence that his receipt or delivery of legal mail was impeded. Plaintiff testified that he "sent a lot of different pieces of mail" to his lawyers, that "legal mail is always recorded when you receive it," and that he "received mail from the lawyer." [2] The record indicates at least twelve occasions on which Plaintiff signed for legal mail for the period from December 2011 through March 2012. Second, there is no evidence that Plaintiff suffered any injury in pursuing his legal claims as a result of any interference with his legal mail. For example, when asked during his deposition whether his criminal case was affected in any way by the incident involving "[the] messing with [his] mail," Plaintiff responded "[o]nly in a mental way." Defendant's Motion for summary judgment on Plaintiff's claims in respect of his legal mail is accordingly granted.

[2]    Similarly, because Plaintiff has not alleged any interference with his access to counsel, nor did any of the evidence indicate as much, a Sixth Amendment claim would also fail on these facts.

### *CONCLUSION*

For the reasons discussed above, Defendant's Motion for summary judgment dismissing all of Plaintiff's claims is hereby GRANTED.

The Clerk of Court is directed to close the motion at docket number 38, to close this case, and to mail a copy of this Opinion and Order to the pro se Plaintiff.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 2095024

---

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Carter v. DeKalb County, Georgia, N.D.Ga., October 18, 2012

2011 WL 4478515
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Philip DeBLASIO, Plaintiff,
v.
David ROCK, et al., Defendants.

No. 9:09–CV–1077 (TJM/GHL).
|
Sept. 26, 2011.

**Attorneys and Law Firms**

Philip Deblasio, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Adele M. Taylor–Scott, Esq., of Counsel, Albany, NY, for Defendants.

*MEMORANDUM DECISION AND ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** In this *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, Plaintiff Philip DeBlasio alleges that twenty-three employees of the New York Department of Corrections and Community Supervision ("DOCCS") violated his constitutional rights by denying him adequate medical care, interfering with his right to exercise his religion, subjecting him to excessive force, and subjecting him to unconstitutional conditions of confinement. (Dkt. No. 1.) Currently pending is Defendants' motion for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion, despite having been advised of the consequences of failing to do so and having been granted four extensions of the deadline by which to do so. (Dkt. No. 55 at 3; Jan. 19, 2011, Text Order; Feb. 16, 2011, Text Order; Mar. 31, 2011 Text Order; June 27, 2011, Text Order.) For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

**I. BACKGROUND**

Plaintiff, an inmate currently in DOCCS custody at Five Points Correctional Facility, complains in this action of a series of events that occurred at Great Meadow Correctional Facility in 2006 and 2009. (Dkt. No. 1.)

**A. Incidents in 2006**

In his verified complaint, Plaintiff alleges that on December 28, 2006, Defendant Physician Assistant Fisher Nesmith stopped at his cell during sick-call rounds. (Dkt. No. 1 at 11.) Plaintiff told Defendant Nesmith that he needed to see the doctor for his chronic back pain and herniated discs. *Id.* Defendant Nesmith would not allow Plaintiff to see the doctor. *Id.* at 12. This happened "several times" again after December 28, 2006. *Id.*

Plaintiff alleges that on December 28, 2006, Defendant Correction Officer Kevin Holden was assigned to pack Plaintiff's personal belongings because Plaintiff was moving to a new cell. (Dkt. No. 1 at 12.) Thereafter, pages were missing from each of Plaintiff's three copies of the Koran. *Id.* One of the three Korans had to be destroyed because it was missing so many pages. *Id.* Plaintiff alleges that Defendant Holden is "defin[i]tely responsible" for the missing pages because he "was the only person to pack [P]laintiff's property ..." *Id.*

**B. Incident with Extraction Team**

Plaintiff alleges that one night in early August 2009 [1], he complained of sharp pains in his left ribcage area and blood in his urine. [2] (Dkt. No. 1 at 12.) Defendant Correction Officer Kelsey Lenney told Plaintiff he would call a nurse. [3] *Id.* After speaking with Defendant Nurse Della Howley, Defendant Lenney returned twenty minutes later and asked Plaintiff if he had requested a sick call. *Id.* at 12–13. Plaintiff was enraged and started banging the gate and asking to see a sergeant. *Id.* at 13. When Defendant Sergeant John Busse responded to the scene, Plaintiff explained the situation and Defendant Busse said he would take care of it. *Id.* Two hours after Plaintiff had first complained of the pain, Defendant Howley arrived at his cell "with a very negative attitude." *Id.* Plaintiff "was so mad she wouldn't help him [that] he threw water at her and hit [Defendant] Lt. Richard Juckett as well." *Id.*

---

[1] Plaintiff's allegations about the precise dates on which the incidents in the complaint occurred are contradictory. Early in the complaint, he alleges that

he complained of the pain in his ribcage on "8–7–09." (Dkt. No. 1 at 12.) Later in the complaint, he says that "the next day" after the event was "9–7–09" and refers to it as "Friday morning of the same day." (Dkt. No. 1 at 14.) September 7, 2009, was a Monday. August 7, 2009, was a Friday. These discrepancies need not be resolved because the precise dates are irrelevant to the issues in this case.

2    Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.)

3    Defendant Lenney declares that he did, indeed, call Defendant Howley about Plaintiff. (Dkt. No. 55–9 ¶ 4.) Defendant Howley declares that she does not recall having a conversation with "the Correction Officer on duty" but that she remembers receiving a telephone call from Defendant Juckett asking her to check on Plaintiff. (Dkt. No. 56 ¶¶ 6–7.)

*2   After Plaintiff threw the water, an extraction team was mobilized to remove him from his cell. (Dkt. No. 1 at 13.) This team included Defendant Juckett, Defendant Busse, Defendant Correction Officer Adam Rivers, Defendant Lenney, Defendant Correction Officer Richard Dempster, and Defendant Correction Officer Richard Buell. *Id.*

According to Plaintiff, Defendant Juckett told Plaintiff that "he was going to OBS[4] one way or the other" even if Defendant Juckett "had to drag [P]laintiff out of the cell himself." *Id.* Plaintiff told Defendant Juckett that he was "not suicidal and should be sent to F–Block" as originally scheduled. *Id.* Defendant Juckett "was then just about to spray [P]laintiff in the face when [P]laintiff pleaded with him to take him out without gas[s]ing him ..." *Id.* In the complaint, Plaintiff alleges that the extraction team moved him to an observation room and then beat him with sticks, their fists, and their feet. *Id.* At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.)

4    The Residential Crisis Treatment Program, often referred to as "OBS", is a special observation area for inmates who cannot be controlled by security officers or who become unmanageable, suicidal, or homicidal. (Dkt. No. 55–2 ¶¶ 4–5.)

Defendants assert that they did not use any force on Plaintiff. Defendant Dempster declares that the only physical contact that any member of the extraction team

had with Plaintiff during the cell extraction was when Defendant Buell placed Plaintiff's wrists and legs in restraints. (Dkt. No. 55–5 ¶ 10; Dkt. No. 55–8 ¶ 18.) Defendant Dempster declares that Plaintiff "voluntarily complied with [a] strip frisk, which is standard procedure for inmates being processed into" the mental health unit. (Dkt. No. 55–5 ¶ 12; Dkt. No. 55–8 ¶¶ 20–21.) After that was done, the team "escorted [P]laintiff to an observation cell," which was "accomplished without incident." (Dkt. No. 55–5 ¶¶ 13–14.) Defendant Juckett declares that "[t]he only physical contact that I or any member of the extraction team had with Inmate DeBlasio that day was to place him in restraints, conduct a pat frisk, and be present when the inmate was subject to strip frisk." (Dkt. No. 55–8 ¶ 25.) Defendant Lenney declares that he "had no physical contact with inmate DeBlasio at all." (Dkt. No. 55–9 ¶ 20.) Defendant Rivers declares that he "had no physical contact with inmate DeBlasio during this engagement." (Dkt. No. 55–11 ¶ 13.)

After Plaintiff was secured in the observation cell, the extraction team members left the area, returned to their regular duties, and did not see Plaintiff again that day. (Dkt. No. 55–5 ¶¶ 15–16; Dkt. No. 55–3 ¶¶ 13–14; Dkt. No. 55–8 ¶ 22; Dkt. No. 55–9 ¶ 21; Dkt. No. 55–1 ¶ 12.) No paperwork was prepared documenting a use of force. (Dkt. No. 55–11 ¶ 14.) It is standard procedure to prepare a Use of Force Report when force is used on an inmate. *Id.*

Plaintiff alleges that after the extraction team left, he remained in the observation cell all night without any medical attention or treatment. (Dkt. No. 1 at 13.) At his deposition he testified that he suffered only from "discomfort [and] bruises" as a result of the incident. (Dkt. No. 55–16 at 83:6–8.) About twenty-four hours after the incident, Plaintiff complained to an officer of chest pains. (Dkt. No. 56 at 2 ¶ 15, 5.) Plaintiff allowed Defendant Howley to examine him. *Id.* Plaintiff told Defendant Howley only that he had indigestion. *Id.* Defendant Howley found that Plaintiff had "no signs of distress." *Id.*

### C. Incident at Conference Room
*3   The day after the incident with the extraction team, Defendant Correction Officer Scott Hamel escorted Plaintiff to a conference room to be interviewed by Defendant Dr. Battu[5] and Defendant Social Worker Sarah Wetherell.[6] (Dkt. No. 1 at 14.) Dr. Battu had been asked to see Plaintiff to "possibly prescribe medications

to control his behavior or adjust medications that were already prescribed." (Dkt. No. 55–2 ¶ 9.) Dr. Battu often performs such interviews alone, but was accompanied by Defendant Wetherell "[b]ecause of the violent nature of this inmate." *Id.* ¶ 10. Defendant Wetherell had "worked with [P]laintiff for a number of years ... and [was] familiar with his history and patterns of behavior." (Dkt. No. 55–20 ¶ 3.) Defendant Wetherell declares that the RCTP Coordinator was also present. (Dkt. No. 55–20 ¶ 13.)

[5]     The parties spell this defendant's name in a variety of ways. In his declaration, he refers to himself as Kalyana Battu. (Dkt. No. 55–2 at 1.) Therefore, I have used that spelling.

[6]     The parties spell this defendant's name in a variety of ways. In her declaration, she refers to herself as Sarah Wetherell. (Dkt. No. 55–20 at 1.) Therefore, I have used that spelling.

Defendant Sergeant Crispin Murray declares that he supervised Defendant Hamel as he escorted Plaintiff to the appointment. (Dkt. No. 55–10 ¶ 5.) Once Plaintiff was in the conference room, Defendant Murray moved to a desk several feet away from the door to the room. (*Id.* ¶ 6; Dkt. No. 55–2 ¶ 11.)

Plaintiff alleges that he told Defendants Battu and Wetherell about the incident with the extraction team. (Dkt. No. 1 at 14.) He alleges that Defendant Battu said that it was none of his concern because he was just "there to handle medications and suicide prevention" and that because Plaintiff threw water at Defendant Howley he "may have deserved" what happened. *Id.* Plaintiff alleges that Defendant Wetherell "refused to comment or help [Plaintiff] in any way at all." *Id.* Plaintiff alleges that he called Defendant Wetherell "a snake sellout C.O. bitch" and she stormed out of the room and talked to Defendant Correction Officer Scott Hamel. *Id.* Dr. Battu declares that Plaintiff "became verbally abusive to Sarah Wetherell, nearly bringing her to tears, and when I tried to calm him down, [P]laintiff became abusive toward me." (Dkt. No. 55–2 ¶ 14.) Dr. Battu declares that Plaintiff's behavior "brought the interview to an end. The officer waiting outside moved in and escorted [P]laintiff out." (Dkt. No. 55–2 ¶ 15.) Defendant Wetherell declares that when "the session started to get hostile, the RCTP Coordinator stood up, and in doing so triggered a prearranged signal to security personnel to move in." (Dkt. No. 55–20 ¶ 19.)

Plaintiff alleges that Defendant Hamel entered the conference room and rushed Plaintiff into a cell. (Dkt. No. 1 at 14.) Defendant Hamel declares that he entered the conference room because "I believe I observed [Plaintiff] stand up during the interview in disobedience of my direct order to him not to do so. When the inmate stood up, I automatically moved in, took control of the restraints, and escorted him out of the room and back to his observation cell." (Dkt. No. 55–7 ¶ 9.) Defendant Murray declares that when a "problem occurred in the interview room," he supervised Defendant Hamel as Defendant Hamel escorted Plaintiff back to his cell and Defendant Stemp joined them "to provide additional security coverage." (Dkt. No. 55–10 ¶¶ 7–9.)

**\*4** The parties dispute what happened next. Defendant Hamel declares that before he placed Plaintiff in his cell, he asked him if he wanted to take a shower because inmates in the observation unit generally take showers on Mondays, Wednesdays, and Fridays. (Dkt. No. 55–7 ¶ 10.) Defendant Hamel declares that Plaintiff declined and then turned and head-butted him, hitting Defendant Hamel's forehead just over his left eye and splitting the skin open. *Id.* ¶ 11. Defendants Murray and Stemp also declare that Plaintiff head-butted Defendant Hamel. (Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Defendant Hamel declares that he "instinctively" pushed Plaintiff "forward and down to the floor with my left hand" and that Plaintiff banged his head on the way down. (Dkt. No. 55–7 ¶ 12.) Defendant Hamel declares that Plaintiff did not stay down and kept kicking and trying to bite Defendant Hamel. *Id.* ¶ 13. Defendant Murray declares that he ordered Defendant Stemp to "go in and pull the inmate out of the cell so they could get control of him." (Dkt. No. 55–10 ¶ 13.) Defendant Hamel declares that he and Defendant Stemp "used the wrist restraints to lift [Plaintiff] out of the cell and onto the floor in the hallway." (Dkt. No. 55–7 ¶ 16.) Defendant Hamel declares that once Plaintiff was on the floor in the hallway, he took control of Plaintiff's legs while Defendant Stemp took control of Plaintiff's upper body. *Id.* ¶ 17. Defendant Stemp declares that he took control of Plaintiff's upper body by putting one knee on his back and the other on his head until he calmed down. (Dkt. No. 55–19 ¶ 10.) Defendant Hamel declares that Plaintiff calmed down and they all remained that way until Defendant Hamel and Defendant Stemp were relieved by other staff. (Dkt. No. 55–7 ¶ 18.)

Defendant Stemp declares that he "used only such force as was necessary to subdue the inmate. Nobody kicked, punched or otherwise asserted unnecessary force against" Plaintiff. (Dkt. No. 55–19 ¶ 13.) Defendant Murray declares that he "personally did not have any physical contact with the inmate." (Dkt. No. 55–10 ¶ 16.) Defendant Murray declares that given Plaintiff's "unprovoked assault on the escorting officer, his attempts to further assault the officer during the course of the take-down, and his refusal to comply with staff direction, I do not believe that ... the actions of the men under my supervision violated any of [P]laintiff's federally protected rights." *Id.* ¶ 21.

Plaintiff's version of this incident is quite different. In his verified complaint, Plaintiff alleges that after Defendant Hamel escorted him to his cell, Defendants Stemp and Murray came into the cell. (Dkt. No. 1 at 14.) Plaintiff alleges that Defendant Murray removed Plaintiff's handcuffs, said "how tough are you now disrespecting Nurse Howley and Wetherell and Dr. Battu," and slapped Plaintiff on the left side of his face with an open hand. *Id.* All of the officers then beat Plaintiff, got him onto his stomach, handcuffed him, and kicked him several more times in the face, head, and body. *Id.* at 14–15. At his deposition, Plaintiff testified that he did not do anything to any of the officers until Defendant Murray removed his handcuffs and punched him in the face. Plaintiff testified that it was only then that "I put my hands up and I started fighting with him." (Dkt. No. 55–16 at 99:12–100:17.)

**\*5** When the relief officers arrived, Defendants Murray, Stemp, and Hamel escorted Plaintiff to the clinic to be examined for injuries. (Dkt. No. 55–10 ¶ 17.) Plaintiff and the officers were examined and photographed and Defendant Murray completed a Use of Force Report. (Dkt. No. 55–10 ¶ 18.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

### D. Conditions of Confinement

Plaintiff alleges that after this incident he was subjected to various harsh conditions of confinement. (Dkt. No. 1 at 15.)

#### 1. *Handcuff Incident with Defendant Segovis*

Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Roswell Segovis handcuffed Plaintiff to take him to the shower. (Dkt. No. 1 at 15.) Defendant Segovis noticed that Plaintiff was wearing socks and refused to let him shower. *Id.* He then left Plaintiff handcuffed in his cell for five hours. *Id .* Plaintiff pleaded with Defendant Segovis to remove the handcuffs so that he could use the bathroom. *Id.* Defendant Segovis refused and after several hours Plaintiff "had no choice but to wet his pants and then defecate on himself." *Id.* Defendant Segovis declares that he left Plaintiff handcuffed because Plaintiff "took the handcuffs hostage and refused to put his hands through the feed-up slot so that they could be removed." (Dkt. No. 55–18 ¶ 4.)

Later, Defendant Segovis issued a misbehavior report charging Plaintiff with committing an unhygienic act. (Dkt. No. 1 at 15.) The hearing officer sentenced Plaintiff to seven days of restricted diet. *Id.* Defendant First Deputy Superintendent Jeffrey Tedford "co-signed" the order for restricted diet. *Id.* The punishment "was brought to the attention" of Defendant Sergeant David Winchip, who "was going along with the entire [charade]." *Id.*

#### 2. *Hot Water*

Plaintiff alleges that he was not able to get hot water because he was not given a bucket. (Dkt. No. 1 at 17.) On August 19, 2009, Plaintiff asked Defendant Sergeant Peter DePalo for hot water. (Dkt. No. 1 at 17.) Defendant DePalo said "Muslims don't deserve hot water. You'll get that when you get to hell." *Id.* On August 24, 2009, Plaintiff told a watch commander, in the presence of Defendant Winchip, that he was not receiving hot water. *Id.* at 18. Defendant Winchip said he would see to it that Plaintiff got a bucket for hot water. *Id.* Later that day, Defendant Winchip came to Plaintiff's cell and said "You won't get that bucket[ ] today you dirty white Muslim wigger." *Id.*

#### 3. *Drinking Water*

Plaintiff alleges that he once went without water for a week. (Dkt. No. 1 at 15.) He alleges that during the week that he went without water, Defendant Correction Officer William Powers was responsible for turning on Plaintiff's water and failed to do so. (Dkt. No. 1 at 6.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150: 2–5, 6–9.)

### 4. *Food*

**\*6** Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Alan White and Defendant Segovis played with Plaintiff's breakfast tray and Plaintiff had to plead with them in order to get it. (Dkt. No. 1 at 16.) At lunch [7] Defendant White gave Plaintiff only a quarter cup of juice to drink and no lunch tray. *Id.* Later, Defendant DePalo came to Plaintiff's cell asking for the empty lunch tray. *Id.* Plaintiff told him that he was never given a lunch tray. *Id.* Defendant DePalo looked under Plaintiff's bed and did not see a tray. *Id.* That night at dinner an officer served Plaintiff a special diet loaf instead of regular food and told him that he would receive it for seven days as punishment for not giving back his lunch tray. *Id.* This punishment was ordered by Defendants White and Segovis and "co-signed" by Defendant DePalo. *Id.* at 17. Plaintiff asserts that Defendants White and Segovis "have a history" with him and "blatantly harass[ed]" Plaintiff "to disturb his Fast of Ramadan." *Id.* at 16–17.

[7]     It is unclear when Plaintiff went to lunch on August 18, 2009, because, as discussed above, he alleges that he was handcuffed in his cell from 8:00 a.m. to 1:00 p.m. (Dkt. No. 1 at 15.)

Plaintiff alleges that on one occasion, Defendant Segovis gave Plaintiff pork instead of the special diet loaf. *Id.* Defendant Segovis said "You know you want to eat some swine." *Id.* at 18.

### 5. *Recreation and Movement*

Plaintiff alleges that he was not allowed to move outside his cell at all when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.)

### 6. *Showers*

Plaintiff alleges that on one occasion, Defendant Segovis would not allow Plaintiff to shower. *Id.* When Plaintiff reported this to Defendant DePalo, he said "That's life in F-block for Muslims." *Id.*

### 7. *Bibles*

Plaintiff alleges that on August 31, 2009, a chaplain came to Plaintiff's cell to deliver two Bibles. (Dkt. No. 1 at 16.) Defendants Powers and Segovis told the chaplain to leave the Bibles and that they would give them to Plaintiff when they were not busy. *Id.* Defendant Powers

came to Plaintiff's cell and "said [he] was banging all day." *Id.* Plaintiff said it was not him who was banging. *Id.* Defendant Powers said he would investigate and that Plaintiff would not be getting his Bibles. *Id.* On or about September 8, 2009, Defendant Powers came to Plaintiff's cell, told him he had discovered that it was not Plaintiff who was banging, and apologized. *Id.* However, he did not give Plaintiff his Bibles. *Id.* The record shows that Plaintiff received the Bibles on September 12, 2009. [8] (Dkt. No. 55–6 at 28.)

[8]     Plaintiff signed the complaint in this action on September 10, 2009. (Dkt. No. 1.) Thus, he had not received the Bibles when he wrote the complaint. Because Plaintiff has not opposed the motion for summary judgment, it is unclear whether he wishes to continue asserting the claim regarding the Bibles.

### E. Restrictions on Religious Practice

Plaintiff claims that Defendant Superintendent David Rock and Defendant CORC Director Karen Bellamy violated his religious rights in three ways. (Dkt. No. 1 at 18.) First, he alleges that he was not allowed to demonstratively pray in the BHU recreation pen. *Id*. Plaintiff alleges that Defendant Rock allows Christians to pray but "is obviously discriminating against the Muslims" by prohibiting demonstrative prayer. *Id.* at 18–19. Second, he alleges that BHU and SHU inmates are not allowed to have razors, which prevents Muslims from shaving their pubic and armpit hair as required by their faith. *Id.* at 19. Third, Plaintiff alleges that he is not given Halal food. *Id.*

### F. Procedural History

**\*7** Plaintiff filed his complaint in this Court on September 23, 2009. (Dkt. No. 1.) Plaintiff's complaint sets forth three causes of action: (1) religious discrimination; (2) "assault and cruel and unusual punishment at the hands of DOCS workers"; and (3) a request that Plaintiff receive "proper medical attention at all times." (Dkt. No. 1 at 20.) Plaintiff requests injunctive relief (being allowed to pray in the recreation pen, being allowed to shave his pubic hair, and given Halal food) and damages. *Id.* at 21.

Defendants now move for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motions for Summary Judgment

Under *Federal Rule of Civil Procedure 56*, summary judgment is warranted if "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a)*. The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir.2006).* The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* In determining whether a genuine issue of material [9] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, 542 F.3d 290, 309 (2d Cir.2008).*

[9]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson, 477 U.S. at 248.*

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996).* Rather, the Court must (1) determine whether any facts are disputed in the record presented on the defendants' motion, and (2) determine whether, based on the *undisputed* material facts, the law indeed warrants judgment for the defendants. *See Champion, 76 F.3d at 486; Allen v. Comprehensive Analytical Grp., Inc., 140 F.Supp.2d 229, 232 (N.D.N.Y.2001);* N.D.N.Y. L.R. 7.1(b)(3).

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under *Federal Rule of Civil Procedure 56* is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6).* As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique, 405 F.2d 270, 273 (2d Cir.1968)* (citations omitted); *accord, Katz v. Molic, 128 F.R.D. 35, 37–38 (S.D.N.Y.1989)* ("This Court finds that ... a conversion [of a *Rule 56* summary judgment motion to a *Rule 12(b)(6)* motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing *Federal Rule of Civil Procedure 12(b)(6)* motions to dismiss.

**\*8** A defendant may move to dismiss a complaint under *Federal Rule of Civil Procedure 12(b)(6)* on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed.R.Civ.P. 8(a)(2).* The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal, ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))* (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id. at 1950* (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under *Rule 12(b)(6),* the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.1994)* (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009).* However, "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

### A. Failure to Exhaust Administrative Remedies Regarding Claims Against Defendants Nesmith and Holden

Plaintiff alleges that Defendant Nesmith would not allow Plaintiff to see a doctor for back pain and that Defendant Holden ripped pages from Plaintiff's Korans. (Dkt. No. 1 at 11–12.) Defendants argue that these claims should be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 55–23 at 13–14.) Defendants are correct.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010).

**\*9** Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at (b)(1). If there is no such informal

resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at (c).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at (d).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

Here, Jeffrey Hale, the Assistant Director of the Inmate Grievance Program for DOCCS, declares that there "are no CORC appeal records that correspond to the December 28, 2006, events as alleged in [P]laintiff's complaint regarding back pain or the loss of personal or religious property at the Great Meadow Correctional Facility." (Dkt. No. 55–6 ¶ 7.) CORC records show that Plaintiff did not file any CORC appeals between October 2006 and October 2008. (Dkt. No. 55–6 at 5.) Indeed, Plaintiff admitted at his deposition that he did not properly exhaust his administrative remedies regarding Defendant Holden's alleged desecration of the Korans. [10] (Dkt. No. 55–16 at 57:17–58:5.) Therefore, Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Nesmith and Holden.

[10]    Plaintiff was not able to recall any of the details about the incident with Defendant Nesmith. (Dkt. No. 55–16 at 37–41.)

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v.*

*New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[11] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

[11] The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

**\*10** Here, as discussed above, an administrative remedy was available to Plaintiff. Defendants preserved the exhaustion defense by asserting it in their answer to the complaint. (Dkt. No. 39 ¶ 18.) The record before the Court on this unopposed motion for summary judgment indicates neither that Defendants should be estopped from asserting the defense nor any special circumstances justifying Plaintiff's failure to exhaust his administrative remedies. Therefore, the Court grants Defendants' motion for summary judgment dismissing the claims against Defendants Nesmith and Holden.

**B. Claims Regarding Failure to Provide Medical Care**
Plaintiff alleges that Defendants Buell, Busse, Dempster, Howley, Juckett, Lenney, and Rivers[12] failed to provide him with adequate medical care. (Dkt. No. 1at 11–14.) Defendants argue that there are "neither objective nor subjective facts to support Plaintiff's conclusory medical indifference claim." (Dkt. No. 55–23 at 14–17.) Defendants are correct.

[12] Defendants characterize the complaint as asserting Eighth Amendment medical care claims against only Defendants Nesmith, Howley, and Battu. (Dkt. No. 55–23 at 14.)

*1. Defendants Lenney, Busse, and Howley*
Plaintiff alleges that Defendants Lenney, Busse, and Howley failed to adequately respond to his complaints of ribcage pain and blood in his urine. (Dkt. No. 1 at 12–13.)

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

The undisputed facts show that Plaintiff did not suffer from a serious medical condition. A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. Here, Plaintiff alleges that he complained to Defendants Lenney, Busse, and Howley of "sharp pains in his left ribcage area and the pissing of blood." (Dkt. No. 1 at 12.) Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.) When Plaintiff allowed Defendant Howley to examine him the next day, he stated only that he had indigestion. (Dkt. No. 56 at 5.) There is no evidence that Plaintiff's ribcage pain and the blood he reported in his urine significantly affected his daily activities or caused

him chronic and substantial pain. The record before the Court, therefore, does not reflect that Plaintiff suffered from "a condition of urgency, one that may produce death, degeneration, or extreme pain."

**\*11** Even if Plaintiff had raised a triable issue as to the objective prong of his Eighth Amendment medical care claim against Defendants Lenney, Busse, and Howley, the Court would grant summary judgment on this claim because Plaintiff has not raised a triable issue of fact that any of these Defendants were deliberately indifferent to his medical needs. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Defendants Lenney and Busse are correction officers, not medical staff members. (Dkt. No. 1 at 8; Dkt. No. 55–9 ¶ 1.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care where the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999). Here, as discussed above, there is no evidence that Plaintiff was in "extreme pain." Moreover, the undisputed facts show that neither Defendant Lenney nor Defendant Busse intentionally delayed Plaintiff's access to medical care. Defendant Lenney declares that he called Defendant Howley regarding Plaintiff's complaints of pain. (Dkt. No. 55–9 ¶ 4.) By Plaintiff's own admission, Defendant Howley came to his cell two hours after he first complained of pain. (Dkt. No. 1 at 13.) A two-hour wait for medical care is not the type of delay that indicates deliberate indifference. *See Baumann,* 36 F.Supp.2d at 512 (denying defendants' motion to dismiss where plaintiff alleged that correction officer delayed care for his injured arm for three weeks). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Lenney and Busse.

Regarding Defendant Howley, to establish deliberate indifference on the part of medical staff, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference.

*Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). The undisputed facts show that Defendant Howley came to Plaintiff's cell to tend to his pain but that Plaintiff threw toilet water on her before she could examine him. (Dkt. No. 1 at 13; Dkt. No. 56 ¶ 11.) Thus, the undisputed facts show that the failure to provide immediate care to Plaintiff was the result of his own conduct rather than any conscious and intentional disregard on the part of Defendant Howley. Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claim against Defendant Howley.

### 2. *Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers*

**\*12** Plaintiff alleges that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) violated his Eighth Amendment rights by leaving him in a cell all night without any medical attention or treatment. (Dkt. No. 1 at 13.)

The undisputed facts show that Plaintiff did not suffer from any serious medical condition as a result of the incident with the extraction team. Plaintiff testified that he suffered from "discomfort [and] bruises" from the incident. (Dkt. No. 55–16 at 83:6–8.) Superficial injuries such as bruises are not "serious medical conditions." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 354 (N.D.N.Y.2010). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers.

### C. Excessive Force Claim Against the Extraction Team

Plaintiff claims that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) used excessive force. (Dkt. No. 1 at 13.) Defendants do not explicitly address Plaintiff's Eighth Amendment excessive force claim regarding the extraction team, although their memorandum of law requests that "[P]laintiff's complaint be dismissed, *in its entirety,* and without leave to replead" and states, in the section regarding medical care, that "the extraction team did not use any force against [P]laintiff." (Dkt. No. 55–23 at 16

and 30, emphasis added.) The Court finds that Plaintiff has, just barely, raised a triable issue of material fact on this issue.

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9.

**\*13** Here, Plaintiff's verified complaint alleges that the members of the extraction team beat Plaintiff with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.) If Plaintiff's version of events is credited, Defendants' use of force was more than *de minimis* despite the fact that Plaintiff suffered only bruises and discomfort as a

result. *Cf. Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking an inmate's ankles and feet during a pat frisk is *de minimis* and insufficient to rise to the level of a constitutional violation); *Show v. Patterson,* 955 F.Supp. 182, 192–93 (S.D.N.Y.1997) (pushing inmate against wall with hands and no use of weapons *de minimis* use of force); *Anderson v. Sullivan,* 702 F.Supp. 424, 425–27 (S.D.N.Y.1988) (pushing inmate's face into a bar while applying handcuffs not significantly disproportional to the goal of handcuffing plaintiff).

Defendants flatly contradict Plaintiff's version of events. The members of the extraction team declare that the only physical contact any of them had with Plaintiff was to place him in restraints, pat frisk him, and strip frisk him. (Dkt. No. 55–8 ¶ 25; Dkt. No. 55–9 ¶ 20; Dkt. No. 55–11 ¶ 13.)

Given these conflicting versions of events, the Court is called upon to weigh the parties' credibility. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). Under this exception, in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete" and the plaintiff's evidence is contradicted by evidence produced by the defendants, the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

Here, although Plaintiff is relying exclusively on his own testimony and his evidence is contradicted by evidence produced by Defendants, the *Jeffreys* exception does not apply because Plaintiff's testimony is not "contradictory and incomplete." The complaint and deposition testimony are moderately contradictory. In the complaint, Plaintiff alleges that the extraction team members beat him with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) However, at his deposition, Plaintiff testified that the team

members hit him only with their fists. (Dkt. No. 56–16 at 84:17–19.) However, this is far less contradictory than the plaintiff's statements in *Jeffreys*. There, the plaintiff, who alleged that a group of police officers beat him and threw him out of a third-floor window, confessed on at least three occasions that he had jumped rather than having been thrown. *Jeffreys,* 426 F.3d at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Plaintiff's deposition and complaint are also far less contradictory than cases in which courts have applied *Jeffreys* to make credibility determinations at the summary judgment stage. *See Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, at *24–26, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (collecting cases). [13] Therefore, although this is a very close question, the Court finds that Plaintiff has raised a triable issue of fact that Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers used excessive force against him. Accordingly, the Court denies Defendants' motion for summary judgment dismissing this claim.

[13]  The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### D. Claims Against Defendants Battu and Wetherell

**\*14**  Plaintiff alleges that he reported the incident with the extraction team to Defendants Battu and Wetherell, that they refused to get involved, and that Defendant Battu told him that he may have deserved the way he was treated. (Dkt. No. 1 at 14.) Defendants move to dismiss these claims, arguing that Plaintiff has failed to allege that Defendants Battu and Wetherell were personally involved in any constitutional violation. (Dkt. No. 55–23 at 11–12.) Plaintiff's allegations against Defendant Battu and Wetherell are properly analyzed as a failure-to-intervene claim. On that claim, summary judgment in favor of Defendants is appropriate.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent*

*v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a reasonable jury could not conclude that Defendants Battu and Wetherell failed to intervene with an ongoing constitutional violation. The undisputed facts show that Plaintiff did not tell Defendants Battu and Wetherell about the incident with the extraction team until several hours after it was over. (Dkt. No. 1 at 13–14.) Even if one fully credits Plaintiff's version of events, Defendants Battu and Wetherell did not have any realistic opportunity to intervene and prevent the harm. Therefore, Defendants' motion for summary judgment dismissing the claims against Defendants Battu and Wetherell is granted.

### E. Excessive Force Claim Against Defendants Hamel, Murray, and Stemp

Plaintiff contends that Defendants Hamel, Murray, and Stemp subjected him to excessive force as directed by Defendants Battu and Wetherell. (Dkt. No. 1 at 14–15; Dkt. No. 55–16 at 93:14–95:3.) Defendants' memorandum of law does not address this excessive force claim.

As discussed above in Section I(C), the parties dispute what happened when Plaintiff was removed from the conference room. Plaintiff alleges that Defendants Hamel, Murray, and Stemp beat him and then kicked him while he was handcuffed. (Dkt. No. 1 at 14–15.) Defendants contend that Plaintiff head-butted Defendant Hamel without provocation and that they used only enough force to bring him under control. (Dkt. No. 55–7 ¶ 11; Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks,

a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

**\*15** Given the parties' conflicting versions of events and Defendants' failure to address the claim, the Court finds that the excessive force claim against Hamel, Murray, and Stemp survives summary judgment.

However, there is no competent evidence that Defendants Battu and Wetherell were involved in the incident. Although Plaintiff claims that they ordered the use of force, he does not have any personal knowledge to support that opinion. To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." Fed.R.Civ.P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir.1999) (citations omitted). Therefore, the claim that Defendants Battu and Wetherell ordered Defendants Hamel, Murray, and Stemp to beat Plaintiff is dismissed.

#### F. Conditions of Confinement Claims

Plaintiff alleges that Defendants DePalo, Powers, Segovis, Tedford [14], White, and Winchip subjected him to cruel and unusual punishment by subjecting him to harsh conditions of confinement. [15] (Dkt. No. 1 at 15–18.) Defendants argue that Plaintiff has "failed to allege a plausible Eighth Amendment claim" regarding the conditions of his confinement. (Dkt. No. 55–23 at 17–20.)

[14]  Defendants do not address the claim against Defendant Tedford.

[15]  Plaintiff does not assert that Defendants subjected him to these conditions of confinement in retaliation for any protected conduct. (Dkt. No. 1 at 20.) Therefore, I will address the conditions of confinement claims solely under Eighth Amendment standards.

##### 1. Handcuff Incident with Defendant Segovis

Plaintiff alleges that Defendant Segovis violated his Eighth Amendment rights by leaving Plaintiff handcuffed in his cell for five hours while Plaintiff pleaded to be un-handcuffed so he could use the bathroom. (Dkt. No. 1 at 15.) Defendants argue that this claim should be dismissed because there is "neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform a cell extraction to retrieve [the handcuffs]." (Dkt. No. 55–23 at 19.) Defendants are not entitled to summary judgment on this claim because Plaintiff's verified complaint raises a triable issue of fact that Defendant Segovis subjected him to unconstitutional conditions of confinement.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. Estelle v. Gamble, 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." Estelle, 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

**\*16** To satisfy the objective component of an Eighth Amendment conditions of confinement claim, "the deprivation alleged must be, objectively, 'sufficiently serious.' " Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." Hudson v.

*McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

To satisfy the subjective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Defendants' extremely spare argument regarding Plaintiff's claim against Defendant Segovis states, in full:

> Plaintiff alleges that on August 18, 2009, he presented himself for shower in socks and was left locked in the cell with handcuffs on for several hours by Defendant Segovis. The only reason security staff would leave an inmate handcuff[ed] in their cell is if they "kidnapped" the cuffs, and [P]laintiff refused to put his hand and wrists through the modified feed-up slot to allow the officer Segovis to remove the cuffs. Once again, [P]laintiff's refusal to comply with staff direction and facility procedures resulted in a reasonable and foreseeable deprivation. These facts, moreover, provide neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform[ ] a cell extraction to retrieve them, for both [P]laintiff and staff. Plaintiff was not subjected to a serious risk of harm, and the circumstance was not the result of deliberate indifference to inmate health or safety such as to give rise to an Eighth Amendment

cause of action. *Gaston v. Coughlin,* 249 F.2d at 16.

(Dkt. No. 55–23 at 19, citations to record omitted.) Defendants do not address Plaintiff's allegation that he pleaded with Defendant Segovis to release him from his handcuffs so that he could use the bathroom or his allegation that he ultimately urinated and defecated on himself.

Defendants cite only *Gaston v. Coughlin,* 249 F.3d 156 (2d Cir.2001)[16] to support their argument. In that case, the Second Circuit held that a triable issue of fact existed on a conditions of confinement claim where the prisoner alleged that, *inter alia,* the area directly in front of his cell was filled with human feces, urine, and sewage water for several days. Although it is not entirely clear, Defendants may be arguing that Plaintiff's claim should be dismissed because his allegations are not as dire as those asserted by the plaintiff in *Gaston.* However, a reasonable juror, if he or she credited Plaintiff's version of events, could find that being handcuffed for five hours while pleading to be released in order to use the bathroom is an extreme deprivation. Similarly, a reasonable juror who credited Plaintiff's version of events could find that Defendant Segovis was deliberately indifferent. Therefore, Defendants' motion for summary judgment dismissing the claim against Defendant Segovis regarding the handcuffing incident is denied.

[16]   As noted in the block citation, Defendants cite this case as "249 F.2d at 16." (Dkt. No. 55–23 at 19.)

### 2. *Hot Water*

**\*17** Plaintiff alleges that he was denied hot water on several occasions. (Dkt. No. 1 at 17.) Defendants move for summary judgment, arguing that the claim should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. The denial of hot water in an inmate's cell fails to state an Eighth Amendment claim because it does "not constitute [a] serious deprivation[ ] of basic human needs." *Graham v. Perez,* 121 F.Supp.2d 317, 323 (S.D.N.Y.2000). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim that Defendants violated his Eighth Amendment rights by failing to provide him with a bucket for hot water is granted.

### 3. *Drinking Water*

Plaintiff's complaint alleges that he was denied drinking water in his cell for a week. (Dkt. No. 1 at 15.) In his complaint and at his deposition, Plaintiff alleged that Defendant Powers was responsible for this deprivation because he failed to turn Plaintiff's water on. (Dkt. No. 1 at 16; Dkt. No. 55–16 at 152:18–19.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150:3–5, 9–12.) Defendants' memorandum of law does not discuss this claim.

Where a prisoner alleges that he or she was denied drinking water in his or her cell, the resolution of the claim hinges on whether the prisoner received fluids at other times or suffered any adverse effects. *Compare Johnson v. Comm'r of Corr. Servs.,* 669 F.Supp. 1071, 1074 (S.D.N.Y.1988) (prisoner confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals) *with Atkins v. County of Orange,* 372 F.Supp.2d 377, 406 (S.D.N.Y.2005) (inmate raised triable issue of fact that the defendants subjected her to unconstitutional conditions of confinement by depriving her of water in her cell for almost one month despite fact that they provided her with fluids at meals where medical records showed inmate suffered adverse effects from water deprivation). Here, Plaintiff received juice at meals. (Dkt. No. 55–16 at 152:9–13.) There is no evidence that Plaintiff suffered any adverse effects from water deprivation. Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the deprivation of drinking water.

### 4. *Food*

Plaintiff alleges that Defendants interfered with his food on several occasions. Specifically, he alleges that (1) Defendants White and Segovis forced Plaintiff to plead with them before they gave him his breakfast tray on August 18, 2009 (Dkt. No. 1 at 16); (2) Defendant White gave Plaintiff only juice for lunch one day (Dkt. No. 1 at 16); Defendants White, Segovis, DePalo, and Tedford punished him by restricting him to a special loaf diet (Dkt. No. 1 at 15, 16–17); and (4) Defendant Segovis gave him pork instead of his special diet on one occasion (Dkt. No. 1 at 18). Defendants move for summary judgment dismissing these claims, arguing that "such deprivations are *de minimis* and do not rise to a level of constitutional significance ..." (Dkt. No. 55–23 at 18.) Defendants are correct.

**\*18** Plaintiff's allegations that he was denied food at lunch one day, given a diet he did not like as punishment, and given food that his religion does not allow him to eat on one occasion are insufficient to raise a triable issue of fact that Defendants violated his Eighth Amendment rights. *See Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (finding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal); *Shakur v. Selsky,* 391 F.3d 106 (2d Cir.2004) (prisoner stated *First Amendment* claim where he alleged that he was denied one religiously significant feast). Therefore, the Court dismisses Plaintiff's Eighth Amendment claims regarding the denial of food.

To the extent that Plaintiff claims that the imposition of the loaf diet violated his right to due process, the claim is *sua sponte* dismissed. In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). An inmate has a liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, any due process claim regarding the loaf diet is dismissed.

### 5. *Recreation and Movement*

Plaintiff alleges that he was not allowed "any recreation or any movement outside his cell" when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.) Defendants do not address this claim in their memorandum of law. [17]

17    Although Defendants do not discuss the issue in their memorandum of law, Defendant Segovis declares that inmates in the Special Housing Unit have one recreation period per day, for which they are required to sign up in advance. (Dkt. No. 55–18 ¶ 16.)

Defendant Segovis escorts any inmates who sign up to recreation. *Id.* ¶ 17. Defendant Segovis declares that Plaintiff "rarely signed up for recreation" during his shift. *Id.* ¶ 18.

Prisoners have the right under the Eighth Amendment to be allowed "some opportunity for exercise." *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996). Plaintiff's complaint, however, does not plausibly allege facts suggesting that this right was violated. Interference with prisoners' recreation must be quite severe in order to state an Eighth Amendment claim. *See Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (officers who denied inmate outdoor exercise for twenty-two days did not violate Eighth Amendment). Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the denial of recreation and movement.

### 6. *Showers*

Plaintiff alleges that Defendant Segovis would not allow him to shower on August 19, 2009. (Dkt. No. 1 at 17.) Plaintiff alleges that when he told Defendant DePalo that he had not been allowed to shower, Defendant DePalo said "That's life in F-block for Muslims." *Id.* Defendants do not address this claim in their memorandum of law. [18]

[18] Although Defendants' memorandum of law does not address this claim, Defendant DePalo declares that at "no time did I derogate [P]laintiff's religion or act in an unprofessional manner toward him ." (Dkt. No. 55–4 ¶ 23.)

**\*19** The denial of one shower does not violate the Eighth Amendment. *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' "). Therefore, the Court dismisses Plaintiff's claim *sua sponte.*

### 7. *Bibles*

Plaintiff alleges that Defendants Segovis and Powers refused to give Plaintiff two Bibles that a chaplain delivered for him. (Dkt. No. 1 at 16.) Defendants' memorandum of law does not address this claim.

The allegation about the Bibles fails to state an Eighth Amendment claim because Plaintiff does not plausibly allege that he was denied "the minimal civilized measure of life's necessities" as a result of the deprivation. The

Court can find no authority suggesting that even a permanent deprivation of the Bibles would rise to that level. Here, Plaintiff received the Bibles twelve days after the chaplain originally delivered them. (Dkt. No. 55–6 at 28.) Therefore, Plaintiff's Eighth Amendment claim regarding the Bibles is *sua sponte* dismissed.

The allegation about the Bibles also fails to state a procedural due process claim. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, Plaintiff's claim regarding the deprivation of the two Bibles is dismissed.

### 8. *Verbal Abuse*

Defendants argue that, to the extent that Plaintiff alleges that his constitutional rights were violated by comments by Defendants DePalo and Winchip regarding Muslims, such claims should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. Verbal harassment, in and of itself, does not rise to the level of a constitutional violation. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Therefore, Defendants' motion for summary judgment dismissing these claims is granted.

### G. Religion Claims

**\*20** Plaintiff alleges that Defendants Rock and Bellamy [19] violated his right to exercise his religion. (Dkt. No. 1 at 18–19.) Defendants move for summary judgment of these claims. (Dkt. No. 55–23 at 20–28.)

[19] Plaintiff alleges that Defendants Rock and Bellamy are responsible for violating his religious rights. (Dkt. No. 1 at 18.) Defendant Rock, who was the Superintendent of Great Meadow when Plaintiff was incarcerated there, was "responsible for the overall administrative functioning of the facility." (Dkt. No. 55–12 ¶ 3 .) He was therefore personally involved in the implementation of the Directive at Great Meadow. The evidence does not show, however, any personal involvement by Defendant Bellamy with implementation of the Directive at Great Meadow. Defendant Bellamy is the Director of the Inmate Grievance Program. (Dkt. No. 55–6 ¶ 12.) Therefore, Defendants' motion for summary judgment dismissing the claims against Defendant Bellamy for lack of personal involvement (Dkt. No. 55–23 at 12) is granted. Hereafter, I will refer to Plaintiff's religion claims as being brought solely against Defendant Rock.

### 1. *Meals*

Plaintiff alleges that Defendant Rock violated his right to exercise his religion because Great Meadow Correctional Facility does not provide a Halal diet. (Dkt. No. 1 at 19.) Defendants move for summary judgment dismissing this claim, arguing that the religious alternative meals provided at Great Meadow meet Plaintiff's religious dietary requirements. (Dkt. No. 55–23.) Defendants are correct.

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his religion's] dietary laws." *Muhammad v. Warithu–Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000) (citing *Abdul–Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at \*6 (S.D.N.Y. Feb. 27, 1997)). [20]

[20] Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 105.)

Defendant Rock declares that DOCCS "has proscribed the use of what is called a [ ] Religious Alternative Meal program to accommodate non[-]Kosher religious dietary requirements." (Dkt. No. 55–12 ¶ 47.) He further declares that the alternative meal "provides a nutritionally adequate diet and meets Islamic requirements regardless of sect." *Id.* ¶ 50. Courts have consistently held that DOCCS' Religious Alternative Meal is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required. *Muhammad,* 98 F.Supp.2d at 343–44 (collecting cases). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the failure to provide Halal meals is granted.

### 2. *Restrictions on Demonstrative Prayer*

DOCCS Directives limit prisoners' freedom to demonstratively pray. Specifically, DOCCS Directive 4202(k) states that "[i]ndividual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters and in designated religious areas whenever feasible as determined by the Superintendent." (Dkt. No. 55–12 ¶ 9.) Plaintiff argues that the Directive as implemented at Great Meadow violates his right to practice his religion. (Dkt. No. 1 at 18, 20.) Defendants argue that this claim should be dismissed. (Dkt. No. 55–23 at 25–26.) The Court will address this claim under both the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

#### a. *First Amendment*

Prisoners retain some measure of the constitutional right to the free exercise of religion guaranteed by the First Amendment. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Id.* Thus, a prison regulation that denies a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right

passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

 **\*21** To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [21] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature [22]. *Ford,* 352 F.3d at 590. Here, there is no dispute that Plaintiff sincerely believes that his religion requires him to demonstratively pray several times each day.

[21]    Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

[22]    However, in some cases "an asserted belief might be so bizarre, so clearly nonreligious in motivation, so as not to be entitled to protection." *Frazee v. Illinois Dept. Of Employment Security,* 489 U.S. 829, 834 n. 2, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989).

A prisoner's sincerely held religious belief is "substantially burdened" "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d

Cir.1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was forced to choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock.").

Defendants argue that the Directive does not substantially burden Plaintiff's sincerely held religious beliefs because Plaintiff "has also admitted that prayer times do not always coincide with recreation times and that he is only forced to choose occasionally." (Dkt. No. 55–23 at 26, citing Dkt. No. 55–16 (Plaintiff's deposition) at 164–65.)

Defendant Rock declares that:

> An inmate housed at Great Meadow who wishes to pray during his recreation period has alternatives to demonstrative prayer in the yard. First, the inmate can make silent, non-demonstrative prayers while in Great Meadow's recreation yard. In addition, an inmate may choose to remain in his cell during the recreation period and, while in his cell, the inmate may pray demonstratively as he wishes. An inmate may choose to go back to his cell during a designated "go back," whereby inmates may return to their cells from the recreation yard under the supervision of staff at a scheduled time. "Go Back" periods, however, are limited, and may not coincide with the exact point in time that an inmate wishes to perform the Salaah, inasmuch as inmates must be escorted while they are transported from the recreation yard to their cells, and vice versa, and [ ] only a finite number of correction officers work at Great Meadow at any time.

(Dkt. No. 55–12 ¶¶ 24–28.)

Defendant Rock asserted the same argument in *Smith v. Artus,* No. 9:07–CV–1150, 2010 U.S. Dist. LEXIS 104660,

2010 WL 3910086 (N.D.N.Y. Sept.30, 2010).[23] There, Judge Mordue found that:

[23]    Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 120.)

The question therefore becomes whether having to choose between attending recreation ... or fulfilling his obligation to pray Salaah in a demonstrative manner would substantially burden plaintiff's religious rights. Although facts produced at trial may show otherwise, the present record, when viewed in the light most favorable to plaintiff, shows that plaintiff's free exercise rights were substantially burdened by defendants' policy of requiring plaintiff to either forego his Salaah prayer or give up other privileges accorded him as an inmate.

*22 *Smith,* 2010 U.S. Dist. LEXIS 104660, at *36–37, 2010 WL 3910086, at *12. Judge Mordue's analysis is persuasive and thus the Court finds that there is a triable issue of fact that the Directive substantially burdened Plaintiff's sincere religious beliefs.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin,* 467 F.3d at 275.

Defendant Rock's declaration discusses, at length, the penological interests on which the Directive is based. Specifically, he declares that:

Demonstrative prayer singles individuals out as members of a particular religious group. This is particularly true of Muslim inmates performing the Salaah, which includes, among other things, kneeling down, bending forward, touching the forehead to the ground, and motioning with the hands and arms. When inmates of a particular faith are involved in an incident, other inmates of the same faith are likely to involve themselves in the incident to protect someone from "their group." Identification of inmates' religious affiliation has also been known to lead to conflicts between different faith groups or different sects within a faith group. These conflicts can escalate rapidly placing staff and other inmates at serious risk of physical injury or death, and threaten the facility's overall security. In the recreation yard, where hundreds of inmates are gathered at one time, this easily could lead to large-scale

violent incidents. During the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison.

Demonstrative prayer in the yard also negatively impacts staff's ability to control inmates. When an inmate is engaged in demonstrative prayer in the recreation yard, that inmate is likely to ignore legitimate direct orders from staff. The inmate praying demonstratively may view the interruption as an insult to his or her religion, and the perceived insult may lead to conflict between staff and the inmate. Staff may be hesitant to interrupt an inmate engaged in demonstrative prayer out of respect for the religious significance of the prayer, and thus be impeded in their attempt to communicate necessary information to the inmate or carry out direct orders or tasks associated with that inmate. This, in turn, disrupts the order of the facility and may adversely impact related safety concerns. As noted above, because the inmate's religion has been identified by his demonstrative prayer, when these conflicts occur, other inmates may join in the conflict, rapidly escalating the situation. Whether the inmate ignores a direct order or staff is unwilling to disrupt prayer, the end result is a diminution of staff's control over the recreation yard and an increased risk to the safety and security of the facility.

*23 I am informed by my attorneys that plaintiff is asserting that these security concerns do not apply to inmates housed in the Behavioral Health Unit (BHU) because they are isolated during recreation periods. However, the fact that inmates in BHU and the Special Housing Unit (SHU) [ ] take recreation in isolated recreation yards does not significantly alter these security and staffing concerns. The recreation yards adjacent to the BHU and SHU are small pens designed for use by one inmate at a time. They abut one another, and although solitary, they are not private and may be observed by other members of the inmate population. Thus, the religious preferences of inmates engaging in demonstrative pray[er] in the BHU and SHU recreation yards would still be identifiable by other inmates, and staff would still have diminished control over inmates praying demonstratively. Moreover, from an administrative perspective, it is better to require staff to apply Directive 4202 across the board to all members of the inmate population without exception. In this way, both staff and inmates know exactly what is allowed and what is not allowed. There are no errors of

discretion, no favors, no favoritism, and no room for inmates in general population to become disruptive as a result of their belief that inmates in BHU or SHU are receiving special privileges.

(Dkt. No. 55–12 ¶¶ 11–34.)

Judge Mordue concluded in *Smith* that the security concerns identified by Defendant Rock satisfied the burden of showing that legitimate penological interests supported the Directive's ban on demonstrative prayer in the recreation yards at Great Meadow. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *41–42, 2010 WL 3910086, at * 14. The undersigned agrees. "Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007).

Therefore, the burden shifts to Plaintiff to show that the concerns articulated by Defendant Rock are irrational. *Salahuddin,* 467 F.3d at 275. When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274–75.

Defendant Rock declares here, as he did in *Smith,* that the Directive's ban on demonstrative prayer in recreation yard at Great Meadow is rational because:

**\*24** Great Meadow's "big recreation yard is approximately 5 acres, and during a typical recreation period, between 100 and 400 inmates are present in the yard, depending on the weather. In the morning, one sergeant and six correction officers are assigned to the yard to supervise the inmates during recreation. In the afternoon, one sergeant and eight correction officers are assigned to the yard and in the evening, one sergeant and twelve correction officers are assigned to the yard. In these large areas of a facility such as the yard or the mess hall, prisoners substantially

outnumber staff, and these are areas of a facility where unusual incidents such as serious fights and assaults will typically occur. BHU and SHU recreation periods run on parallel schedules. Fewer staff are assigned because BHU and SHU inmates are released to the yard individually but must be escorted by at least two officers. BHU and SHU populations, even though isolated from the general population, tend to be more unpredictable and difficult to control. These populations often present greater safety and security risks for staff. When an inmate becomes involved in a conflict situation in one area of the facility, staff must be diverted from other areas of the facility to back up the staff assigned to the location where the incident is occurring. During recreation periods the diversion of staff away from more populated areas or escort responsibilities to address incidents with BHU or SHU inmates can be dangerous, and creates critical security concerns. During such incidents, inmates and staff are placed at risk of sustaining serious physical injury or death. Further, during the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison. It is imperative, therefore, that rules and regulations designed to minimize the potential for conflict, and the drain on human resources be implemented, across the board, without exception. This is particularly true in the current economic climate as, upon information and belief, there are no resources available to hire additional facility staff, and DOCS is being encouraged to reduce the number of hours that staff may work overtime.

(Dkt. No. 55–12 ¶¶ 36–45.)

In *Smith,* the plaintiff opposed the defendants' motion for summary judgment. In his opposition, the plaintiff argued that the Directive's ban on demonstrative prayer in the recreation yard at Great Meadow was an irrational response to the concerns articulated by Defendant Rock because (1) the Directive contains other provisions explicitly allowing religious behaviors that single out members of particular faith groups, such as wearing distinctive head coverings and facial hair and being served on different colored trays in the mess hall; (2) officers are just as likely to lose control over inmates praying non-demonstratively, which is allowed under the Directive, as they are over inmates praying demonstratively; (3) other activities in the recreation yard—such as sports—also lead to conflict but are permitted; and (4) demonstrative prayer is allowed in the recreation yards at other facilities.

*Smith,* 2010 U.S. Dist. LEXIS 104660, at *42–26, 2010 WL 3910086, at * 14–15. Judge Mordue found that the plaintiff had raised a triable issue of fact that the Directive was an irrational response to the facility's legitimate penological interests. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *47–48, 2010 WL 3910086, at *16.

**\*25** In *Smith,* the plaintiff asserted that the alternatives that the facility offered to praying in the recreation yard—namely, non-demonstrative prayer or staying in his cell at recreation time to pray-were not reasonable. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *48–53, 2010 WL 3910086, at *16–17. Judge Mordue found that the plaintiff had raised a triable issue of fact regarding the reasonableness of the facility's alternatives. *Id.*

In *Smith,* Judge Mordue found that the same issues that raised a triable issue of fact regarding the rationality of the Directive also raised a triable issue regarding the third *Turner* factor, which considers the impact on guards, inmates, and prison resources. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *53–54, 2010 WL 3910086, at *17.

Finally, in *Smith* the plaintiff proposed alternatives to the Directive's ban on demonstrative prayer in the recreation yard-for instances, adding an additional "Go Back" period for Muslim inmates or setting aside an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *54–56, 2010 WL 3910086, at *18. Judge Mordue found that Plaintiff had raised a triable issue of fact that the facility could accommodate Muslims' need to demonstratively pray by designating an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *57–58, 2010 WL 3910086, at *19.

Thus, in *Smith,* Judge Mordue found that there was a triable issue of fact that the very policy challenged by Plaintiff in this case-Great Meadow's implementation of DOCCS Directive 4202(k) banning demonstrative prayer in the recreation yard-violated Muslim inmates' free exercise rights.

However, unlike the plaintiff in *Smith,* Plaintiff here has not opposed Defendants' motion for summary judgment. Thus, Plaintiff here has not met his burden of showing that the concerns articulated by Defendant Rock are irrational.

Even if Plaintiff had opposed the motion and met his burden, Defendants would be entitled to summary judgment on Plaintiff's free exercise claim because (1) the doctrine of qualified immunity shields them from liability for damages; and (2) Plaintiff's request for injunctive relief is moot.

The affirmative defense of qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)). A qualified immunity inquiry in prisoner civil rights cases generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted); accord, *Higazy v. Templeton,* 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted). In the context of religion claims, the Supreme Court and the Second Circuit have "expressly cautioned against framing the constitutional right at too broad a level of generality." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The Second Circuit imposes a " 'reasonable specificity' requirement on defining the contours of a constitutional right for qualified immunity purposes." *Id.* Thus, conduct does not violate clearly established rights unless the Supreme Court or the Second Circuit has quite specifically held that conduct is unconstitutional. *Id.*

**\*26** Here, neither the Second Circuit nor the Supreme Court has held that the policy against demonstrative prayer in the solitary recreation pen at Great Meadow Correctional Facility violates prisoners' rights under the First Amendment or RLUIPA. Indeed, *Smith* appears to be the only case on the issue. Even if *Smith* was sufficient to create "clearly established statutory or constitutional rights," it would have no effect here because it was decided after Plaintiff filed this action. Moreover, Judge Mordue dismissed the plaintiff's action in *Smith* on the basis of qualified immunity because "it still does not appear well established that an inmate has the right to pray demonstratively in the recreation yard." *Smith,* 2010 U.S. Dist. LEXIS 104660, at *88, 2010

WL 3910086, at *29. Therefore, Defendants are entitled to qualified immunity on Plaintiff's claim for money damages regarding demonstrative prayer.

Defendants argue that Plaintiff's claims for injunctive relief are moot because he is no longer housed at Great Meadow. (Dkt. No. 55–23 at 10–11.) Defendants are correct. "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam). Plaintiff has not been housed at Great Meadow since October 2009. (Dkt. No. 7.) Therefore, his request for injunctive relief is moot.

Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's First Amendment claim regarding the ban on demonstrative prayer is granted.

### b. *RLUIPA*

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [24] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

[24]   An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

In *Smith,* Judge Mordue found that the plaintiff had raised a triable issue of fact that Great Meadows' ban on demonstrative prayer violated RLUIPA for the same reasons that he articulated regarding the First Amendment. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *58–62, 2010 WL 3910086, at *19–20. However, he found that the defendants were entitled to qualified immunity. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *89, 2010 WL 3910086, at *29.

Here, even if Plaintiff had raised a triable issue of fact, Defendants would be entitled to summary judgment dismissing the RLUIPA claim for two reasons. First, money damages are not available under RLUIPA. *Sossamon v. Texas,* ––––U.S. ––––, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011). Second, as discussed above, Plaintiff's claims for injunctive relief are moot. Therefore, Defendants' motion for summary judgment dismissing Plaintiff's RLUIPA claim regarding the ban on demonstrative prayer is granted.

### 3. *Access to Personal Razor*

**\*27** Plaintiff alleges that Defendants violated his religious rights by refusing to allow him a razor or clippers to shave his pubic hair and armpits. (Dkt. No. 1 at 19.) Defendants argue that their refusal to give Plaintiff a personal razor is supported by legitimate health and safety concerns because inmates in the SHU and BHU, where Plaintiff resided at Great Meadow, "are there because they have threatened to ... commit suicide, inflict self harm, or because they have assaulted staff or other inmates." (Dkt. No. 55–23 at 27.) Even if Plaintiff had raised a triable issue of fact regarding the merits of this claim, Defendants are entitled to summary judgment on the basis of qualified immunity. The Court can find no Supreme Court or Second Circuit authority holding that prisoners are entitled to possess a personal razor or clippers to perform grooming mandated by their religion. Additionally, as discussed above, Plaintiff's requests for injunctive relief are moot because he is no longer housed at Great Meadow. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

### H. Claim Against Defendant Karandy

Defendants argue that complaint fails to state that Defendant Karandy was personally involved in any of the alleged constitutional violations. (Dkt. No. 52–33 at 11– 12.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Here, the complaint includes Defendant Karandy in the list of defendants but does not contain any allegations about any acts or omissions by Defendant

Karandy. (Dkt. No. 1 at 9.) Therefore, I grant Defendants' motion for summary judgment and dismiss the claim against Defendant Karandy.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 55) is *GRANTED IN PART AND DENIED IN PART.* All claims are dismissed with the exception of: (1) the excessive force claim against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers; (2) the excessive force claim against Defendants Hamel, Murray, and Stemp; and (3) the claim against

Defendant Segovis regarding the handcuffing incident; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy *Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, 2010 WL 3398156 (S.D.N.Y. May 18, 2010) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4478515

---

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 980272
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
GRAHAM; Peter M. Sigona; Richard D. Ruston, III;
Phil J. Manna; A. Vega; and Ryerson, Defendants.

No. 9:08-CV-534 (NAM/DEP).
|
March 15, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General,
State of New York, Adrienne J. Kerwin, Esq., of Counsel,
Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

HON. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
brought this action for declaratory and monetary relief
under 42 U.S.C. § 1983, claiming excessive use of force,
failure to intervene, and denial of adequate medical
care stemming from a disturbance involving 17 or more
inmates occurring in a "holding pen" or "cage" at
Auburn Correctional Facility ("ACF") on March 7, 2006.
Plaintiff moved for summary judgment (Dkt. No. 35) and
defendants cross-moved for summary judgment (Dkt. No.
38). Upon referral of the motions pursuant to 28 U.S.C.
§ 636(b)(1)(B) and Local Rule 72.3(c), United States
Magistrate Judge David E. Peebles issued a Report and
Recommendation (Dkt. No. 41) recommending that this
Court deny plaintiff's motion, grant defendants' motion,
and dismiss the action.

Plaintiff has submitted an objection (Dkt. No. 42).
Plaintiff states that the Court should have reviewed the
transcripts from his disciplinary hearing, because the
testimony of defendants Peter M. Sigona and Richard
D. Ruston, III at that hearing "contradicts the reports
that [Magistrate Judge Peebles] relied on in making [his]
decision." Plaintiff gives no specifics and thus appears to
be interposing a general objection directed to the issues of
excessive force and failure to intervene. His objection does
not refer to the issue of medical indifference.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews
*de novo* those parts of a report and recommendation
to which a party specifically objects. Where, as here, a
party interposes only general objections to a report and
recommendation, the Court reviews for clear error or
manifest injustice. *See Davis v. Chapple,* 2010 WL 145298,
\*2 (N.D.N.Y. Jan.8, 2010), *Brown v. Peters,* 1997 WL
599355,\*2-\* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007
(2d Cir.1999). Failure to object to any portion of a report
and recommendation waives further judicial review of the
matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d
Cir.1993).

The Court accepts and adopts Magistrate Judge Peebles'
Report and Recommendation. In view of plaintiff's
objection, which, as noted, appears to be directed to the
evidence on the issues of excessive force and failure to
intervene, the Court briefly revisits these issues. Although
plaintiff interposes only a general objection on these
issues, in light of his *pro se* status and the nature of
the objection, the Court conducts a *de novo* review.
Plaintiff requests the Court to obtain the transcript of the
disciplinary hearing and contends that the testimony given
by Sigona and Ruston at that hearing contradicts the
reports relied on by Magistrate Judge Peebles; however,
as explained below, the award of summary judgment to
defendants is based on plaintiff's own evidence.

The record evidence pertinent to the excessive force
and failure to intervene claims is briefly summarized
as follows. In a declaration supporting the motion for
summary judgment, Sigona, a sergeant at ACF, states:

**\*2** On March 7, 2006, I was supervising the hospital
depot area at Auburn. While waiting with a group of
inmates in the holding pen in the hospital depot, inmate
Baer became disruptive and began threatening staff.
Baer ignored several orders by me to cease his behavior.
I then entered the holding pen with Officers Manna and
Ruston with the intention of removing inmate Baer.

All of the inmates in the pen were ordered to one side of the pen, while Baer remained on the other. Inmate Green refused to move, so I guided him to the side directed.

While I was guiding inmate Green, plaintiff Cicio then lunged at Officer Manna, striking him with a closed fist and knocking him to the ground. I immediately went to Officer Manna's aid and assisted with gaining control of Cicio by taking control of Cicio's right side. Officer Manna and I then escorted a struggling Cicio out of the pen, after which Cicio and Officer Manna fell to the floor. Once Cicio stopped struggling, he was removed from the area and taken to medical for examination.

The declaration from defendant Philip J. Manna, a corrections officer at ACF, is consistent with Sigona's declaration.

Plaintiff's complaint states that defendant Sigona pushed plaintiff into defendant Manna "who then grabbed plaintiff by the hair and began to pull plaintiff towards [the] holding pen door at which point plaintiff was thrown to the floor and kneed in [the] nose." The complaint further states that, after plaintiff was brought to his feet and escorted out of the immediate area, defendant Manna "once again grabbed plaintiff by his hair and pushed plaintiff's face into [the] wall." According to plaintiff, Sigona and Ruston "stood and watched the incident" and did not "intervene[ ] to stop the assault."

Plaintiff testified in his deposition that there were 17 or 18 inmates in the holding pen awaiting transport; that there were no corrections officers in the pen but there were some in the vicinity; that another inmate George Baer started "cursing up a storm" at a corrections officer; and that the sergeant told Baer to "cut it out," to which Baer responded, "No." The sergeant then said, "Take him out of there," ordered Baer to come up front, and ordered everyone else to the back of the pen. Instead of coming up front, Baer "sat down in the middle of the cage." Plaintiff stated that everyone else went to the back of the pen except plaintiff and inmate Green; according to plaintiff, they could not go back because "there was no more room." As plaintiff describes it:

There wasn't any more room. And he [Green] was standing directly in front of Inmate Baer. So they started taking Green out of the holding pen, and

that's where everything just a whole jumble of things happened. I ended up getting mixed up in that, because one of officers tried to barge in there and push me into the sergeant, and then I got into a use of force behind it. So a whole lot of events that took place after one move.

**\*3** \* \* \*

Once they started pulling [Green] out [of the pen], other officers barged into the cage. I don't know if done purposely or not, but I was pushed into the sergeant, and from there I was given an assault charge and taken down.

\* \* \*

... [Baer] was sitting there [in the middle of the pen] when Green was being taken out. After I was pushed to the sergeant, I don't know what happened.

Plaintiff's deposition testimony continued:

Q. Was Green eventually taken out?

A. Yes.

Q. Okay. Now, was he still in the cage when you got pushed into the sergeant?

A. I am not sure.

Q. It was all happening at the same time?

A. Yes.

Q. Did you see any officers go to Baer to get him up and out?

A. Not specifically, because by this time it was just chaos in the cage. I was on the floor somewhere. I don't know where.

Q. How many officers were taking out Green?

A. When I first seen, I only saw one before everything just-

Q. When the sergeant said, "Take him of there," meaning Baer, how many officers entered the pen?

A. At the time, there was about five or six.

Q. They entered at the time just to remove Baer because of the goings on?

A. Yes.

Q. Was one of them the sergeant?

A. Yes. There was a sergeant in there.

Q. So the sergeant and/or three or four officers?

A. Quite a few, yes. Something like that.

Q. Okay. So they enter. Then Green is told to move. He doesn't. Somebody, was it one of those officers that entered that tried to remove Green?

A. The first officer that enters, the one that ... talked to him at first trying to remove him. I don't know which officer that was.

Q. Okay. But no additional officers to deal with Green, it was somebody in there from Baer?

A. Right. Once Green, once they saw an officer pulling Green out of the cage, that's when more officers entered the cage.

Q. So I think, and when I try to recap what you just said, I am not trying to put words in your mouth, but tell me if I am doing it wrong. I am trying to make sure I get it right. You said five or six officers came in to deal with Baer; is that right?

A. Something close to, right.

Q. How many more entered once Green became an issue?

A. I have no idea, because by that time I was into the sergeant and on the floor.

Q. Okay. All right. So somebody, as they are rushing in, whether intentional or not, you don't know, pushed you into the sergeant?

A. Right.

Q. Then what happened?

A. From there, I was taken down. I got kneed in the nose.

Q. Do you know who took you to the floor?

A. I am only going by the reports.

Q. Okay.

A. I don't know specifically. Only in the reports that they wrote do I know any names.

Q. Okay.

A. But other than that, at the time of the incident, I didn't know anything.

Q. Okay. At what point in time did you-at some point in time did you see the report?

 *4  A. I saw the reports after I got my misbehavior report, and I got my assistance, and I asked for the use of force report, and the unusual incident report, and everything else.

Q. Okay. Now, once you were taken to the floor, then what happened? Take me through it totally.

A, Once I was taken to the floor, another CO kneed me in the nose. I don't know who.

Q. You don't think it was the same person that took you to the floor? A. I doubt it.

Q. All right. Okay.

A. And once I was lifted, I was pulled [from] the cage by my hair. At the time I had a lot of hair. I was pulled out [of] the cage by my hair, and then I hit the floor again.

Q. Okay. Now when you hit the floor again, were you taken to the floor? Do you know how that happened, the second hitting of the floor?

A. I am not sure.

Q. Okay.

A. I am not sure.

Q. You ended up on the floor?

A. I just ended up on the floor with a couple C.O.s on top of me. I don't know if they fell, if I fell. I have no idea.

Q. There were other officers on the floor with you?

A. Right.

Plaintiff explained that he was then removed from the scene, taken upstairs to "their SHU" and given a ticket. He was placed in a different holding pen where a nurse came to see him within 15 or 20 minutes. According to plaintiff, he told the nurse that his nose hurt, he had pains in his right wrist, which was swollen, and some of his hair "had got pulled out in back." He was not bleeding. He requested and was denied pain medication, although at some later time he was given ibuprofen. He had headaches "off and on" for two or three weeks and his wrist was swollen for a few days, although it did not limit any of his activities.

When the disputed facts are viewed most favorably to plaintiff and considered in combination with the undisputed facts, the record shows the following: a group of 17 or 18 inmates was confined in the pen; one inmate, Baer, became disruptive and refused to comply with Sergeant Sigona's direction to stop; five or six corrections officers entered the pen to remove Baer; the other inmates were directed to move to the back of the pen; there was not room for Green and plaintiff to do so; Green was told to move but did not do so; and corrections officers began removing Green. The evidence further shows that at that point "just a whole jumble of things happened"; more corrections officers entered the pen; as they were entering, one of them-intentionally or not-pushed plaintiff into Sergeant Sigona; it was "chaos" in the pen; a corrections officer took plaintiff to the floor; and plaintiff then "got kneed in the nose," probably by a different corrections officer. Plaintiff was then pulled out of the pen. In his complaint he states that Officer Manna again grabbed him by the hair and pushed his face into the wall, whereas in his deposition, plaintiff stated that he was pulled out of the pen by his hair and "ended up on the floor again" with a couple of corrections officers on top of him, and added: "I don't know if they fell, if I fell." He was then removed and taken to SHU, where a nurse examined him within 20 minutes.

**\*5** The Court agrees with Magistrate Judge Peebles that defendants are entitled to summary judgment dismissing plaintiff's claims of excessive force. It is undisputed that the force used on plaintiff on March 7, 2006 occurred in the context of a disturbance involving 17 or 18 inmates in a holding pen. In plaintiff's own word, it was "chaos." Indeed, plaintiff states that when he was pushed into Sergeant Sindona it may have been unintentional, and that, when he went to the floor a second time, it may have been because he and/or the corrections officers fell. In

view of this evidence and the minimal nature of plaintiff's injuries, no rational trier of fact could conclude that plaintiff was subjected to force that was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. *See Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). For the same reason, there is no basis for a claim of failure to intervene. Moreover, no rational trier of fact could find that plaintiff suffered a serious medical need. As to the other issues raised, the Court agrees with the Report and Recommendation. Accordingly, the Court hold that plaintiff has failed to establish that he is entitled to summary judgment; defendants have demonstrated their entitlement to summary judgment; and plaintiff has failed to show the existence of a material question of fact.

In addition to his objection to the Report and Recommendation (Dkt. No. 42), plaintiff has filed what appears to be an appeal from the Report and Recommendation (Dkt. No. 43). Because Magistrate Judge Peebles did not issue any order which could be the subject of the appeal, the appeal is denied. In the event that plaintiff wishes to appeal from this Memorandum-Decision and Order, he should follow the procedure set forth in the Civil Appeals Packet, which will be provided to him with this decision.

It is therefore

ORDERED that United States Magistrate Judge David E. Peebles's Report and Recommendation (Dkt. No. 41) is accepted and adopted; and it is further

ORDERED that the appeal (Dkt. No. 43) from the Report and Recommendation is denied; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 35) is denied; and it is further

ORDERED that defendants' cross motion for summary judgment (Dkt. No. 38) is granted and the complaint dismissed on the merits; and it is further

ORDERED that the Clerk is directed to provide plaintiff with a Civil Appeals Packet.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint plaintiff asserts that he was assaulted by one of the defendants while two others stood by and failed to intervene, and that following the assault medical personnel at the prison facility where the incident took place failed to provide requested medical treatment for his resulting injuries. Plaintiff's complaint seeks both declaratory and monetary relief.

**\*6** Currently pending before the court are cross-motions for summary judgment. Plaintiff initiated the motion process, moving for summary judgment and claiming that the evidence in the record supports a finding in his favor on the issue of liability and that no reasonable factfinder could conclude otherwise. Defendants have responded by both opposing plaintiff's motion and seeking summary judgment dismissing plaintiff's complaint. In their motion defendants assert that based upon the record now before the court no reasonable factfinder could find in plaintiff's favor on any of his claims and that, in any event, they are deserving of qualified immunity from suit under the circumstances presented.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's motion be denied.

I. *BACKGROUND*

The facts forming the basis for plaintiff's claims are not particularly complex, although the parties have given conflicting accounts of the relevant events, particularly with regard to the circumstances surrounding the use of force by prison officials of force against Cicio.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Cicio was housed at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *See generally* Complaint (Dkt. No. 1). On

March 7, 2006, while plaintiff was among a group of between sixteen and eighteen inmates confined in the Auburn hospital depot awaiting transfer out a disruption occurred involving a fellow prisoner. Complaint (Dkt. No. 1) Statement of Facts ¶ 1; Sigona Decl. (Dkt. No. 38-8) ¶ 3; Manna Decl. (Dkt. No. 38-9) ¶ 3; *see also* Kerwin Aff. (Dkt. No. 38-3) Exh. K (transcript of plaintiff's deposition, conducted on May 15, 2009 and hereinafter cited as "Plaintiff's Dep. Tr." at pp. 8-10). Defendants Sigona, Manna and Ruston, all three of whom are employed as corrections workers at the facility, responded to the incident, entering the cell and ordering all of the inmates to retreat to the back. Complaint (Dkt. No. 1) Statement of Facts ¶ 2, Manna Decl. (Dkt. No. 38-9) ¶ 3; Sigona Decl. (Dkt. No. 38-8) ¶ 3. While those corrections officers attempted to remove the dissident inmate from the cell plaintiff Cicio became involved. It is at this point that the parties' versions of the relevant events significantly diverge.

Plaintiff contends that during the ensuing events he was pushed into defendant Manna, who then grabbed him by the hair and began to pull him toward the cell door, resulting in Cicio being thrown to the floor and kneed in the nose. Complaint (Dkt. No. 1) Statement of Facts ¶ 4; Cicio Decl. (Dkt. No. 40-2) ¶ 4. Plaintiff maintains that after regaining his footing he was again grabbed by the hair and pushed face first into the wall. Complaint (Dkt. No. 1) Statement of Facts ¶ 5. Plaintiff asserts that while this was occurring defendants Sigona and Ruston stood by and watched without coming to his assistance. *Id.*

**\*7** Defendants offer a markedly different version of the relevant events. According to the defendants, while they were attempting to extricate the disruptive inmate from the holding cell Manna issued a direct order to the plaintiff to move to the back of the cage. Plaintiff's Exh. D (Dkt. No. 35-2) Disregarding the order, plaintiff blocked Corrections Officer Manna's path, lunged at him and struck him with a closed fist knocking him to the floor. *Id.; see also,* Manna Decl. (Dkt. No. 38-9) ¶ 4; Sigona Decl. (Dkt. No. 38-8) ¶ 5. Cicio then began yelling to the other inmates in the cage, encouraging them to join in, exclaiming, "let's get them." Plaintiff's Exh. D (Dkt. No. 35-2). At that point, defendants Manna and Sigona attempted to subdue Cicio, who continued to struggle and resist, resulting in Cicio and Officer Manna falling to the floor. Manna Decl. (Dkt. No. 38-9) ¶¶ 4-5; Sigona Decl. (Dkt. No. 38-8) ¶ 5.

As a result of the incident a misbehavior report was subsequently issued by Corrections Officer Manna charging Cicio with disciplinary infractions, including 1) assault on staff; 2) prison takeover; 3) engaging in violent conduct; 4) inciting inmates; 5) disobeying a direct order; 6) physically interfering with an employee; and 7) impeding inmate movement. Mann Decl. (Dkt. No. 38-9) ¶ 7. Following a Tier III disciplinary hearing commenced on March 13, 2006, plaintiff was found guilty of five of the six violations including, *inter alia,* assault on staff. Kerwin Aff. (Dkt. No. 38-3) Exh. I. As a result of that determination plaintiff received a series of sanctions which, after being modified on appeal, included twelve months of confinement in a facility special housing unit ("SHU") with a corresponding loss of packages, commissary, and telephone privileges, and an additional recommendation that plaintiff forfeit twelve months of good time credits. *Id.*

Following the incident plaintiff was immediately removed from the area and taken to be examined by facility medical personnel. Manna Decl. (Dkt. No. 38-9) ¶ 6. Plaintiff was examined by defendant A. Vega, a registered nurse, within fifteen to twenty minutes after the incident. Cicio Decl. (Dkt. No. 40-2) ¶ 5; Plaintiff's Dep. Tr. at p. 22. During that examination Nurse Vega observed a reddened area on the bridge of plaintiff's nose and noted his reports of minor pain in the nose and head areas. Plaintiff's Dep. Tr. at pp. 25-26; *see also* Kerwin Aff. (Dkt. No. 38-3) Exhs. B and H. Plaintiff was not treated for his injuries nor was he scheduled to see a doctor. Complaint (Dkt. No. 1) Statement of Facts ¶ 8.

Plaintiff claims that following the incident he submitted sick call slips on March 8, 9, 13 and 19, 2006, requesting medical intervention to address his injuries. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 9, 11-12 and 15. Plaintiff contends, however, that those sick call slips were not processed by defendant Ryerson, the nurse administrator at Auburn. *Id.* ¶ 22. Defendant Ryerson denies that allegation and counters that based upon her review of all sick call slips received during the time period involved, there is no record of plaintiff having requested sick call at any time between March 8 and March 20, 2006. Ryerson Decl. (Dkt. No. 38-10) ¶ 4.

**\*8** As is the case with regard to plaintiff's substantive allegations, the parties disagree over the procedural steps taken by the plaintiff to seek internal review of the relevant events. Plaintiff contends that following the incident he filed two separate grievances, filing the first on March 14, 2006, and both related to the failure of prison officials to permit him to attend sick call. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 14, 16. Plaintiff does not assert in his complaint that he filed a grievance regarding the alleged use of force and failure of prison officials to intervene on his behalf, although in an affirmation in opposition to defendants' summary judgment motion Cicio succinctly states "[p]laintiff filed grievances on both incidents, only one was responded to." *See* Cicio Aff. (Dkt. No. 39) ¶ 3. Plaintiff's motion submission also includes a handwritten memorandum, dated March 14, 2006 and addressed to the facility inmate grievance review committee ("IGRC"), citing the events including the alleged assault by prison officials. *See* Plaintiff's Exhs. (Dkt. No. 35-3) p. 24 of 27.

According to the defendants, the sole grievance filed by plaintiff regarding the incident was submitted on March 24, 2006 and was denied by the facility IGRC on April 3, 2006 after plaintiff was transferred out of Auburn. Graham Decl. (Dkt. No. 38-7) ¶ 6. That denial was subsequently affirmed by defendant Graham, the Superintendent at Auburn, on April 3, 2006. While plaintiff claims to have appealed that determination on June 12, 2006, presumably to the DOCS Central Office Review Committee ("CORC"), the record contains no further indication of whether that appeal was in fact taken, and if so, the result. *See* Complaint (Dkt. No. 1) Statement of Facts ¶ 18. According to prison officials at Auburn, their research of relevant records at the facility failed to disclose additional documents regarding plaintiff's exhaustion of remedies and, significantly, to show that plaintiff appealed to Superintendent Graham from the disposition of his claimed use of force grievance. *See* Graham Decl. (Dkt. No. 38-7) ¶ 4.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on April 28, 2008. [1] As defendants, plaintiff's complaint names Auburn Superintendent Harold D. Graham; Corrections Sergeant Peter M. Sigona; Corrections Officers Richard D. Ruston and Phil J. Manna; Registered Nurse A. Vega; and Nurse Administrator Ryerson. The complaint alleges varying claims against those defendants including for the alleged use of excessive force and failure to protect the plaintiff from the use of force as well as indifference to his medical

needs arising from the incident. [2] *See generally* Complaint (Dkt. No. 1).

[1]    This action was filed in the Western District of New York but was subsequently transferred here by order issued on May 2, 2008 by Chief District Judge Richard J. Arcara. Dkt. Nos. 1, 3.

[2]    In his motion submission, plaintiff also claims to have asserted a cause of action for violation of procedural due process, based upon the defendants' alleged failure to process and investigate his grievances. Plaintiff's Memorandum (Dkt. No. 35-3) at p. 2. Such a claim, if indeed present in this action, is nonetheless subject to dismissal, since it is well established that a prison inmate has no cognizable constitutional right of access to the grievance process or to have grievances which have been filed investigated. *Avent v. Doe,* No. 9:05-CV-1311, 2008 WL 877176, at *8 (N.D.N.Y. Mar.31, 2008) (Scullin, S.J. & DiBianco, M.J.) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003)).

Issue was initially joined in the action by defendant Manna through his filing of an answer on September 25, 2008. Dkt. No. 23. Following the denial of their pre-answer motion seeking dismissal of plaintiff's claims against them on a variety of bases, *see* Dkt. Nos. 29, 32, an answer was filed on behalf of the remaining defendants on February 25, 2009. Dkt. No. 30.

**\*9** On July 15, 2009, following pretrial discovery, plaintiff filed a motion for summary judgment in his favor. Dkt. No. 35. While plaintiff's motion appears to focus on the defendants' use of force, it purports to seek summary judgment on all of his claims. *See id* . On September 28, 2009, defendants responded in opposition to plaintiff's motion and in support of a cross-motion requesting judgment dismissing all of plaintiff's claims against them as a matter of law. Dkt. No. 38. In their motion, defendants argue that 1) plaintiff's deliberate medical indifference claim is legally deficient based both upon his inability to establish the existence of a serious medical need and the lack of evidence of indifference on the part of defendants Vega or Ryerson, the two medical personnel against whom the claim appears to have been lodged; 2) plaintiff's claim surrounding the alleged use of a excessive force and failure to intervene lacks merit; 3) plaintiff's claims against Superintendent Graham are subject to dismissal based upon his lack of personal involvement in the constitutional deprivations alleged;

and 4) in any event defendants are entitled to qualified immunity from suit. Plaintiff has since responded in opposition to defendants' motion and in further support of his initial summary judgment motion. Dkt. Nos. 38, 39, 40.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson)*. A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more

than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*10** When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

### B. *Excessive Force/ Failure To Intervene*

At the heart of plaintiff's complaint is his claim that on March 7, 2006 he was subjected to an unprovoked attack by defendant Manna and that defendants Sigona and Ruston watched and failed to take any measures to end the assault and that, as a result, he suffered physical injuries. Plaintiff claims that the record supports his excessive force and failure to intervene claims as a matter of law. Defendants counter by arguing that no reasonable factfinder can conclude, based upon the record now before the court, that plaintiff's constitutional rights were violated, even assuming the truth of his version of the relevant events.

#### 1. *Excessive Force*

Plaintiff's excessive force claim must be analyzed under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290,

291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

**\*11** Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. --- U.S. ----, ---, --- S.Ct. ----, --- L.Ed.2d - - - -, 2010 WL 596513, at \*3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This

is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a de *minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268-69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000). That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*12** Addressing the objective prong of the Eighth Amendment analysis, the fact that Cicio suffered minor though discernable injuries from the use of force distinguishes this case from others in which the lack of injury has justified summary judgment dismissing excessive force claims under the Eighth Amendment. *See, e.g., Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002).[3] Under the circumstances now presented it would be inappropriate to find, as a matter of law, that objectively plaintiff's injuries were not sufficiently serious to rise to a constitutionally cognizable level.

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

Turning to the subjective element, the record is devoid of any evidence from which a reasonable factfinder could conclude that this element of plaintiff's excessive force claim against Manna has been met. Rather than representing an unprovoked use of force, by plaintiff's own version, the use of force against the plaintiff occurred during a period of turmoil when one or more disruptive inmates in a group of between sixteen and eighteen combined in a single holding cell became unruly and were being urged to lash out against corrections officers. Plaintiff alleges in his complaint and states in a sworn declaration that he was pushed into a corrections officer by Sergeant Sigona, pulled out of the holding pen by his hair, and thrown to the floor and kneed in the nose. During his deposition, however, plaintiff testified that five or six corrections officers rushed into the holding pen directing him to move to the back, which he could not do because there was no room. Plaintiff's Dep. Tr. at pp. 16 and 51. From there, plaintiff is not exactly sure what happened; he does not know whether he was pushed intentionally, only that "[he] was taken down ... [and] ... kneed in the nose." *Id.* at p. 16. Additionally, at the time of the incident, plaintiff did not know who the officers involved were, who "took him down", or who kneed him in the nose, and could not say whether there were also

officers on the floor with him. [4] *Id.* at pp. 16-17, 52. Plaintiff further testified that after he fell to the floor, he was lifted and pulled out of the cage by his hair, and then he hit the floor again. *Id.* at p. 18. Again, plaintiff admittedly does not know how he ended up on the floor a second time, or whether he fell or the corrections officers fell on him, although he recalls that he was on the floor with a couple of corrections officers on top of him. *Id.*

[4]     Plaintiff later learned the names of the officers he identified in his complaint when he received a copy of the misbehavior report that was issued to him as a result of the incident. Plaintiff's Dep. Tr. at p. 17.

Under the circumstances presented, even accepting as true plaintiff's version of the events, when considering the four factors informing the subjective analysis no reasonable factfinder could conclude that the force applied was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. Moreover, considering the extent of the force applied and the relatively minor injuries suffered even by plaintiff's account, coupled with the lack of evidence of malicious motives on the part of the corrections officers involved, I recommend a finding that the use of force was truly *de minimis* and did not abridge plaintiff's Eighth Amendment rights. [5]

[5]     By plaintiff's own account, the injures suffered as a result of the incident were minor. *See* Plaintiff's Dep. Tr. at pp. 21-26.

### 2. *Failure to Intervene*

**\*13** A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive

force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

Based upon my finding that plaintiff's Eighth Amendment rights were not violated through the actions of defendant Manna, there can be no cognizable claim for liability on the part of defendants Sigona and Ruston for failure to intervene and protect plaintiff from the constitutional violation. *See Curley,* 268 F.3d at 72. I therefore recommend that plaintiff's claims against those defendants be dismissed as well.

### C. *Medical Indifference*

The second component of plaintiff's complaint alleges that defendants Vega and Ryerson failed to provide him with needed medical treatment. Plaintiff's claim against Nurse Vega apparently stems from her failure, upon examining Cicio immediately following the March 7, 2006 incident, to arrange for him to see a doctor or to prescribe pain medication. The allegations against defendant Nurse Administrator Ryerson result from her alleged failure to process sick call slips submitted on several occasions following the incident by plaintiff. While plaintiff's summary judgment motion does not speak directly to this claim, he apparently seeks summary judgment on the issue of liability on this claim as well. For their part, defendants urge dismissal of plaintiff's medical indifference claims as a matter of law due to his failure to assert the existence of a serious medical need and additionally for lack of any evidence to satisfy the subjective element of the controlling test.

**\*14** Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed

within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

### 1. *Serious Medical Need*

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A

serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

**\*15** The record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of. Plaintiff alleges that during the incident he suffered from a swollen and painful wrist as well as head pain. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; *see also* Plaintiff's Dep. Tr. at pp. 21-22, 24-26. The record, including plaintiff's submission in support of his summary judgment motion and later opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration. Instead, the record discloses only injuries of a transitory nature which are insufficient to establish existence of a serious medical need of constitutional proportions. *Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 WL 946703, at *12 (S.D.N.Y. Mar.27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

### 2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."

*Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of which diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment", and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference. Even if plaintiff could establish the existence of a serious medical need, the record does not provide a basis for a reasonable factfinder to conclude that either defendant Vega or defendant Ryerson was deliberately indifferent to such a need. Plaintiff's claim against Nurse Vega is that on one occasion she failed to provide pain medication or to refer the plaintiff to a physician as a result of his injuries. Such an allegation of a single instance of delayed or denied medical care does not establish constitutional claim of medical deliberate indifference. *See Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003).

**\*16** Turning to the allegations against defendant Ryerson, those stem from an alleged failure to process sick call slips on four or five occasions following the March 7, 2006 incident. Even assuming the existence of a serious medical condition prompting the need for medical care and defendant Ryerson's failure to process sick call slips over a brief period of time, these facts alone do not suffice to establish a deliberate indifference claim as against defendant Ryerson since there is no evidence suggesting that the minimal delay caused any significant adverse effect to plaintiff's health. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 324 (W.D.N.Y.2007). Accordingly, I recommend dismissal of plaintiff's deliberate indifference claim against defendant Ryerson on this alternative basis.

### D. *Personal Involvement*

In their motion defendants assert that even if plaintiff could establish a cognizable excessive force or deliberate indifference claim, his cause of action against defendant

Graham, the superintendent at Auburn, is legally insufficient based upon his lack of personal involvement in any conduct forming the basis for those claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Importantly, a supervisor like Superintendent Graham cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 2931 (2009); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*17** In my earlier report and recommendation, addressing a pre-answer dismissal motion filed by certain of the defendants including Superintendent Graham, I recommended against dismissing plaintiff's claim against defendant Graham, finding that the proof at trial could potentially establish that defendant Graham learned, through the appeal of plaintiff's grievance denial, that he was deprived of medical care at a point when he had an opportunity to cure that alleged constitutional deficiency. *See* Report and Recommendation dated February 10, 2009 (Dkt. No. 29) at pp. 17-21. The more fully developed record now before the court, however, firmly establishes that this is not the case. There is no indication that defendant Graham was aware of plaintiff's circumstances prior to plaintiff's appeal on April 12, 2006 of the IGRC's grievance denial. *See* Graham Decl. (Dkt. No. 38-7) ¶ 6. By that point, plaintiff had been transferred out of Auburn, and thus even if defendant Graham was placed on notice of a constitutional deprivation in the form of denial of adequate medical treatment, he was no longer in a position to cure that deficiency. *Id.* Accordingly, because the record fails to disclose any basis on which defendant Graham could be held liable for the constitutional violations alleged, there is an independent, alternate basis for dismissing plaintiff's claims against him.

## *IV. SUMMARY AND RECOMMENDATION*

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendant Manna during the course of the March 7, 2006 incident and defendants Sigona and Ruston failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of that incident or that the defendants were subjectively indifferent to the medical needs presented by those injuries. Finally, the record discloses no basis on which a reasonable factfinder could assign liability on the part of defendant Graham, as superintendent of the Auburn Correctional Facility. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED and that plaintiff's complaint be dismissed in its entirety, and that based upon that determination plaintiff's summary judgment motion (Dkt. No. 35) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 980272

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1500422
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Troy SMITH, Plaintiff,
v.
C. ROSATI, et al., Defendants.

Civil Action No. 9:10–CV–1502 (DNH/DEP).
|
Feb. 20, 2013.

**Attorneys and Law Firms**

Troy Smith, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Troy Smith, a New York State prison inmate, has commenced this action, pursuant to 42 U.S.C. § 1983, against the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") and several DOCCS employees, alleging deprivation of his civil rights. In general terms, plaintiff's amended complaint alleges that two defendants assaulted him at the instruction of other defendants, that one defendant failed to intervene and protect him from the assault, that two defendants failed to provide him with adequate medical care, that several defendants conspired to conceal the assault, and that he was deprived procedural due process at a disciplinary hearing arising from the event.

Currently pending before the court in connection with the action is defendants' motion for the entry of partial summary judgment. Specifically, defendants seek dismissal of all claims against all defendants with the exception of those asserted against defendants Rosati and St. John, who, plaintiff alleges, assaulted him. For the reasons set forth below, I recommend that defendants' motion be granted except as it relates to the failure to

intervene claim asserted against defendant Fraser and the retaliation claim interposed against defendant Goodman.

**I.** *BACKGROUND*[1]

[1]      In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Am. Compl. (Dkt. No. 7). Although he is currently confined elsewhere, at all times relevant to this action, Smith was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *Id.* at 1. Two series of events, separately discussed below, give rise to this action.

**A.** *Mattress Incident*

In January 2010, plaintiff attempted to trade in his old mattress to defendant B. Mars, the laundry supervisor at Great Meadow, in return for a new one. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 9. According to plaintiff, defendant Mars improperly ordered plaintiff to pay the full price for the new mattress because she believed that plaintiff had purposely damaged his old one. *Id.* at 9–10. Defendant Mars issued a misbehavior to plaintiff, and plaintiff filed a grievance against defendant Mars with the Inmate Grievance Resolution Committee ("IGRC"), both as a result of the incident. *Id.* at 10. Defendant Craig Goodman, a corrections captain employed by the DOCCS, presided over the disciplinary hearing that resulted from the misbehavior report issued by defendant Mars. *Id.* at 11; Goodman Decl. (Dkt. No. 79, Attach.12) at ¶ 1. According to plaintiff, at that hearing, defendant Goodman acknowledged that plaintiff's old mattress was damaged as a result of normal wear-and-tear, promised to testify on plaintiff's behalf at the IGRC hearing, and dismissed the misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 11. Plaintiff alleges, however, that defendant Goodman ultimately refused to testify on his behalf at the IGRC hearing, and denied that he told plaintiff his mattress was damaged as a result of normal wear-and-tear. *Id.* at 12. As a result, in January or February 2010, plaintiff filed a grievance with the IGRC alleging that defendant Goodman lied to him. *Id.* at 15, 17.

**\*2** In May 2010, plaintiff tested positive for marijuana use, and was issued a misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 13. Defendant Goodman presided over the ensuing disciplinary hearing and, after finding plaintiff guilty, sentenced him principally to twelve months of disciplinary confinement in the Special Housing Unit ("SHU"). *Id.* at 18, 21. Due to plaintiff's mental health status, however, this sentence was subsequently modified by the facility superintendent to six months in keeplock confinement. *Id.* at 23. On or about June 11, 2010, plaintiff arrived in keeplock at Great Meadow. *Id.*

B. *Assault*
On June 18, 2010, defendant Paul Zarnetski, a corrections lieutenant employed by the DOCCS, instructed defendant Craig Rosati, a corrections officer also employed by the DOCCS, to escort plaintiff to his scheduled disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 87; Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶¶ 1, 4. At approximately 12:45 p.m. on the same date, defendant Rosati retrieved plaintiff from his cell for the escort. Am. Compl. (Dkt. No. 7) at 9; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. As the two entered a nearby stairway, an altercation occurred between them, which resulted in both plaintiff and defendant Rosati falling down the stairs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. Plaintiff alleges that defendant Rosati pushed him down the stairs and then jumped on him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31, 35. Defendant Rosati, on the other hand, reported that plaintiff turned toward him in a threatening manner, causing him to use force that consisted of a strike to plaintiff's forehead with a closed fist. Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. It is undisputed, however, that, after plaintiff and defendant Rosati fell down the stairs, defendant Chad St. John, another corrections officer, arrived at the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. Plaintiff alleges that defendant St. John began kicking him while he was still on the ground. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36. Defendants, however, maintain that defendant St. John used force that consisted only of applying mechanical hand restraints. Goodman Decl. (Dkt. No. 79, Attach.13) at 1.

Shortly after the arrival of defendant St. John, defendant C. Fraser, a corrections sergeant at Great Meadow, also arrived on the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 37; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. The parties dispute whether defendant Fraser witnessed a further use of force by defendant Rosati when defendant Rosati pushed plaintiff's face into a wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38; Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9. It is undisputed, however, that defendant Fraser ordered that a video camera be brought to the scene; upon its arrival, a corrections officer began filming plaintiff's escort from the stairway to the Great Meadow hospital. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically filed).

**\*3** Upon his arrival at the hospital, Smith was examined by defendant David Lindemann, a DOCCS registered nurse. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 40; Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶¶ 1, 4. As a result of his examination and interview of plaintiff, defendant Lindemann noted plaintiff's complaints of a sore left shoulder, pain to his left rib area, and facial area pain, but observed no decrease in plaintiff's range of motion in his shoulder and no visible injuries to his rib area. Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 5; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.8, 9). Defendant Lindemann observed a swollen area on plaintiff's head and a laceration of approximately one and one-half inches in length above plaintiff's left eye, for which he referred plaintiff to defendant Nesmith for stitches. *Id.* Defendant Ted Nesmith, a physicians assistant employed by the DOCCS, closed plaintiff's laceration above his left eye with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80; Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶ 5.

As a result of the incident, plaintiff was issued a misbehavior report accusing him of engaging in violent conduct, attempted assault on staff, and refusing a direct order. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5) at 2–3. A Tier III disciplinary hearing was subsequently convened by defendant Andrew Harvey, a commissioner's hearing officer, to address the charges. [2] *Id.* at 2. Plaintiff was assigned a corrections counselor, defendant Torres, to help him prepare his defense at the disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–79. At the close of that hearing, plaintiff was found guilty on all three counts, and was sentenced to a six-month period of disciplinary SHU confinement, together with a loss of packages, commissary, and telephone privileges for a similar period. *Id.* at 21.

2    The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

In the months that followed the incident involving defendants Rosati and St. John, both plaintiff and his mother, Linda Terry, wrote letters to defendant Fischer, the DOCCS Commissioner, complaining of the alleged assault. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 5, 8–12. On September 15, 2010, defendant Lucien LeClaire, the Deputy DOCCS Commissioner, responded by letter, advising plaintiff that defendant Fischer had referred plaintiff's complaint to him, and that he, in turn, had referred the matter to the Office of Special Housing/Inmate Disciplinary Programs. *Id.* at 6. The next day, defendant Albert Prack, the acting director of the Office of Special Housing/Inmate Disciplinary Programs, wrote a letter to plaintiff indicating that his letters to defendant Fischer, which he construed as a request for reconsideration of his appeal of the disciplinary conviction, was without merit, and advising plaintiff that "[n]o further administrative action will be taken." *Id.* at 7.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 13, 2010, and on February 14, 2011, filed an amended complaint as a matter of right. Dkt. Nos. 1, 7. Those named as defendants in plaintiff's amended complaint include DOCCS Commissioner Brian Fischer; DOCCS Chief Counsel and Deputy Commissioner Anthony J. Annucci; DOCCS Deputy Commissioner Lucien LeClaire, Jr.; DOCCS Inspector General Richard Roy; Deputy Superintendent for Security at Great Meadow Charles Kelly; Deputy Superintendent for Administration at the Great Meadow D. Lindstrand; Corrections Captains Joseph Carey and Craig Goodman; [3] Corrections Sergeants D. Bebee and C. Fraser; Corrections Lieutenants T. Pray and Paul Zarnetski; [4] Commissioner's Hearing Officer Andrew Harvey; Corrections Counselor Torres; Corrections Officers Craig P. Rosati and Chad W. St. John; Physicians Assistant Ted Nesmith; [5] Register Nurse David Lindemann; [6] Laundry Supervisor B. Mars; and Acting Director of the Office of Special Housing/Inmate Disciplinary Programs Albert Prack. [7]

3    Plaintiff's amended complaint identifies defendant Goodman as a lieutenant. Am. Compl. (Dkt. No. 7) at 5. In his affidavit submitted in support of defendants' pending motion, however, defendant Goodman states that he is a corrections captain. Goodman Decl. (Dkt. No. 79, Attach.12) at ¶ 1.

4    Defendant Zarnetski's name has been spelled by plaintiff in various ways, and is listed on the court's records as Zaratski. The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Zarnetski.

5    Defendant Nesmith was sued by plaintiff as "Nesmith (Ted) Fisher, III," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "Nesmith Fisher." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Ted Nesmith.

6    Defendant Lindemann was sued by plaintiff as "D. Lindermann," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "D. Lindermann." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as David Lindemann.

7    The record reflects that defendant Prack's name has been spelled in a variety of ways, and is listed on the court's records as "Albert Prach." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Albert Prack.

**\*4** Liberally construed, plaintiff's amended complaint asserts eight causes of action, claiming (1) the use of excessive force by defendants Rosati and St. John; (2) conspiracy to conceal the alleged assault by defendants Rosati and St. John against defendants Rosati, St. John, Fraser, Bebee, Kelly, Lindemann, Nesmith, Lindstrand, Goodman, Torres, and Harvey; (3) deliberate indifference to plaintiff's serious medical needs against defendants Lindemann and Nesmith; (4) retaliation against defendants Goodman, Rosati, and St. John; (5) failure to enforce DOCCS regulations against defendants

Fischer, Annucci, Roy, and LeClaire; (6) withholding personal property against defendant Mars and Goodman; (7) procedural due process against defendants Harvey, Torres and Prack; and (8) failure to train and supervise against defendants Fischer, Annucci, LeClaire, Roy, Kelly, and Lindstrand. [8] Am. Compl. (Dkt. No. 7) at 19–20. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

[8]    At several points in his complaint, as amended, plaintiff alleges that defendants violated various regulations regarding such matters as reporting the requirement of prison medical personnel to assess medical conditions, and the requirement that a disciplinary hearing be held within seven days. It is well-established that the violation of a prison regulation is not redressable in a civil rights action brought pursuant to section 1983. *See Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson,* 628 F.Supp.2d 407, 411 (W.D.N.Y.2009) ( "[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). Plaintiff's complaint also references 18 U.S.C. § 1351, a criminal statute addressing fraud and foreign labor contracting, as well as the Torture Victim Protection Act of 1991, codified at 28 U.S.C. § 1350, and providing a private right of action by an alien for a tort committed in violation of international law or a United States treaty. Those sections do not appear to have any applicability to the facts of this case.

By decision and order dated June 23, 2011, following an initial review of plaintiff's amended complaint, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, the court *sua sponte* dismissed all of plaintiff's claims against defendants Kelly, Lindstrand, Carey, Bebee, and Pray, without prejudice, as well as plaintiff's equal protection claims against defendants Mars and Goodman, also without prejudice, and otherwise authorized the action to go forward. Dkt. No. 10.

On May 14, 2012, following the close of discovery, defendants moved for the entry of partial summary judgment dismissing the majority of the claims made in plaintiff's amended complaint. Dkt. No. 79. In their motion, defendants argue that (1) defendants Fischer, Annucci, LeClaire, Roy, and Prack are entitled to dismissal based upon the lack of their personal

involvement in the alleged constitutional violations; (2) the record fails to support a claim of deliberate medical indifference against defendant Nesmith and Lindemann; (3) the record does not disclose a basis to hold defendant Fraser liable for failure to protect or intervene; (4) plaintiff's claims against defendant Zarnetski are subject to dismissal, based upon his lack of prior knowledge of and involvement in the assault; (5) plaintiff's verbal harassment claim against defendant Goodman is not cognizable under section 1983; (6) plaintiff's procedural due process cause of action against defendant Harvey lacks merit; (7) plaintiff's claim based upon the payment of $65 for a new mattress does not state a cognizable constitutional claim; and (8) in any event, all defendants, except for defendants Rosati and St. John, are entitled to qualified immunity. Defs.' Memo. of Law (Dkt. No. 79, Attach.17). Defendants' motion, to which plaintiff has since responded, Dkt. No. 87, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72(3)(c). *See* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S.

at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Personal Involvement*

In their motion, defendants seek dismissal of all claims against defendants Fischer, Annucci, LeClaire, Roy, and Prack based upon lack of personal involvement. Plaintiff responds by arguing that, through his letters, those individuals were or should have been aware of plaintiff's circumstances, but were deliberately indifferent, and additionally were derelict in the performance of their duties and in supervising subordinates, permitting the alleged constitutional deprivations to occur.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). It is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor because there is no *respondeat superior* liability under section 1983.[9] *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). A supervisor, however, may be held responsible for a civil rights violation when it is established that he (1) has directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to

continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[10]

9  Here, the defendants implicated in this portion of the pending motion are principally supervisory DOCCS employees.

10  The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* on the categories of supervisory liability under *Colon.* Lower courts have struggled with this issue—specifically in deciding whether *Iqbal* effectively calls into question certain categories of supervisor liability in *Colon. Sash v. United States,* 674 F.Supp.2d 542–44 (S.D.N.Y.2009); *see also Stewart v. Howard,* No. 09–CV0069, 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) (Lowe, M.J.) ("The Supreme Court's decision in [*Iqbal* ] arguably casts in doubt the continued viability of some of the categories set forth in *Colon."* (citing *Sash* )). In this case, absent any controlling authority to the contrary, the court assumes that all of the *Colon* categories still apply.

### 1. *Defendant Fischer*

**\*6** At his deposition, plaintiff testified that he sued DOCCS Commissioner Fischer for two reasons: (1) he wrote defendant Fischer about the alleged assault by defendants Rosati and St. John, and defendant Fischer failed to respond; and (2) as the DOCCS Commissioner, defendant Fischer is responsible for the actions of his subordinate employees. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 55–57. Neither of these reasons provides an adequate basis for suit under section 1983. *See, e.g., Hernandez v. Keane,* 342 F.3d 137, 144 (2d Cir.2003) ("[S]upervisor liability in a [section] 1983 action ... cannot rest on *respondeat superior." ); Parks v. Smith,* No. 08–CV–0586, 2011 WL 4055415, at *14 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y.2011) (McAvoy, J.) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").[11] Except for this testimony by plaintiff, there is no other record evidence relating to defendant Fischer. As a result, I find that no reasonable

factfinder could conclude, based on the record evidence, that defendant Fischer was personally involved in any of the allegations giving rise to this action.

11    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

## 2. *Defendant Annucci*

At his deposition, plaintiff testified that he sued DOCCS Chief Counsel and Deputy Commissioner Annucci in this action for four reasons: (1) he is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) he failed to investigate the alleged assault on plaintiff; (3) he merely passed the letters from plaintiff and plaintiff's family down the chain of command; (4) he did not do his job. Plf.'s Dep. Tr. (Dkt. No. 79, Attach 3) at 57–59. Plaintiff's argument that defendant Annucci did not do his job by failing to investigate is based on plaintiff's unsupported assumption that defendant Fischer forwarded plaintiff's letter to defendant Annucci and instructed him to investigate. *See id.* at 58 ("[Defendant Annucci] didn't do what I figured he was told to be done by investigating[.]"). Indeed, there is no record evidence, including any testimony from plaintiff, that plaintiff or any members of his family wrote a letter or complaint directly to defendant Annucci. In any event, even assuming that defendant Annucci received plaintiff's letters, defendant Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks,* 2011 WL 4055415, at *14 ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."). For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

## 3. *Defendant LeClaire*

At his deposition, plaintiff testified that he sued Deputy DOCCS Commissioner LeClaire because defendant LeClaire forwarded plaintiff's letter addressed to defendant Fischer regarding the alleged assault to the Office of Special Housing/Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 60; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 6. That allegation is insufficient to raise a dispute of material fact as to

whether defendant LeClaire is personally involved in any of the allegations giving rise to this action. *See, e.g., Ward v. LeClaire,* No. 07–CV–0026, 2010 WL 1189354, at *5 (N.D.N.Y. Mar. 24, 2010) (Suddaby, J.) ("[I]t is well settled that referring letters and grievances to staff for investigation is not sufficient to establish personal involvement." (internal quotation marks and alterations omitted)). Because there is no other record evidence that relates to defendant LeClaire, I find that no reasonable factfinder could conclude that he was personally involved in any of the allegations giving rise to this action.

## 4. *Defendant Roy*

**\*7** At his deposition, plaintiff stated that he sued defendant Roy because he has not received a response from the Inspector General's Office, where defendant Roy heads the Internal Affairs Department, regarding plaintiff's grievance. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 61. Plaintiff testified that he gave a copy of his grievance regarding the alleged assault to an Internal Affairs employee while at Great Meadow, and was later interviewed regarding the incident, but has not yet received a result of the investigation. *Id.* at 61–64. Importantly, plaintiff testified that he has no personal knowledge that defendant Roy, as the head of Internal Affairs, was ever personally aware of the investigation. *Id.* Because there is no *respondeat superior* liability under section 1983, this evidence is not sufficient to support a claim against defendant Roy. *Hernandez,* 342 F.3d at 144. For that reason, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Roy was personally involved in any of the allegations giving rise to this action.

## 5. *Defendant Prack*

At his deposition, plaintiff testified that he sued defendant Prack because Prack cursorily reviewed plaintiff's appeal of his disciplinary conviction in his capacity as the acting director of the Office of Special Housing/Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 92; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7. A review of the record evidence reveals that defendant Prack did, in fact, respond to plaintiff's appeal of his disciplinary conviction, and that defendant Prack indicated in that response that plaintiff's appeal was meritless. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7.

Whether review of an inmate's disciplinary conviction by a person in defendant Prack's position is sufficient to establish personal involvement in section 1983 cases is the subject of debate in this circuit. Some courts have determined that the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon.* [12] *See Baez v. Harris,* No. 01–CV–0807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (finding that the response of "the Director of the Special Housing/Inmate Disciplinary Program" to the plaintiff's appeal is "sufficient to withstand summary judgment on the issue of personal involvement"); *Ciaprazi v. Goord,* No. 02–CV–0915, 2005 WL 3531464, at *16 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J., *adopting report and recommendation by* Peebles, M.J.) (recommending that [the director of Office of Special Housing/Inmate Disciplinary Programs] not be dismissed for lack of personal involvement because a "review of [the plaintiff's appeal from a disciplinary conviction] sufficiently establishes his personal involvement based upon [the defendant] being positioned to discern and remedy the ongoing effects of any such violations"); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint sufficiently alleged personal involvement of the superintendent and DOCCS commissioner to withstand motion to dismiss because the complaint alleged that both defendants had actual or constructive notice of the alleged constitutional violation that occurred at the disciplinary hearing); *Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of a violation through ... an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) (holding that, on a motion to dismiss, the allegation that the DOCCS's commissioner "entertained" and "affirmed" the plaintiff's appeal is sufficient to state a claim against the commissioner because "the allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation").

12    *See Colon,* 58 F.3d at 873 ("The personal involvement of a supervisory defendant may be shown by evidence that: ... (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[.]").

**\*8** On the other hand, some courts have concluded otherwise, holding that the mere allegation that a defendant reviewed a disciplinary conviction appeal is insufficient to find that defendant personally involved. *See Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y.2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J .) ("The affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation."); *Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning [the director of the Special Housing/Inmate Disciplinary Program] ... is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU. That is not enough to establish [his] personal involvement." (internal citation omitted)); *Odom v. Calero,* No. 06–CV–15527, 2008 WL 2735868, at *7 (S.D.N.Y. Jul. 10, 2008) (holding that the allegation that the director of the Special Housing/ Inmate Disciplinary Program was personally involved as a result his denial of the plaintiff's appeal of his disciplinary conviction was not sufficient to trigger the second category establishing personal involvement under *Colon* because, "[o]nce the [disciplinary] hearing was over and [the defendant's] decision was issued, the due process violation was completed"); *Ramsey v. Goord,* No. 05–CV–0047A, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005) ("[T]he fact that [the DOCCS commissioner and SHU director], as officials in the DOC[C]S 'chain of command,' affirmed [a] determination on appeal is not enough to establish personal involvement of their part."); *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance—which is all that is alleged against him—is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant." (internal quotation marks omitted)).

At this time, I am inclined to agree with those courts that have determined that a defendant's review and response to an appeal of a disciplinary conviction is sufficient under *Colon* to find that defendant personally involved. Mindful that on a motion for summary judgment I must view the facts, and draw all inferences, in the light most favorable to the non-movant, I find that a reasonable factfinder could conclude, if plaintiff's testimony is credited, that defendant Prack's review of plaintiff's disciplinary conviction revealed a due process violation,

and by defendant Prack dismissing plaintiff's appeal, he failed to remedy that violation. Additionally, because it appears that plaintiff was still serving the sentence imposed at the disciplinary hearing where his alleged due process violation occurred, I find that any violation that may have occurred was ongoing, and defendant Prack was in a position to remedy that violation, at least in part, at the time plaintiff appealed his conviction. All of this is enough to find that there is a dispute of material fact as to whether defendant Prack was personally involved in the allegations giving rise to plaintiff's due process claim by way of the second of the five potential grounds for supervisor liability under *Colon.* Cf. *Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) ("We disagree, however, with the district court's denial of leave to amend to add [the director of the Special Housing/Inmate Disciplinary Program], who [was] personally involved in [the plaintiff's] disciplinary proceedings[.]"). [13]

[13]    Based on the record evidence now before the court, I find that defendant Prack could have been personally involved only in plaintiff's procedural due process claim. As discussed more completely below, however, I recommend dismissal of that claim. Therefore, the finding that a dispute of material fact exists as to whether defendant Prack was personally involved in the allegations giving rise to this action is largely academic.

**\*9** In summary, I recommend that defendants' motion for summary judgment on the basis of personal involvement be granted with respect to defendants Fischer, Annucci, LeClaire, and Roy, but denied as it relates to defendant Prack.

### C. *Deliberate Indifference Claims Against Defendants Nesmith and Lindemann*

Defendants next seek dismissal of plaintiff's Eighth Amendment deliberate indifference claims against defendants Nesmith and Lindemann, arguing that the record lacks any evidence of their deliberate indifference to plaintiff's serious medical needs. In his amended complaint, plaintiff contends that defendants Nesmith and Lindemann failed to provide him with proper medical treatment for back pain, blurred vision, and hearing loss resulting from alleged assault by defendants Rosati and St. John on June 18, 2010. Am. Compl. (Dkt. No. 7) at 12.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v.. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (internal citations omitted).

**\*10** The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dutrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Here, after carefully reviewing the record evidence, I find that no dispute of material fact exists as to whether

defendants Nesmith and Lindemann were deliberately indifferent to plaintiff's medical needs as a result of the alleged assault by defendants Rosati and St. John. More specifically, although plaintiff testified at his deposition that defendant Nesmith did not follow "his procedure as being a physician" and failed to follow-up with plaintiff, plaintiff also testified that defendant Nesmith cleaned plaintiff's laceration and closed it with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80. Importantly, plaintiff testified that, on the date of the alleged assault, defendant Nesmith did everything that plaintiff requested of him. *Id.* at 80, 81. The record also reflects that defendant Lindemann completed an examination of plaintiff upon his arrival at the Great Meadow hospital, and that he completed a two-page "Use of Force Report" and one-page "Alleged Fight Exam" report during his examination of plaintiff. [14] Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 4; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8); Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶4. I have also reviewed the videotape submitted by defendants that recorded the treatment that defendants Nesmith and Lindemann provided plaintiff following the alleged assault by defendants Rosati and St. John. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically filed). This recording did not display anything unusual, and, although the recording did not include any sound, it appeared that defendants Lindemann and Nesmith asked plaintiff questions, responded to plaintiff's answers, and provided plaintiff with thorough medical care for his reported injuries. *See generally id.* After carefully reviewing all of this evidence, including plaintiff's testimony, I conclude that no reasonable factfinder could find that the care defendants Nesmith and Lindemann provided plaintiff was inadequate, or that they acted with the requisite deliberate indifference when providing medical treatment to plaintiff.

[14]  These reports do not include any complaints of hearing loss or blurred vision—complaints that plaintiff has alleged are ongoing and long-term effects of the alleged assault. *See generally* Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8).

**\*11** As it relates to plaintiff's allegations that he received inadequate follow-up medical treatment, the record evidence does not support this allegation. Specifically, plaintiff testified that defendant Nesmith removed his stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 83. Additionally, a review of plaintiff's ambulatory health

record reveals that plaintiff was subsequently treated by other medical staff members at Great Meadow on several occasions, including on June 20 and 25, 2010; July 1, 6, 20, 23, 27, and 29, 2010; and August 3, 2010. Lindemann Decl. Exhs. (Dkt. No. 79, Attach 11). While some of those visits reference symptoms that plaintiff now attributes to the alleged assault on June 18, 2010, including a notation that plaintiff was scheduled to see an eye doctor (June 25, 2010), others involved matters unrelated to the alleged assault, including missing dentures (July 20, 2010), bug bites (July 23, 2010) and a request for toenail clippers (July 29, 2010). *Id.* Even considered in the light most favorable to plaintiff, the cumulation of this evidence leads me to find that a reasonable factfinder could not conclude that plaintiff received inadequate follow-up medical care by any of the named-defendants, including defendants Nesmith and Lindemann, or that any of the named-defendants acted with the requisite deliberate indifference.

In summary, I find that there is no record evidence to support a reasonable factfinder's determination that, objectively, defendants Nesmith and Lindemann provided plaintiff with inadequate treatment for a serious medical need, or that, subjectively, they knew of but disregarded an excessive risk to plaintiff's health or safety. I therefore recommend dismissal of plaintiff's deliberate medical indifference claim against those two defendants.

D. *Plaintiff's Claims Against Defendant Fraser*

Defendants next seek dismissal of all claims asserted in plaintiff's amended complaint against defendant Fraser. A careful review of plaintiff's amended complaint reveals that it asserts three causes of action against defendant Fraser, including (1) conspiracy to cover-up the alleged assault on June 18, 2010; (2) the issuance of a false misbehavior report; and (3) failure to intervene. In their motion, defendants only specifically seek dismissal of a perceived excessive force claim, and the issuance of a false misbehavior report claim against defendant Fraser. For the sake of completeness, I will nonetheless address all of the claims asserted against defendant Fraser.

To the extent that plaintiff's amended complaint may be construed as asserting an excessive force claim against defendant Fraser, I recommend dismissal of that claim because there is no record evidence that defendant Fraser used any force against plaintiff. Specifically, a review of both plaintiff's amended complaint and his deposition

transcript do not reveal an allegation that defendant Fraser used any force against him. Plaintiff only alleges that defendants Rosati and St. John used force, which is not sufficient to support an excessive force claim against defendant Fraser.

**\*12** The remaining claims asserted against defendant Fraser, except for plaintiff's failure to intervene cause of action, are also easily discounted. Plaintiff's conspiracy claim fails against defendant Fraser, as well as defendants Rosati, St. John, Harvey and Torres, Am. Compl. (Dkt. No. 7) at 19, because there is no record evidence that these defendants agreed to violate any of plaintiff's constitutional rights. *See Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). Specifically, plaintiff did not testify at his deposition to the existence of any agreement among those defendants, and the only mention of such an agreement is a conclusory allegation in plaintiff's amended complaint. *See* Am. Compl. (Dkt. No. 7) at 19 ("Defendant[ ]s Fraser, Rosati, St. John, Harvey, and Torres conspired to use Tier III hearing to deflect official misconduct for exercising a protected right[.]"). Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact. *See, e.g., Hilson v. Maltese,* No. 09–CV–1373, 2012 WL 6965105, at \*6 n.10 (N.D.N.Y. Dec. 14, 2012) (Baxter, M.J.), *adopted by* 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (Mordue, J.) ("Plaintiff's conclusory assertion ... is not sufficient to establish a material issue of fact[.]" (listing cases)).

Plaintiff's claim that defendant Fraser issued a false misbehavior report against him is not cognizable under section 1983. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report.").

The allegations in plaintiff's amended complaint related to defendant Fraser's failure to adhere to DOCCS's regulations or policies, do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes*

*v. Henderson,* 628 F.Supp.2d 407, 411 (W.D.N .Y.2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

Plaintiff's failure to intervene claim against defendant Fraser, however, cannot be dismissed at this juncture. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994), *accord, Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *see also Mowry v. Noone,* No. 02–CV–6257, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004) ("Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used."). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle,* No. 10–CV–0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *JeanLaurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008)).

**\*13** Here, a review of the record evidence reveals the existence of a genuine dispute of material fact as to whether defendant Rosati's continued use of force against plaintiff triggered defendant Fraser's duty to intervene. Although defendants cite plaintiff's deposition testimony for the proposition that "no further assault occurred after Defendant Fraser's arrival on the scene," Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9, the record does not support this fact. Instead, during two separate lines of questioning, plaintiff testified at his deposition that, after defendant Fraser arrived on the scene, defendant Rosati "pushed" or "mushed" plaintiff's face into the wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38, 65. Because this testimony clearly indicates that defendant Fraser was present for this alleged use of force by defendant Rosati, and because the record evidence does not conclusively support a finding that defendant Rosati's additional use of force was unconstitutional, [15] I find that a reasonable factfinder could conclude, based on the record evidence now before

the court, that defendant Fraser's duty to intervene was triggered by defendant Rosati's conduct.

[15]    In their motion, defendants have expressly represented that they do not move for summary judgment on the excessive force claim asserted against defendants Rosati and St. John because "[t]hat claim ... necessarily involves a credibility determination ... [and] remain[s] for trial." Defs.' Memo of Law (Dkt. No. 79, Attach.17) at 3.

In summary, I recommend that all claims against defendant Fraser be dismissed, with the exception of the failure to intervene claim.

*E. Plaintiff's Claims Against Defendant Zarnetski*
Defendants next seek dismissal of all claims against defendant Zarnetski. Plaintiff's amended complaint alleges that defendant Zarnetski is liable for the force used by defendant Rosati because he should have predicted that, when he instructed defendant Rosati to escort plaintiff to the disciplinary hearing, defendant Rosati would assault him. Although such an allegation, if properly supported by the record, may give rise to a failure to intervene or conspiracy to use excessive force claim, the evidence in this case does not support either claim.

In his verified amended complaint, plaintiff avers that defendant Zarnetski sent defendant Rosati to escort him to his disciplinary hearing, and on the way to the hearing, defendant Rosati assaulted him. Am. Compl. (Dkt. No. 7) at 17. During his deposition, plaintiff elaborated on this allegation only to the extent of testifying that it is "known" at Great Meadow that defendant Rosati "is a hothead," and, as a result of this common prison knowledge, defendant Zarnetski should have predicted that defendant Rosati would assault plaintiff. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 88–89. Plaintiff also admitted, however, that, in order to attend his disciplinary hearing, he was required to be escorted by a corrections officer. *Id.* at 88. In his affidavit, defendant Zarnetski avers that he "had absolutely no foreknowledge that C.O. Rosati and plaintiff would be involved in a use of force on June 18, 2010." Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶ 4. Because, in the face of defendant Zarnetski's denial, plaintiff's allegations amount to nothing more than his rank speculation that defendant Zarnetski knew or should have known that defendant Rosati would assault plaintiff, I find that no reasonable factfinder could conclude that

defendant Zarnetski had a duty to intervene. *See Henry,* 2011 WL 5975027, at *4 (finding that, to establish liability on the part of a defendant for failure to intervene, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene."). In addition, because none of this evidence raises a genuine dispute of material fact as to whether defendants Zarnetski and Rosati agreed to use force against plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski conspired to violate plaintiff's constitutional rights. *See Pangburn,* 200 F.3d at 72 ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). For all of these reasons, I recommend dismissing all of plaintiff's claims against defendant Zarnetski.

### F. *Plaintiff's Claims Against Defendant Lieutenant Goodman*

**\*14** In his amended complaint, plaintiff alleges that defendant Goodman conspired with defendants Rosati and St. John to effectuate the alleged assault on plaintiff because plaintiff successfully modified a disciplinary sentence imposed by defendant Goodman. Am. Compl. (Dkt. No. 7) at 8. Plaintiff supports this contention with a further allegation that, three days after the alleged assault by defendants Rosati and St. John, defendant Goodman said to plaintiff, " 'That is what you get for getting my sentence modified [.]' " *Id.* at 14. Defendants properly construe these allegations as plaintiff's assertion of a First Amendment retaliation claim, and seek its dismissal. Defendants also seek dismissal of plaintiff's verbal harassment claim asserted against defendant Goodman.

### 1. *First Amendment Retaliation*

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, which is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) ( "In general, a section 1983 claim will lie where the government takes

negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Garrett v. Reynolds,* No. 99–CV–2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

Here, it is well settled that plaintiff's appeal of defendant Goodman's disciplinary sentence is constitutionally protected conduct, satisfying the first prong of a retaliation claim. *See, e.g., Santiago v. Holden,* No. 11–CV–0567, 2011 WL 7431068, at *5 (N.D.N.Y. Nov. 29, 2011) (Homer, M.J.), *adopted by* 2012 WL 651871 (N.D.N.Y. Feb. 28, 2012) (Suddaby, J.) ("There is no question that [the plaintiff's] conduct in filing grievances and appeals was conduct protected by the First Amendment."); *Brown v. Bascomb,* No. 05–CV–1466, 2008 WL 4283367, at *6 (N.D.N.Y. Sept. 16, 2008) (Mordue, C.J.). In addition, being assaulted plainly constitutes an adverse action sufficient to satisfy the second prong of a retaliation claim. *See Cole v. N.Y. S. Dep't of Corrs. Svcs.,* 2012 WL 4491825, at *13 (N.D.N.Y. Aug. 31, 2012) (Dancks, M . J.), *adopted by* 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (Mordue, J.) ("An assault by corrections officers is sufficient to chill a person of ordinary firmness from continuing to engage in his First Amendment activity." (internal quotation marks omitted)). Turning to the third requirement for a retaliation claim, requiring that a plaintiff to establish a casual connection between the protected conduct and adverse action, drawing all inferences in favor of plaintiff, I find that both plaintiff's amended complaint and his deposition testimony, if credited by a factfinder, may serve to support the allegation that defendant Goodman did, in fact, conspire with defendants Rosati and St. John to assault plaintiff. More specifically, if plaintiff's testimony regarding defendant Goodman's statements three days after the assault is credited, a reasonable factfinder could conclude that this statement was an admission by defendant Goodman that he orchestrated, in some

way, the assault on plaintiff. However, because defendant Goodman explicitly denied conspiring with defendants Rosati and St. John to assault plaintiff, Goodman Decl. (Dkt. No. 79, Attach.12) at ¶¶ 3, 4, I find that a genuine dispute of fact exists as to whether defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff for having exercised his First Amendment rights. For this reason, I recommend that defendants' motion for summary judgment be denied as it relates to plaintiff's retaliation claim against defendant Goodman.

### 2. *Verbal Harassment*

**\*15** To the extent that plaintiff's amended complaint may be construed as asserting a verbal harassment claim against defendant Goodman for allegedly stating to plaintiff, " 'That is what you get for getting my sentence modified,' " Am. Compl. (Dkt. No. 7) at 14, that claim is not cognizable under section 1983. *See, e.g., Moncrieffe v. Witbeck,* No. 97–CV–0253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) ("A claim for verbal harassment is not actionable under 42 U.S.C. § 1983."). For this reason, I recommend that plaintiff's verbal harassment claim asserted against defendant Goodman be dismissed. [16]

[16]     In the court's initial order, plaintiff's equal protection cause of action was dismissed against defendants Goodman and Mars. Dkt. No. 10 at 16.

### G. *Plaintiff's Claims Against Defendants Harvey, Torres, and Prack*

Defendants next seek dismissal of plaintiff's procedural due process claims asserted against defendants Harvey, Torres, and Prack. Defendant Harvey served as the hearing officer who presided at plaintiff's Tier III disciplinary hearing arising from the incident on June 18, 2010. Defendant Torres was assigned to assist Smith in his defense at that disciplinary hearing. Plaintiff's amended complaint also alleges that defendants Harvey and Torres conspired with others to use the Tier III hearing to conceal official misconduct. Additionally, as was briefly noted above, plaintiff's amended complaint asserts a due process claim against defendant Prack.

### 1. *Due Process Claims*

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564–67 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include (1) advanced written notice of the charges, (2) a hearing in which the inmate is provided the opportunity to appear at a disciplinary hearing and present witnesses and evidence, (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken, and, in some circumstances, (4) the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–70; *see also Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner at least "some eviden[tiary]" support. *Superintendent, MA Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985).

Here, as it relates to defendant Harvey, plaintiff's amended complaint alleges that defendant Harvey failed to provide plaintiff with a timely hearing. Am. Compl. (Dkt. No. 7) at 13. To the extent that plaintiff bases this claim on an allegation that defendant Harvey violated a state agency's regulation, that claim fails as a matter of law. *See Bolden,* 810 F.2d at 358 ("State procedural requirements do not establish federal constitutional rights."); *Barnes,* 628 F.Supp.2d at 411 ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

**\*16** As it relates to defendant Torres, plaintiff's allegation that she failed to call or interview witnesses on his behalf is unsupported by the record evidence. Specifically, plaintiff admitted at his deposition that he has no basis to believe that defendant Torres failed to interview the people identified by plaintiff as potential witnesses to the alleged assault. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–76. In addition, plaintiff admitted that defendant Torres returned to plaintiff with a list of witnesses that would or would not testify on his behalf.

*Id.* at 77. Finally, plaintiff admitted that he did, in fact, call as witnesses those people that agreed to testify on his behalf. *Id.* at 78. From this record evidence, I find that no reasonable factfinder could conclude that defendant Torres denied plaintiff due process based on a failure to assist plaintiff in identifying and calling witnesses on his behalf.

As it relates to defendant Prack, plaintiff's amended complaint alleges that defendant Prack "failed to stop the torture in SHU." Am. Compl. (Dkt. No. 7) at 19. The court construes this allegation to suggest that, because defendant Prack denied plaintiff's appeal of his disciplinary conviction, he contributed to whatever procedural due process violations occurred during the disciplinary hearing below. The record evidence, however, does not support this conclusion because, as discussed above, defendant was provided the opportunity to investigate and present witnesses on his behalf, and he was appointed a corrections counselor to assist in the preparation of his defense. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75, 77–78. Moreover, a careful review of the Tier III hearing transcript, submitted by defendants in support of their motion, reveals that plaintiff was provided adequate due process during the disciplinary hearing from which plaintiff appealed to defendant Prack. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5). All of this evidence leads the court to conclude that no reasonable factfinder could find that defendant Prack's determination that plaintiff's appeal contributed to a due process violation.

For all of these reasons, I recommend that plaintiff's procedural due process claim asserted against defendant Harvey, Torres, and Prack be dismissed.

### 2. *Conspiracy Claim*

To the extent it is alleged that defendants Harvey and Torres conspired to conceal the June 18, 2010 assault, such claims are not cognizable under section 1983. *De Ponceau v. Bruner,* No. 09–CV–0605, at *7 (N.D.N.Y. Feb. 21, 2012) (Peebles, M.J.), *adopted by* 2012 WL 1014821 (N.D.N.Y. Mar. 23, 2012) (Suddaby, J.). In any event, as was discussed above in determining that plaintiff's conspiracy claim asserted against defendant Fraser, there is no record evidence that defendants Harvey and Torres engaged in an agreement to violate any of plaintiff's constitutional rights. For these reasons, I recommend that

plaintiff's conspiracy claim asserted against defendants Harvey and Torres be dismissed.

### H. *Plaintiff's Claims Against Defendant Mars*

*17 Defendants next seek dismissal of all claims against defendant Mars, including plaintiff's claim that she violated his Fourteenth Amendment rights by making him pay $65 to replace a damaged mattress. The Fourteenth Amendment, however, does not give rise to a claim that a defendant deprived a plaintiff of private property; it only protects a plaintiff's right to due process as a result of a deprivation of private property. *See, e.g., Edwards v. Bezio,* No. 08–CV–0256, 2010 WL 681369, at *5 (N.D.N.Y. Feb. 24, 2010) (Kahn, J., *adopting report and recommendation by* Treece, M.J.) ("The lynchpin of a due process claim based on a state actor's unauthorized deprivation of private property is the availability of post-deprivation remedies provided by the state, not the deprivation itself .... Plaintiff does not allege that New York State has failed to provide a meaningful post-deprivation remedy, and, in fact, New York provides a venue for challenging such appropriations in the New York State Court of Claims."). For this reason, I recommend that any claim asserted by plaintiff against defendant Mars based on an allegation that she charged him too much money for his new mattress be dismissed.

Defendants also seek dismissal of plaintiff's claim against defendant Mars relating to the issuance of a false misbehavior report. The mere allegation of the issuance of a false misbehavior report against an inmate, however, is not cognizable under section 1983. *See Boddy,* 105 F.3d at 862 ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Moreover, even assuming that defendant Mars did issue a false misbehavior report, whatever wrong arose out of that conduct is rectified by the court's finding that plaintiff received adequate due process at the ensuing disciplinary hearing. *See, e.g.,* Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 12–13. *See Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995) (finding that, where an alleged false misbehavior report is filed against a prisoner, his "due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them").

Finally, defendants seek dismissal of plaintiff's equal protection claim asserted against defendant Mars based on plaintiff's admission that defendant Mars did not single him out or treat him differently than other inmates based

on his race. Plaintiff's equal protection claim against defendant Mars, however, was previously dismissed by the court, and it has not been revived by plaintiff's amended complaint. Dkt. No. 10 at 16.

For all of these reasons, I recommend that all of plaintiff's claims asserted against defendant Mars be dismissed.

### I. *Qualified Immunity*

Because I recommend that one claim against each defendant Fraser and defendant Goodman survive defendants' pending motion for summary judgment, I will only address defendants' defense of qualified immunity as it relates to those two defendants.

**\*18** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir.2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson,* 555 U.S. 223).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011). The inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, whether that right is clearly established at the relevant time. *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011); *Nagle v. Marron,* 663 F.3d 100, 114 (2d Cir.2011); *Doninger,* 642 F.3d at 345 (citing cases). To be clearly established, a right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft,* 131 S.Ct. at 2083 (internal quotation marks omitted). Until recently, courts were required to analyze qualified immunity by considering the two factors

in order. *Doninger,* 642 F.3d at 345 (citing *Saucier,* 533 U.S. at 201). Following the Supreme Court's decision in *Pearson,* however, courts are no longer wedded to the *Saucier* "two step," and instead retain the discretion to decide the order in which the two relevant factors are to be considered. [17] *Id.; see also Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 429 n.9 (2d Cir.2009).

[17]  Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231 (internal quotation marks omitted).

To prevail on a qualified immunity defense, a defendant must establish that "(1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their actions did not violate such law." *Green v. Montgomery,* 219 F.3d 52, at 59 (2d Cir.2000).

### 1. *Defendant Fraser*

Because the right to be free from excessive force is a clearly established right, the relevant qualified immunity inquiry turns on whether a reasonable officer in defendant Fraser's position would have known that defendant Rosati's conduct amounted to excessive force. *See Green,* 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."). Defendants have already acknowledged that whether defendant Rosati's use of force against plaintiff constitutes excessive force is a question for the jury, and I agree. As a result, I cannot conclude that defendant Fraser is entitled to qualified immunity as it relates to plaintiff's failure to intervene claim.

### 2. *Defendant Goodman*

**\*19** As noted earlier, an inmate's right to appeal a disciplinary sentence is protected by the First Amendment. *Santiago,* 2011 WL 7431068, at \*5. Therefore, the relevant inquiry is whether a reasonable officer in defendant Goodman's position would have known that conspiring with other corrections officers to have plaintiff assaulted in retaliation for plaintiff appealing the sentence violated his clearly established First Amendment right. Because that answer is clearly,

"yes," I cannot conclude that defendant Goodman is entitled to qualified immunity as it relates to plaintiff's retaliation claim.

In summary, I recommend that defendants' motion for summary judgment be denied as it relates to defendants' qualified immunity defense.

## IV. *SUMMARY AND RECOMMENDATION*

At the center of plaintiff's amended complaint in this action is his claim that he was assaulted by defendants Rosati and St. John, two corrections officers stationed at Great Meadow, during an escort from his cell to a disciplinary hearing. While defendants have moved for summary judgment dismissing many of plaintiff's other claims, they do not challenge that cause of action at this juncture, acknowledging that its resolution will undoubtedly turn upon credibility determinations, which are not properly made on a motion for summary judgment.

After carefully reviewing the record evidence in this case, I recommend that all of plaintiff's claims against all of the remaining defendants be dismissed, with the exception of plaintiff's failure to intervene claim against defendant Fraser, and plaintiff's retaliation claim against defendant Goodman. As it relates to those two remaining claims, I conclude that a reasonable factfinder could determine, if plaintiff's testimony is credited, that defendant Fraser's duty to intervene was triggered, and that defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff. Additionally, at this juncture, the record evidence does not establish a basis to find that defendants Fraser or Goodman are entitled to qualified immunity.

Addressing plaintiff's remaining claims, I find that the record before the court fails to establish a proper basis to conclude that defendants Fischer, Annucci, LeClaire, and Roy were personally involved in any of the allegations giving rise to this action. The record also reflects that

no reasonable factfinder could conclude that defendant Nesmith and Lindermann are liable for deliberate medical indifference to plaintiff's serious medical needs. Similarly, plaintiff has stated no claim against defendant Zarnetski associated with the assault or otherwise, nor has he stated a cognizable due process claim against defendants Harvey, Torres or Prack. Finally plaintiff's claims against defendant Mars, related to the requirement that he pay $65 to replace a damaged mattress, and the issuance of a false misbehavior report, lack merit. Based upon the foregoing, it is hereby respectfully,

**\*20** RECOMMENDED that defendants' summary judgment motion (Dkt. No. 79) be GRANTED, in part, as it relates to all of plaintiff's claims against all defendants, with the exception of (1) plaintiff's claims against defendants Rosati and St. John, (2) plaintiff's failure to intervene claim against defendant Fraser, and (3) plaintiff's First Amendment retaliation claim against defendant Goodman.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

ORDERED that the clerk is respectfully directed to amend court records to reflect the correct name spellings of defendants Zarnetski, Nesmith, Lindemann, and Prack.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1500422

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.